## STATE OF CONNECTICUT *v.* IVO COLON
## (SC 16446)

Borden, Norcott, Katz, Palmer, Vertefeuille, Zarella and Lavery, Js.

108

114

Argued October 30, 2003—officially released December 28, 2004

*John Holdridge*, assistant public defender, with whom was *Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, assistant state's attorney, with whom were *John A. Connelly*, state's attorney, *Maureen M. Keegan*, assistant state's attorney, and, on the brief, *Judith Rossi*, executive assistant state's attorney, *Susan C. Marks*, *Michael O'Hare* and *Harry Weller*, supervisory assistant state's attorneys, *James G. Clark*, *Timothy J. Sugrue*, *Rita M. Shair* and *Marjorie Allen Dauster*, senior assistant state's attorneys, and *Bruce R. Lockwood*, assistant state's attorney, for the appellee (state).

*Opinion*

TABLE OF CONTENTS

I. THE FACTS . . . . . . . . . . . . . . . . . 131

II. GUILT PHASE ISSUES . . . . . . . . . . 135
 A. Motion to Suppress Statements and
 Other Tangible Evidence . . . . . . . 135
 1. Entry into the Apartment at 418
 Mill Street . . . . . . . . . . . . . 141
 2. Illegal Seizure . . . . . . . . . . . 148
 B. Voir Dire of Prospective Jurors . . . 152
 1. Granting of State's Challenges for
 Cause . . . . . . . . . . . . . . . . 152
 a. Venireperson J.B. . . . . . . . . . 158
 b. Venireperson K.L. . . . . . . . . . 161

| | c. Venireperson K.S. . . . . . . . . . . | 163 |
| | 2. Restrictions on the Scope of Voir Dire . . . . . . . . . . . . . . . . . . | 165 |
| | a. Venireperson A.M. . . . . . . . . | 167 |
| | b. Venirepersons J.C. and C.H. . . . . | 168 |
| | c. Venireperson R.L. . . . . . . . . . . | 171 |
| | d. Venirepersons J.J. and N.A. . . . . | 173 |
| | e. Venireperson S.P. . . . . . . . . . . | 177 |
| C. | Evidentiary Rulings . . . . . . . . . . | 179 |
| | 1. Expert Testimony Regarding the Severity of the Victim's Injuries. . | 181 |
| | 2. Admissibility of the Defendant's Written Confession to the Police | 188 |
| | 3. Sustaining of Objection During Defense Counsel's Closing Argument . . . . . . . . . . . . . . . . | 192 |
| | 4. Admission of Lieutenant O'Leary's Testimony . . . . . . . . . . . . . | 194 |
| | 5. Admission of Neighbor's Testimony . . . . . . . . . . . . . . . . | 196 |
| D. | Additional Evidentiary Claims Implicating the Defendant's Right to Present a Defense . . . . . . . . . . . . | 197 |
| | 1. Testimony Regarding the Defendant's Escape from Police Custody | 199 |
| | 2. Evidence Relating to the Defendant's Mother's Felony Conviction | 202 |
| | 3. Exclusion of Evidence of Character for Untruthfulness . . . . . . | 205 |
| | 4. Exclusion of Opinion Testimony Concerning Lieutenant O'Leary's Character for Untruthfulness . . . | 209 |
| | 5. Exclusion of the Statement that Virginia Quintero's Aunt Had Given to the Police . . . . . . . . . . . . | 211 |
| | 6. Exclusion of the Testimony of the Defendant's Expert Witness . . . . | 213 |

7. Exclusion of the Testimony of Offi-
cer Michael Dimaria . . . . . . . . 214

8. Exclusion of Certain Testimony of
Virginia Quintero's Attorney. . . . 216

9. Cumulative Error . . . . . . . . . . 218

E. Jury Instructions. . . . . . . . . . . . 218

1. Manslaughter by Omission Instruc-
tion . . . . . . . . . . . . . . . . . . 219

2. Accessory Liability Instruction . . 226

3. Instruction Regarding the Defen-
dant's Attempt to Provide Medical
Assistance to the Victim . . . . . . 229

4. Instructions Regarding Reasonable
Doubt. . . . . . . . . . . . . . . . 232

F. Prosecutorial Misconduct . . . . . 234

1. The Assertion of Contradictory
Theories with Respect to the Vic-
tim's Death. . . . . . . . . . . . . 240

2. Questioning Regarding Privileged
Attorney-Client Communications 244

3. Prosecutorial Misconduct During
Closing and Rebuttal Arguments 247

G. Subpoenas Duces Tecum and the
State's Motion to Quash . . . . . . 252

1. Order Compelling Defense Coun-
sel to Turn Over State Police
Reports. . . . . . . . . . . . . . . 253

2. The Trial Court's Granting of the
State's Motion to Quash and Its
Refusal to Conduct an In Camera
Inspection of Certain Documents 260

3. Invitation to Overrule *State* v. *Har-
ris*. . . . . . . . . . . . . . . . . . . 266

4. Review of the Privileged Records
for *Brady* Material . . . . . . . . . 266

H. Sufficiency of the Evidence . . . . 269

| | | |
|---|---|---|
| III. | PENALTY PHASE ISSUES . . . . . . . . . | 274 |
| | A. Jury Instructions Regarding the Weighing of the Aggravating and Mitigating Factors . . . . . . . . . . . . | 274 |
| | B. The Trial Court's Acceptance of the Jury's Second, Corrected Verdict . . | 277 |
| | 1. Authority of the Trial Court to Recall the Jury Prior to Discharge | 281 |
| | 2. Scrivener's Error . . . . . . . . . | 291 |
| | 3. Double Jeopardy . . . . . . . . . | 293 |
| | 4. Cruel and Unusual Punishment . . | 300 |
| | C. Right of Allocution. . . . . . . . . . | 302 |
| | 1. Right of Allocution under the Common Law, General Statutes and Rules of Practice . . . . . . . . . | 305 |
| | 2. Federal Constitutional Right of Allocution . . . . . . . . . . . . . | 313 |
| | 3. State Constitutional Right of Allocution. . . . . . . . . . . . . . . | 319 |
| | D. Evidence of Prior Misconduct . . . . | 327 |
| | E. Sufficiency of the Evidence of the Existence of the Aggravating Factor | 335 |
| | F. Mitigation Evidence . . . . . . . . . . | 338 |
| | 1. Evidence of the Defendant's Childhood and His Demeanor Toward a Friend . . . . . . . . . . . . . . . | 338 |
| | 2. Shackles and Handcuffs . . . . . . | 341 |
| | G. Other Jury Instructions During the Penalty Phase . . . . . . . . . . . . . | 342 |
| | 1. Instructions Regarding Juror Participation in the Weighing Process | 343 |
| | 2. Instructions Regarding § 53a-46a (h) (2) . . . . . . . . . . . . . . . . | 348 |
| | 3. Instructions Regarding the Requirement of Unanimity with Respect to the Finding of the Existence of Mitigating Factors . . . . | 349 |

4. Instructions Regarding the Requirement of Unanimity with Respect to the Determination of Whether the Defendant Has Proven Any Statutory Bars to the Imposition of the Death Penalty . . . . . 352

5. Incomprehensibility of the Trial Court's Instructions. . . . . . . . . 354

6. Instructions on the Standard of Reasonable Doubt. . . . . . . . . . 354

7. Instructions on the Need for Unanimity Regarding the Defendant's Sentence . . . . . . . . . . . . . . . 355

H. The Special Verdict Form. . . . . . . 358

IV. JUDICIAL MISCONDUCT CLAIMS . . . . 362

A. Expression of Impatience During the Penalty Phase . . . . . . . . . . . . . 363

B. Alleged Improprieties During the Guilt Phase . . . . . . . . . . . . . . . 365

V. MISCELLANEOUS CONSTITUTIONAL CLAIMS . . . . . . . . . . . . . . . . . . . . 370

A. Constitutionality of the "Facts and Circumstances" Language of § 53a-46a (d). . . . . . . . . . . . . . . . . . 370

B. Vagueness Challenge to § 53a-46a (i) (4) . . . . . . . . . . . . . . . . . . . . . 376

C. The Trial Court's Denial of the Defendant's Request for a Hearing to Consider Racial Disparities in the Administration of the Death Penalty 377

D. Constitutionality of General Statutes (Rev. to 1997) § 53a-54b (9) . . . . . 379

E. Constitutionality of Connecticut's Death Penalty Statutes . . . . . . . . 382

ZARELLA, J. The defendant, Ivo Colon, appeals from the judgment imposing a sentence of death rendered

in accordance with his conviction of capital felony in violation of General Statutes (Rev. to 1997) § 53a-54b (9)[1] and murder in violation of General Statutes § 53a-54a (a).[2] The defendant was charged with one count of murder and one count of capital felony in connection with the death of the victim, Keriana Tellado, who was two years old at the time of her death. After a jury found the defendant guilty of all counts, a separate penalty phase hearing was conducted pursuant to General Statutes (Rev. to 1997) § 53a-46a.[3] At the conclusion

[1] General Statutes (Rev. to 1997) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (9) murder of a person under sixteen years of age."

[2] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[3] General Statutes (Rev. to 1997) § 53a-46a provides: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, and any aggravating factor set forth in subsection (i). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (i) of this section exists or that any factor set forth in subsection (h) exists. Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause, or (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors

of the penalty phase hearing, the jury returned a special

set forth in subsection (i) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the aggravating factors set forth in subsection (i) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any factor set forth in subsection (h), the existence of any aggravating factor or factors set forth in subsection (i) and whether any aggravating factor or factors outweigh any mitigating factor or factors found to exist pursuant to subsection (d).

"(f) If the jury or, if there is no jury, the court finds that (1) none of the factors set forth in subsection (h) exist, (2) one or more of the aggravating factors set forth in subsection (i) exist and (3) (A) no mitigating factor exists or (B) one or more mitigating factors exist but are outweighed by one or more aggravating factors set forth in subsection (i), the court shall sentence the defendant to death.

"(g) If the jury or, if there is no jury, the court finds that (1) any of the factors set forth in subsection (h) exist, or (2) none of the aggravating factors set forth in subsection (i) exists or (3) one or more of the aggravating factors set forth in subsection (i) exist and one or more mitigating factors exist, but the one or more aggravating factors set forth in subsection (i) do not outweigh the one or more mitigating factors, the court shall impose a sentence of life imprisonment without the possibility of release.

"(h) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that at the time of the offense (1) he was under the age of eighteen years or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense

verdict finding the existence of an aggravating factor and one or more mitigating factors, and that the aggravating factor outweighed the mitigating factor or factors.[4] The trial court, *D'Addabbo, J.*, thereupon rendered judgment of guilty of capital felony and murder, merged the capital felony conviction and the murder conviction, and sentenced the defendant to death in accordance with the jury's finding of guilt and the special verdict.

to prosecution or (3) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (4) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(i) The aggravating factors to be considered shall be limited to the following: (1) The defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value; or (7) the defendant committed the offense with an assault weapon, as defined in section 53-202a."

All references to § 53a-46a throughout this opinion are to the 1997 revision unless otherwise noted.

[4] As we will discuss subsequently in this opinion; see part III B of this opinion; the jury initially returned a verdict finding that the aggravating factor did not outweigh the mitigating factor or factors. After one or more jurors determined that the jury had made an error, they notified the court, which reassembled the jury. The jury submitted a second special verdict finding that the aggravating factor did outweigh the mitigating factor or factors, and the trial court ultimately accepted the second verdict as the verdict of the case.

On appeal to this court,[5] the defendant challenges the judgment of conviction and the sentence of death. The defendant's claims on appeal that relate to the guilt phase of the trial fall into eight discrete categories: (1) the trial court's denial of the defendant's motion to suppress; (2) jury selection; (3) evidentiary rulings; (4) additional evidentiary rulings that, according to the defendant, implicated his right to present a defense; (5) jury instructions; (6) prosecutorial misconduct; (7) the trial court's rulings regarding the issuance of certain subpoenas and the state's motion to quash; and (8) sufficiency of the evidence. The defendant's claims on appeal that relate to the penalty phase of the trial fall into six categories: (1) jury instructions; (2) the authority of the trial court to reassemble the jury and the acceptance of the jury's second, corrected verdict; (3) the trial court's denial of the defendant's motion to exercise his right of allocution; (4) the admission of prior misconduct evidence; (5) sufficiency of the evidence of the existence of an aggravating factor; and (6) evidentiary issues regarding the existence of mitigating factors. Additionally, the defendant claims on appeal that the trial court engaged in judicial misconduct during both the guilt phase and the penalty phase. The defendant also challenges the constitutionality of Connecticut's capital sentencing scheme. We affirm the judgment as to the defendant's conviction of capital felony and murder. Additionally, we conclude that, pursuant to our decision in *State* v. *Rizzo*, 266 Conn. 171, 242, 833 A.2d 363 (2003), the trial court did not instruct the jury properly under § 53a-46a (e) and (f) with respect to the process of weighing the aggravating and mitigating factors.[6] Accordingly, we reverse the judg-

[5] The defendant appealed to this court pursuant to General Statutes §§ 51-199 (b) (3) and (4), and 53a-46b (a).

[6] We note that our decision in *Rizzo* was released long after the defendant's trial. Accordingly, we underscore the fact that the trial court in the present case did not have the benefit of our decision in *Rizzo* when it instructed the jury regarding the weighing process.

ment of the trial court insofar as it imposes the death penalty and remand the case for a new penalty phase hearing.

## I

## THE FACTS

The jury reasonably could have found the following facts. In July, 1998, the defendant was residing with his girlfriend, Virginia Quintero, and two of her three children, namely, the victim and her sister, Crystal Tellado, in Quintero's apartment located on the second floor of 633 South Main Street in Waterbury. On July 17, 1998, the defendant left the apartment and returned several hours later with food for Quintero and the two children. After Quintero tried unsuccessfully to get the victim to eat, the defendant attempted to feed the victim by stuffing food in her mouth, which apparently caused the victim to vomit. Quintero then removed the victim's clothing and proceeded to take her to the bathroom. Before Quintero and the victim made it to the bathroom, however, the defendant grabbed the victim and pulled her into the bathroom. Although Quintero attempted to accompany the defendant and the victim, the defendant prevented Quintero from entering the bathroom by closing the door and blocking it with a chair. Thereafter, the defendant, while standing immediately outside the shower, grabbed the victim by her hair and began hitting the victim's head against the shower wall. After the victim fell to the shower floor as a result of having her head hit the shower wall, the defendant pulled the victim up by her hair and hit her head against the shower wall again. After the defendant hit the victim's head against the shower wall several times, the victim began bleeding and became unresponsive. Once the defendant realized that the victim was unresponsive, he allowed Quintero into the bathroom and splashed cold water on the victim. The defendant then brought the victim

into the living room of the apartment and started pushing on her chest and blowing air into her mouth. The defendant then left the apartment to go to a neighbor's apartment to call his mother, Maria Ocasio.

Shortly thereafter, the defendant's mother arrived at Quintero's apartment. Upon observing the victim, the defendant's mother drove the victim and Quintero to the emergency room at Saint Mary's Hospital (hospital) in Waterbury. Before leaving, the defendant told Quintero and his mother to tell hospital personnel that the victim was injured when she fell while playing with her sister. The defendant then took the victim's sister, who, at that time, was three years old, and went to his mother's apartment at 418 Mill Street in Waterbury.

At the hospital, the victim was treated by Peter Jacoby, an emergency room physician, who pronounced the victim dead shortly after she arrived at the hospital. In addition to the victim's injuries to her head, Jacoby noticed the existence of several bruises, scrapes, gouge marks, swelling and discoloration on various parts of the victim's body, as well as evidence that the victim's arm had been broken. When Quintero was asked what had happened to the victim, Quintero told hospital personnel that the injuries were a result of a fall. A subsequent autopsy revealed, however, that the cause of death was a subdural hematoma[7] that resulted from blunt force trauma to the head.

On the basis of the circumstances surrounding the victim's death, Jacoby directed hospital personnel to

---

[7] A subdural hematoma is the accumulation of blood between certain membranes surrounding the brain. See Mosby's Medical, Nursing and Allied Health Dictionary (6th Ed. 2002) p. 1646. According to the medical examiner who conducted the autopsy of the victim, a subdural hematoma involving a large accumulation of blood can lead to compression of the brain, which, in turn, can result in the cessation of brain function and death. A subdural hematoma also can indicate that the brain has been subject to the application of enough force to cause brain swelling, which also can lead to the cessation of brain function and ultimate death.

notify the police in order to report a suspected case of child abuse. Lieutenant Neil O'Leary and Detectives David Balnis and Howard Jones of the Waterbury police department responded to the call and went to the hospital. When O'Leary asked Quintero what had happened, she responded that the victim had fallen in the shower. Quintero also told O'Leary that the defendant was not in Waterbury and had been in Puerto Rico for two months. After viewing the body of the victim and discussing the case with Jacoby, O'Leary asked Quintero to go to the police station so that the police could investigate the death of the victim further. While at the station, Quintero first maintained, in a written statement to Jones, that the victim had sustained injuries when she fell in the shower and that the defendant was in Puerto Rico. After learning that the defendant had been located at his mother's apartment and was in the custody of the police, Quintero gave a second statement to the police in which she implicated the defendant in the victim's death.

The defendant was apprehended at his mother's apartment and went to the police station for questioning. After several hours, the defendant gave both oral and written statements to the police in which he admitted to killing the victim. The defendant subsequently was charged with one count of capital felony and one count of murder. The trial court, *Damiani, J.*, held a probable cause hearing in accordance with article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments,[8] and General Statutes § 54-46a.[9] The trial court, *Damiani, J.*, found

[8] Article first, § 8, of the constitution of Connecticut, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ."

[9] General Statutes § 54-46a provides in relevant part: "(a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable

probable cause to believe that the defendant had committed the crimes with which he was charged. Thereafter, the state notified the defendant of the aggravating factor that it intended to prove at the defendant's penalty phase hearing, namely, that the defendant had committed the capital felony "in an especially heinous, cruel or depraved manner . . . ." General Statutes (Rev. to 1997) § 53a-46a (i) (4).

Prior to trial, the defendant filed a motion to suppress certain statements that he had made to the police during the investigation of the victim's death and tangible evidence that the police had seized without a warrant. After an evidentiary hearing, the trial court, *D'Addabbo, J.*, denied the motion to suppress. The case then was tried to a jury, which found the defendant guilty of both capital felony and murder. Thereafter, at the conclusion of the penalty phase hearing, the jury found that the state had satisfied its burden of proving the existence of an aggravating factor, namely, that the crime had been committed in an especially heinous, cruel or depraved manner. See General Statutes (Rev. to 1997) § 53a-46a (i) (4). The jury also found that the defendant had satisfied his burden of proving the existence of one or more mitigating factors. The jury determined, however, that the aggravating factor outweighed the mitigating factor or factors and returned a special verdict reflecting that determination. The trial court merged the capital felony conviction and the murder conviction, the latter offense being a lesser included offense of the former offense, and rendered judgment in accordance with the jury's special verdict, sentencing the defendant to death. This appeal followed. Additional facts will be set forth as necessary.

by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause. . . ."

## II

## GUILT PHASE ISSUES

### A

### Motion to Suppress Statements and Other Tangible Evidence

The defendant claims that the trial court improperly denied his motion to suppress (1) oral and written statements that he had given to the police, in which he admitted to killing the victim, and (2) other tangible property that the police had seized from his person, including two rings, a belt and a pair of shoes. Specifically, the defendant claims that the trial court improperly concluded that the entry by police into the apartment of the defendant's mother at 418 Mill Street was justified under the emergency exception to the warrant requirement of the fourth amendment to the United States constitution. E.g., *State* v. *Magnano*, 204 Conn. 259, 266, 528 A.2d 760 (1987); see *Mincey* v. *Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); see also *State* v. *Geisler*, 222 Conn. 672, 691, 610 A.2d 1225 (1992) (recognizing exception under state constitution). The defendant further claims that even if the emergency exception to the warrant requirement justified the entry into the apartment, the trial court improperly concluded that the defendant voluntarily had agreed to accompany the officers to the police station and contends, instead, that the police illegally seized him without a warrant or probable cause. We reject the defendant's claim that the court improperly denied his motion to suppress.

The memorandum of decision of the trial court, *D'Addabbo, J.*, concerning the defendant's motion to suppress contains the following relevant facts. "On July 17, 1998, [the victim] . . . was presented at [the hospital]. At or about 7 p.m., members of the Waterbury

police department, including [Lieutenant O'Leary] and Captain Kathleen Wilson, reported to [the hospital] to investigate the death of the [victim]. Both . . . O'Leary and . . . Wilson viewed the badly bruised body of the [victim]. . . . O'Leary discussed the circumstances of the [victim's] injuries and death with . . . Quintero. Medical personnel indicated to . . . O'Leary that they were uncomfortable with the history received concerning the [victim's] injuries and death. . . . Quintero went to the Waterbury police department, where she was interviewed by . . . O'Leary and [Detective Jones]. They received information that the defendant . . . was out of the country. Further investigation established that [the defendant] was not out of the country, but at 418 Mill Street . . . and possibly with a young child who was a sibling of the [victim]. This other child was reported as 'taken' from 633 South Main Street. At that time, [O'Leary] knew nothing about [the defendant] but was presented with (1) a severely injured [victim] who had died as a result of these injuries; (2) representations that did not coincide with the injuries [of] the [victim]; (3) the name of [the defendant] who had some relationship with . . . Quintero and had been introduced into these investigations; and (4) [that] the present location of [the defendant was] contradicted.

"With this information, [O'Leary] went to 418 Mill Street with other police personnel to locate [the defendant] and the other child, who was later learned to be [the victim's sister]. A plan was established which sent [Detective Balnis] and . . . Wilson [to] the back door and . . . O'Leary, Officer Tony Olivera, [and] Officer Randolph Velez [to] the front door of the apartment. . . . Velez was and is Spanish speaking. . . . O'Leary's testimony indicated that upon getting to the top floor of the apartment, he [had] heard a child crying and [had] heard someone running in the apartment. . . . O'Leary knocked on the door . . . [and received] no

response. . . . Velez announced in Spanish, 'Police.' There was no response. They waited a very short time . . . and kicked in the door. Upon entry, they saw a male running down the hall . . . and heard a child crying. . . . Wilson was let in, and her testimony is that she went directly to the [victim's sister], who was about three years old . . . and observed 'a lot of what appeared to be fresh bruises on the legs.' [Wilson] further testified that the [victim's sister] appeared scared. . . . Wilson asked [the victim's sister], in English and some Spanish, 'Who did this?'' The child responded, '[The defendant] did it.' [The defendant] was grabbed by . . . Velez by his arm to keep him from going into the bedroom. . . . O'Leary attempted to speak to [the defendant] in English, but it appeared to him that he wasn't responding, so . . . Velez translated in Spanish from . . . O'Leary to [the defendant] and in English from [the defendant] to . . . O'Leary. . . . O'Leary testified that he [had] told [the defendant] through . . . Velez that he was there to talk to him about the injuries to [the victim] and that he [had] asked him to come to the police station. The testimony was that [the defendant] nodded his head in the affirmative . . . and responded in English. The testimony presented was that there were no guns drawn by police personnel. [The victim's sister] was taken to the hospital by ambulance and [the defendant] was taken to the Waterbury police station in a police vehicle. There were three police personnel and [the defendant] in the vehicle. . . . Velez and [the defendant] were in the backseat. There were no cages between [the] front [seat] and [the] backseat. There were no discussions between [the defendant] and police personnel at the apartment or during his transportation to the police department. The credible evidence established that the defendant was not handcuffed at the apartment and during his transportation to the police department.

"At the police station, at approximately 9 p.m., the defendant was put into an interview room which had a table and a computer. There are no locks on the doors to the interview room, which opens into the detective bureau area. [Lieutenant] Michael Ricci conducted discussions with the defendant and . . . Velez was instructed to translate for the defendant and . . . Ricci. The testimony [established] that the defendant, when put into the interview room, was advised in Spanish by . . . Velez of his constitutional rights as established in [*Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]. He was presented with those rights on the interview card . . . which [contains both the] English and Spanish [versions], which . . . Velez read to him. . . . Velez testified that he [had] asked the defendant if he understood his rights, [and] the defendant said, 'Yes,' and if he was willing to waive those rights and answer questions, and he said, 'Yes.' After the [defendant's] oral waiver of his rights, [Velez] requested that the defendant sign the card and date it on the . . . side [that contained the Spanish version]. After signing the advisement card, [Ricci] asked the defendant questions translated by . . . Velez, which addressed if he knew the cause of [the victim's] injuries. [The defendant] responded that [the victim] had fallen down the stairs. These questions were asked repeatedly.

"[Ricci] testified that the defendant's demeanor was quiet and calm, and during the course of the time that the defendant was there he had eaten . . . and drank a soda. The police denied that the defendant [had been] abused or threatened while at the police station. . . . O'Leary was moving between the interviews of . . . Quintero and the defendant. At approximately 11 p.m., on July 17, 1998, [O'Leary] relayed to . . . Ricci that . . . Quintero had implicated the defendant in the homicide of [the victim], and [told Ricci] to convey that to the defendant. . . . Ricci testified that when pre-

sented with this information, the defendant said he was going to tell the truth. . . .

"The defendant then through . . . Velez orally stated how he had hurt the child . . . . Ricci and . . . Velez did not view the [victim's] body at the hospital. The defendant was then handcuffed to the chair. . . .

"After the defendant gave the oral statement, [Ricci] reduced that statement to writing. The process utilized was that the defendant was advised of his rights pursuant to *Miranda*; these advisements were on the top of the statement. They were translated to the defendant in Spanish by . . . Velez. After each sentence of rights [was] read and translated to [the defendant], he initialed them 'IC.' Then . . . Ricci would ask questions, [Velez] would translate in Spanish to [the defendant], [the defendant] responded to Velez in Spanish and Velez translated in English to Ricci who typed it into the computer. . . . Velez viewed the statement as typed on the [computer] screen. When completed, [Velez] read the written statement in Spanish to [the defendant]. [The defendant] was asked if any changes should be made . . . [and] he responded no. [The defendant] was also asked if it was the truth [and] he responded yes. The original statement was signed by the defendant and [was] notarized by . . . O'Leary."

The trial court's memorandum of decision also notes that the defendant gave the police a second written statement in the early morning hours of July 18, 1998. The same process that the police utilized in taking the first statement was utilized in taking the second statement, namely, that: (1) Velez advised the defendant of his constitutional rights in Spanish and English; (2) the defendant waived those rights; (3) the defendant was presented with the statement form with the *Miranda* rights printed on top and they were read to him in Spanish; (4) Ricci then would ask the questions in

English, Velez would translate the questions to Spanish for the defendant, who then would answer in Spanish; (5) Velez would translate the defendant's answers to English for Ricci; (6) after the statement was typed, Velez would read the statement to the defendant in Spanish; (7) the defendant was asked if he wanted to make any changes; and (8) the defendant signed the statement.

In rejecting the defendant's claims, the trial court specifically credited O'Leary's testimony that, before the police entered the apartment at 418 Mill Street, O'Leary had viewed the victim's body at the hospital and noted the severe nature of the injuries that the victim had sustained, and that medical personnel had opined that Quintero's explanation of the cause of the victim's injuries was not plausible. The trial court also credited O'Leary's testimony that he had received information that the victim's sister was with the defendant at an unknown location after abruptly being taken from Quintero's apartment, and that O'Leary had received inconsistent information about the defendant's whereabouts. Moreover, the trial court credited O'Leary's testimony that when he arrived at 418 Mill Street, he heard a child crying and an adult running around the apartment, and that there was no response to his knock and a verbal declaration that the police were at the door.

On the basis of its findings, the trial court concluded that, in light of the information known to O'Leary at the time of entry, it was reasonable for him to believe that an emergency existed, namely, that a child's health or welfare was subject to imminent potential harm. Thus, the trial court found that the entry into the home was justified under the emergency exception to the warrant requirement.

The trial court also found that the defendant voluntarily agreed to accompany the police to the station for

questioning. In support of this finding, the trial court credited the testimony of certain officers that, after entering the apartment, the police confronted the defendant in the hallway, and when asked in English and in Spanish whether he would come to the station to discuss the victim's death, the defendant nodded affirmatively. The trial court also found credible evidence adduced by the state that the defendant was not handcuffed, there were no guns drawn, and that there was no physical force except Velez' act of grabbing the defendant's arm.[10]

1

Entry into the Apartment at 418 Mill Street

Our review of the defendant's claim is governed by well established principles. "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. *Wong Sun* v. *United States,* [371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)]." (Internal quotation marks omitted.) *State* v. *Blackmun,* 246 Conn. 547, 553, 716 A.2d 101 (1998). Thus, on appeal, we must determine whether the trial court properly concluded that the defendant's statements and other evidence from the defendant's person were not the product of any police illegality. In addition, "in reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo." *State* v. *Geisler,* supra, 222 Conn. 694. "Conclusions drawn from [the] underlying facts must be legal

---

[10] The trial court further concluded that, even if there had been a seizure of the defendant in the apartment, it was not illegal because probable cause existed for the seizure. Probable cause existed, according to the trial court, because of the statements of the victim's sister, in response to Wilson's question regarding the bruises that appeared on the body of the victim's sister, that the defendant "did it."

and logical." Id., 693. We must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when they entered the apartment where the defendant subsequently was apprehended.

"[A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions. . . . [T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited . . . [to] a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search." (Citations omitted; internal quotation marks omitted.) *State* v. *Blades*, 225 Conn. 609, 617–18, 626 A.2d 273 (1993).

"The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception. *Mincey* v. *Arizona*, [supra, 437 U.S. 390–91]. An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home. . . . [The police] must have valid reasons for the belief that an emergency exception exists, a belief that must be

grounded in empirical facts rather than subjective feelings . . . . *People* v. *Mitchell,* 39 N.Y.2d 173, 178, 347 N.E.2d 607, 383 N.Y.S.2d 246, cert. denied, 426 U.S. 953, 96 S. Ct. 3178, 49 L. Ed. 2d 1191 (1976). . . . The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry." (Citations omitted; internal quotation marks omitted.) *State* v. *Blades,* supra, 225 Conn. 618–19.

Moreover, as we have explained, "the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . . *People* v. *Mitchell,* supra, [39 N.Y.2d] 180." (Citation omitted; internal quotation marks omitted.) *State* v. *Blades,* supra, 225 Conn. 619.

In *Blades,* we rejected the claim of the defendant, Ivan J. Blades, that the trial court improperly had denied his motion to suppress. See id., 624. In that case, the police had received several telephone calls from relatives of the victim who expressed concern about the victim's whereabouts. Id., 620. The police also learned that the victim and Blades had been involved in a troubled marriage and that the victim's mother believed

that Blades had harmed the victim. Id. The police also knew that Blades had sent his and the victim's children, unattended, to New York by train. Id. The police also observed a "blood-like smear" on the interior door to the common hallway of the building in which Blades resided. Id., 621. On the basis of this information, the police entered the apartment with a key obtained from the apartment building manager and discovered the victim's body. Id., 616.

On appeal, Blades claimed that the trial court improperly had concluded that the emergency exception to the warrant requirement justified entry into the apartment. Id., 617. We concluded that, on the basis of "the empirical facts upon which the police acted at the time of the entry"; id., 621; it was reasonable for police to believe that the victim was in immediate need of aid, and, thus, they were justified in making the warrantless entry. See id. In so concluding, we explained that, "[i]n the cool morning of appellate review we will not ignore the heated passion of immediacy that was the essence of the anxious concerns about the victim's safety and well-being during those nighttime hours." Id.

In the present case, the trial court specifically credited the testimony of O'Leary that at or before the time of the entry, he had: (1) viewed the victim's body and observed the nature and type of injuries that she had sustained; (2) discussed with Quintero the purported cause of those injuries; (3) discussed with hospital personnel their opinion that Quintero's explanation of the victim's injuries was not plausible; (4) received inconsistent information about the defendant's whereabouts; and (5) received information that the defendant abruptly had taken the victim's three year old sister. Moreover, once the police had arrived at 418 Mill Street, O'Leary heard a child crying and an adult running through the apartment. Furthermore, there was no response to the declaration that the police were present.

We conclude that it was reasonable for the police to believe that an emergency situation existed, namely, that the health and safety of the victim's sister was in jeopardy. This conclusion is further supported by the circumstances surrounding the victim's death, which police had known before entering the apartment, and the fact that the victim's sister was a very young child and, therefore, less able than an adult to protect herself from further harm. See, e.g., *State* v. *Boggess*, 115 Wis. 2d 443, 457–58, 340 N.W.2d 516 (1983) (concluding that social worker's warrantless entry into home, after receiving anonymous call notifying her of suspected child abuse and defendant's bad temper, was justified under emergency exception to warrant requirement, and explaining that situation "involved small children inside a home, who are less able to protect themselves from further harm or to independently seek medical attention than are adults").[11] Thus, we conclude that the trial court properly determined that the warrantless entry into the apartment at 418 Mill Street was justified by the emergency exception to the warrant requirement.

The defendant relies on our decision in *State* v. *Geisler*, supra, 222 Conn. 672, however, in claiming that the emergency exception applies only when the police have direct evidence that a person is in need of immedi-

---

[11] In *People* v. *Malczewski*, 744 P.2d 62 (Colo. 1987), the wife of the defendant, Jerry Malczewski, flagged down a police officer and reported that Malczewski had taken their baby from her. Id., 64. She expressed concern for the safety of the baby because Malczewski had been drinking. Id. With this knowledge, the police officer went to Malczewski's apartment and knocked on the door. Id. The police officer could hear the baby crying but Malczewski refused to open the door. Id. Malczewski then took the baby in his arms and went to the door. Id. After Malczewski opened the door, the police officer entered the apartment. Id. Under these circumstances, the Colorado Supreme Court concluded that the police officer reasonably could have determined that an immediate emergency existed with respect to the baby. Accordingly, the court determined that the entry was justified under the emergency exception to the warrant requirement. Id.

ate aid. In *Geisler*, police officers determined that a car meeting the description of the defendant's had been involved in an accident with another motorist. Id., 677. When the police arrived at the home of the defendant, Martin Geisler, they saw the car in the driveway and noticed that the door was ajar and the keys were in the ignition. Id., 678. The police also observed minor damage to the car and that the car's radiator was warm, as if the car recently had been driven. Id. After one of the officers knocked on the door and received no response, the officers discussed the possibility that the driver of the car might have been injured and might need assistance. Id. The officers thereafter entered the premises and found Geisler lying on a bed. Id. The officers, who smelled alcohol, woke Geisler and asked him if he was all right. Id, 679. Geisler responded that he was all right, and the police determined that Geisler was not injured. Id. Subsequently, however, the police asked Geisler if he had been drinking; Geisler responded in the affirmative. Id. Geisler subsequently was charged with operating a motor vehicle while under the influence of intoxicating liquor. Id., 674.

On appeal, the state claimed that the Appellate Court improperly concluded that the entry was not justified under the emergency exception to the warrant requirement. Id., 681. This court determined, however, that the facts known to the officers at the time of the entry reasonably could not have lead to the "conclusion that the driver might have suffered the type of injury that would require emergency aid." Id., 695. This determination was based on the fact that the police had observed only minor damage to the car and on the fact that the only other evidence that an emergency existed was that the occupant of the house did not respond when the officers rang the doorbell and declared their presence. Id.

The present case is distinguishable from *Geisler*. First, the police entry in the present case was not based simply on the fact that the defendant did not respond to the knock on the door and the declaration that police were present. Rather, the entry also was based on the knowledge that the sister of the victim, who had suffered injuries consistent with severe child abuse, potentially was inside the apartment and that the officers heard a child crying and an adult running in the apartment. Moreover, the whereabouts of the defendant, whom the officers knew was involved with the victim's mother, was in dispute. Thus, unlike the facts of *Geisler*, the facts known to the police at the time of entry in the present case gave rise to a reasonable belief that an emergency situation existed.

Second, we do not read *Geisler* to require direct evidence of an emergency situation, as the defendant claims. In *Geisler*, we merely explained that the officers reasonably could not conclude, on the basis of the facts known to them at the time of entry, that an emergency existed to such an extent that the officers could dispense with the necessity of obtaining a warrant supported by probable cause in accordance with the dictates of the fourth amendment. See id., 695–96. We therefore conclude that the trial court properly determined that the entry into the apartment at 418 Mill Street was justified by the emergency exception to the warrant requirement.[12]

---

[12] The defendant also claims that we should reconsider our prior cases and define more narrowly the emergency exception to the warrant requirement. Specifically, the defendant contends that we should adopt the three-pronged test set forth in *People* v. *Mitchell*, supra, 39 N.Y.2d 173. In that case, the New York Court of Appeals summarized the elements of the exception as follows:

"(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

"(2) The search must not be primarily motivated by intent to arrest and seize evidence.

"(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." Id., 177–78.

2

## Illegal Seizure

The defendant further claims that, upon entering the apartment, the police illegally seized him without a warrant or probable cause. Specifically, the defendant claims that, once inside the apartment, Velez immediately grabbed the defendant's arm, and that such action constituted an illegal seizure. In response, the state contends that the seizure of the defendant was proper under the doctrine of *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).[13] We agree with the state.

As we noted in *Blades*, "[w]e read the third of these elements as merely suggesting a higher standard with respect to the association between the place to be entered and the person being sought. In other words, once having determined that an emergency situation exists, the police cannot, under the pretext of an emergency, enter just any place. They should have some basis akin to probable cause to believe that the place to be entered is relevant to their emergency search." *State* v. *Blades*, supra, 225 Conn. 622–23 n.7. In *Blades*, we also declined to adopt the language of the New York court "because we believe[d] that our 'reasonable belief' standard, without further refinement, suffices to govern the emergency doctrine in Connecticut." Id. We see no reason to depart from this view in the present case.

The defendant further claims that if this court declines to adopt the entire three-pronged test of *Mitchell*, it nevertheless should adopt the second prong, which, according to the defendant, would require the state to establish that the officers' entry into the apartment at 418 Mill Street was not a pretext for an entry for which they did not have probable cause. We again conclude that our reasonable belief standard sufficiently addresses the concerns that the second prong of *Mitchell* addresses. If the facts known to the police officer at the time of entry would not lead a reasonable police officer to believe that an emergency situation exists, then reliance on the emergency exception to the warrant requirement is not justified. Thus, if the trier of fact concludes that the entry was not reasonable, or that it was merely a pretext for a warrantless entry, the emergency doctrine will not apply and the warrantless entry will not withstand constitutional scrutiny. Accordingly, we do not adopt the three-pronged test espoused by the New York Court of Appeals in *Mitchell*.

[13] The state also claims that, even if it is assumed that the temporary seizure of the defendant was unlawful, the evidence subsequently obtained was sufficiently attenuated so as to purge the taint. In light of our conclusion that the seizure was lawful, we need not reach the issue of attenuation.

"Under the fourth amendment to the United States Constitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, *even if there is no probable cause to make an arrest. Alabama* v. *White,* 496 U.S. 325, 330–31, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990); *Terry* v. *Ohio,* [supra, 392 U.S. 22]; *State* v. *Mitchell,* 204 Conn. 187, 194–95, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . .

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion. *Terry* v. *Ohio,* supra, 392 U.S. 21 . . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . *A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Lipscomb,* 258 Conn. 68, 75–76, 779 A.2d 88 (2001); see also *Adams*

v. *Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) ("[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time").

In addition, "[e]ffective crime prevention and detection . . . [underlie] the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. *Terry* v. *Ohio*, supra, 392 U.S. 22. Therefore, [a]*n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal.* . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Lipscomb*, supra, 258 Conn. 76.

We conclude that the seizure of the defendant, after the justified entry into the apartment, was permissible under *Terry* v. *Ohio*, supra, 392 U.S. 1. Velez grabbed the defendant's arm to prevent the defendant from entering the bedroom in order to detain the defendant briefly and to maintain the status quo of the situation. In addition, in light of the nature of the emergency that justified the entry into the apartment, it is clear that the police officers were entitled to detain the defendant briefly to prevent him from entering another room in order to assess the extent of the emergency.[14] Specifi-

---

[14] In discussing the emergency exception, Professor Wayne R. LaFave explains: "The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry—the officer may do no more than is reasonably necessary to ascertain whether someone is in need

cally, in the present case, the police reasonably suspected, on the basis of information known to them at the time, that the victim's sister abruptly had been taken by the defendant. Moreover, at the time of entry, the police knew that: (1) a severely injured child had died as a result of her injuries; (2) the explanation that Quintero had given for the condition of the victim's body was inconsistent with the injuries that the victim actually had sustained; (3) the defendant had some relationship with Quintero and had been introduced into the investigation; and (4) different people had provided different accounts as to the defendant's whereabouts. Prior to the officers' entry, moreover, the officers received no response after knocking on the door and declaring their presence. In addition, the police found the victim's sister crying as they were questioning the defendant. On the basis of these specific and articulable facts known to the police at the time of the seizure, taken together with the rational inferences drawn therefrom, the brief seizure of the defendant, undertaken in order to maintain the status quo of the situation, was justified[15] under *Terry* v. *Ohio*, supra,

of assistance and to provide that assistance." 3 W. LaFave, Search and Seizure (3d Ed. 1996) § 6.6 (a), p. 401. We conclude that the police officers' conduct after entering the apartment fell well within these bounds. Specifically, after briefly grabbing the defendant's arm to prevent him from retreating into another room in which the officers could not have seen him, the officers ascertained the nature of the situation by immediately turning to the victim's sister to determine if she was in need of assistance and asking her about the bruises on her body.

[15] After Velez grabbed the defendant's arm, Wilson asked the victim's sister, who caused the bruises on her legs? The victim's sister responded that "[the defendant] did it."

"The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. *If, on the contrary, the officer's suspicions are confirmed or further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Rodriguez*, 239 Conn. 235, 247, 684 A.2d 1165 (1996). Thus, on the basis of the victim's sister's response to Wilson's question, the police officer's suspicions were aroused further and the prolonged seizure was justified. In any event, the

1.[16] Accordingly, the trial court properly denied the defendant's motion to suppress.

## B

## Voir Dire of Prospective Jurors

## 1

## Granting of State's Challenges for Cause

The defendant next claims that the trial court improperly granted the state's challenges for cause with respect to three prospective jurors, J.B., K.L. and K.S.,[17] on the basis of their views about the death penalty. The

findings of the trial court suggest that, after Velez briefly detained the defendant pursuant to *Terry* v. *Ohio*, supra, 392 U.S. 1, the defendant voluntarily went with the police to the station to assist the police in their investigation of the victim's death. Specifically, the trial court found that: "The police confronted the defendant moving down the hallway. When he was asked in English and then in Spanish if he would come to the police station to discuss [the victim's] injuries, he nodded yes. There were no guns drawn, or any evidence of threats, or physical force. The evidence that the court finds credible is that the defendant was not handcuffed. He was placed in an unmarked police cruiser, without a cage, and taken to police headquarters. The defendant's demeanor was calm and [he was] under control. Although the police did not tell the defendant [that] he could refuse to go to the police station, he did not object or request to go to the police station at another time." Thus, after the brief *Terry* stop, the defendant agreed to go to the police station for questioning. Even if it is assumed the defendant did not voluntarily agree to go to the station because he had been illegally seized prior to agreeing to go to the station, the police had probable cause to arrest the defendant as a result of the statement of the victim's sister that "[the defendant] did it." The subsequent statements he gave to the police, therefore, were not the result of any illegal entry or seizure under the fourth amendment.

[16] The defendant further claims that his oral and written statements and the items taken from his person were "fruits of the poisonous tree" and, therefore, must be suppressed. In light of our conclusion that both the entry into 418 Mill Street and the subsequent seizure of the defendant did not violate his constitutional rights, we need not address this claim.

[17] We refer to all venirepersons in this opinion by using their initials to protect their legitimate privacy interests. E.g., *State* v. *Reynolds*, 264 Conn. 1, 116 n.109, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

defendant urges that their voir dire testimony did not indicate that they would automatically vote against the imposition of the death penalty; see *Witherspoon* v. *Illinois*, 391 U.S. 510, 522 n.21, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968); or that they were unable to follow Connecticut's death penalty laws. See *Wainwright* v. *Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) (*Witt*). Accordingly, the defendant maintains that the trial court's rulings violated his rights under the sixth,[18] eighth[19] and fourteenth[20] amendments to the United States constitution, article first, §§ 8,[21] 9,[22]

[18] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . ."

The sixth amendment right to a trial by an impartial jury is made applicable to the states through the fourteenth amendment due process clause. See, e.g., *Ring* v. *Arizona*, 536 U.S. 584, 597, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

[19] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003), quoting *Merchant* v. *State Ethics Commission*, 53 Conn. App. 808, 818, 733 A.2d 287 (1999). Because the defendant has offered no analysis of his eighth amendment claim, we decline to review it. Id.

[20] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. . . ."

[21] Article first, § 8, of the Connecticut constitution provides in relevant part: "[T]he accused shall have a right . . . in all prosecutions by indictment or information, to a . . . trial by an impartial jury. No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

[22] Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

$10^{23}$ and $20,^{24}$ of the Connecticut constitution, and article first, § 19, of the Connecticut constitution, as amended by article four[25] of the amendments.[26] We disagree with the defendant's contentions.

We begin our analysis of the defendant's claims with a brief review of the governing law. The sixth amend-

[23] Article first, § 10, of the constitution of Connecticut provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[24] Article first, § 20, of the constitution of Connecticut provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

[25] Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides in relevant part: "The right to question each juror individually by counsel shall be inviolate."

[26] We decline to review the defendant's state constitutional claims because he has not briefed them adequately. In *State* v. *Geisler*, supra, 222 Conn. 684–85, we set forth six things that should be considered in examining state constitutional claims: (1) the text of the state constitutional provision; (2) holdings and dicta of this court and the Appellate Court; (3) federal precedent; (4) sister state decisions; (5) the history of the provision, including the historical constitutional setting and the debates of the framers; and (6) economic and sociological considerations. We repeatedly have emphasized that "we expect counsel to employ [the *Geisler* analysis] [i]n order to [allow us to] construe the contours of our state constitution and [to] reach reasoned and principled results . . . ." (Internal quotation marks omitted.) *State* v. *Joyce*, 229 Conn. 10, 16 n.7, 639 A.2d 1007 (1994). When a party fails to analyze these factors separately and distinctly, "[w]e have made clear that . . . we are not bound to review the state constitutional claim." Id., 16.

Moreover, even in capital cases, we have held that, "[a]lthough the defendant's brief adverts to independent rights under the [state] constitution, [when] no such arguments have been briefed . . . they are . . . deemed to have been waived." *State* v. *Ross*, 230 Conn. 183, 208, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); see also *State* v. *Rizzo*, supra, 266 Conn. 290 n.69; *State* v. *Webb*, 238 Conn. 389, 423 n.32, 680 A.2d 147 (1996).

We note that we have not yet decided whether the *Witherspoon* or *Witt* standards should be applied under the state constitution. See *State* v. *Webb*, supra, 238 Conn. 438. The defendant has made no attempt to broach this issue, and his entire argument regarding his state constitutional claims consists of a single sentence in which he simply asserts that the trial court's rulings violated various provisions of the state constitution. The defendant's failure to engage in a *Geisler* analysis and his failure to analyze his state constitutional claims independently of his federal constitutional claims precludes our review of his state constitutional claims.

ment to the United States constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . ." U.S. Const., amend. VI. The due process clause of the fourteenth amendment likewise "independently re-quire[s] the impartiality of any jury empanelled to try a cause." *Morgan* v. *Illinois*, 504 U.S. 719, 726, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).[27] Pursuant to this mandate, the United States Supreme Court has held that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Id., 729. Accordingly, "[v]oir dire plays a critical function in assuring the criminal defen-dant that his [constitutional] right to an impartial jury will be honored." (Internal quotation marks omitted.) Id.

Furthermore, "[o]ur constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine the venireperson's fitness to serve on the jury. Conn. Const., art. I, § 19; General Statutes § 54-82f;[28] Practice

---

[27] As the court in *Morgan* observed, "due process alone has long demanded that, if a jury is to be provided the defendant . . . the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan* v. *Illinois*, supra, 504 U.S. 727.

[28] General Statutes § 54-82f provides: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

Book § [42-12].[29] After the completion of the voir dire of a particular venireperson, a party may challenge the venireperson for cause. The court must excuse that [venireperson] if the judge . . . is of the opinion from the examination that [the venireperson] would be unable to render a fair and impartial verdict . . . . General Statutes § 54-82f; Practice Book § [42-12]. . . . The trial court is vested with wide discretion in determining the competency of [prospective] jurors to serve. . . . [T]he exercise of [the trial court's] discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 116–17, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

"In *Wainwright* v. *Witt*, [supra, 469 U.S. 412] . . . the United States Supreme Court . . . considered the effect [of] a prospective juror's beliefs concerning the death penalty . . . on that individual's eligibility to serve as a juror in a capital case . . . [and] clarified the standard for determining whether a venireperson properly may be challenged for cause on the basis of his beliefs regarding the death penalty. Specifically, the court concluded that the federal constitution permits the excusal for cause of venirepersons whose opposition to capital punishment would prevent or substan-

---

[29] Practice Book § 42-12 provides: "Each party shall have the right to examine, personally or by counsel, each juror outside the presence of other prospective jurors as to qualifications to sit as a juror in the action, or as to interest, if any, in the subject matter of the action, or as to relations with the parties thereto. If the judicial authority before whom such examination is held is of the opinion from such examination that any juror would be unable to render a fair and impartial verdict, such juror shall be excused by the judicial authority from any further service upon the panel, or in such action, as the judicial authority determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of the trial."

tially impair the performance of their duties as jurors in accordance with the court's instructions and the juror's oath. Id., 424. . . . [A]s interpreted in . . . *Witt*, the federal constitution permits the excusal for cause of venirepersons whose opposition to the death penalty would prevent or substantially impair the performance of their duties as jurors during either: (1) the guilt phase of the trial; or (2) the sentence phase of the trial. For a venireperson's opposition to the death penalty to be considered as preventing or substantially impairing the performance of that individual's duties as a juror during the sentencing phase of the trial, so as to permit excusal for cause, the federal constitution does not require that the venireperson explicitly state that . . . he automatically would vote not to impose a sentence of death. Instead, the federal constitution permits the excusal for cause of venirepersons whose responses during voir dire raise serious doubt as to their ability to follow the law during the sentencing phase.[30] . . .

"Furthermore, a trial judge's finding that a particular venire[person] was not biased and therefore was properly seated [is] a finding of fact . . . . [T]he question whether a [venireperson] is biased has traditionally been determined through voir dire culminating in a

---

[30] "As the court stated in [*Witt*], this standard does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the matter of a catechism. What common sense should have realized experience has proved: many venire[persons] simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these venire[persons] may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [Consequently] deference must be paid to the trial judge who sees and hears the [prospective] juror." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 118 n.113.

finding by the trial judge concerning the [venire-person's] state of mind. . . . [S]uch a finding [also] is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review . . . . [This] holding applies equally [as] well to a trial court's determination that a prospective capital sentencing juror was properly excluded for cause." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 117–19.

a

Venireperson J.B.

Relying on *Wainwright* v. *Witt*, supra, 469 U.S. 424, the defendant contends that the trial court improperly granted the state's challenge to venireperson J.B.[31] Spe-

---

[31] The defendant also asserts that J.B. "was not treated in a similar manner as other prospective jurors, and [that] his excusal violated his rights to equal protection of the law under the fourteenth amendment to the United States constitution and article first, § 20, of the Connecticut constitution." The defendant further claims that "the trial court's and the state's attorney's treatment of [J.B.] violated his rights to equal protection of the law." Inasmuch as the record reveals that J.B. was a minority venireperson, we glean from the defendant's brief that the defendant is raising a claim, for the first time on appeal, that the trial court excused J.B. in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), a case that the defendant does not even cite in his brief.

"In *Batson* . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 344, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

Challenges to the removal of a potential juror under *Batson* occur within the context of the state's use of peremptory challenges. The trial court excused venireperson J.B. for cause, however. According to the state, it challenged J.B. for cause on the basis of J.B.'s assertion that he did not

cifically, the defendant contends that nothing venireperson J.B. said during voir dire reasonably could have been construed to suggest that he would vote automatically against the death penalty. We reject this claim.

In response to questioning by defense counsel, venireperson J.B., while conveying his ability to follow the law, specifically expressed doubts that the defendant actually would be executed if he, in fact, were sentenced to death.[32] Thereafter, the state's attorney moved to excuse J.B. for cause, claiming that J.B.'s response that he did not believe that the defendant would be executed upon the imposition of a death sentence warranted his removal from the panel.[33] Defense counsel responded that J.B.'s testimony, in which J.B. indicated that he would follow the law as given by the judge, rendered him fit to serve on the jury. Thereafter, the trial court excused J.B. for cause.[34]

think that the defendant actually would be executed even if the jury voted to sentence him to death. We conclude that the trial court properly excused J.B. for cause as a result of J.B.'s assertion. Thus, the defendant's equal protection claim is without merit.

[32] During voir dire, the following exchanged occurred:

"[Defense Counsel]: Do you think if the jury decided that death was the appropriate penalty that [the defendant would] actually be executed?

"[J.B.]: No.

"[Defense Counsel]: Why?

"[J.B.]: I can say why should you kill him. Like I said, if he's in jail for the rest of his life, it's just as worse.

"[Defense Counsel]: Yes, I understand. But you'd be willing to follow the law as the judge gives it to you, and you'd be willing to sit on this case?

"[J.B.]: Yeah."

[33] The state's attorney maintained that "[t]he law of the state of Connecticut and the case law is that the juror must presume that the law will be followed. And if [the jurors] return a verdict of death, death will indeed mean death. If they return a verdict of life in prison without the possibility of release, that's what will occur. And to say, if we come back with the death penalty, I don't think that the death penalty will be followed I think is reason enough for the . . . [prospective] juror to be excused."

[34] Specifically, the trial court concluded: "I think that my concern is— what he said is—I just think that it comes to this type of case when the venireperson indicates—the way he responded that he never thought that [the defendant] would get the death penalty. I think that the jurors sitting

The trial court's ruling makes it clear that the court excused J.B. on the basis of his failure to appreciate the true consequences of the imposition of a death sentence, rather than on the basis of any opposition to capital punishment. Thus, the holdings in *Witherspoon* and *Witt* are not implicated, as the defendant contends. In particular, neither the state, in challenging J.B. for cause, nor the trial court, in granting the state's challenge, relied on *Witt* because J.B.'s voir dire testimony revealed that he was neither in favor of nor opposed to the death penalty. Instead, the trial court properly excused J.B. on the basis of J.B.'s statement that he did not believe that the defendant actually would be executed even if the jury returned a verdict that would result in the imposition of the death penalty. In other words, the trial court did not excuse J.B. on the basis of his responses regarding the appropriateness of the death penalty, which would have implicated *Witherspoon* and *Witt*, but because J.B. apparently had failed to comprehend the consequences of the jury's potential verdict in the case, namely, that the defendant actually would be executed if that were the jury's verdict.

Finally, we note that the trial court occupied a unique position to observe and to evaluate J.B.'s demeanor when he answered questions during voir dire, and the court specifically relied upon "the way [J.B.] responded" in making its ruling. "We are mindful . . . that appellate review of a cold record is no substitute for the ability of the trial court to witness firsthand a venireperson's responses and demeanor." *State* v. *Hodge*, 248 Conn. 207, 253–54, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

on this case, when deciding that issue, with that magnitude, to understand and comprehend the consequences of their decision and not to assume or think that their decision won't have an effect, whether or not it will or not, but the point is that the juror[s] should know the significance and comprehension of what they do by their decision, which is binding on this court."

Bearing in mind the deference that we afford the trial court in these assessments; e.g., *State* v. *Reynolds*, supra, 264 Conn. 119; we conclude that the trial court did not abuse its discretion in excusing J.B. for cause on the basis of his demeanor and on the basis of his belief that the defendant would not be executed even if he was sentenced to death.[35]

b

Venireperson K.L.

The defendant next claims that the trial court improperly granted the state's challenge to venireperson K.L. because K.L.'s responses to questions regarding the death penalty indicated that he could follow Connecticut's capital sentencing scheme. We do not agree.

During voir dire, the state's attorney asked K.L. about his views on the death penalty and whether any moral or religious beliefs would prevent or impair his ability to serve on the jury. K.L. stated that a decision regarding the death penalty would require "a lot of soul searching" and that he had been "brought up [as] a Christian and for the most part . . . believe[d] [that] that's God's job, you know, who lives and who dies . . . ." In addition, K.L. stated, in response to questions by the state's attorney regarding his ability to follow the law even if it conflicted with his personal or religious views, that he "would probably have to go with [his] own personal beliefs." Subsequently, however, K.L. explained that he "would probably follow the law" and that, despite his

---

[35] The defendant also claims that the trial court improperly denied his request to rehabilitate J.B. Defense counsel, however, asked to rehabilitate J.B. after the trial court already had granted the state's motion to excuse J.B. for cause. Once the trial court granted the motion of the state's attorney to excuse J.B. for cause, that ruling became binding, and, therefore, any request by defense counsel to ask additional questions was presented too late. We therefore reject the defendant's claim.

personal views, he believed that he could act fairly and impartially to the state and the defendant.[36]

The trial court thereafter excused K.L. for cause, noting the inconsistencies in K.L.'s testimony: on the one hand, K.L. testified that he would have "to do a lot of soul searching . . . and for the most part . . . [it's] God's job," but, on the other hand, K.L. stated that "he would follow the law, [and] then change[d] his mind or change[d] his words and [said], but, if my personal beliefs affected it, I would have to follow my personal beliefs. Then he [said], but, I am not sure I would follow the judge's law." The trial court concluded that "with the terms and the usage of the words that [K.L.] used and the way he gave answers, especially his personal beliefs he would have to follow, I think that it would affect his ability to be a juror on this case."

K.L.'s reservations about imposing the death penalty on the basis of his personal and religious beliefs, his assertion that he would "rather do things right by [God] than by the law," and his statement that he would follow his personal beliefs if they conflicted with the law, lead us to conclude that the trial court properly excused K.L. for cause. The trial court deduced from K.L.'s testimony that K.L.'s religious background would have served to "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath"; (internal quotation marks omitted) *Wainwright* v. *Witt*, supra, 469 U.S. 424; and we conclude that the trial court did not abuse its discretion in excluding K.L. for cause.

---

[36] In response to a similar question posed by defense counsel, K.L. stated that he would follow the court's instructions and would act fairly with respect to the state and the defendant.

c

## Venireperson K.S.

The defendant next claims that the trial court improperly excused venireperson K.S. for cause on the basis of her views concerning the death penalty. We disagree.

During voir dire, K.S. first acknowledged that, although it would be difficult for her to participate in the process of deciding whether the defendant would receive the death penalty, she indicated that she probably could do so.[37] Thereafter, in response to a question by the state's attorney regarding the possibility that the law would conflict with her religious beliefs, K.S. stated: "I would think that would be difficult for me to do to, to go along with the law that was different" from her religious beliefs, and that she could not sit as an impartial juror in the present case.[38] In addition, K.S. candidly acknowledged that, "if it got to the point where I had a belief that was different than, you know, what the judge [was] telling me the law is . . . I would end up going with my moral beliefs . . . ." K.S. further explained that she would have some hesitation in agreeing with a verdict that would result in the death of the defendant.[39]

---

[37] Specifically, after stating that she was not in favor of the death penalty "for everything," K.S. stated that it "would be difficult to have . . . that control over someone else's life." In response to the state's attorney's further questions about her ability to serve on the jury, K.S. stated: "I probably could if, you know, that's what I had to do. I probably could."

[38] Specifically, the following exchange occurred during the questioning of K.S.:

"[State's Attorney]: Knowing that, the way you feel, do you think this is a case where you could sit as a juror and be a fair and impartial juror? That's fair not only to the defendant, of course, but fair to the state . . . and we're seeking the death penalty in this case.

"[K.S.]: I probably [would] have to say no then."

[39] In response to the question of the state's attorney as to whether K.S. would "personally hesitate in any way from walking out of that jury room, walking back into this jury box, standing up, looking over upon the defendant, and pronouncing the verdict that . . . will ultimately lead to [the defendant's] death by lethal injection . . . at the hands of the state," K.S. stated that "[t]here might be some hesitation."

The state's attorney thereafter moved to excuse K.S. for cause, citing to her testimony that she would have difficulty following the law if it conflicted with her personal beliefs and her repeated hesitation about imposing the death penalty. Defense counsel objected to the challenge of the state's attorney, claiming that the standard for excusal of a juror for cause had not been met. The trial court thereafter excused K.S. for cause, expressing its "major concern about . . . [the] hesitation aspect . . . and that's what I'm basing my decision to grant the excusal for cause on . . . ." The court noted that K.S "indicated that she didn't know what she would do and . . . she never got over [the hesitation] issue . . . ."

We conclude that the trial court properly excused K.S. for cause on the basis of her equivocation about imposing the death sentence, as well as her admission that she "would end up going with [her] moral beliefs" if her beliefs conflicted with the law as given by the court. K.S. consistently hesitated in stating her ability to overcome her personal beliefs if they conflicted with the law and expressed a likely inability to overcome

In addition, after both the state's attorney and defense counsel had questioned K.S., the trial court sought to clarify K.S.'s position with regard to the death penalty:

"The Court: . . . You and the rest of the jurors consider all the evidence and listen to the law and the procedure [on which] the court instructs you and you come back and you and the rest of the jurors agree that based upon your consideration of the evidence that you return a verdict that would lead to the imposition of the death penalty. . . . Putting it in that circumstance, would you be able to do that?

"[K.S.]: I—I think so, but I'm not—I'm—I'm not positive.
* * *
"The Court: It's down the road and it's—We need to know your answer and that's the confusion that—that I have that I would like you to see if you can do the best you can at clearing it up for me. And could you—do I have to repeat it or do you understand?

"[K.S.]: I—I understand what you're asking me, but I—I'm not sure I can give you a yes or no. I—I would like to say that I would try to do the best that I was, you know, I was instructed."

those beliefs if it meant agreeing with a verdict that would result in the death penalty. Thus, the trial court properly determined that K.S.'s "views would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." (Internal quotation marks omitted.) *Wainwright* v. *Witt*, supra, 469 U.S. 424. The trial court therefore did not abuse its discretion in excusing K.S. for cause.

2

Restrictions on the Scope of Voir Dire

The defendant further contends that the trial court improperly restricted the scope of defense counsel's voir dire questioning of seven venirepersons, thereby depriving the defendant of the opportunity fully to explore these potential jurors' biases or prejudices. Specifically, the defendant claims that the trial court improperly restricted defense counsel's questioning of venirepersons about: (1) whether they would give more credibility to the testimony of police officers; (2) their philosophical views concerning the function of capital punishment in society and whether such a penalty is a "good thing"; (3) their ability to presume the defendant "completely" innocent of any wrongdoing; and (4) whether they wanted to serve on a capital jury. Additionally, the defendant challenges the trial court's alleged refusal to allow defense counsel to rehabilitate S.P. and claims that the trial court improperly restricted defense counsel from exploring S.P.'s "ability . . . to consider [the defendant's] mitigation evidence [which] was critical in this case." The defendant urges that these purported restrictions violated his rights under the sixth, eighth and fourteenth amendments to the United States constitution, article first, §§ 8 and 9, of the constitution of Connecticut, article first, § 19, of the constitu-

tion of Connecticut, as amended by article four of the amendments,[40] and § 54-82f.[41] We disagree.

We have observed that "the purpose of examining members of the venire is twofold: first, to provide information upon which the trial court may decide which prospective jurors, if any, should be excused for cause; and second, to provide information to counsel which may aid them in the exercise of their right to peremptory challenge." (Internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 252, 849 A.2d 648 (2004). We also have noted that "[t]he court should grant such latitude as is reasonably necessary to fairly accomplish the purposes of the voir dire. Clearly, therefore, if there is any likelihood that some prejudice is in the [prospective] juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case." (Internal quotation marks omitted.) Id.

In addition, we have noted that, "[b]ecause of the wide range of cases submitted to juries and the impossibility of establishing a set pattern of questions appropriate for the voir dire examination of prospective jurors, the trial court is vested with broad discretion in determining the scope of counsel's inquiry. . . . The court has a duty to analyze the examination of venire members and to act to prevent abuses in the voir dire process . . . . [Accordingly], the court's actions ordinarily will not be disturbed unless the court has clearly abused its discretion or it appears that prejudice to one of the parties has resulted." (Citations omitted; internal quotation marks omitted.) Id., 251–52.

---

[40] We decline to address the defendant's state constitutional claims because they were not adequately briefed. See footnote 26 of this opinion.

[41] See footnote 28 of this opinion.

a

## Venireperson A.M.

The defendant claims that the trial court abused its discretion in restricting defense counsel's questioning of A.M. about the credibility afforded to the testimony of police officers. We disagree.

While questioning A.M., defense counsel improperly characterized as the law, rather than as an instruction, the trial court's charge that the jurors are to treat the testimony of all the witnesses, even police officers, the same.[42] After the trial court clarified that it was an instruction, A.M. asserted that she indeed could follow the trial court's instruction to treat all witnesses the same. Thereafter, defense counsel moved on from this

---

[42] For instance, the following colloquy occurred:

"[Defense Counsel]: . . . [L]et me go somewhere else for a minute. Being a criminal case, there's a strong likelihood that there would [be] police officers who come in and testify on this case. Okay? Did you get the sense from [the judge] yesterday that jurors are to treat all witnesses the same?

"[A.M.]: Yes. He made that very clear.

"[Defense Counsel]: Okay. And for some people, again, that's what you should do. But some people will tell us, I know that's the *law* and I know that a police officer's not going to be given any more or less credibility just because he's a police officer, but I don't know if I'll be able to follow the *law*. Other people say I can follow that *law*. How do you—

"[State's Attorney]: Objection . . . .

"The Court: *Instruction* . . . . Objection is sustained. *Instruction* . . . .

"[Defense Counsel]: Oh, did I misspeak? Okay. I'm sorry." (Emphasis added.)

Defense counsel thereafter continued to question A.M.

"[Defense Counsel]: Would—do you feel you'd be able to follow that instruction, to treat all witnesses including police officers the same? No one gets more or less credibility based on who they are or what they are?

"[A.M.]: Yes.

"[Defense Counsel]: Okay.

"[A.M.]: He made it very clear.

"[Defense Counsel]: Okay. But that's the law.

"[A.M.]: No. He made it clear that—did I get this right?

"[State's Attorney]: I'm going to object. It's not the law, it's an instruction."

line of questioning and asked A.M. about her understanding about the guilt and penalty phases of the case, the state's burden of proof, her ability to follow the judge's instruction not to hold the defendant's silence at trial against him, and the presumption of innocence. After the state's attorney had examined A.M., he moved, without objection, to excuse A.M. for cause on the basis of her testimony that this case was "emotional" for her. The trial court thereafter excused A.M. from the panel.

Although we have recognized that "[w]hen important testimony is anticipated from certain witnesses whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination should be permitted"; (internal quotation marks omitted) *State* v. *Lugo*, 266 Conn. 674, 688, 835 A.2d 451 (2003); our review of the record reveals that the trial court did not restrict defense counsel's questioning of A.M. about the credibility she might give to the testimony of police officers. The trial court merely corrected defense counsel's mischaracterization—a fact to which defense counsel himself conceded—of the court's *instructions* as the *law*, and the court invited defense counsel to correct and to clarify his question to A.M., which he did. Defense counsel thereafter voluntarily ceased this line of questioning, concluding his examination of A.M. by questioning her about her views on different matters in the case. Because the trial court did not restrict the scope of defense counsel's voir dire examination of A.M. with respect to the credibility that she would give to the testimony of police officers, we reject the defendant's claim.

b

Venirepersons J.C. and C.H.

The defendant claims that the trial court improperly restricted defense counsel's questioning of J.C. and

C.H., both of whom the trial court subsequently excused pursuant to defense counsel's exercise of peremptory challenges. Specifically, the defendant claims that the trial court abused its discretion in prohibiting defense counsel from inquiring about their philosophical views with respect to the purpose of the death penalty in society and why the death penalty is a "good thing." We disagree.

During voir dire, defense counsel attempted to ask both J.C. and C.H. about their opinions regarding the purposes that the death penalty serves.[43] In response to the objection of the state's attorney to these questions, defense counsel claimed that the answers to his questions would assist him in making "intelligent peremptory challenges" and in finding out the potential juror's attitude toward the death penalty. The trial court sustained the objections of the state's attorney with regard to both J.C. and C.H., concluding that the question of what purposes the death penalty serves was not relevant and was too philosophical.[44] Thereafter, defense

---

[43] Defense counsel asked J.C., "What does it do for us to have a death penalty?" Defense counsel asked C.H., "Why do you think [the death penalty is] a good thing?"

[44] With regard to J.C., the trial court stated: "I'll let you get into areas of the death penalty, but asking this [prospective] juror what could the death penalty do for us, I think, is a little bit beyond the scope of the proper questioning. You can get into areas why you feel the way about the death penalty, you understand that other states don't have it, things of that sort. But what does it do for us, I think that question is not relevant."

With respect to C.H., the trial court noted: "[G]etting into the questions of, so tell me about the death penalty, [that] type of thing, I think, is a little bit too much—as far as this court's concerned, a little bit too philosophical. . . . I think you can get into the area of how they feel about the death penalty, do they think it applies in certain cases, would they—would it affect their ability to be . . . fair and impartial juror[s], do they understand Connecticut has a death penalty. I think that's all fair and appropriate, but getting into the philosophical aspect is the part that's concerning me. I expressed that yesterday. . . . I'm going to sustain the objection because I think it is a little bit too . . . philosophical . . . ."

counsel asked J.C. and C.H. how they felt about the
death penalty and the appropriateness of the death pen-
alty under the facts of the present case.[45] Defense coun-
sel subsequently invoked two peremptory challenges
to excuse both J.C. and C.H., which the trial court per-
mitted.

Even though the trial court limited the scope of
defense counsel's voir dire of J.C. and C.H. by preclud-
ing questions pertaining to their philosophical views on
capital punishment, we conclude that the trial court

[45] Specifically, J.C. stated that she "accept[ed] [the death penalty] as part
of our judicial system . . . ." In addition, the following exchange occurred:

"[Defense Counsel]: This particular case, and you know already what the
information says, what the state claims [it's] going to prove. Do you think
in this particular case if the state is able to prove to you beyond a reasonable
doubt that there was the intentional murder of a two and one-half year old
child by blunt force trauma, that she was beaten to death, that you would
think that this is a particularly appropriate case for the death penalty?

"[J.C.]: It would have to be. If those are the choices, death penalty or in
jail for the rest of your life, we'd have to make that call, correct? Those are
the two choices.

\* \* \*

"[Defense Counsel]: [W]ould you be already predisposed towards death
as a penalty?

"[J.C.]: No.

"[Defense Counsel]: Okay, so you'd be willing to enter into the penalty
phase with an open mind?

"[J.C.]: Yes. I'd have to wait for my instructions.

\* \* \*

"[Defense Counsel]: . . . [I]f you were convinced in your heart that [the
state] proved [its case] beyond a reasonable doubt and [it] also proved that
aggravating factor that it was especially heinous, cruel or depraved, would
death be the only appropriate penalty for you?

"[J.C.]: If they had something they wanted me to listen to, would I listen
to it after it? I would listen to it."

C.H. stated that she felt that the death penalty was an appropriate penalty
in any murder case. She also admitted that her mind may be made up after
the defendant was found guilty and might not be able to remain open-minded
about the defendant's alleged mitigating factors.

acted well within its broad discretion in doing so. E.g., *State* v. *Ross*, supra, 269 Conn. 251; *State* v. *Lugo*, supra, 266 Conn. 690. Moreover, a review of the record reveals that defense counsel, in fact, was able to uncover J.C.'s and C.H.'s views about the death penalty after the trial court had made its respective rulings on the scope of voir dire so as to enable the intelligent exercise of peremptory challenges. Defense counsel therefore enjoyed a sufficient "opportunity to expose any predisposition that would undermine the prospective juror's objectivity."[46] (Internal quotation marks omitted.) *State* v. *Lugo*, supra, 690. Accordingly, we reject the defendant's claims with respect to J.C. and C.H.

c

### Venireperson R.L.

The defendant next claims that the trial court improperly sustained the state's attorney's objections to defense counsel's statements to R.L., during voir dire, that "the presumption of innocence says you have to presume [the defendant] innocent, *perfectly clean slate as he sits here*"; (emphasis added); and that "the jurors have to presume an accused person *completely* innocent of any wrongdoing." (Emphasis added.) The defendant maintains that the trial court should have permitted defense counsel to explore R.L.'s "ability to presume [the defendant] *completely* innocent unless

---

[46] The defendant does not claim that the trial court improperly "forced [the defendant] to use peremptory challenges on persons who should have been excused for cause" in violation of his state constitutional right to a trial by an impartial jury. (Citations omitted; internal quotation marks omitted.) *State* v. *Tucker*, 226 Conn. 618, 632, 629 A.2d 1067 (1993).

and until convinced beyond a reasonable doubt of his guilt."[47] (Emphasis added.) We disagree.[48]

We conclude that the trial court acted within its broad discretion when it precluded defense counsel from modifying the phrase "presumption of innocence" with the word "completely." See *State* v. *Ross*, supra, 269 Conn. 251 ("[b]ecause of the wide range of cases submitted to juries and the impossibility of establishing a set pattern of questions appropriate for the voir dire examination of prospective jurors, the trial court is vested with broad discretion in determining the scope of counsel's inquiry" [internal quotation marks omitted]). Additionally, the record reveals that defense counsel, in fact, did explore R.L.'s ability to presume the defendant innocent. After the court had sustained the objections of the state's attorney, defense counsel asked R.L. if

---

[47] The exchange at issue unfolded as follows:

"[Defense Counsel]: Well, you know, some people come in and they have a sense of—well, where there's smoke, there's fire. So they have it in their mind already that somewhere in their mind they think, well, he did something to get here. If the presumption of innocence says you have to presume him innocent, *perfectly clean slate as he sits here—*

"[State's Attorney]: I object to that, Your Honor. Misstatement. Obviously he wasn't just picked up off the street and brought here.

"The Court: I will sustain—I'm going to sustain the objection. Why don't you rephrase? I'm going to sustain the objection.

"[Defense Counsel]: The law says people charged with a crime, even as they sit here right now, that the jurors have to presume an accused person *completely innocent of any wrongdoing.*

"[State's Attorney]: I'm going to object to that also, Your Honor.

"[Defense Counsel]: Can you do it?

\* \* \*

"[State's Attorney]: Presumption of innocence, period.

\* \* \*

"The Court: Just . . . don't modify the term. Just say what the term is. The presumption of innocence, [defense counsel]. Objection is sustained. Go ahead . . . ask the question.

"[Defense Counsel]: You see what we're getting at? Can you presume? Can you presume him innocent?

"[R.L.]: Yes, I think so." (Emphasis added.)

[48] After the state's attorney had examined R.L., he exercised a peremptory challenge, and the trial court thereafter excused R.L.

she could presume the defendant innocent of the crimes charged, and she responded, "Yes, I think so." Accordingly, the trial court did not abuse its discretion in sustaining the objections of the state's attorney. The record reveals that the trial court did not deprive defense counsel of the opportunity to discover R.L.'s views or bias with respect to the presumption of innocence.

d

Venirepersons J.J. and N.A.

The defendant contends that the trial court improperly precluded defense counsel from asking venireperson J.J. whether he wanted to serve on a capital jury and, if so, why he wanted to do so.[49] The defendant also challenges the trial court's ruling sustaining the objections of the state's attorney to the following two questions that defense counsel had posed to venirepersons J.J. and N.A., respectively: "Is that the type of case that you feel an eye for an eye is appropriate?" "Is this the kind of case that you think the death penalty could be appropriate in?" We do not agree with the defendant's claims.

---

[49] With respect to the defendant's first claim regarding defense counsel's inquiry of whether J.J. wanted to serve as a juror in the case, the relevant exchange unfolded as follows:

"[Defense Counsel]: Do you want to sit on this case?

"[Assistant State's Attorney]: Objection.

"The Court: I'm going to sustain that . . . .

"[Defense Counsel]: Do you have any reason why you wouldn't want to sit on this case?

"[J.J.]: Time wise, I guess.

"[Defense Counsel]: Time wise, just the job concerns that you said earlier?

"[J.J.]: Yes.

* * *

"[Defense Counsel]: Are you willing to sit [on] this case?

"[Assistant State's Attorney]: Objection.

"The Court: I'll allow it.

"[J.J.]: Yes."

Even if we assume, without deciding, that the trial court improperly prohibited defense counsel from asking J.J. whether he *wanted* to sit on the case, defense counsel nevertheless was able to elicit information about J.J.'s willingness and ability to serve, and, accordingly, defense counsel had ample opportunity to ascertain "any predisposition that would [have] undermine[d] the prospective juror's objectivity" through the permitted questions. *State* v. *Lugo,* supra, 266 Conn. 690. Accordingly, there was no error.

The defendant further claims that the trial court improperly declined to permit defense counsel to ask J.J. whether, in the present case, he felt that "an eye for an eye is appropriate."[50] After the trial court sustained the objection of the assistant state's attorney to that question, defense counsel was allowed to ask hypothetical questions regarding the appropriateness

---

[50] In particular, the following exchange occurred:

"[Defense Counsel]: You feel like that's legitimate, an eye for an eye? If somebody commits a murder, then they should be executed?

"[J.J.]: It depends on the certain type of case, I believe.

\* \* \*

"[Defense Counsel]: Well, you know what the allegations are in this case?

"[J.J.]: Yes, I do.

"[Defense Counsel]: The charge is that [the defendant] intended to murder a two and one-half year old child, and that he did so by blunt force trauma. Is that the type of case that you feel an eye for an eye is appropriate?

"[Assistant State's Attorney]: Objection, Your Honor.

"The Court: Sustained.

"[Defense Counsel]: Well, [in] what type of cases do you think an eye for an eye is appropriate . . . ?

"[J.J.]: Well, I don't know really. I guess I [would] have to be presented with one first.

"[Defense Counsel]: Are there any in your mind before you even came in here that you feel certain types of murders or homicides deserve the punishment of death?

"[J.J.]: I guess maybe [there are] a few.

\* \* \*

"[Defense Counsel]: Can you tell me what those few are?

"[J.J.]: I guess the most violent ones."

of the death penalty in specific situations.[51] Thereafter, J.J. was selected to sit on the jury panel.

We previously have cautioned that "[q]uestions addressed to prospective jurors involving assumptions or hypotheses concerning the evidence which may be offered at the trial . . . should be discouraged . . . . [A]ll too frequently such inquiries represent a calculated effort on the part of counsel to ascertain before the trial starts what the reaction of the venire[person] will be to certain issues of fact or law or, at least, to implant in [the venireperson's] mind a prejudice or prejudgment on those issues." (Internal quotation marks omitted.) *State* v. *Lugo,* supra, 266 Conn. 684; accord *Green* v. *Johnson,* 160 F.3d 1029, 1034 (5th Cir. 1998); *Hobbs* v. *Lockhart,* 791 F.2d 125, 129–30 (8th Cir. 1986); *Commonwealth* v. *McGrew,* 375 Pa. 518, 525, 100 A.2d 467 (1953); see also 47 Am. Jur. 2d, Jury § 206 (1995), pp. 887–89. Moreover, we have declared that "[s]uch an effort transcends the proper limits of the voir dire and represents an abuse of the statutory right of examination." (Internal quotation marks omitted.) *State* v. *Lugo,* supra, 684.

In the present case, the trial court acted within its discretion and properly limited the scope of defense counsel's questioning of J.J. insofar as defense counsel improperly sought predictions based on the facts of the case. Moreover, the trial court subsequently permitted defense counsel to ask hypothetical questions of J.J., in response to which J.J. provided informative answers. Accordingly, there was no abuse of discretion.

[51] Specifically, defense counsel was permitted to ask: "I want to ask you to assume something hypothetically. I'm not asking you to predict what you're going to do. . . . So the question is if you and your other eleven jurors decide unanimously that the state has proven beyond a reasonable doubt that this young man killed that little girl intentionally by blunt force trauma and you convict him of capital felony, do you think that this is the type of case that requires a death penalty?" In response, J.J. stated: "Possibly, yes."

The defendant similarly challenges the trial court's ruling sustaining the objection of the state's attorney to defense counsel's question to N.A. as to whether the defendant's case was "the kind of case that [he thought] the death penalty could be appropriate in." Specifically, defense counsel attempted to ask N.A. the following question: "[The defendant] not only beat to death a little girl, but his intent was to kill her when he did . . . . [T]hat's the allegation. . . . What about this type of case? Is this the kind of case that you would think the death penalty could be appropriate in?" The trial court sustained the state's objection to this question, concluding that defense counsel improperly was asking N.A. to predict the outcome of the case.[52] Thereafter, defense counsel questioned N.A. regarding his ability to keep an open mind with respect to the appropriate penalty in the present case and with respect to the mitigation evidence.[53] After defense counsel concluded his examination of N.A., N.A. was selected to serve on the jury panel.

We conclude that the trial court properly restricted the scope of defense counsel's question because it

[52] The trial court stated: "I've been very concerned about putting [prospective] jurors in the position of predicting or telling us where they're going to vote. . . . I don't like that question because I think that [it] is too close to prediction. It wasn't objected to before. I've let it go because both offices are professional. . . . I think this is not a question that gets into their feelings about the death penalty, but gets into their feelings about the death penalty about this case. And I think it's a prediction, and if it wasn't objected to before, then it wasn't objected to, but my rulings have been clear that my concerns have been clear about predictions . . . . That question . . . I think, is inappropriate. I'll sustain the objection."

[53] For example, defense counsel stated: "And that's why I'm asking you to assume that you heard the evidence and the evidence convinced you [that the defendant] beat to death his two and [one-half] year old girl. Could you still be open-minded as to the penalties?" N.A. responded, "Yes." In addition, defense counsel inquired: "Even if we got to the second phase and [the state] prove[s] an aggravating factor, you would still be open to listen to the rest of the evidence in order to make the decision about which of the two [penalties is] appropriate?" N.A. responded, "Yes."

called for N.A. to predict how he would vote on the basis of the facts of the case. "Numerous courts have held . . . [that such] questions [are] objectionable when the question [is] predicated on facts specific to the case at issue or upon speculation as to what facts may or may not be proven at trial. . . . When a defendant seeks to ask a juror to speculate or [to] precommit on how that juror might vote based on any particular facts, the question strays beyond the [scope of permissible inquiry] . . . ." (Citations omitted.) *United States* v. *McVeigh*, 153 F.3d 1166, 1207 (10th Cir. 1998). Accordingly, because defense counsel asked N.A. to predict how he would vote on the basis of the facts of the present case, the trial court properly sustained the objection of the state's attorney.

Moreover, as the record reveals, defense counsel nevertheless was able to elicit responses from N.A. that sufficed to apprise defense counsel of N.A.'s ability to keep an open mind with respect to the penalties of death or life imprisonment. Accordingly, we reject the defendant's claim.

e

Venireperson S.P.

The defendant's final claim regarding voir dire is that the trial court improperly restricted defense counsel's scope of examination with respect to S.P. by prohibiting defense counsel from rehabilitating her. Additionally, the defendant claims that the trial court improperly restricted the scope of defense counsel's examination of S.P. with respect to her consideration of mitigating factors. We do not agree.

A review of the record reveals that the trial court, in fact, did allow defense counsel to attempt to rehabilitate S.P. after both parties had finished questioning her. Upon defense counsel's request to ask follow-up ques-

tions of S.P., the trial court responded that, while it would not permit defense counsel to recall any prospective juror, it would ask S.P. to clarify an answer pursuant to defense counsel's request.[54] Defense counsel then replied that, "[t]he question [he] had . . . would be that whether [S.P.] would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial. That's it." Thereafter, the trial court asked S.P. about her opinion regarding the death penalty.[55] Defense counsel then assured the trial court that he received the clarification that he desired. Thereafter, the state's attorney moved to excuse S.P. for cause, and the trial court excused S.P.

The record discloses that the trial court permitted defense counsel to rehabilitate S.P., albeit through the trial court. After the trial court questioned S.P., defense counsel stated that the trial court's inquiry was "[a]ccceptable" to him. Thus, because defense counsel was able to rehabilitate S.P. through the trial court's follow-up inquiry, we reject the defendant's claim.

---

[54] The trial court stated: "My practice is that I don't allow the recalling of prospective jurors by the attorneys. However, if there is a question that the court feels ought to be clarified, the way this court reacts is that if I get the question, I will bring the [prospective] juror in and I will ask the question. That's what I will do. . . . Just tell me the question you want me to ask her."

[55] The trial court questioned S.P. as follows:

"The Court: . . . What I'm trying to determine is while you're sitting there you've also expressed to us what your feelings are against capital punishment and the death penalty, right?

"[S.P.]: Yes.

"The Court: Now, having that expression, your feelings that you have indicated for us, would you vote against the death penalty . . . .

"[S.P.]: Yes.

* * *

"The Court:—without regard to the consideration of the evidence developed and everything in the case? Would it just be—Your decision would be based—based upon your feelings of the death penalty?

"[S.P.]: Yes. It would have to be. . . . It's a moral issue for me."

The defendant also contends that his "right to explore fully . . . whether [venirepersons] believed the facts of the case to be tried to be so horrendous that they could not consider the proposed mitigating factors," was violated when the trial court sustained the state's attorney's objection to a question that defense counsel had posed to S.P. We find no merit to this contention.

The state's attorney had objected to what he deemed to be a "confusing question" through which defense counsel asked S.P. whether she would be able to return a verdict indicating that the jury had found an aggravating factor to have existed, "[e]ven though [she is] opposed to the death penalty . . . ." After the trial court had sustained the objection because "it was not an accurate representation of what the process is and . . . I don't want jurors to think of the process one way and then the court instructs them as to another way," defense counsel resumed his questioning of S.P. Specifically, defense counsel asked S.P. whether she would "openly listen to mitigating factors," to which S.P. responded, "Absolutely."

The trial court's ruling sustaining the state's attorney's objection notwithstanding, the record reveals that defense counsel asked S.P. whether she would consider mitigating factors and received an unequivocal and affirmative answer to that question. Accordingly, because S.P. clearly indicated that she could consider the existence of mitigating factors, we reject the defendant's claim.

C

Evidentiary Rulings

The defendant next claims that certain evidentiary rulings of the trial court were improper. Specifically, the defendant claims that the trial court improperly: (1) permitted the physician who conducted the autopsy

of the victim to testify that, in his fifty cases involving a child's death caused by blunt force trauma, this case was the most severe; (2) allowed the state to introduce into evidence the defendant's written confession; (3) precluded defense counsel from arguing that the state had failed to call witnesses to rebut the defendant's demonstration of how the crime occurred; (4) allowed Lieutenant O'Leary to testify that he had decided to interview the defendant after speaking with the victim's sister; and (5) allowed a neighbor of the victim to testify that she saw bruises on the victim's sister on the date of the victim's death. In response, the state claims that the trial court properly exercised its discretion with respect to the foregoing evidentiary rulings. We address each claim in turn.

Our analysis of the defendant's evidentiary claims is based on well established principles of law. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 354–55, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003); accord *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).

1

## Expert Testimony Regarding the Severity of the Victim's Injuries

The following facts are relevant to the defendant's claim. Prior to trial, the defendant filed a motion in limine to exclude, inter alia, testimony from any medical examiners or treating physicians that drew a comparison between the victim's injuries and any injuries that they had observed in other cases or testimony regarding their personal opinions about their feelings upon observing the victim. Subsequently, the trial court ruled on the defendant's motion before Ira Kanfer, the physician who performed the autopsy of the victim, testified. The trial court concluded that treating physicians or medical examiners who testified would not be permitted to express their opinions that this case was the worst case of numerous cases involving children who had died as a result of blunt force trauma that they had seen during their careers. The trial court permitted such experts to testify, however, regarding the nature of the injuries that the victim had sustained. The state complied with the trial court's order during direct examination of Kanfer and refrained from asking Kanfer to compare the victim's injuries to any injuries that he had observed in other cases in which he had been involved. Thereafter, during cross-examination, defense counsel asked Kanfer how many of the 2500 autopsies he previously had performed involved children who had died of blunt force trauma. In response, Kanfer testified that "[d]ozens and dozens" had involved children who died as a result of blunt force trauma. In addition, during cross-examination, defense counsel inquired as to Kanfer's pretrial hearing testimony that, prior to her death, the victim had been in a coma for two days. Kanfer admitted on cross-examination that his prior testimony regarding the victim being in a coma was mistaken.

Subsequently, before redirect examination of Kanfer, defense counsel expressed his concern, outside the presence of the jury, that Kanfer's testimony regarding how many autopsies he had performed involving children who had died as a result of blunt force trauma would allow the state's attorney to ask Kanfer to compare the severity of the victim's injuries to the injuries of similar victims in other cases in which he had been involved. In response, the trial court expressed its belief that defense counsel had opened the door to the "comparison of injuries" issue when he asked Kanfer how many of the autopsies he had performed had involved children who had died of blunt force trauma. The trial court thus concluded that the state's attorney could delve into this matter during redirect examination. The trial court reaffirmed its earlier ruling that Kanfer would not be permitted to testify that this was the worst case he had ever seen during his career, but concluded that Kanfer could testify as to the severity of the victim's injuries.[56]

Thereafter, Kanfer testified that, during his sixteen years of experience and approximately fifty cases of homicidal blunt force trauma to a child, the present case was "the most severe case" that he ever had seen. In addition, on redirect examination, Kanfer testified

[56] Specifically, the trial court ruled as follows: "Number one, as indicated, the question was asked on cross-examination, the number of children [that Kanfer] has performed autopsies on that died as a result of blunt force trauma. By the offer of proof, there [were] questions asked as to . . . that these were all human agents, they were not accidents. The questions that were asked by [the assistant state's attorney] in the offer of proof involved why this was a—compared to them as to very severe injuries and why they are severe. The prejudicial issue comes into the terms, the description of terms such as horrific and things of that sort which the court has maintained throughout its rulings and that was the request of the offer of proof. I think the questions that [the assistant state's attorney] is posing to this witness and the anticipated answers are within the scope of the redirect based on the questions that have been asked on cross and do not involve any prejudicial terms or remarks."

that the reason that he had been mistaken about the victim being in a coma was that the autopsy was an "extremely stressful event" for him and that "the stress contributed to [his] making [the] error of thinking that the child was in [a] coma for two days . . . ."[57]

On appeal, the defendant claims that the trial court improperly allowed Kanfer to testify that the present case was the most severe that he had observed during his career and that the autopsy was a "stressful event . . . ." Specifically, the defendant claims that the testimony was irrelevant and that its probative value was outweighed by the risk of unfair prejudice. The defendant also claims that the trial court improperly concluded that defense counsel, during cross-examination of Kanfer, had opened the door to the testimony about the severity of the victim's injuries. The state, in response, claims that the evidence that the victim's injuries were the most severe was relevant to the defendant's intent. The state further claims that Kanfer's testimony that the autopsy was stressful was relevant to explain the reason for his prior mistaken testimony. We conclude that the trial court did not abuse its discretion in allowing Kanfer's testimony on redirect examination.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not

---

[57] On the basis of this testimony, defense counsel moved for a mistrial, claiming that Kanfer's testimony created "substantial, irreparable prejudice to the defendant's case." The trial court denied defense counsel's motion.

worthy or safe to be admitted in the proof of the latter.
. . . Evidence is not rendered inadmissible because it
is not conclusive. All that is required is that the evidence
tend to support a relevant fact even to a slight degree,
so long as it is not prejudicial or merely cumulative."
(Internal quotation marks omitted.) *State* v. *Wargo*, 255
Conn. 113, 123–24, 763 A.2d 1 (2000); see also Conn.
Code Evid. § 4-1.

Applying these principles, we conclude that the trial
court did not abuse its discretion when it allowed
Kanfer to testify that, out of approximately fifty cases
that involved a child dying as a result of a blunt force
trauma, the present case was the most severe. As the
state notes, the fact that the victim's injuries were the
most severe that Kanfer had observed was relevant to
the issue of whether the defendant had intended to kill
the victim. In other words, the severity of the victim's
injuries had a tendency to make the existence of a fact,
namely, the defendant's intent to kill the victim, more
probable than it would have been without the evidence.
Thus, the trial court properly determined that Kanfer's
testimony about the severity of the victim's injuries was
relevant. In addition, Kanfer's explanation of the reason
for the error in his prior testimony, namely, because
the autopsy of the victim was a stressful event, was
relevant evidence as it served to rehabilitate his credibil-
ity. See, e.g., *State* v. *Walker*, 214 Conn. 122, 130, 571
A.2d 686 (1990) ("[i]n order to avoid the effect of cross-
examination a witness may be asked for reasons for
acts or conduct on his part, or for inconsistent state-
ments that have been brought out on cross-examina-
tion" [internal quotation marks omitted]).

The defendant next claims that the probative value of
Kanfer's testimony regarding the severity of the victim's
injuries was outweighed by the danger of unfair preju-
dice. "Although relevant, evidence may be excluded by
the trial court if the court determines that the prejudicial

effect of the evidence outweighs its probative value. . . . [T]he trial court's discretionary determination that the probative value of evidence is . . . outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates *undue* prejudice so that it threatens an injustice were it to be admitted. . . . [Accordingly] [t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sandoval,* 263 Conn. 524, 544, 821 A.2d 247 (2003); see also Conn. Code Evid. § 4-3.

We conclude that the trial court properly determined that the probative value of Kanfer's testimony regarding the severity of the victim's injuries was not outweighed by the risk of unfair prejudice. To the contrary, the trial court made it clear to the state that it would not allow Kanfer to use terms or phrases that could be considered highly prejudicial and inflammatory, such as "the worst" case or "most horrific" beating. In our view, the trial court properly weighed the probative value of Kanfer's testimony against the danger of unfair prejudice, and the admission of Kanfer's testimony as to the severity of the victim's injuries was not unduly prejudicial to the defendant. Moreover, it is unlikely that the brief and passing testimony "arouse[d] the emotions of the jur[ors]"; *State* v. *Sandoval,* supra, 263 Conn. 544; especially in light of the numerous autopsy photographs, which illustrated the severity of the victim's injuries, to which the jury was exposed during trial.

The trial court also limited Kanfer's explanation of his prior mistaken statement that the victim had been in a coma for two days. Specifically, during the state's offer of proof, Kanfer testified that the reason he had been mistaken was that, at the time of the autopsy, he had a six month old child and, as a father, found the case to be "extremely disturbing . . . ."[58] Subsequently, the trial court allowed Kanfer to explain his mistake by testifying that the autopsy was a very stressful event, but precluded him from testifying that he was the father of a six month old child. The trial court therefore sought to limit any undue prejudice that might result from Kanfer's testimony and properly weighed the probative value of that testimony against the danger of unfair prejudice. Accordingly, we conclude that Kanfer's testimony that the autopsy was a very stressful event did not result in unfair prejudice to the defendant.

The defendant finally claims that the trial court improperly concluded that defense counsel opened the door to inquiry about the severity of the victim's injuries when he asked Kanfer on cross-examination how many of his cases involved children who had died as a result of blunt force trauma. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even

___

[58] Specifically, Kanfer stated: "I think a reasonable explanation why I made this mistake was that, at the time I did this autopsy on this two year old child, I, myself, had a six month old child and, in addition to being a physician and a medical examiner, I'm also a father, a husband, and it was an extremely disturbing case, [and] my assistant . . . had a daughter similar [in] age to the deceased, and he was also extremely upset due to the nature of . . . the injuries, and it was an extremely stressful situation doing this autopsy. True, we are professionals. True, we are doctors. But we still are fathers, husbands, and I think under those circumstances, it may have caused me to err in my interpretation of what [the detective] had told me."

though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context. . . .

"The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Citations omitted; internal quotation marks omitted.) *State* v. *Graham*, 200 Conn. 9, 13–14, 509 A.2d 493 (1986).

Even if we assume that the defendant is correct in claiming that defense counsel did not open the door to Kanfer's testimony, we conclude that the evidence regarding the severity of the victim's injuries in comparison to the injuries of other victims of blunt force trauma would have been admissible to establish the intent of the defendant when he killed the victim. We note that "[t]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994). In addition, we note that when "the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's

action if proper grounds exist to support it." (Internal quotation marks omitted.) *Kelley* v. *Bonney*, 221 Conn. 549, 592, 606 A.2d 693 (1992). We may "affirm the court's judgment on a dispositive alternate ground for which there is support in the trial court record." (Internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 599, 790 A.2d 1178 (2002). Accordingly, we conclude that the trial court did not abuse its discretion in allowing Kanfer to compare the severity of the victim's injuries to the injuries he had observed in his other cases involving minor victims that had died from blunt force trauma.

2

### Admissibility of the Defendant's Written Confession to the Police

The defendant next claims that the trial court improperly allowed the state to introduce into evidence the defendant's written confession to the police. The defendant contends that the evidence was not authenticated properly. The state claims in response that the evidence properly was authenticated by the police officer who translated it and observed the transcription. We agree with the state.

"Authentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . .

"Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evi-

dence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 233, 733 A.2d 156 (1999). "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a).

Prior to trial, the defendant filed a motion in limine to exclude his written statement to police, claiming that it could not be authenticated properly. The trial court denied the motion, concluding that the document properly was authenticated. Thereafter, the state's attorney offered the document through Officer Velez, the bilingual police officer who had translated from English to Spanish, and then from Spanish to English, for the defendant and Lieutenant Ricci. Velez testified regarding the process through which the police had taken the defendant's statement. Specifically, Velez testified that Ricci would ask him the question in English, and Velez would, in turn, translate the question into Spanish and ask the defendant. The defendant then would answer the question in Spanish, and Velez would translate the defendant's answer into English for Ricci, who then would type the answer into the computer. In addition, the answers would appear on the computer screen, and Velez would read what Ricci had typed. After the defendant finished giving his statement, Velez read it to him in Spanish, and the defendant signed it. In addition, Velez identified the statement that the state's attorney sought to introduce as the statement that the defendant had given to the police on the night of his arrest.

With this background in mind, we conclude that the trial court did not abuse its discretion in determining that the state's attorney properly authenticated the written statement that the defendant had given to the police on the night of his arrest. There was sufficient evidence

from which the trial court reasonably could conclude that the document was what the state claimed it to be, namely, the defendant's written confession.

The defendant relies, however, on our decision in *State* v. *Rosa*, 170 Conn. 417, 426, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976), to support his claim that the statement was not authenticated properly. In *Rosa*, the defendant, Jose Miguel Rosa, challenged the trial court's denial of his motion to suppress an oral confession that he had given to a police officer after his arrest for his involvement in a murder. Id., 424. Rosa gave his oral confession to police after giving a written confession that was deemed inadmissible by this court because the written confession was not authenticated. Id., 426–27. Specifically, a few hours after Rosa had been arrested, he told the police that he was prepared to make a formal statement. Id., 421. A Spanish speaking officer thereafter read Rosa his *Miranda* warnings, in Spanish and in English, from a printed form, which Rosa signed. See id. The defendant then gave his statement in Spanish, and the Spanish speaking officer translated the statement to English for another officer, who typed the statement in English. Id. When the other officer finished typing the statement, the Spanish speaking officer read it back to Rosa in Spanish, and Rosa signed the document. See id., 421–22.

In discussing Rosa's challenge to the admission of his subsequent oral statement, we concluded that the trial court properly suppressed the written statement because the state had not established that the statement was authenticated properly. Id., 426–27. Specifically, we stated: "The written confession was an extrajudicial statement offered by the state for the truth of its contents. As such, it required proper authentication, which the state failed to establish, thus justifying [its] exclusion . . . . Evidence concerning the circumstances at the police station revealed that [Rosa] spoke Spanish

which [the Spanish speaking officer] translated into English for the police stenographer, who understood only English and typed the confession in that language. Thus, the stenographer had no way of verifying whether the written statement was an accurate translation. It is clear that the written confession, although properly excluded since it was not authenticated, was not impermissibly obtained . . . ." (Citations omitted.) Id.

Although, at first blush, our decision in *Rosa* may seem to be applicable, we are convinced that it does not control the present case. Although the procedure through which the defendant's statement was obtained is similar to the procedure that the police had employed in *Rosa*, the procedure employed in the present case included additional steps that did not exist in *Rosa*. First, Velez testified that he read what Ricci was typing on the computer screen and confirmed that it was, in fact, what he just had translated. Thus, although Ricci spoke only English, Velez verified that the statement that Ricci was transcribing was an accurate representation of what the defendant had stated in Spanish. Second, Velez actually testified at the defendant's trial, thereby subjecting himself to cross-examination regarding both his translation and his identification of the document as the statement that the defendant had given on the night of his arrest. In addition, the defendant never had challenged—and does not do so on appeal— Velez' ability as a translator. Accordingly, the facts of the present case are distinguishable from the facts of *Rosa*, and the trial court did not abuse its discretion in concluding that the defendant's written statement properly was authenticated. See *Commonwealth* v. *Colon*, 408 Mass. 419, 427–28, 558 N.E.2d 974 (1990) (concluding that statement that had been translated from Spanish to English properly was authenticated after translating officer testified as to fairness and accu-

rateness of statement and was subject to cross-examination).

3

Sustaining of Objection During Defense
Counsel's Closing Argument

The defendant next claims that the trial court improperly sustained the objection of the state's attorney during defense counsel's closing argument. During closing arguments, defense counsel suggested that the jury should credit the testimony of the defendant's medical expert, Louis Roh, a forensic pathologist, rather than the testimony of Ira Kanfer, the state's medical expert, because the state had failed to call additional experts to rebut Roh's testimony. The state's attorney objected to this line of argument, claiming that the state was not required to call rebuttal witnesses. The trial court sustained the objection.

Upon review of the record, there is nothing to persuade us that the trial court abused its broad discretion in sustaining the state's attorney's objection. As the state notes, the state is not required to call rebuttal witnesses; the state may choose to rely on the testimony adduced during its case-in-chief. Thus, the trial court did not abuse its discretion in sustaining the objection of the state's attorney.

In support of his claim, however, the defendant relies on *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). In *Malave*, we abandoned the missing witness rule in criminal cases; id., 730, 738; which previously had allowed the trial court to instruct the jury that it could draw an adverse inference from the failure of a party to produce an available witness whom the party naturally would have called to testify. Id., 728–29. In abandoning the missing witness rule, however, we

specifically noted that counsel was "not prohibit[ed] . . . from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case." Id., 739. *Malave* is inapposite to the facts of the present case, however, inasmuch as defense counsel sought to comment on the failure of the state to call a witness in rebuttal of the defense. In other words, the state's medical expert, namely, Kanfer, testified during the state's case-in-chief. Defense counsel therefore was not seeking to comment on the absence of a witness but, instead, was seeking to comment on the absence of an *additional* rebuttal witness.

The defendant also relies on *Ruiz* v. *Hamburg-American Line*, 478 F.2d 29, 32 (9th Cir. 1973). In *Ruiz*, the third party plaintiff, Hamburg-American Line (Hamburg), sought indemnification from Jones Stevedoring Company (Jones), the third party defendant. Id., 30. During trial, the district court denied Hamburg's motion for a continuance in order to seek rebuttal witnesses to address what Hamburg characterized as surprise witnesses produced by Jones. Id., 31. Thereafter, during closing arguments, counsel for Jones repeatedly referred to the fact that Hamburg had failed to call rebuttal witnesses. Id., 33. In addressing Hamburg's claim on appeal that counsel's remarks were inappropriate in view of the trial court's denial of Hamburg's motion for a continuance, the Ninth Circuit Court of Appeals stated: "*Although generally comment on the failure to call available rebuttal witnesses is proper,* under these circumstances . . . we are convinced that the judgment cannot stand." (Emphasis added.) Id., 34. The defendant relies on this brief passage to support his claim that defense counsel's comment regarding the state's failure to call rebuttal witnesses was proper.

We first note that the court's statement in *Ruiz* was dictum in that it had no bearing on the ultimate outcome of the case. Moreover, to permit comment on the failure of a party to call rebuttal expert witnesses would be contrary to our decision in *Malave*, in which we stated that comment on the absence of a witness is proper "insofar as that witness' absence *may reflect on the weakness of the opposing party's case.*" (Emphasis added.) *State* v. *Malave*, supra, 250 Conn. 739. In our view, the failure of the state to call an expert witness to rebut Roh's testimony did not reflect on a weakness in the state's case. Rather, the state merely sought to conserve judicial time and resources by relying on Kanfer's testimony during its case-in-chief. Accordingly, we reject the defendant's claim.

4

Admission of Lieutenant O'Leary's Testimony

The defendant next claims that the trial court improperly allowed O'Leary to testify that, after speaking with Crystal Tellado, the victim's three year old sister, at the apartment located at 418 Mill Street, he asked the defendant to come to the police station in order to investigate the victim's death further.[59] Specifically, the defendant claims that, because O'Leary was allowed to

---

[59] The following colloquy occurred at trial:

"[State's Attorney]: Good afternoon, Lieutenant O'Leary. I believe prior to lunch where we left off is that you were down . . . on Mill Street at the apartment there?

"[O'Leary]: Yes, sir.

"[State's Attorney]: And you viewed Crystal Tellado?

"[O'Leary]: Yes, sir.

"[State's Attorney]: And did you have a conversation with Crystal Tellado?

"[O'Leary]: Yes, sir.

"[State's Attorney]: And based on that conversation what did you do next?

"[O'Leary]: I asked [the defendant] through the interpreter, [Officer] Velez, if he would accompany us to the Waterbury police department as we were investigating injuries to [the victim], and he agreed to come with us voluntarily."

testify regarding this matter, the jury reasonably could have inferred that something the victim's sister had said caused the police to want the defendant to come to the police station. The defendant contends that O'Leary's testimony, which implied what the victim's sister had told O'Leary, constituted inadmissible hearsay and violated the defendant's constitutional right to confront the witnesses against him. The state contends, in response, that the trial court properly allowed O'Leary's testimony because the statement of the victim's sister was not offered for its truth but, rather, to show the effect that it had on the listener, namely, O'Leary. We reject the defendant's claim.

"An out-of-court statement is hearsay when it is offered to establish the truth of the matters contained therein. . . . A statement offered solely to show its effect upon the hearer, [however], is not hearsay." (Citations omitted; internal quotation marks omitted.) *State v. Cruz*, 212 Conn. 351, 356–57, 562 A.2d 1071 (1989). In *Cruz*, this court rejected the claim of the defendant, Jose L. Cruz, that certain testimony of a police officer contained inadmissible hearsay. See id., 357. In *Cruz*, the police officer testified at trial that, after he interviewed several unidentified parties at the scene of a shooting, he sought a Hispanic male whose street name was "Cheo." Id., 356. Cruz claimed that the trial court improperly had allowed the police officer to testify concerning the information that the officer had received from several unidentified parties because such testimony contained inadmissible hearsay. See id.

In *Cruz*, we noted that no testimony actually was elicited as to anything Cruz did or was accused of doing. Id., 357. Specifically, we explained that, had the police officer "been permitted to testify as to the specific contents of [the out-of-court] conversations, that testimony would have been inadmissible." Id. We observed, however, that the state "offered [the officer's] testimony

not to identify [Cruz] as being involved in the shooting, but for the limited purpose of explaining the [officer's] reasons for instituting a search for [a] Hispanic male [named] Cheo. Thus, [the officer's] testimony [was] not barred by the hearsay rule. . . . Furthermore, because the [officer's] testimony . . . was offered for a non-hearsay purpose and [Cruz] had a full opportunity to cross-examine [the officer], [Cruz'] sixth amendment right to confront the witnesses against him was not violated." (Citations omitted.) Id.

We find the reasoning of *Cruz* persuasive. As in *Cruz*, the officer in the present case, namely, O'Leary, did not testify as to anything the victim's sister actually had said to him. Indeed, the trial court precluded O'Leary from testifying as to the victim's sister's statement, which she made in response to questioning about the bruises on her leg, that "[the defendant] did it." In addition, the state offered the testimony of O'Leary not for the purpose of identifying the defendant as the perpetrator of the victim's death or the injuries of the victim's sister, but for the limited purpose of explaining why the police had asked the defendant to accompany them to the police station. O'Leary's testimony, therefore, was not barred by the hearsay rule, and, consequently, the admission of that testimony did not violate the defendant's right to confront the witnesses against him. See *Tennessee* v. *Street*, 471 U.S. 409, 418, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985) (admission of out-of-court statement for "nonhearsay" purposes "raises no Confrontation Clause problems").

5

## Admission of Neighbor's Testimony

The defendant's final evidentiary claim is that the trial court improperly allowed Juana Rivera, a neighbor of the victim, to testify that she had seen bruises on the victim's sister on the day of the victim's death.

Specifically, the defendant claims that the testimony was irrelevant and highly prejudicial because its effect was to lead the jury to conclude that the defendant had abused the victim's sister.

Rivera testified that, on the day of the victim's death, she saw Virginia Quintero carry the victim's sister out of Quintero's apartment. When asked to describe the victim's sister when she saw her, Rivera testified that she had bruises on her.[60] Defense counsel objected to the testimony, claiming that it was irrelevant. The trial court overruled the objection, concluding that Rivera's testimony related to her observations.

We conclude, upon review of the record, that the trial court did not abuse its wide discretion in allowing Rivera's testimony. In particular, it was highly unlikely that the testimony had the effect of leading the jury to conclude that it was the defendant who had caused the bruises on the victim's sister in light of the fact that Rivera was the first witness; the jury had no other information that would have led it to conclude that it was the defendant who had inflicted the bruises on the victim's sister. Accordingly, the trial court's decision to allow Rivera to testify as to her observations on the day of the victim's murder was not an abuse of discretion.

D

Additional Evidentiary Claims Implicating the Defendant's Right to Present a Defense

The defendant next claims that certain of the trial court's evidentiary rulings deprived him of his right to present a defense. Specifically, the defendant claims that the trial court improperly precluded: (1) him from testifying regarding his escape from police custody; (2)

---

[60] Rivera also testified that the victim's sister looked "[l]ike she was abused." The trial court struck this testimony, however, and instructed the jury to disregard it.

defense counsel from questioning the defendant's mother about the details of her conviction and precluded the defendant from obtaining certain department of correction records relating to her release from prison; (3) defense counsel from questioning certain witnesses concerning specific instances of conduct bearing on their character for untruthfulness; (4) defense counsel from introducing certain opinion evidence regarding Lieutenant O'Leary's veracity; (5) certain testimony of Maria Hernandez, Virginia Quintero's aunt; (6) Louis Roh, a forensic pathologist, from testifying that a woman could have killed the victim; (7) Officer Michael Dimaria from testifying about statements that the defendant had made in connection with a prior arrest; and (8) defense counsel from eliciting testimony from Quintero's attorney concerning whether anyone in the office of the state's attorney had discussed the prospect of Quintero receiving favorable treatment in return for her testimony in the present case.

We begin our analysis of the defendant's claims with a review of the governing legal principles. "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . .

"A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . Thus, our law is clear that a defendant may introduce

only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Citations omitted; internal quotation marks omitted.) *State* v. *Sandoval,* supra, 263 Conn. 541–42.

In addition, we review the defendant's claims under the abuse of discretion standard that we previously explained in this opinion. See, e.g., id., 543. "Accordingly, the trial court's ruling is entitled to every reasonable presumption in its favor . . . and we will disturb the ruling only if the defendant can demonstrate a clear abuse of the court's discretion." (Internal quotation marks omitted.) Id.

1

### Testimony Regarding the Defendant's Escape from Police Custody

The defendant claims that the trial court improperly precluded him from testifying regarding his escape from police custody. Specifically, the defendant claims that the testimony was relevant to show his state of mind at the time he signed his statement in which he admitted to killing the victim and that the testimony tended to corroborate his testimony that he signed the statement out of ignorance because he was willing to do anything to leave the police station. The state claims, in response, that no evidence was offered to establish a connection between the defendant's signing of the confession and the subsequent escape, and, therefore, the evidence was not relevant. In addition, the state contends that, even if the exclusion of such evidence was improper, it nevertheless was harmless.

The following facts are relevant to the defendant's claim. After being questioned by the police and giving statements, the defendant escaped from the Waterbury police department the day after the victim's death. The

defendant was apprehended the next day, when he was arrested for escape in the first degree, and brought back to the police station. Thereafter, the defendant gave a statement to the police admitting to the escape.

At trial, the defendant testified before the jury that, while at the police station on the night of the victim's death, he was nervous and wanted to leave; he also testified that when he asked to leave, the officers gave him some papers and said he could leave when he signed them. The defendant testified that he signed the papers because he wanted to leave. Thus, the defendant's claim was that the only reason he signed the statements in which he confessed to killing the victim was because he was desperate to leave the police station. After giving this testimony, the defendant sought to testify regarding his escape. The state's attorney objected to any testimony regarding the escape, however, claiming that it was irrelevant and that it involved a collateral issue. Defense counsel claimed that the evidence was relevant to show that the defendant was desperate to leave the police station in order to obtain drugs and that he would have signed anything, including a confession, just to be able to leave. The trial court sustained the objection and precluded any evidence as to the escape, concluding that it was irrelevant and lacked a proper foundation.

As we discussed previously, "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worth or safe to be admitted in the proof of the latter. . . . Evidence is not rendered

inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not [unfairly] prejudicial or merely cumulative." (Internal quotation marks omitted.) Id., 542–43; see also Conn. Code Evid. § 4-1.

We conclude that evidence of the defendant's escape from police custody was at least minimally relevant to the defendant's claimed state of mind at the time he signed his confession. Thus, the fact that the defendant escaped from police custody tends to support the relevant claimed fact that the only reason that he signed the confession was that he was desperate to leave the police station in order to find drugs. Because evidence of the defendant's escape was relevant to his state of mind at the time he signed his confession admitting to killing the victim, the trial court improperly precluded the defendant from testifying regarding his escape.

We conclude that, although the exclusion of the evidence of escape was improper, such impropriety constituted harmless error. We first note that the evidence of escape enjoyed little probative value. The state's attorney represented, and defense counsel did not dispute, that the escape occurred nearly twelve hours after the defendant had signed the confession. Thus, the connection between the defendant's state of mind at the time that he signed the confession and his state of mind twelve hours later when he escaped is, at best, tenuous. Moreover, the defendant never testified that he was suffering from the effects of withdrawal or that he was under the influence of drugs when he signed the confession. Instead, the defendant merely testified that he was desperate to leave the police station.

Second, if the trial court had permitted the defendant to testify regarding his escape, the state would have been allowed to seek an instruction to the jury that

the defendant's escape demonstrated the defendant's consciousness of guilt.[61] Accordingly, any benefit that the defendant could have derived from testifying about his escape likely would have been negated by an instruction regarding consciousness of guilt. Finally, we note that the state presented substantial evidence of the defendant's guilt. Accordingly, we conclude that the trial court's exclusion of the defendant's testimony about his escape from police custody, although improper, was harmless.

2

### Evidence Relating to the Defendant's Mother's Felony Conviction

The defendant next claims that the trial court improperly precluded Maria Ocasio, the defendant's mother, from testifying about the details of her felony conviction. Specifically, the defendant claims that the state opened the door to defense counsel's questions regarding the details of Ocasio's conviction, which resulted from her actions during the defendant's escape. The defendant also contends that the trial court improperly precluded defense counsel from introducing certain department of correction records establishing the date of Ocasio's release from prison. The state claims that the trial court properly excluded this evidence.

---

[61] As we stated in State v. Kelly, 256 Conn. 23, 770 A.2d 908 (2001), "[i]t is a well settled evidentiary principle that flight, when unexplained, tends to prove a consciousness of guilt . . . ." (Internal quotation marks omitted.) Id., 54.

At trial, defense counsel acknowledged that, if evidence of the defendant's escape were admissible, the state would be permitted to have the trial court instruct the jury on the defendant's consciousness of guilt. Specifically, defense counsel acknowledged: "We know consciousness of guilt escaping from the police department and we're not going to stop that from coming in. We'll never be able to stop that from coming in under the existing law in the state of Connecticut alone . . . and there's no doubt in anyone's mind, I would think, that the state would have every opportunity to bring that in, and if the defendant were going to object during the state's case-in-chief, [he] wouldn't have a leg to stand on."

Ocasio testified, during direct examination by defense counsel, that she had been convicted of hindering prosecution.[62] She also testified that, as a result of that felony conviction, she served time in prison, where her cellmate was Quintero, the victim's mother. She also testified that she was released from prison on January 8, 1999. On cross-examination, Ocasio again testified that she had been "convicted of a felony related to this case, capital felony and murder," that the conviction was for hindering prosecution, that she had served time in prison for her conviction, and that Quintero was her cellmate. Thereafter, defense counsel, outside the presence of the jury, moved to have the trial court reconsider its earlier ruling precluding evidence of the defendant's escape in view of the state's questioning of Ocasio regarding her conviction. See part II D 1 of this opinion. The trial court, however, preserved its earlier ruling excluding evidence of the defendant's escape from police custody.

On appeal, the defendant claims that the trial court improperly precluded Ocasio from testifying about the details of her conviction because the state had opened the door[63] to that subject during cross-examination. The

---

[62] Ocasio also testified that she had been convicted because "[her] son escaped." The trial court struck this testimony, however.

[63] As we noted previously; see part II C 1 of this opinion; "[g]enerally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context. . . .

"The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove

record indicates, however, that the state's attorney merely was reiterating a fact that defense counsel had established during his direct examination of Ocasio, namely, that Ocasio indeed had been convicted of a felony related to the present case. Defense counsel's objection at trial, moreover, was that Ocasio's testimony rendered the evidence of the defendant's *escape* relevant, not, as the defendant claims on appeal, that the state had opened the door to defense counsel's questioning of Ocasio about the details of her *conviction*. Thus, the trial court properly precluded Ocasio from testifying about the details of her conviction of hindering prosecution.

The defendant further claims that the trial court improperly precluded defense counsel from introducing into evidence department of correction records corroborating Ocasio's date of release from prison. During trial, Quintero admitted to sending letters to the defendant from prison, but claimed that she wrote the letters only because Ocasio, her cellmate, had asked her to do so. Defense counsel sought to attack Quintero's credibility by eliciting testimony from Ocasio that, after she had been released from prison, she received letters from Quintero and that Quintero instructed Ocasio to send those letters to the defendant in jail. Specifically, Ocasio testified that she was released from prison on January 8, 1999, and that she received letters from Quintero in February, March and April of that same year with direction to send them to the defendant. Subsequently, defense counsel offered department of correction records that corroborated Ocasio's testimony that she had been released from prison in January, 1999. The

any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Citations omitted; internal quotation marks omitted.) *State* v. *Graham*, supra, 200 Conn. 13–14.

trial court determined that the proffered information was cumulative of Ocasio's testimony and excluded the records.

We conclude that the trial court did not abuse its discretion in precluding defense counsel from introducing the department of correction records into evidence. In the present case, Ocasio testified that she was released from prison in January, 1999, and that she continued to receive letters from Quintero subsequent to that time. The state never challenged that testimony, and there was no other evidence to indicate that Ocasio was released from prison at a different time than that to which she testified. Therefore, the trial court properly excluded the department of correction records as cumulative of Ocasio's testimony. See, e.g., *State* v. *Ramos*, 261 Conn. 156, 180, 801 A.2d 788 (2002).

3

Exclusion of Evidence of Character for Untruthfulness

The defendant next claims that the trial court improperly precluded defense counsel from asking Detective Jones, Lieutenant O'Leary and Officer Velez certain questions concerning specific instances of conduct that, according to the defendant, were probative of their character for untruthfulness. The defendant further claims that, by precluding these questions, the trial court unduly restricted his ability to cross-examine the witnesses against him, in violation of his confrontation rights. We are not persuaded.

"[C]ross-examination is the principal means by which the credibility of witnesses and the truth of their testimony is tested." (Internal quotation marks omitted.) *State* v. *Chance*, 236 Conn. 31, 58, 671 A.2d 323 (1996). "The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination." (Internal

quotation marks omitted.) *State* v. *Barnes*, 232 Conn. 740, 746, 657 A.2d 611 (1995). During cross-examination, "[a] witness may be asked, in good faith, about specific instances of conduct of the witness, *if probative of the witness' character for untruthfulness*." (Emphasis added.) Conn. Code Evid. § 6-6 (b) (1). "The right to cross-examine a witness concerning specific acts of misconduct is limited in three distinct ways. First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the issue of veracity . . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible." (Internal quotation marks omitted.) *State* v. *Chance*, supra, 60; see also Conn. Code Evid. § 6-6 (b), commentary.

In the present case, defense counsel attempted to cross-examine three state's witnesses, namely, Jones, O'Leary and Velez, concerning specific acts of misconduct. First, defense counsel sought to ask the witnesses about the contents of an anonymous letter to the editor that had been published in The Waterbury Observer as the basis of certain acts of misconduct by all three witnesses. Second, with respect to O'Leary, defense counsel attempted to ask O'Leary about certain information contained in an internal affairs report.[64] Third,

---

[64] During defense counsel's offer of proof, the following colloquy occurred outside the presence of the jury:

"[Defense Counsel]: Did you go to Ontario, California, with Trooper Joseph Vokett on a marijuana investigation?

\* \* \*

"[O'Leary]: Yes.

"[Defense Counsel]: Did you tell police officers in Ontario, California, that that marijuana case was related to the murder of a police officer?

"[O'Leary]: No.

"[Defense Counsel]: Did you speak to the Illinois state police . . . an Illinois state police Sergeant Brugermann while you were out in California in connection with that case?

"[O'Leary]: Yes.

defense counsel attempted to ask Velez about an allegation that he had driven a car that contained a stolen

"[Defense Counsel]: Did you tell Sergeant Brugermann that a man they had in custody in Illinois was related to the murder of a police officer— that he was a witness to or that he was present during the murder of a Connecticut state police officer?

"[O'Leary]: Absolutely not.

"[Defense Counsel]: Did you speak to Trooper Heminghouse of the Illinois state police?

"[O'Leary]: Yes.

"[Defense Counsel]: And did you tell him that the marijuana case that you were working on in California was connected to the case that they had in Illinois and that it was related to the murder of a police officer?

"[O'Leary]: Absolutely not.

"[Defense Counsel]: Did you talk to Deputy Sheriff Krieke . . . also an Illinois police authority, during the course of that time you were investigating this marijuana case?

"[O'Leary]: No, I don't think so.

"[Defense Counsel]: You didn't talk to him at all?

"[O'Leary]: No.

"[Defense Counsel]: . . . Did you talk to Assistant United States Attorney Susan Wisman about that marijuana investigation and about a man they had in custody in Illinois for marijuana?

"[O'Leary]: Yes, yes I did.

"[Defense Counsel]: Did you tell her that [the] man they had in custody was related to and observed or participated in the execution style murder of a Connecticut state police officer?

"[O'Leary]: Absolutely not.

"[Defense Counsel]: Did you tell any of those four people [namely] Brugermann, Heminghouse, Krieke or Wisman that the person they had in custody was connected to a Jamaican drug organization?

"[O'Leary]: No.

"[Defense Counsel]: That the person they had in custody was connected to the homicide of a police officer in any fashion?

"[O'Leary]: No.

"[Defense Counsel]: That the person they had in custody in Illinois was connected to a wire tap investigation that you had been working on?

"[O'Leary]: No.

"[Defense Counsel]: Do you have a condominium on Cape Cod?

"[O'Leary]: Yeah.

"[Defense Counsel]: Did you go there on January [22] and January [23] of 1996?

"[O'Leary]: Yeah.

"[Defense Counsel]: Did you collect your police pay while you were there in Cape Cod at your condominium?

"[O'Leary]: I'd have to look and see. I don't know."

Defense counsel also asked O'Leary, during the offer of proof, whether he had taken a beeper from a prisoner and used it for his personal use.

engine.[65] The trial court precluded any questions relating to the contents of the anonymous letter to the editor, concluding that the anonymous letter could not serve to establish a good faith basis for cross-examination. In addition, the trial court allowed defense counsel, on cross-examination, to inquire of O'Leary regarding certain information contained in the internal affairs report, but precluded two questions that the trial court deemed to be irrelevant as to O'Leary's character for untruthfulness.[66] Finally, the trial court allowed defense counsel, on cross-examination, to ask Velez one question concerning his alleged use of a car containing a stolen engine.[67]

We are persuaded that the trial court did not abuse its discretion in limiting defense counsel's cross-examination of Jones, O'Leary and Velez. First, we agree with the trial court's conclusion that an anonymous letter to a newspaper editor, without more, does not serve to establish a good faith basis for the cross-examination of a witness regarding alleged prior misconduct; such an examination would constitute nothing more than a fishing expedition. See, e.g., *State* v. *Barnes*, supra, 232 Conn. 749–50 ("[i]t is entirely proper for a court to deny

[65] The trial court allowed defense counsel to make an offer of proof regarding whether Velez once had driven a car that contained a stolen engine. The offer of proof revealed that Velez had driven the car but did not know that the car housed a stolen engine.

[66] The trial court allowed defense counsel to ask, in the presence of the jury, all of the questions that he had asked during his offer of proof except for two. Specifically, the trial court precluded defense counsel from asking O'Leary about his ownership of a condominium in Massachusetts and about O'Leary's use of a prisoner's beeper. See footnote 64 of this opinion. The trial court concluded that these questions were not relevant to O'Leary's character for untruthfulness. Defense counsel chose not to ask the remaining questions before the jury.

[67] The defendant sought to ask Velez two questions, namely, whether he had driven the car and whether he knew the car contained a stolen engine. The trial court permitted defense counsel to ask Velez: "On July [3], 1996, did you drive a car knowing it had a stolen motor in it?" Defense counsel chose not to ask this question before the jury.

a request to present certain testimony that will further nothing more than a fishing expedition . . . or result in a wild goose chase" [citations omitted; internal quotation marks omitted]). Second, with respect to the trial court's limitation of defense counsel's cross-examination of O'Leary and Velez regarding the internal affairs report and the car with the stolen engine, respectively, we conclude that the trial court properly framed the specific questions that it allowed defense counsel to ask in order to ensure that they were probative of the witnesses' character for untruthfulness. For instance, the trial court allowed defense counsel to ask Velez only whether he drove a car *knowing* that it contained a stolen engine because that was the only question that was probative of his veracity. Similarly, the question of whether O'Leary owned a condominium in Massachusetts, in and of itself, had no bearing on O'Leary's character for untruthfulness, and, therefore, the trial court properly precluded it. Accordingly, we conclude that the trial court did not abuse its discretion in restricting the scope of defense counsel's cross-examination of Jones, O'Leary and Velez, and thus the defendant's right to cross-examine the witnesses against him was not unduly restricted.

4

Exclusion of Opinion Testimony Concerning Lieutenant O'Leary's Character for Untruthfulness

The defendant's next claim is that the trial court improperly precluded Richard Lyding from offering his opinion as to O'Leary's character for untruthfulness. We conclude that the trial court did not abuse its discretion.

Defense counsel sought to elicit the opinion testimony of Lyding, a former captain of the Connecticut state police, that O'Leary was untruthful. During

defense counsel's offer of proof, Lyding testified that he became acquainted with O'Leary during an internal affairs investigation that occurred between March, 1996, and June, 1996. Lyding stated that he had conducted a personal interview with O'Leary and O'Leary's attorney during that investigation, which lasted approximately two to three hours. In addition, Lyding testified that he had discussed O'Leary's conduct with other people in the community, including other police officers. Lyding testified that, on the basis of the foregoing investigation, he was able to form an opinion about O'Leary's character for untruthfulness, and that his opinion was that O'Leary was untruthful. Lyding also acknowledged, however, that he had not had any additional contact with O'Leary since 1996. The state's attorney objected to Lyding's testimony regarding his opinion of O'Leary's character for untruthfulness, claiming that defense counsel had not laid a sufficient foundation for such testimony. The trial court precluded Lyding from giving his opinion regarding O'Leary's character for untruthfulness, citing the fact that Lyding's personal contact with O'Leary occurred more than four years prior to the date of trial and the fact that Lyding's opinion would have been based primarily on a single meeting between Lyding and O'Leary.

"The veracity of a witness may be attacked by evidence of the witness' general reputation in the community for veracity. . . . A witness' character for veracity may also be proved by opinion evidence of those who have formed an opinion as to the character of the witness with respect to truth and veracity. . . . Whether a witness has had sufficient contact with a person to be qualified to testify as to a particular character trait is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law. . . . The witness

must be able to testify as to the person's general reputation in the community at the time of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Gould*, 241 Conn. 1, 19–20, 695 A.2d 1022 (1997); see also Conn. Code Evid. § 6-6 (a).

The trial court found that Lyding's only contact with O'Leary had occurred more than four years prior to trial and more than two years prior to O'Leary's participation in the investigation of the victim's death. Moreover, Lyding's opinion primarily was based on a two to three hour interview that was conducted in connection with an investigation of O'Leary's alleged misconduct and at which O'Leary's attorney was present. Under these circumstances, we conclude that the trial court did not abuse its discretion in concluding that defense counsel had not laid an adequate foundation for the admissibility of Lyding's opinion regarding O'Leary's character for untruthfulness. See *State* v. *Gould*, supra, 241 Conn. 20 (opinion regarding witness' veracity properly excluded when one and one-half years had passed between time opinion was formed and time of trial).

5

Exclusion of the Statement that Virginia Quintero's Aunt Had Given to the Police

The defendant claims that the trial court improperly excluded a statement that Maria Hernandez, Quintero's aunt, had given to the police on the night that the victim had died. Specifically, the defendant claims that Hernandez' statement fell within the residual exception to the hearsay rule.

Defense counsel attempted to introduce the statement of Hernandez, who was deceased at the time of trial, through the testimony of Detective Balnis. Defense counsel claimed that the statement that Hernandez had given to the police revealed that Quintero had spoken

to Hernandez on the night that the victim had died and that Quintero had told Hernandez that the victim fell in the shower, hit her head and "breathe[d] in some . . . bath water." Defense counsel claimed that Hernandez' statement was admissible because it revealed an inconsistency in Quintero's earlier testimony that Quintero did not remember talking to Hernandez that night. The state's attorney objected, and the trial court sustained the objection and excluded Hernandez' statement.[68]

Because Hernandez' statement contained an additional level of hearsay, namely, what Quintero had told Hernandez, both Quintero's statement to Hernandez and Hernandez' statement to the police about what Quintero had told her must be independently admissible under a hearsay exception in order for Hernandez' statement to be substantively admissible. See Conn. Code Evid. § 8-7 ("[h]earsay within hearsay is admissible only if *each part of the combined statements is independently admissible under a hearsay exception*" [emphasis added]).

"The residual, or catch-all, exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the tradi-

---

[68] Specifically, the trial court stated: "The information that's being offered here, first of all, the inconsistency in . . . Quintero's testimony has been brought out both by her testimony and by other witnesses. . . . [T]he offer—the court sees it also as a double hearsay issue so, as a result of that, the court feels that . . . this is not a situation where the residual hearsay rule was established. Based on the offer, the court . . . will sustain the objection." In addition, the trial court stated: "This court rules that it doesn't come in under the residual—the only way that this could come in, because it is hearsay, would be under the residual hearsay [exception] and the court feels that it has not been—the necessity factor has not been met . . . ."

tional hearsay exceptions." (Internal quotation marks omitted.) *State* v. *McClendon*, 248 Conn. 572, 583, 730 A.2d 1107 (1999); accord Conn. Code Evid. § 8-9. The requirement of reasonable necessity "is met when, unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or otherwise unavailable, or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources." (Internal quotation marks omitted.) *State* v. *Hines*, supra, 243 Conn. 809; accord Conn. Code Evid. § 8-9, commentary.

We conclude that the trial court did not abuse its discretion in excluding Hernandez' statement. Quintero's first written statement to the police, in which she claimed that the victim had died when she fell in the shower and that the victim had thrown up water already was before the jury. Because the fact that Quintero first claimed that the victim's death had been an accident already was before the jury, it was unnecessary to introduce Quintero's similar statement to Hernandez through the admission of Hernandez' statement. See Conn. Code Evid. § 8-9 (hearsay statement admissible under residual exception to hearsay rule only "if the court determines that . . . there is a reasonable necessity for the admission of the statement"). Furthermore, the trial court properly excluded Hernandez' statement because it contained another level of hearsay, namely, Quintero's statement to Hernandez, that was not independently admissible under an exception to the hearsay rule.

6

Exclusion of the Testimony of the
Defendant's Expert Witness

The defendant next claims that the trial court improperly precluded the defendant's expert, Louis Roh, a

forensic pathologist, from testifying that a woman could have caused the fatal injury to the victim's head. The defendant specifically claims that Roh's testimony corroborated his theory that Quintero, rather than the defendant, had killed the victim.

During direct examination, defense counsel asked Roh the following question: "The injury that you've described as the cause of death, the blow to the right forehead which caused the left side subdural hematoma, would it take a man to inflict that injury or could a woman inflict that injury?" Before Roh could answer, the state's attorney objected to the question, and the trial court sustained the objection without further explanation. Defense counsel made no further offer of proof and did not ask Roh any further questions with respect to that subject.

The record in the present case does not reveal how Roh would have answered the question or what details he would have provided in answering the question. "It is therefore impossible to determine whether those details were so important to the defendant's case that their preclusion . . . impaired his constitutional rights." *State* v. *Smith*, 219 Conn. 160, 164, 592 A.2d 382 (1991). Moreover, even if the trial court had allowed Roh to answer and his answer would have been that a woman could have caused the victim's fatal injury, his answer would have been nothing more than speculation in that there was no foundation laid for the basis of his answer. Accordingly, the trial court did not abuse its discretion in precluding Roh from giving his opinion regarding whether a woman could have caused the victim's fatal injury.

7

Exclusion of the Testimony of Officer Michael Dimaria

The defendant's next claim is that the trial court improperly excluded the testimony of Officer Dimaria

of the Waterbury police department. At trial, Dimaria testified that he had arrested the defendant in April, 1998, for possession of heroin. Defense counsel also sought to elicit additional testimony from Dimaria regarding a certain statement that the defendant had made during that arrest. Defense counsel claimed that this statement was relevant to the defendant's claim that he was addicted to heroin during the months prior to the victim's death and that it fell within the residual hearsay exception. See Conn. Code Evid. § 8-9. The trial court excluded the statements as inadmissible hearsay, however.[69]

On appeal, the defendant claims that Dimaria should have been allowed to testify regarding the statement that the defendant had made to him during the arrest because the statement concerned the defendant's then-existing physical condition or, alternatively, constituted a spontaneous utterance. See Conn. Code Evid. § 8-3 (2) and (3). Our review of the record indicates, however, that the defendant did not raise these claims before the trial court. "Only in the most exceptional circumstances . . . will this court consider a claim that was not raised [below]. . . . Such exceptional circumstances may occur [when] a new and unforeseen constitutional right has arisen between the time of trial and appeal or [when] the record supports a claim that a litigant has been deprived of a fundamental constitutional right and a fair trial. . . . An exception may also be made [when] consideration of the question is in the interest of public welfare or of justice between the parties." (Citations omitted; internal quotation marks omitted.) *Skrzypiec* v. *Noonan*, 228 Conn. 1, 14–15, 633 A.2d 716 (1993). In the present case, the defendant has not established the existence of any exceptional circumstances warranting

---

[69] Dimaria's testimony would have revealed that the defendant was holding a glassine bag when he was arrested for possession of heroin and that he stated to Dimaria that he needed to use the bag because he was sick.

our review of his claim. Accordingly, we decline to review the merits of the defendant's claim.[70]

## 8

### Exclusion of Certain Testimony of Virginia Quintero's Attorney

The defendant claims that the trial court improperly sustained an objection to a question posed by defense counsel to Anthony Wallace, Quintero's attorney at the proceeding to terminate her parental rights. We are not persuaded.

During trial, defense counsel offered the testimony of Wallace as proof that Quintero expected consideration from the state in her own criminal case[71] in return for her testimony against the defendant. After an offer of proof, the trial court allowed Wallace to testify, but limited his testimony to what he had told Quintero as it related to any consideration that she may have received as a result of her testimony.[72] Thereafter,

---

[70] Even if we were to address the merits of the claim and assume that the testimony improperly was excluded, the exclusion would be harmless. The statement that the defendant sought to admit was relevant to the defendant's drug use during the months prior to the victim's death. There already was evidence before the jury, however, of the defendant's drug use. Specifically, the defendant previously had testified that he was addicted to heroin. Accordingly, the statement that the defendant was sick and needed the drugs he was found in possession of merely would have been cumulative of other evidence admitted at trial.

[71] Quintero had been charged with certain crimes in connection with the victim's death. See part II E 2 of this opinion.

[72] Specifically, the trial court stated: "The court's ruling is as follows: Mr. Wallace can testify. However, the scope of his testimony is very limited. It's limited to the following as it relates to what . . . he told . . . Quintero as it relates to any consideration that she may receive if she were to testify. It's not to address who was there, what happened next, things of that sort. It's limited on that focus of what he said to her as to any consideration that she may receive if she were to testify. The court feels that that goes to her state of mind which the jury ought to be able to hear as it relates to interest, motive and or bias." Subsequently, the trial court stated: "The only relevance that the court sees is what [it has] ruled: Did [Wallace] represent to [Quintero] that there were going to be any considerations made for her testimony. That's the relevancy. If [the state's attorney] wants to inquire as to where

defense counsel asked Wallace if he had discussed with Quintero the fact that she could receive any consideration for her testimony against the defendant, to which Wallace answered affirmatively. Wallace further testified that he discussed with Quintero that, if she pleaded to a certain charge, she might receive consideration for her testimony at her subsequent sentencing. On cross-examination, Wallace acknowledged that no one in the office of the state's attorney told him that there would be any consideration for Quintero's testimony against the defendant. On redirect examination, defense counsel attempted to ask Wallace whether anyone had discussed the possibility of any consideration for Quintero if she testified against the defendant, and the trial court sustained the objection of the state's attorney to that question on the ground that it was "beyond the scope of [its earlier] ruling."

We conclude that the trial court did not abuse its discretion in precluding Wallace from testifying regarding whether anyone had discussed with him the possibility that Quintero would receive any consideration in return for her testimony against the defendant. The purpose of Wallace's testimony was to illustrate Quintero's bias or motive for testifying against the defendant. Thus, the trial court allowed Wallace to testify that he had communicated *to Quintero* the possibility that she could receive some consideration for her testimony. Whether anyone else had told *Wallace* that Quintero could receive consideration simply was irrelevant to *Quintero's* bias or motive for testifying. In addition, the trial court properly allowed the state, on cross-examination, to rebut the implication that the source of Wallace's statement to Quintero that she could receive some consideration for her testimony against the defendant, was the office of the state's attorney. Accordingly,

he got that term of considerations, he can because that falls within the scope of considerations."

the trial court did not abuse its discretion in sustaining the state's attorney's objection to defense counsel's question regarding whether anyone had discussed with Wallace the possibility that Quintero would receive consideration for purposes of her sentencing if she testified against the defendant.

9

Cumulative Error

The defendant's final evidentiary claim is that, when viewed cumulatively, the trial court's alleged evidentiary improprieties constitute a violation of his constitutional rights, including the right to testify in his own behalf, the right to confront the witnesses against him, the right to present a defense and the right to be free from cruel and unusual punishments. After a thorough review of the record and consideration of all of the defendant's claims, we disagree.

In the present case, none of the defendant's claims of impropriety constituted a violation of any constitutional right. The defendant contends, however, that these claims should be aggregated to form a separate constitutional claim that provides an alternative basis for relief. We rejected a similar argument in *State v. Robinson*, 227 Conn. 711, 746–47, 631 A.2d 288 (1993), and, therefore, reject the defendant's claim in the present case. As we explained in *Robinson*, "[w]e decline to create a new constitutional claim in which the totality of alleged constitutional error is greater than the sum of its parts." (Internal quotation marks omitted.) Id., 747. Thus, because we have found no evidentiary improprieties, the combined claims cannot give rise to a constitutional violation.

E

Jury Instructions

The defendant claims that the trial court, in instructing the jury at the conclusion of the guilt phase,

improperly: (1) declined to instruct the jury on the offense of manslaughter by omission; (2) declined to instruct the jury on accessory liability with respect to Virginia Quintero's testimony; (3) declined to instruct the jury that a finding that the defendant provided medical assistance to the victim could support an inference that the defendant lacked the intent to kill the victim; and (4) instructed the jury as to the proper meaning of reasonable doubt. The state claims that the trial court properly instructed the jury.

In reviewing all the defendant's claims regarding the trial court's jury instructions, we utilize a well established standard of review. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rule of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 714, 756 A.2d 799 (2000).

1

Manslaughter by Omission Instruction

The defendant claims that the trial court inadequately charged the jury with respect to its manslaughter instruction. Specifically, the defendant claims that the trial court improperly declined to instruct the jury regarding manslaughter by omission. See General Stat-

utes § 53a-55 (a) (3).[73] In response, the state contends that the trial court properly determined that the defendant was not entitled to such an instruction. We agree with the state.

"This court repeatedly has recognized that [t]here is no fundamental constitutional right to a jury instruction on every lesser included offense . . . . *State* v. *Whistnant*, 179 Conn. 576, 583, 427 A.2d 414 (1980). Rather, the right to such an instruction is purely a matter of our common law. A defendant is entitled to an instruction on a lesser [included] offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant [not guilty] of the greater offense but guilty of the lesser. Id., 588." (Internal quotation marks omitted.) *State* v. *Corbin*, 260 Conn. 730, 744–45, 799 A.2d 1056 (2002).

"In considering whether the defendant has satisfied the requirements set forth in *State* v. *Whistnant*, supra, 179 Conn. 588, we view the evidence in the light most favorable to the defendant's request for a charge on the lesser included offense. . . . On appeal, an appellate court must reverse a trial court's failure to give the

---

[73] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

requested instruction if we cannot as a matter of law exclude [the] possibility that the defendant is guilty only of the lesser offense." (Internal quotation marks omitted.) *State* v. *Corbin,* supra, 260 Conn. 745.

In the present case, the defendant submitted to the trial court a request to charge, which contained proposed instructions for several lesser included offenses, including manslaughter in the first degree under § 53a-55 (a) (1) and (3). With respect to manslaughter in the first degree under § 53a-55 (a) (3), the defendant requested, in addition to an instruction regarding conduct evincing extreme indifference to human life, an alternative instruction, in accordance with this court's decision in *State* v. *Miranda,* 245 Conn. 209, 226, 715 A.2d 680 (1998),[74] that the defendant could be found guilty of manslaughter in the first degree for failing to protect the victim from abuse inflicted by another person.[75] At the charging conference, the trial court heard arguments from both the state's attorney and defense counsel regarding the propriety of instructing the jury on manslaughter by omission in accordance with this court's decision in *Miranda.* Thereafter, the trial court concluded that, although it would charge the

[74] In *State* v. *Miranda,* supra, 245 Conn. 209, we concluded that the defendant, Santos Miranda, who had established a familial relationship with the victim's mother and her children and who had assumed the role of a father in the victim's life, "assumed . . . the same legal duty to protect the victim from the abuse as if he were, in fact, the victim's guardian." Id., 226. In addition, we concluded that "to require [Miranda] as a matter of law to take affirmative action to prevent harm to the victim or be criminally responsible imposes a reasonable duty." Id. We recognize, however, that Miranda was convicted of assault in the first degree rather than manslaughter.

[75] Specifically, the defendant requested the following charge: "If you find from the evidence that the defendant has assumed the role of parent then you may also find that he had a duty under the law to protect the child. If he failed to protect the child from abuse inflicted by another, then you may consider whether that failure to protect constitutes reckless conduct demonstrating an extreme indifference to human life, and if so, whether the defendant is guilty of manslaughter in the first degree."

jury on the lesser offense of manslaughter in the first degree, it would not instruct the jury on manslaughter by omission. Specifically, the trial court concluded that the second prong of *State* v. *Whistnant*, supra, 179 Conn. 588, was not met with respect to the offense of manslaughter by omission because the defendant could have committed manslaughter by omission without committing the murder. Thereafter, the trial court charged the jury regarding manslaughter in the first degree.[76]

---

[76] The trial court's charge with respect to manslaughter in the first degree under § 53a-55 (a) (3) was as follows: "The lesser included offense is reckless indifference manslaughter in the first degree in violation of [§] 53a-55 (a) (3). A person is guilty of reckless indifference in the first degree when under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person. There is no element of intent involved in this crime. Do not apply my instructions regarding intent. In order to prove a person guilty of the crime of reckless indifference manslaughter in the first degree, the state must prove that:

"1. the defendant recklessly engaged in conduct which created a grave risk of death to [the victim] and;

"2. he did so under circumstances which evinced or demonstrated an extreme indifference to human life; and

"3. he thereby caused the death of the victim.

"The first element is that the defendant recklessly engaged in conduct creating a grave risk of death to [the victim]. A person acts recklessly with respect to result or to circumstances described by statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that just a result will occur or such a circumstance exists. The risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard that a reasonable person would observe in that situation. Recklessness then means being aware of a substantial and unjustifiable risk and consciously disregarding the risk. It's more than failing to perceive such a risk . . . . There must be an awareness of the risk and a conscious disregard of it.

"The risk must be substantial and unjustifiable. Furthermore, the risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in that situation.

"This requires that I define for you what is meant by the standard of conduct that a reasonable person would observe in this situation. The standard of conduct of a reasonable person in the same situation as the defendant is doing of something which a reasonably prudent person would do under

On appeal, the defendant claims[77] that the trial court improperly declined to instruct the jury with respect to manslaughter by omission. Specifically, the defendant

the circumstances or the omitting to do what a reasonably prudent person would not do under the circumstances.

"Deviating from the standard of conduct of a reasonable person or failing to observe that a standard of conduct is a failure to exercise reasonable care. Reasonable care is care which a reasonably prudent person would use in view of all the circumstances. You must determine the question of reasonable care [by placing] an ordinarily prudent person in the situation and circumstances in which the defendant found himself and then ask yourself, what would a reasonably prudent person have done or not have done in such a situation and under such circumstances.

"Having determined [what] a reasonable person's conduct would have been in that circumstance, you must then compare that conduct with the defendant's conduct in order for there to be recklessness on the part of the defendant. It is necessary that his conduct in disregarding the substantial and unjustifiable risk constituted a gross deviation from the standard of conduct that a reasonable person would have observed in this situation. A gross deviation is a great or substantial deviation . . . not just a slight or moderate deviation. Whether a risk is substantial and unjustifiable is a question of fact for you to determine under all the circumstances.

"The second element and circumstances under which the defendant engaged in such reckless conduct demonstrated an extreme indifference to human life. The phrase 'extreme indifference to human life' has its ordinary meaning. Mere carelessness is not enough, nor is ordinary recklessness sufficient to constitute demonstrating extreme indifference to human life. You must find circumstances showing extreme indifference to human life.

"And the third element is that the defendant's conduct caused the death of [the victim]. And you will recall and apply my instructions [on] cause which I have already given to you."

[77] The defendant claims that the trial court improperly characterized the issue as one involving an instruction on a lesser included offense. The defendant argues that, because the trial court instructed the jury with respect to manslaughter in the first degree under § 53a-55 (a) (1) and (3), the issue is that the instruction itself was inadequate because it did not contain the defendant's requested charge on manslaughter by omission.

The defendant's claim is foreclosed by our decision in *State* v. *Tomlin*, 266 Conn. 608, 835 A.2d 12 (2003). In *Tomlin*, we concluded that "the term 'offense,' as it is used in *Whistnant*, refers to each distinct method, which may be comprised of different elements, by which a crime may be completed. The term 'offense' does not refer to the title of the crime encompassing each of those distinct methods." Id., 624. Thus, because the "offense" that the defendant claims improperly was not included in the charge to the jury, namely, manslaughter by omission under § 53a-55 (a) (3), is a distinct method by which the crime of manslaughter may be completed, the trial court properly analyzed the issue under *State* v. *Whistnant*, supra, 179 Conn. 588.

claims that he satisfied all four prongs of *Whistnant* and that sufficient evidence was presented at trial to permit the jury reasonably to conclude that the defendant was guilty of manslaughter by omission. The state contends that the defendant failed to satisfy all the prongs of the *Whistnant* test.[78]

"The second prong of *Whistnant* derives from our earlier decision in *State* v. *Brown*, 163 Conn. 52, 301 A.2d 547 (1972). In *Brown*, we stated that '[c]ourts have taken three approaches in determining whether a crime is a "lesser included crime" when the evidence would support a conclusion that the lesser crime was committed: (1) The included crime may be one consisting solely of elements which must always be present for the greater crime to have been committed; (2) it may be

[78] We initially conclude that the defendant has satisfied the first prong of *Whistnant*. "It is well settled that . . . [a] proposed instruction on a lesser included offense constitutes an appropriate instruction for purposes of the first prong of *Whistnant* if it complies with Practice Book [§ 42-18]. . . . We previously have held, in the context of a written request to charge on a lesser included offense, [that the] requirement of [§ 42-18] is met only if the proposed request contains such a complete statement of the essential facts as would have justified the court in charging in the form requested." (Internal quotation marks omitted.) *State* v. *Smith*, 262 Conn. 453, 465, 815 A.2d 1216 (2003). In addition, however, the first prong of *Whistnant* also is satisfied "when the record indicates that the trial court knew the precise point to which the defendant wished to call attention." (Internal quotation marks omitted.) Id., 466. Accordingly, the first prong is satisfied when "the trial court is informed adequately of the factual and legal bases for the instructional request." Id.

First, the defendant's written request to charge included a section entitled, "APPLICABLE EVIDENCE," which asserted a factual basis for the instruction on manslaughter by omission. Moreover, during the charging conference, defense counsel further explained the basis for the instruction. Specifically, defense counsel contended that the charge was warranted because of Virginia Quintero's testimony that the defendant was toilet training the victim and that the defendant was living with her at the time of the victim's death, thereby demonstrating that he had established a familial relationship with the victim and her mother. Moreover, the trial court acknowledged that the instruction properly had been requested. Accordingly, we conclude that the defendant has satisfied the first prong of *Whistnant*.

one consisting solely of elements which must have been present for the greater offense to have been committed in the manner described by the information or bill of particulars thereto; [or] (3) . . . it may be a crime which the evidence suggests and which could have been included in the information. The Connecticut rule on this question follows the second course . . . .'

"That second course comprises the second prong in *Whistnant*, which encompasses the cognate pleadings approach. 'The cognate-pleadings approach . . . does not insist that the elements of the lesser offense be a subset of the higher offense. It is sufficient that the lesser offense have certain elements in common with the higher offense, which thereby makes it a "cognate" or "allied" offense even though it also has other elements not essential to the greater crime. [In addition], the relationship between the offenses is determined not by a comparison of statutory elements in the abstract, but by reference to the pleadings in the case. The key ordinarily is whether the allegations in the pleading charging the higher offense . . . include all of the elements of the lesser offense.' " (Citation omitted.) *State* v. *Tomlin*, 266 Conn. 608, 617–18, 835 A.2d 12 (2003).

In the present case, we conclude that the defendant has not satisfied the second prong of *Whistnant*. Specifically, it was possible to commit murder, in the manner described in the information and bill of particulars, without first having committed the lesser included offense of manslaughter by omission. The state asserted in the information that the defendant "caused the death of [the victim] by means of blunt force trauma." Thus, the state alleged in the information that the defendant had committed a physical act against the victim that caused the victim to suffer blunt force trauma and that he had done so with the intention of killing the victim. With respect to manslaughter by omission, our decision in *Miranda* presumably would have required the state

to establish different elements, namely, that the defendant had "established a familial relationship" with the victim and that the defendant had failed "to take affirmative action to prevent harm to the victim . . . ." *State* v. *Miranda*, supra, 245 Conn. 226. Thus, at least two elements distinguish murder, the crime with which the defendant was charged, from manslaughter by omission, namely, the establishment of a familial relationship and, more importantly, the failure of the defendant to protect the victim from the act of another person rather than the defendant's commission of a physical act upon the victim. Thus, it was possible for the defendant to have committed the greater offense, namely, murder, in the manner described in the information, without having first committed the lesser offense, namely, manslaughter by omission. Consequently, the trial court properly declined to instruct the jury on manslaughter by omission.

2

Accessory Liability Instruction

The defendant next claims that the trial court improperly declined to instruct the jury with respect to the credibility of Virginia Quintero's testimony. Specifically, the defendant contends that the trial court improperly declined to give an instruction characterizing Quintero as an accessory to the crimes for which the defendant was tried. The state contends that the trial court properly declined to give such an instruction.

The defendant's written request to charge included a proposed instruction that Quintero's testimony should be scrutinized inasmuch as Quintero also was charged with certain crimes in connection with the victim's death.[79] At the charging conference, the trial court con-

[79] The defendant proposed the following instruction: "The jury has the duty to scrutinize the testimony offered by . . . Quintero carefully. As you have heard, [Quintero] is also charged with crimes arising out of the death of [the victim]. The jury must scrutinize this testimony in the light of any

cluded that Quintero did not fit the definition of an accessory because there was no evidence to support the conclusion that she shared a mutuality of interest or community of purpose with the defendant.

"Generally, a defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." *State* v. *Ortiz*, 252 Conn. 533, 561, 747 A.2d 487 (2000). An exception to this rule, however, involves the credibility of accomplice witnesses. Id. "[W]here it is warranted by the evidence, it is the *court's duty* to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if [she] assisted or aided or abetted in the commission, of the offense with which the defendant is charged." (Emphasis in original; internal quotation marks omitted.) Id., 562. In addition, "[i]n order for one to be an accomplice there must be mutuality of intent and community of unlawful purpose." *State* v. *Boles*, 223 Conn. 535, 552, 613 A.2d 770 (1992).

In *State* v. *Ortiz*, supra, 252 Conn. 533, the defendants, Angel Luis Ortiz and Julio Diaz-Marrero, claimed that the trial court improperly had declined to instruct the jury regarding the credibility of a witness who had been present during the commission of the crimes with which the defendants were charged. Id., 542, 562. We concluded, however, that the trial court properly had determined that there was insufficient evidence to infer that the witness was an accomplice. See id., 562–63. First, we noted that the witness was not charged with the crimes for which the defendants were tried and that there was no evidence presented at trial that directly linked the witness to the crimes as an accomplice. Id., 562. Second, we explained that the jury was privy to

motive the jury may find that she had for testifying falsely and inculpating the accused."

evidence that the witness was with the defendants during the crimes and that the witness was subject to cross-examination. Id. These factors, in addition to the trial court's general instructions regarding the credibility of witnesses generally, led us to conclude that the trial court properly had declined to give the requested instruction. Id., 562–63.

In the present case, the trial court determined that there was insufficient evidence from which to conclude that Quintero was an accomplice. Specifically, Quintero was not charged with the crimes for which the defendant was tried and there was no evidence that directly linked Quintero to the crimes as an accomplice. Although Quintero testified that she had been charged with certain crimes in connection with the victim's death, she was charged with those crimes on the basis of her failure to protect the victim from the defendant. Specifically, Quintero was charged with manslaughter, assault and risk of injury to a child, all stemming from her failure to protect the victim. In addition, there was no evidence that Quintero shared the mental state required for the crime with which the defendant was charged, namely, intentional murder, and there was no evidence that Quintero committed any of the accessorial acts outlined in General Statutes § 53a-8 (a),[80] such as solicitation or intentionally providing aid to the principal offender, namely, the defendant. Moreover, the trial court instructed the jury to consider whether a witness had "any interest in the outcome of the case or any bias or prejudice concerning any part of any matter involved in [the] case" and also to consider "[a] witness' interest, motive, bias or sympathy or prejudice

[80] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

for or against the state and . . . what may be in the witness' own mind when testifying as to interest, motive, bias, prejudice . . . [or] sympathy for or against the state." We deem the instructions in the present case, as well as the determination that there was insufficient evidence from which a jury reasonably could conclude that Quintero was an accessory to the crimes for which the defendant was tried, adequate to protect the rights of the defendant and to inform the jury regarding the relevant issues at trial. Accordingly, the trial court properly declined to instruct the jury as the defendant requested.

### 3

Instruction Regarding the Defendant's Attempt
to Provide Medical Assistance to the Victim

The defendant next claims that the trial court improperly declined to instruct the jury regarding his attempt to provide medical assistance to the victim. Specifically, the defendant contends that the trial court improperly declined to instruct the jury that it could infer from the evidence that, because the defendant attempted to provide medical assistance to the victim, he did not have the intent to kill her. In response, the state contends that the trial court properly declined to instruct the jury that a finding that the defendant attempted to provide medical assistance to the victim supported an inference that he lacked the intent to kill her.

The defendant's written request to charge included a proposed instruction that, if the jury found that the defendant had attempted to provide medical assistance to the victim, it was permitted to infer that such conduct evinced a lack of intent on the part of the defendant to kill the victim.[81] The trial court denied the defendant's

---

[81] The defendant proposed the following instruction: "In this case the defendant has offered evidence that he did attempt emergency resuscitation efforts, and that he did seek medical attention for the child. Under our law, if a defendant fails to seek medical attention for the victim of a homicide

request to instruct the jury with respect to his attempt to provide medical assistance and its effect on his intent to kill the victim, but allowed defense counsel to argue that point to the jury during closing arguments.

On appeal to this court, the defendant relies on our decision in *State* v. *Sivri*, supra, 231 Conn. 115, in support of his claim that the trial court improperly declined to instruct the jury that it could infer from the evidence that the fact that the defendant attempted to resuscitate the victim supported an inference that he did not intend to kill the victim. In *Sivri*, we concluded that the failure of the defendant, Tevfik Sivri, to summon medical assistance for the victim, who had lost a substantial amount of blood, permitted an inference that Sivri intended to kill the victim. Id., 128, 129. Specifically, we explained that, "if [Sivri] has caused a grievous wound that could cause the victim's death if not treated promptly, the failure to summon that treatment is consistent with an antecedent intent to cause death." Id., 129. Thus, the defendant's claim essentially is that, because our decision in *Sivri* allows a jury to draw an inference that, as a result of failing to summon medical assistance the defendant had an intent to kill, the inverse of that situation also must be true, namely, that evidence indicating that the defendant attempted to resuscitate the victim permits an inference that the defendant lacked the intent to kill. We disagree.

We first note that, although several states permit a fact finder to infer intent to kill from the failure to summon medical assistance for a victim, the defendant has not referred us to, and our research has not revealed, any case in which the fact finder was instructed that it could draw an inference that the defen-

the jury may infer from that an intent to kill. In this case, if you believe from all the evidence that the defendant did seek medical attention for the child, then you may infer from that that he did not have the intent to kill and would therefore not be guilty of murder."

dant lacked any intent to kill because he summoned medical assistance for the victim. To the contrary, our Appellate Court has concluded that, notwithstanding a defendant's attempt to summon medical assistance for the victim, a jury reasonably could conclude that the defendant intended to kill the victim. See *State* v. *Downey*, 45 Conn. App. 148, 155–56, 694 A.2d 1367 (despite fact that defendant summoned medical assistance for victim, evidence that defendant shot victim at close range and acted in hostile and threatening manner toward victim before incident supported jury's conclusion that defendant intended to kill victim), cert. denied, 242 Conn. 909, 697 A.2d 367 (1997).

Similarly, the defendant's proposed instruction was not a statement of the law applicable to the case but, rather, was argumentative in nature. This court never has concluded that a defendant is entitled to an instruction that the fact finder may draw an inference that the defendant lacked the intent to kill from evidence establishing that the defendant summoned medical assistance for or provided medical assistance to the victim. The determination of whether to give such an instruction is, therefore, a matter within the trial court's discretion. The defendant's proposed instruction, therefore, was not an accurate statement of the law but, rather, a matter more appropriately addressed during closing arguments. Accordingly, we conclude that the trial court properly declined to instruct the jury in accordance with the defendant's proposed instruction.[82] Cf.

[82] We also note that the evidence that, according to the defendant, permitted an inference that the defendant lacked the intent to kill the victim was vigorously contested by the state. In fact, although there was evidence that the defendant attempted to resuscitate the victim after repeatedly hitting her head against the shower wall, there also was evidence that the defendant did not call an ambulance but, rather, used a telephone at his neighbor's house to call his mother after the victim became unresponsive. In addition, there was evidence that, although the defendant allowed his mother and Virginia Quintero to take the victim to the hospital after the victim became unresponsive, he told them to lie about the cause of the victim's injuries. Moreover, the state argued at trial that the fact that the defendant called

*State* v. *Hines*, supra, 243 Conn. 813 ("[T]he court was not required to supply to the jury possible innocent explanations that the defendant himself had not offered. Indeed, even when there is such evidence, we have held that, although the trial court may, it is not required to enumerate all the possible innocent explanations offered by the defendant." [Internal quotation marks omitted.]).

4

Instructions Regarding Reasonable Doubt

The defendant's final instructional claim is that the trial court improperly instructed the jury regarding the standard of reasonable doubt.[83] Specifically, the defen-

his mother rather than an ambulance constituted evidence of his intent to kill the victim. On the basis of the foregoing, we conclude that the trial court properly deemed the question of the proper inference to be drawn from the evidence as one for the jury and properly declined to instruct the jury as the defendant requested.

[83] The trial court instructed the jury in relevant part: "The phrase beyond reasonable doubt has no technical or unusual meaning. The meaning of reasonable doubt can be arrived at by emphasizing the word 'reasonable.' It is not a surmise, a guess or mere conjecture. It is not a doubt suggested by counsel or a jury which is not warranted by the evidence. Reasonable doubt is a doubt for which there exists a reasonable basis arises [sic] out of the evidence or lack of evidence. It is such a doubt that in the serious affairs that concern you, you would heed, that is, such a doubt as would cause a reasonable man and woman to hesitate to act upon it in matters of importance. It is not hesitation springing from feelings of pity or sympathy for the accused, or any other person who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is a doubt that is honestly entertained, is reasonable in light of the evidence after fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute mathematical certainty on the part of the jury before it returns a verdict of guilty. Absolute certainty in the affairs of life is almost never obtainable. The state does not have to prove guilt beyond all doubt or to a mathematical certainty, or to an absolute moral certitude. The law requires that after hearing all the evidence, if there is something in the evidence or lack of evidence which leaves in the minds of the jur[ors], as reasonable men and women, a reasonable doubt about the guilt of the accused, then the accused must be given the benefit of the

dant claims that the trial court's instructions impermissibly diluted the state's burden of proving his guilt beyond a reasonable doubt, thereby resulting in a violation of his due process rights. The defendant points to five statements that he claims were improper, but concedes that this court previously has upheld substantially similar instructions. The defendant nevertheless urges us to reconsider these prior cases upholding the instructions.

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence— that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . [Id.], 363. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Jackson* v. *Virginia*, [443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)]. [Consequently, the] defendants in a criminal case are entitled to a clear and unequivocal charge by the court that the guilt of the defendants must be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 370–71, 796 A.2d 1118 (2002).

As the defendant acknowledges, we consistently have rejected constitutional challenges to instructional language substantially similar in all material respects to the instructional language that the defendant challenges on appeal. E.g., *State* v. *Betances*, 265 Conn. 493, 510,

doubt and acquitted. If there is no reasonable doubt, then the accused must be found guilty."

828 A.2d 1248 (2003) (rejecting challenge to instruction that reasonable doubt is "not a doubt suggested by counsel which is not warranted by the evidence" [internal quotation marks omitted]); *State* v. *Ferguson*, supra, 260 Conn. 369 (rejecting challenge to instruction that reasonable doubt "is a real doubt . . . an honest doubt" [internal quotation marks omitted]); *State* v. *Velasco*, 253 Conn. 210, 249, 751 A.2d 800 (2000) (rejecting challenge to instruction that reasonable doubt is "a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence in the case" [internal quotation marks omitted]). The defendant has offered no compelling reason for us to reconsider these cases. In addition, we see no reasonable possibility that the challenged language, when read in the context of the entire charge regarding reasonable doubt, misled the jury in its understanding of the state's burden of proving the defendant's guilt beyond a reasonable doubt. Accordingly, we conclude that the trial court's instructions concerning the standard of reasonable doubt were not improper.

F

Prosecutorial Misconduct

The defendant next claims that the state's attorney and the assistant state's attorney committed misconduct during the guilt phase of the proceedings, thereby depriving the defendant of his right to a fair trial in violation of the due process clause of the fourteenth amendment to the United States constitution. Specifically, the defendant claims that: (1) the state's attorney improperly pursued contradictory theories with respect to Virginia Quintero's role in the victim's death; (2) the state's attorney improperly questioned the defendant about certain privileged attorney-client communications during cross-examination; and (3) the state's attorney and the assistant state's attorney improperly

injected their personal opinions into closing and rebuttal arguments. In response, the state claims that none of the defendant's claims of misconduct has merit. Because the defendant failed to object to the majority of the conduct that he now challenges on appeal, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989),[84] the plain error doc-

---

[84] In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

Although the defendant seeks to prevail on his unpreserved claims of prosecutorial misconduct under *Golding*, our recent decision in *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004), counsels that *Golding* is inapplicable to unpreserved prosecutorial misconduct claims. Instead, "a reviewing court must apply the [factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial." *State* v. *Stevenson*, supra, 573. "[F]ollowing a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial." Id., 575.

We noted, however, that "[t]his does not mean . . . that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . Moreover, ordinarily, when a defendant who raises an objection to the allegedly improper remarks of a prosecutor elects to pursue one remedy at trial instead of another, he will not be permitted to claim on appeal that the remedy he pursued was insufficient. . . . In other words, the fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Citations omitted; internal quotation marks omitted.) Id., 575–76.

trine,[85] or, alternatively, asks us to invoke our inherent supervisory authority over the administration of justice.[86] We conclude that none of the defendant's claims rises to the level of a due process violation.

"Before addressing the merits of the defendant's claim, we first review the principles that govern our resolution of claims of prosecutorial misconduct. [T]he touchstone of due process analysis in cases of alleged

[85] The plain error doctrine is set forth in Practice Book § 60-5, which provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

We repeatedly have noted, however, that "[p]lain error review is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [Thus, a] defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; internal quotation marks omitted.) State v. Whipper, 258 Conn. 229, 279–80, 780 A.2d 53 (2001), overruled in part on other grounds, State v. Cruz, 269 Conn. 97, 848 A.2d 445 (2004).

[86] "We may review a claim of prosecutorial misconduct under our inherent supervisory authority over the administration of justice even though the alleged impropriety does not rise to the level of a constitutional violation." State v. Reynolds, supra, 264 Conn. 160 n.144. "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . .

"Although [w]e previously have exercised our supervisory powers to direct trial courts to adopt judicial procedures . . . we also have exercised our authority to address the result in individual cases, notably those involving instances of prosecutorial misconduct because we recognize that such conduct, although not rising to the level of constitutional magnitude, is unduly offensive to the maintenance of a sound judicial process." (Citations omitted; internal quotation marks omitted.) State v. Anderson, 255 Conn. 425, 438–39, 773 A.2d 287 (2001).

prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [M]oreover . . . [a defendant is not entitled to prevail under *Golding*] whe[n] the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial. . . .

"As we previously have recognized, prosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great

influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Citations omitted; internal quotation marks omitted.) *State v. Reynolds*, supra, 264 Conn. 161–63. "[W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

Furthermore, "the prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . .

"Prosecutorial misconduct [also] may occur in the course of cross-examination of witnesses . . . and

may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . .

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Furthermore, whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . .

"[E]ven when prosecutorial misconduct is not so egregious as to implicate the defendant's [due process] right to a fair trial, an appellate court may invoke its supervisory authority [over the administration of justice] to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, however, only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effec-

tively prevent such assaults on the integrity of the tribunal. . . . Thus, in cases in which prosecutorial misconduct does not rise to the level of a constitutional violation, we will exercise our supervisory authority to reverse an otherwise lawful conviction only when the drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial misconduct in the future. . . . Accordingly, [r]eversal of a conviction under [our] supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 163–66. With these overarching principles in mind, we turn to the defendant's specific allegations of prosecutorial misconduct.

1

## The Assertion of Contradictory Theories with Respect to the Victim's Death

The defendant first claims that the state's attorney engaged in prosecutorial misconduct by asserting contradictory claims regarding Virginia Quintero's role in the victim's death. Specifically, the defendant claims that his due process rights were violated when the state's attorney claimed at trial that Quintero was held captive by the defendant during the period prior to the victim's death while charging Quintero with manslaughter, assault and risk of injury to a child in connection with the victim's death. In response, the state claims that the state's attorney did not pursue contradictory theories with respect to the role of Quintero in the

victim's death. Because no objection was made at trial, the defendant seeks to prevail under *Golding*.[87]

In the present case, Lieutenant O'Leary testified that Quintero had been charged with manslaughter, assault in the first degree and risk of injury to a child. O'Leary also testified that these charges were based on Quintero's failure to protect the victim from the defendant. Thereafter, Quintero testified that the defendant had forced her to stay in the apartment and did not let her leave during the weeks leading up to the victim's death. The defendant's claim essentially is that, if the defendant, as the state's attorney asserted, held Quintero captive during the period leading up to the victim's death, Quintero could not have been guilty of manslaughter, assault or risk of injury and, therefore, the state's attorney pursued inherently contradictory theories regarding Quintero's role in the victim's death, in violation of the defendant's constitutional rights.

In support of his claim, the defendant relies on *Smith* v. *Groose*, 205 F.3d 1045 (8th Cir.), cert. denied sub nom. *Gammon* v. *Smith*, 531 U.S. 985, 121 S. Ct. 441, 148 L. Ed. 2d 446 (2000), in which the Eighth Circuit Court of Appeals concluded that a prosecutor's use of "inherently factually contradictory theories violates the principles of due process." Id., 1052. In *Smith*, a group of juveniles set out to burglarize a house. Id., 1047. When the group reached their intended target, they encountered another group of individuals who already were in the process of burglarizing the same house. Id. After a brief discussion, the two groups both took property from the house. Id. Sometime during the

---

[87] See footnote 84 of this opinion. Because we conclude that there was no impropriety, we need not address the *Williams* factors. See *State* v. *Stevenson*, 269 Conn. 563, 575, 849 A.2d 626 (2004) ("following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial").

course of the burglary, two occupants of the home were killed. See id.

Subsequently, one of the juveniles, Anthony Lytle, gave a statement (first statement) to the police claiming that the first group of burglars already had killed one of the occupants before the juvenile group entered the house. Id. Two days later, however, Lytle gave a second statement to police in which he claimed that the occupant was killed while the juveniles were inside the house. Id. Specifically, Lytle told the police that he saw James Bowman, one of the juveniles with whom he had planned on burglarizing the house, kneeling over the victim and stabbing him. Id., 1047–48. Lytle subsequently recanted this second statement and testified consistently with his first statement at the trial of one of the juveniles, Jon Keith Smith. Id., 1047. At Smith's trial, the prosecutor used Lytle's second statement to prove that the murder occurred while the juveniles were in the house. Id., 1048. The prosecutor's theory was that Bowman was the murderer and that Smith was guilty of, inter alia, felony murder because the murder had occurred while Smith was in the house committing the burglary. Id. Smith ultimately was found guilty of first degree felony murder. Id.

Subsequently, during the trial of Michael Cunningham, one of the individuals who was in the house before the group of juveniles had arrived, the prosecutor relied on Lytle's first statement to police and his testimony at Smith's trial to claim that the victim already was dead when the juveniles entered the home. Id. Thus, the prosecutor's theory in Cunningham's trial was that, because Lytle had testified that the victim already was dead when the juveniles had entered the home, Cunningham was the murderer. Id. Cunningham subsequently was found guilty of, inter alia, first degree murder. Id.

In reviewing the district court's denial of Smith's petition for a writ of habeas corpus, the Eighth Circuit Court of Appeals began by framing the specific issue involved in the case, namely, whether the due process clause "forbids a state from using inconsistent, irreconcilable theories to secure convictions against two or more defendants in prosecutions for the same offenses arising out of the same event." Id., 1049. The court also explained that several other federal circuit courts had recognized that inconsistent prosecutorial theories could, in certain circumstances, violate due process. Id., citing *Thompson* v. *Calderon*, 120 F.3d 1045, 1058–59 (9th Cir. 1997), rev'd on other grounds, 523 U.S. 538, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998); *Drake* v. *Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., specially concurring), cert. denied, 478 U.S. 1020, 106 S. Ct. 3333, 92 L. Ed. 2d 738 (1986). In *Smith*, the court explained that, "what the [prosecutor] claimed to be true in Smith's case it rejected in Cunningham's case"; *Smith* v. *Groose*, supra, 205 F.3d 1050; and that the prosecutor "successful[ly] attempt[ed] to prove beyond a reasonable doubt that . . . [the murder occurred] at two different times." Id. This temporal distinction, the court explained, was at "the heart of the prosecutorial inconsistency that allowed the [prosecutor] to convict as many defendants as possible in a series of cases in which the question of timing was crucial." Id., 1051. In addition, in *Smith*, the defendant could not "have been convicted of felony murder under both theories." Id. The use of these factually inconsistent theories regarding when the murder occurred, in the court's view, "constituted 'foul blows' . . . that fatally infected Smith's conviction." Id. Thus, pursuant to the holding of the Eighth Circuit Court of Appeals in *Smith*, the use of inherently factually contradictory theories violates the principles of due process. See id., 1052.

In the present case, the defendant's reliance on *Smith* is misplaced. The defendant and Quintero were not charged with the same crime; specifically, the defendant was charged and convicted on the theory that he intentionally had killed the victim, while Quintero, as O'Leary's testimony revealed, was charged with manslaughter and assault as a result of her failure to protect the victim from the conduct of the defendant. The theories that the state's attorney asserted against the defendant and Quintero thus were not factually inconsistent. In the present case, the state clearly demonstrated that the defendant had killed the victim through the infliction of blunt force trauma to the victim's head. Although the state claimed that Quintero was not allowed to leave her apartment in order to seek help for the victim, the state also contended that Quintero could have done more to save the victim's life. Thus, in charging Quintero with manslaughter, assault and risk of injury for failing to protect the victim, the state's attorney was not pursuing inherently factually contradictory theories, as the defendant claims. Rather, the state properly was attempting to hold accountable all those who contributed to the victim's death. Contrary to the defendant's claim, such conduct does not violate principles of due process.

2

Questioning Regarding Privileged
Attorney-Client Communications

The defendant next claims that the state's attorney improperly questioned the defendant during cross-examination regarding privileged communications with his attorneys, thereby violating the defendant's attorney-client privilege. The state claims that the state's attorney's cross-examination of the defendant properly was confined to permissible subjects of impeachment, namely, whether the defendant had been "coached" in

preparation of his testimony. The state also contends that the cross-examination did not violate the defendant's attorney-client privilege because none of the questions actually elicited the substance of any communication between the defendant and his attorneys. The defendant acknowledges that no objection was raised at trial and, thus, seeks to prevail under *Golding*.[88]

The United States Supreme Court has determined that cross-examination constitutes a proper method to address the issue of an attorney's possible improper influence on a witness' testimony or the possibility that an attorney coached a witness. See *Geders* v. *United States*, 425 U.S. 80, 89, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976). "The opposing counsel in the adversary system is not without weapons to cope with 'coached' witnesses. A prosecutor may cross-examine a defendant as to the extent of any 'coaching' during a recess, subject, of course, to the control of the court. Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond on the remaining direct examination and on cross-examination." Id., 89–90.

As the defendant acknowledges, defense counsel did not object to this line of questioning at trial on the basis of the attorney-client privilege, suggesting that he did not view the line of questioning to be seriously prejudicial at the time.[89] As we noted previously, "whether a

---

[88] See footnote 84 of this opinion. Again, because we conclude that the state's attorney's cross-examination of the defendant was not improper, we need not address the *Williams* factors.

[89] Defense counsel objected several times during this line of questioning, but never on the basis of the attorney-client privilege. For instance, defense counsel objected to the state's attorney's question regarding the defendant's claim that, during an hour long discussion, defense counsel showed the defendant only one photograph, by claiming that the state's attorney was misleading the jury. In addition, defense counsel claimed that the state's attorney was "assuming facts not in evidence . . . ." Subsequently, defense

new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." *State* v. *Reynolds*, supra, 264 Conn. 165; see also *State* v. *Andrews*, 248 Conn. 1, 20, 726 A.2d 104 (1999) (failure of defense counsel to object to prosecutor's rebuttal argument suggested that "defense counsel did not believe that it was unfair in light of the record of the case at the time").

As we explained in *Reynolds*, "[i]nasmuch as defense counsel had heard the comments of the state's attorney when they were made, defense counsel was in a position to assess what impact, if any, the comments may have had on the jury and to determine what remedy to seek." *State* v. *Reynolds*, supra, 264 Conn. 207. "Our rules of procedure do not allow a defendant to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade. . . . An appellant cannot create a reviewable claim because his appellate counsel disagrees with the strategy of his trial counsel." (Internal quotation marks omitted.) Id. The defendant in the present case was represented by two attorneys who "presumably [did] not view the alleged impropriety as prejudicial enough

---

counsel objected to the state's attorney's question, "You want this jury to believe that for the two years [that your attorneys] represented you, they never talked about what you would say when you took the witness stand yesterday and today?" The basis of the objection, however, was that the question was confusing. Specifically, defense counsel stated: "*I'd object on the basis of clarification* because the last answer implied that—told you what you would say versus discussed the facts of this case and there's a distinction. *I'd ask [that] the question be rephrased to avoid that confusion.*" (Emphasis added.)

to jeopardize seriously the defendant's right to a fair trial." Id., 165. Thus, we find no merit to the defendant's claim that the state's attorney's line of questioning was improper.

### 3

### Prosecutorial Misconduct During Closing and Rebuttal Arguments

The defendant next claims that the state's attorney and assistant state's attorney engaged in misconduct during closing and rebuttal arguments. Specifically, the defendant claims that: (1) the assistant state's attorney improperly injected her personal opinion by stating that "there can be no real question here about intent"; (2) the assistant state's attorney improperly commented on the credibility of the defendant by stating that the defendant's testimony was "a lie"; and (3) the state's attorney improperly declared, during rebuttal argument, that his interest was "the same as [the jury's], to see that justice is done . . . ." The state responds by claiming that: (1) defense counsel failed to object to the first two claimed instances of misconduct, suggesting that defense counsel did not deem the arguments as prejudicial; and (2) neither of the remarks made during closing argument was improper. In response to the defendant's claim regarding the state's attorney's rebuttal argument, the state claims, inter alia, that the remark regarding the state's attorney's interest in the case was: (1) invited by defense counsel's closing argument; (2) not improper because it merely "identif[ied] the unique role [that] prosecutors have in our judicial system" (internal quotation marks omitted); (3) not as prejudicial as other statements previously found by this court to be improper; and (4) fleeting and thus had no bearing on the jury's verdict.

During closing argument, the assistant state's attorney outlined the evidence establishing the state's claim

that the defendant intentionally had killed the victim. This evidence included explanations of the victim's various injuries, Ira Kanfer's testimony that the blunt force trauma that the victim had suffered was the most severe he had seen in his career, the prior acts of violence that the defendant allegedly had committed against the victim and the defendant's failure to summon medical assistance for the victim. After summarizing this evidence, the assistant state's attorney remarked: "*I think there can be no real question here about intent.* When you look at the injuries to that child, when you look at the subdural hematoma, and you look at it all together, what question can there be about intent?" (Emphasis added.) Defense counsel did not object to these remarks.

In addition, during closing arguments, the assistant state's attorney remarked: "[The defendant] tells you that he signed [his] statement [that he gave to the police] because he thought he could go home. Well, ladies and gentlemen, you can't have it both ways. [The defendant] cannot get on this witness stand and tell you that he didn't know what was going on, that the police were yelling and screaming at him and pointing . . . at him and accusing him and taking him out of Mill Street in handcuffs and police had their guns drawn and yet, he's going to sign this statement. *It's a lie*, ladies and gentlemen. Anybody knew. Anybody knew it was serious. He saw that child. This is what he did to that child. Everybody knew it was serious. He can't have it both ways." (Emphasis added.) Defense counsel did not object to this statement.

During rebuttal argument, the state's attorney remarked: "You know, [defense counsel] says, 'Well, the police have an interest in this case; the state has an interest in this case.' You know and we do and I do have an interest in this case and [the assistant state's attorney] has an interest in this case and the state's

attorney's office in Waterbury has an interest in this case. And do you know what that interest is? . . . That interest is the same as yours, to see that justice is done in this case." In addition, at the end of rebuttal argument, the state's attorney remarked: "Yeah, I have an interest in the case. The interest is to see that justice is done." Defense counsel objected to both of these remarks. The trial court overruled the objection to the first remark, but sustained the objection to the final remark that the state's attorney's interest was to see that justice was done. The trial court instructed the jury several times, however, that arguments of counsel are not evidence.

The defendant first claims that the assistant state's attorney, in stating that "there can be no real question here about intent," improperly injected her personal opinion and, therefore, committed prosecutorial misconduct. We reject the defendant's claim.

"It is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on [the] one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Citation omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 465–66, 832 A.2d 626 (2003).

A review of the transcript reveals that the assistant state's attorney's remark that, "I think there can be no real question here about intent," followed several

paragraphs of explanation regarding the state's evidence that the defendant had killed the victim. Thus, the remark specifically was connected to the evidence, and the assistant state's attorney was permitted to suggest to the jury the inferences that could be derived from that evidence. In addition, "[t]he mere use of phrases such as 'I would think,' 'I would submit,' and 'I really don't think,' does not transform a closing [argument] into the improper assertions of personal opinion by the [prosecutor]." *State* v. *Coney*, 266 Conn. 787, 814–15, 835 A.2d 977 (2003). Accordingly, the remark of the assistant state's attorney was not improper.

The defendant next claims that the assistant state's attorney, in stating that the defendant's testimony was "a lie," improperly commented on the credibility of a witness' testimony. As we noted previously, "the prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 163. Nevertheless, "[i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 465. In addition, "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the [witness'] credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *United States* v. *Peterson*, 808 F.2d 969, 977 (2d Cir. 1987).

The remark that the defendant lied when he testified that he had signed his statement to the police only because the police had told him that he could leave if he did so occurred in the context of the assistant state's attorney's discussion of the evidence that would support an inference that the defendant had lied. In particular, the assistant state's attorney remarked that the defendant had prior experience with the police, that he

previously had lied to police about his address and previously had failed to appear for court dates. She further claimed that the defendant knew that, because of the victim's condition, the situation was serious, and, accordingly, it was unreasonable for him to believe that he could have returned home after signing the statement. We also note that the assistant state's attorney's characterization of the defendant's testimony as a lie was the sole reference to the truthfulness of the defendant's testimony regarding his statement to the police. Accordingly, because the brief remark of the assistant state's attorney characterizing the defendant's testimony as a lie "followed a detailed summary of the evidence supporting that inference," the remark was not improper. *State* v. *Thompson*, supra, 266 Conn. 466.

Finally, the defendant claims that the state's attorney, in stating during rebuttal argument that his interest in the case was to see that justice was done, improperly injected his personal opinion into the trial. We acknowledge that it would have been preferable for the state's attorney to have refrained from using the first person to emphasize that his interest in the case was to see that justice was done. Thus, we turn to the question of whether the impropriety "so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 589, 849 A.2d 626 (2004). We conclude that the misconduct did not so infect the trial with unfairness as to make the defendant's conviction a denial of due process.

In *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987), we stated that, "[i]n determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument

. . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id., 540. In the present case, we note that the state's attorney's remark regarding his interest in the case was brief and isolated. In addition, we believe that the remark was invited, at least in part, by defense counsel who argued, during closing arguments, that the testifying police officers had an interest in the case.[90] Moreover, the trial court repeatedly instructed the jury that the statements of counsel were not evidence in the case. Finally, we note that the state's case against the defendant was particularly strong and included a signed confession. We therefore conclude that none of the challenged comments, individually or collectively, resulted in a denial of due process.

## G

### Subpoenas Duces Tecum and the State's Motion to Quash

The defendant claims that the trial court improperly compelled defense counsel to turn over to the trial court redacted copies of certain state police reports. The defendant further claims that the trial court improperly granted the state's motion to quash the defendant's subpoena of certain records from the office of the chief state's attorney and failed to conduct an in camera

---

[90] Specifically, defense counsel stated during closing arguments: "Lieutenant O'Leary testified 100 times. [The defendant] never testified before. I wonder . . . how many defendants or people [the state's attorney] has cross-examined in his . . . career that he told you about. Consider that when you scrutinize [the defendant's] testimony and you should scrutinize it. He has an interest in this case. No doubt about it. And I ask you to hear it played back if you need to. *But he's not the only person who has an interest in this case and he's not the only witness who needs their* [sic] *testimony scrutinized in this case.*" (Emphasis added.)

review of those documents. The defendant also invites us to reconsider our decision in *State* v. *Harris*, 227 Conn. 751, 631 A.2d 309 (1993), and to allow the defendant independently to review privileged records. We disagree with the defendant's claims.

1

### Order Compelling Defense Counsel to Turn Over State Police Reports

The defendant first claims that the trial court improperly compelled defense counsel to turn over redacted copies of certain state police internal affairs investigation reports that defense counsel had received from Lieutenant Wayne Rioux of the Connecticut state police force. In response, the state contends that the trial court properly exercised its discretion in requiring defense counsel to turn over the reports so that the trial court could review them. In addition, the state claims that any impropriety was harmless.

The following facts are necessary to our resolution of the defendant's claim. On August 30, 2000, a subpoena duces tecum was served on Rioux seeking copies of certain state police internal affairs reports. Additional subpoenas were served on the state police and another state office seeking material relating to the alleged misconduct of certain Waterbury police officers. The state thereafter filed a motion to quash the subpoenas.

During argument before the trial court on the state's motion to quash, defense counsel admitted that he possessed redacted versions of the internal affairs reports. The state claimed that defense counsel improperly possessed the reports because the subpoena duces tecum required Rioux to bring the reports to court instead of sending them directly to defense counsel in redacted form. The trial court also clarified that the subpoena required Rioux to bring the reports to court. During

further argument regarding the internal affairs reports, the state acknowledged that the reports were not exempt from disclosure under the Freedom of Information Act (act) because they were public records but nevertheless expressed concern over their release to defense counsel as they contained confidential information. On the basis of these concerns, the state asked the court to review the unredacted version of the reports in camera to screen for confidential information. Thereafter, defense counsel explained that he had received the reports from Rioux in a redacted form, and that Rioux told him that he had "received them under the [act]." Defense counsel claimed that he properly possessed the redacted versions of the reports because he could have requested them from the freedom of information commission himself. In response, the state claimed that, notwithstanding the fact that the reports were subject to disclosure under the act, it still was improper for Rioux to have given them directly to defense counsel instead of bringing them to court as the subpoena directed.

Later that day, defense counsel sought to use the information in the redacted reports in support of his request for an in camera review of other records, namely, an investigatory file of the office of the chief state's attorney. At that point, the trial court asked defense counsel to turn over the redacted internal affairs reports, stating that it was "not making any accusations . . . but [that it] need[ed] to know . . . if that was something that should not have been given to you, and, if it was, that you're in possession of something that you may not or should not have had until the court has ruled on it." Defense counsel thereafter turned over the redacted reports to the court. After reviewing both the redacted and unredacted versions of the internal affairs reports in camera, the trial court released to defense counsel the information that it believed to be

relevant to defense counsel's cross-examination of certain state witnesses, namely, several Waterbury police officers. Thereafter, defense counsel informed the court that he was planning to use copies of the redacted reports during his cross-examination of Lieutenant O'Leary. Defense counsel acknowledged that the trial court already had reviewed the reports in their entirety and had released to defense counsel what the trial court deemed to be exculpatory and relevant to cross-examination. Defense counsel nevertheless contended that the redacted reports contained other information relevant to his cross-examination of O'Leary that the trial court had not released. The trial court stated, however, that, "[a]s it relates to the redacted versus unredacted, this court views it as the same thing. It's what was in the internal affairs investigation. I've reviewed it . . . and I've ruled as it relates on what I saw, what I feel, under the law, the defendant's issues, the privilege issues, and I ruled [on] it all this morning . . . . The scope of the cross-examination, as this court sees it, is from the information that this court turned over [to you] after its review . . . ."

On appeal, the defendant challenges the trial court's decision to compel defense counsel to turn over the redacted reports. Specifically, the defendant claims that the trial court: (1) lacked the authority to compel defense counsel to turn over the redacted reports; (2) violated the defendant's right to present a defense; and (3) violated the defendant's right of free speech.

We first address the standard of review under which we address the defendant's first claim. The defendant claims that the trial court lacked authority to compel defense counsel to turn over the reports and that our review, therefore, is plenary. The state maintains, however, that the trial court merely was exercising its inherent authority to manage the case before it and to rule on evidentiary matters, and, therefore, its decision to

compel defense counsel to turn over the reports should be reviewed for an abuse of discretion. We agree with the state.

In *Krevis* v. *Bridgeport*, 262 Conn. 813, 818–19, 817 A.2d 628 (2003), we concluded that the determination of whether the trial court had authority to decide a dispositive question of law that the parties had submitted to the court orally and not in compliance with certain rules of practice was subject to an abuse of discretion standard. In so concluding, we noted that trial courts have "the authority to manage cases before it as necessary. . . . Deference is afforded to the trial court in making case management decisions because it is in a much better position to determine the effect that a particular procedure will have on both parties. . . . The case management authority is an inherent power necessarily vested in trial courts to manage their own affairs in order to achieve the expeditious disposition of cases. . . . The ability of trial judges to manage cases is essential to judicial economy and justice." (Citations omitted; internal quotation marks omitted.) Id., 819.

In the present case, after the state raised questions about the propriety of defense counsel's possession of the reports, the trial court compelled defense counsel to turn over the reports and reviewed them in camera. We conclude that, in doing so, the trial court was exercising its inherent case management authority. Accordingly, we review this claim under an abuse of discretion standard.

"We will not disturb a trial court's decision regarding case management unless after carefully examining the factual circumstances of the case, we determine that there was an abuse of discretion. . . . Abuse is not present if discretion is not exercised arbitrarily or wilfully, but with regard to what is right and equitable

under the circumstances and the law, and [it is] directed by the reason and conscience of the judge to a just result. . . . And [sound discretion] requires a knowledge and understanding of the material circumstances surrounding the matter . . . ." (Citation omitted; internal quotation marks omitted.) Id.

Our review of the record reveals that the trial court did not abuse its discretion in ordering defense counsel to turn over the redacted reports that he had received from Rioux. The subpoena issued to Rioux clearly indicated that Rioux was to bring copies of the requested reports to the court. For reasons unclear to us from the record, Rioux sent redacted versions of these reports directly to defense counsel. Defense counsel also represented to the trial court that Rioux had told him that he had received the records in accordance with a freedom of information request. As we noted previously, the state acknowledged that the reports were not exempt from disclosure under the act, but asserted that the reports contained confidential information, and, inasmuch as the state did not know what parts were redacted in the copies that defense counsel had received from Rioux, the state asked the court to review the entire reports in camera. The reports also were the subject of the state's motion to quash. Thus, the propriety of defense counsel's possession of the reports was in dispute. Accordingly, we conclude that the trial court, acting pursuant to its inherent authority over the management of trials, did not abuse its discretion in ordering defense counsel to turn over the redacted reports.

Even if we assume that the trial court improperly ordered defense counsel to turn over the reports, we conclude that it was harmless error. During voir dire, the trial court permitted defense counsel to ask questions of O'Leary from the material that the trial court had given to defense counsel after its in camera review

of the reports. See footnote 64 of this opinion. On voir dire, O'Leary denied the allegations set forth in the reports. Id. Defense counsel sought to ask only one question that derived from the contents of one of the redacted reports and that was not part of the information that the trial court had given to defense counsel after reviewing the reports in camera. The question was whether O'Leary had told a police officer in California that he was in that state investigating a homicide when he, in fact, was investigating a drug case. Although the trial court did not permit that question because it was outside the scope of what the trial court had given to defense counsel, the trial court did allow defense counsel to ask O'Leary, on voir dire, whether he had told police officers in California that a marijuana case was related to the murder of a police officer. O'Leary again denied the allegation. Thereafter, defense counsel did not ask O'Leary any questions that derived from the contents of the redacted reports in the jury's presence.

Thus, because defense counsel chose not to pursue this avenue of impeachment of O'Leary, and because O'Leary denied all wrongdoing alleged in the internal affairs reports, the reports, in either the redacted or unredacted versions, were irrelevant for purposes of defense counsel's impeachment of O'Leary. Cf. Conn. Code Evid. § 6-6 (b) (2) (specific instances of conduct probative of witness' character for untruthfulness may not be proved by *extrinsic evidence*). Accordingly, even if we assume that the trial court improperly ordered defense counsel to turn over the reports that he had received from Rioux, such action on the part of the trial court constituted harmless error.

We also conclude that the trial court's decision to compel defense counsel to turn over the redacted copies of the internal affairs reports did not unduly interfere with defense counsel's representation of the defendant and, thus, did not violate the defendant's constitutional

right to present a defense. We first note that the defendant does *not* claim that the trial court's review of the reports in their entirety was improper or that the document that defense counsel received from the trial court after its review of the reports lacked sufficient information with which to impeach O'Leary and Officer Velez. The defendant merely challenges the trial court's authority to compel defense counsel to turn over the reports in the first instance. Accordingly, it is clear to us that, as we previously discussed, the trial court acted within its broad discretion to manage its own affairs, and the trial court's decision to compel defense counsel to turn over the reports did not rise to the level of a constitutional violation.

Our review of the record, including the reports and the document that defense counsel had received from the trial court after its in camera review of the reports, reveals that defense counsel was given adequate information with which to impeach O'Leary, and that it was O'Leary's denial, during voir dire, of the allegations in the internal affairs reports that led to a less than favorable impeachment of O'Leary by defense counsel. In addition, defense counsel acknowledged at trial that, prior to turning over the redacted reports to the trial court, he thoroughly had reviewed them and understood the nature of the allegations made therein. Specifically, defense counsel stated that "we had the redacted file and we have had it for some time and we've been through it in detail . . . ." Thus, in light of the foregoing, it is unclear to us how defense counsel's representation of the defendant was compromised by the trial court's order compelling defense counsel to turn over the redacted versions of the internal affairs reports.

Finally, the defendant claims that the trial court's order compelling him to turn over the reports violated his rights under the first amendment to the United

States constitution.[91] Specifically, the defendant contends that, because the reports contained public information, he had a first amendment right to possess them without interference from the trial court. This claim is without merit.

In support of his contention, the defendant relies on *Gentile* v. *State Bar of Nevada*, 501 U.S. 1030, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991). That case is inapposite to the defendant's claim, however. In particular, *Gentile* determined the constitutionality of a Nevada court rule that authorized the discipline of attorneys who make certain extrajudicial statements to the press that are likely to prejudice materially an adjudicatory proceeding. See id., 1034. It did not involve, as in the present case, the propriety of an order compelling an attorney to turn over certain documents during a trial. Accordingly, we reject the defendant's claim.

2

The Trial Court's Granting of the State's
Motion to Quash and Its Refusal to
Conduct an In Camera Inspection
of Certain Documents

The defendant next claims that the trial court improperly granted the state's motion to quash a subpoena seeking from the office of the chief state's attorney any investigatory materials concerning five Waterbury police officers.[92] In addition, the defendant contends

---

[91] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

This prohibition is made applicable to the states under the due process clause of the fourteenth amendment. See, e.g., *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996).

[92] Specifically, the subpoena sought "any and all materials, hard copies, electronically or otherwise recorded, including but not limited to documents, letters, reports, tapes, or investigative summaries, relating to allegations of corruption against the following members of the Waterbury police department . . . including but not limited to allegations of payroll abuse, overtime

that the trial court committed error by failing to conduct an in camera review of those materials. In response, the state claims that the trial court properly granted the motion to quash because the materials were protected from disclosure under a law enforcement privilege. The state also claims that the trial court did not commit error in failing to conduct an in camera review of the materials. We agree with the state.

The following facts are necessary to our resolution of the defendant's claims. On September 5, 2000, a subpoena duces tecum was served on the office of the chief state's attorney seeking documents related to an investigation into alleged corruption at the Waterbury police department. Specifically, defense counsel sought information regarding certain Waterbury police officers who were listed as potential state witnesses for the defendant's trial. See footnote 92 of this opinion. The state filed a motion to quash the subpoena on the ground that it sought materials relating to an ongoing investigation that were subject to a qualified law enforcement privilege. The state also claimed that the defendant had not met a threshold showing of cause to overcome that privilege.

In opposition to the motion to quash, defense counsel asserted several instances of alleged misconduct and corruption in the Waterbury police department. The source of these allegations was a published anonymous letter to the editor of a local Waterbury newspaper. Defense counsel asserted that he received a copy of the anonymous letter from the newspaper and that it also had documents attached to it that supported the allegations in the published anonymous letter. Defense counsel also relied on the existence of an ongoing inves-

fraud, missing evidence, stolen drugs, stolen money or conspiracy to violate any state or federal statute."

The list of members of the Waterbury police department included Lieutenants O'Leary and Ricci, Detective Jones, and Officer Velez.

tigation to support his claim that he should be privy to the investigatory files of the office of the chief state's attorney.[93] Finally, as part of his showing of cause, defense counsel relied on redacted copies of certain internal affairs reports that he had come to possess. See part II G 1 of this opinion.

Thereafter, the trial court determined that the defendant had not met his burden of overcoming the law enforcement privilege. Specifically, the trial court found that the sources of the information supporting the defendant's claim were an anonymous letter to a newspaper and "rumor."[94] In addition, the trial court determined that the defendant had not established that the source possessed a "sufficient . . . nexus to truth, veracity of a witness, or exculpatory information. To use the basis of the information would be allowing a . . . fishing expedition into all accusations without

[93] The state's memorandum of law in support of its motion to quash stated that, "[w]hile the [chief state's attorney] cannot confirm the identity of individual officers under investigation, the chief state's attorney corroborates that there is presently pending an open investigation of several members of the Waterbury police department being conducted by the statewide prosecution bureau of the office of the chief state's attorney. At this point, no arrests have occurred as a result of the investigation, nor can it be disclosed at this point in the investigation whether arrests will be forthcoming."

[94] The defendant also challenges the trial court's granting of the state's motion to quash on the basis of what the defendant claims is a false characterization of the source of the information as "rumor." We note that, during trial, defense counsel suggested that "rumor" was involved in making the decision to seek the investigatory material from the office of the chief state's attorney. Specifically, the following colloquy took place in the trial court:

"The Court: . . . What is the source of this information to you [defense counsel]?

"[Defense Counsel]: The letter was received by a local newspaper and provided to me by the publisher of the local newspaper. I can also indicate, Your Honor, and I have the original article . . . [that] this article is from The Waterbury Observer, August, 2000, a monthly newspaper. *This article, along with, well, basically rumor, started our inquiries.*" (Emphasis added.)

Thus, the defendant's claim lacks merit.

corroboration . . . ." After the trial court granted the state's motion to quash, the state noted that, pursuant to its obligations under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), it had reviewed the entire investigatory file from the office of the chief state's attorney. The state then asked the court to review, in camera, a five page document to determine if it contained exculpatory material. During a brief recess, the court reviewed the document in camera and determined that it did not contain exculpatory material.

On appeal, the defendant claims that the trial court improperly granted the motion to quash and committed error in failing to review the entire investigatory file of the office of the chief state's attorney in camera. We review a court's conclusion that a defendant has failed to make a threshold showing of entitlement to an in camera review of purportedly privileged records under the abuse of discretion standard. E.g., *State* v. *Betances*, supra, 265 Conn. 506. Accordingly, "[w]e must make every reasonable presumption in favor of the trial court's action. . . . The trial court's exercise of its discretion will be reversed only where the abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) Id.

As the state notes, the materials sought by the defendant, namely, documents, letters, and reports regarding any ongoing investigation by the office of the chief state's attorney, were shielded from disclosure under a law enforcement privilege. We noted in *Seebeck* v. *State*, 246 Conn. 514, 717 A.2d 1161 (1998), that "the reason for this privilege is to aid the state's attorney and the police in conducting investigations by encouraging people to disclose information without fear of embarrassment through subsequent, needless public disclosure." Id., 546. Because the materials that defense counsel sought were privileged, and were sought for

purposes of impeachment, defense counsel was required to establish that "there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken." (Internal quotation marks omitted.) *State* v. *Bruno*, 236 Conn. 514, 523, 673 A.2d 1117 (1996); cf. *State* v. *Harris*, supra, 227 Conn. 766 ("[a] criminal defendant does not have the right to conduct a general fishing expedition into [privileged or sensitive] records" [internal quotation marks omitted]). Moreover, "[w]e have found error in the refusal of a trial court to examine documents in camera where a sufficient foundation has been laid to indicate a reasonable likelihood that they contain material relevant to the case or useful for impeachment of a witness." (Internal quotation marks omitted.) *State* v. *Betances*, supra, 265 Conn. 507.

In *State* v. *Kulmac*, 230 Conn. 43, 56, 644 A.2d 887 (1994), the defendant, Steven B. Kulmac, claimed that his right to confrontation had been violated when the trial court declined to conduct an in camera inspection of certain records of the department of children and youth services concerning the victims. After the victims had testified at trial, Kulmac subpoenaed the records in question. Id. Kulmac claimed that he "assumed" the privileged records would contain accounts of the abuse alleged at trial and that they potentially could be inconsistent with the testimony of the victims, thereby providing a basis for impeachment of the victims' credibility. Id., 57. An agent of the department of children and youth services indicated, however, that nothing in the records was exculpatory or inconsistent with the victims' testimony. Id. Because of the absence of any preliminary showing of cause by Kulmac other than his assumption that the records would contain something useful, we concluded that the trial court properly declined to review the records in camera. Id., 59.

Similarly, our review of the record in the present case reveals that the trial court did not abuse its discretion in granting the state's motion to quash and in failing to conduct an in camera inspection of the privileged material. As we noted previously, the only basis that the defendant offered for seeking the privileged materials was certain allegations of corruption made in a published anonymous letter to the editor of a Waterbury newspaper. The defendant also asserted that he was entitled to subpoena the privileged materials on the basis of an independent internal affairs investigation involving at least one Waterbury police officer. The investigation being conducted by the office of the chief state's attorney, however, was ongoing and had not involved any arrests. Beyond the bare assertion that the allegations contained in the anonymous letter to the editor likely would have been confirmed by the contents of the materials that had been sought under the subpoena, the defendant did not offer any other support to satisfy his burden of showing that his rights would be curtailed without access to the privileged materials. Moreover, the propriety of the trial court's granting of the state's motion to quash is bolstered by the fact that the state's attorney had reviewed the materials in their entirety pursuant to the state's obligations under *Brady* and determined that they contained no exculpatory information. After his review of the materials, the state's attorney, in an abundance of caution, asked the trial court to review a five page document to confirm that it lacked exculpatory information. Thereafter, the trial court determined that the document did not contain any exculpatory information. Thus, balancing the importance of confidentiality against the defendant's right to confront the witnesses against him, we conclude that the trial court did not abuse its discretion in quashing the subpoena. We also conclude, for the same reasons, that the trial court did

not abuse its discretion in failing to conduct an in camera inspection of the privileged materials.

### 3

### Invitation to Overrule *State* v. *Harris*

The defendant also invites us to overrule our decision in *State* v. *Harris*, supra, 227 Conn. 751, in which we concluded that the defendant's confrontational rights had not been violated by the decision of the trial court not to allow the defendant, Silas Harris, access to confidential records of a testifying witness. Id., 763–64. In so doing, we concluded that Harris did not have a constitutional right to view the confidential records, but that an in camera review of the records by the trial court, after a sufficient showing of cause, adequately protected the defendant's rights. See id., 764. The defendant in the present case invites us to reconsider this approach and allow the defendant to review sealed or privileged records "[as] long as strict protective orders are issued." Because the defendant has not offered any compelling reasons for us to reconsider our decision in *Harris*, we decline his invitation to overrule prior case law.

### 4

### Review of the Privileged Records for *Brady* Material

The defendant next requests that he be permitted to review the privileged records from the office of the chief state's attorney to determine if they contain exculpatory material. The defendant also seeks to review the five page document that the state's attorney had turned over to the trial court, which determined that it did not contain any exculpatory material. Alternatively, the defendant asks this court to review all the foregoing materials for potentially exculpatory information. We conclude that the defendant is not entitled to review

any of the requested material. In addition, we conclude that our review is limited to the five page document that the trial court had reviewed in camera. We further conclude that the trial court properly determined that the five page document lacked any exculpatory value.

It is axiomatic that the state has an obligation to turn over evidence in its possession that is favorable to the defendant and that is material to guilt or punishment. *Brady* v. *Maryland*, supra, 373 U.S. 87. It also is well settled that, "if the trial court discovers material exculpatory evidence in the course of an in camera inspection, it has a duty to disclose it to the defense and the defendant has a due process right to its disclosure." *State* v. *Harris*, supra, 227 Conn. 762. "A defendant's right to discover exculpatory evidence [however] does not include the unsupervised authority to search through the [state's] files. . . . Settled practice is to the contrary. In the typical case [in which] a defendant makes only a general request for exculpatory material under *Brady* . . . it is the [s]tate that decides which information must be disclosed. *Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.* Defense counsel has no constitutional right to conduct his own search of the [s]tate's files to argue relevance." (Citations omitted; emphasis added.) *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 59, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987).

It is clear to us that the same reasoning applies to the defendant's request on appeal. We note that the defendant's claim is *not* that the state violated *Brady* by withholding certain exculpatory or material information. Rather, the defendant is seeking an opportunity to sift through the records of the office of the chief state's attorney in search of a *potential Brady* violation.

Yet, the defendant has not referred us to any authority, and our research has revealed none, that permits him to do so. Instead, the defendant claims that he was entitled to the records at trial and, thus, is now entitled to view them on appeal. We rejected the defendant's claim that the trial court improperly had quashed the defendant's subpoena in part II G 2 of this opinion. We similarly reject the defendant's claim that he is entitled to review on appeal the records that the defendant sought through the issuance of that subpoena.

We also reject the defendant's request that this court review the entire file of the office of the chief state's attorney. Again, we note that the defendant has not referred us to any authority that would allow this court to review records that the trial court has determined were not subject to discovery by the defendant. In other words, the trial court determined that the defendant had not met his burden of establishing sufficient cause to overcome the law enforcement privilege, which served to exempt the sought-after materials from discovery by the defendant. We know of no authority, nor has the defendant directed us to any, that allows this court, on appeal, to review those records that the trial court never viewed.[95] The review of the sealed documents, which were not even viewed in camera by the trial court, clearly would constitute an improper appellate function.

Finally, our review of the five page document that the trial court reviewed in camera reveals that the trial court properly determined that it did not contain material, exculpatory information.[96] "The test for materiality

[95] We specifically are referring to the entire file of the office of the chief state's attorney, less the five page document that the state's attorney had turned over to the trial court. See footnote 96 of this opinion.

[96] As we noted previously, after the trial court granted the state's motion to quash the subpoena seeking any records from the office of the chief state's attorney concerning the investigation of certain Waterbury police officers, the state's attorney asked the court to review, in camera, a five page document from the file that he determined might contain exculpatory

is well established. The United States Supreme Court . . . in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 453–54, 758 A.2d 824 (2000). We conclude that this standard also applies to documents reviewed by the trial court in camera and determined by the trial court to lack exculpatory value. Our review of the five page document at issue reveals that there is no reasonable possibility that, had the evidence been disclosed, the result of the trial would have been different. We note that the document contained brief references to one Waterbury police officer who testified at trial. Although we acknowledge that impeachment evidence may be crucial to the defense, nothing in the five page document persuades us that the result of the trial would have been any different had the defendant had access to the information.

## H

### Sufficiency of the Evidence

The defendant's final guilt phase claim is that there was insufficient evidence presented at trial to convince a reasonable trier of fact to conclude, beyond a reasonable doubt, that the defendant had intended to kill the victim. In response, the state contends that the evidence was sufficient to establish that the defendant intentionally had killed the victim. We agree with the state.

---

material. The trial court reviewed the five page document and determined that it did not contain exculpatory material and, therefore, did not disclose it to the defendant.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 517–18, 782 A.2d 658 (2001).

Moreover, "[t]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Internal quotation marks omitted.) *State* v. *Sivri*, supra, 231 Conn. 126. With this background in mind, we turn to the defendant's sufficiency claim.

In the present case, the evidence revealed that the defendant dragged the victim into the bathroom, grabbed her by her hair and hit her head against the shower wall. The defendant repeatedly hit the victim's head against the shower wall, and when the victim fell to the floor, the defendant pulled her up by her hair with such force that clumps of the victim's hair and pieces of the victim's scalp were missing. In addition, after realizing that the victim was unresponsive, and after unsuccessfully trying to resuscitate her by pushing on her chest and blowing air into her mouth, the defendant did not seek medical attention for the victim. Instead, the defendant called his mother, even after the neighbor who allowed the defendant to use her telephone urged the defendant to call an ambulance. Furthermore, the defendant allowed his mother and Virginia Quintero to take the victim to the hospital, but only after they agreed to tell medical personnel a lie regarding the cause of the victim's injuries, specifically that the victim was injured when she fell while playing with her sister. On the basis of these facts, we conclude that the jury reasonably could have concluded that the defendant intended to cause the death of the victim.

The defendant relies, however, on our decision in *State* v. *Carpenter*, 214 Conn. 77, 570 A.2d 203 (1990), in support of his claim that there was insufficient evidence for a jury reasonably to conclude that he intentionally had killed the victim. In *Carpenter*, we concluded that the evidence adduced by the state, specifically, that the defendant, Richard T. Carpenter, Jr., had killed the victim, an eighteen month old child, by throwing her into a bathtub, was insufficient to support an inference that Carpenter had the requisite intent to cause the victim's death. Id., 83. We determined that the evidence was "insufficient to preclude the reasonable hypothesis that [Carpenter], out of frustration, engaged in reckless conduct that caused the death of the victim."

Id., 84–85. The defendant's reliance on *Carpenter* is misplaced, however.

We first note that, under our established scope of review of sufficiency of evidence claims, "we give deference not to the hypothesis of innocence posed by the defendant, but to the evidence and the reasonable inferences drawable therefrom that support the jury's determination of guilt. On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." *State v. Sivri*, supra, 231 Conn. 134.[97]

---

[97] We further note that the legal principles utilized in *Carpenter* were clarified in our decision in *Sivri*. In *Sivri*, we stated: "We believe . . . that there are two reasons that explain the apparent contradiction between the *Carpenter* principles and the principles regarding our traditional scope of review. The first reason is that the *Carpenter* principles, although not irrelevant to the appellate function of reviewing a claim of evidentiary insufficiency, are more properly viewed as principles that relate to the jury's function of applying the concept of proof beyond a reasonable doubt than to the function of an appellate court in reviewing the jury's verdict. That is, the jury, in sorting out the evidence and determining whether the state has proved its case beyond a reasonable doubt, must be instructed to, and must in fact, view the evidence in such a way that it cannot render a guilty verdict unless it is satisfied that the evidence meets the standards articulated in *Carpenter*. Once the jury has done that, however, and has determined that, in its best judgment, the hypothesis or hypotheses of innocence posed by the defendant are no more than 'possible' as opposed to 'reasonable' . . . that jury determination is entitled to deference on appeal. It would be inconsistent with the entire process of trial fact-finding for an appellate court to do otherwise. Thus, viewed through this prism, the *Carpenter* principles have their primary operation as rules of law for the guidance of the fact finder, rather than for the guidance of appellate courts in reviewing the sufficiency of evidence regarding the fact finder's verdict.

"The second reason involves the appropriate . . . role that *Carpenter* principles do play on the appellate level. Rather than contradict the traditional scope of review, those principles supplement that scope of review in the following way. The appellate court's first task, in responding to a claim of evidentiary insufficiency, is to apply the traditional scope of review to the evidence. . . . We then determine the sum of that evidence and the inferences, and for purposes of analysis, we assume that the facts established by that sum are true.

The facts of *Carpenter* are readily distinguishable from the facts of the present case. The evidence presented by the state in *Carpenter* revealed that Carpenter had killed the victim by throwing her into an empty bathtub. *State* v. *Carpenter*, supra, 214 Conn. 83. In the present case, however, the evidence revealed that the defendant dragged the victim into the bathroom, repeatedly thrust the victim's head against the shower wall and pulled the victim up from the floor by her hair with such force that pieces of the victim's hair and scalp had been torn off. In addition, although the defendant in *Carpenter* "immediately summoned medical aid for the [victim]"; id., 83–84; the defendant in the present case ignored requests to call an ambulance and called his mother instead. The defendant also told Quintero and his mother to lie about the cause of the victim's injuries to medical personnel. Thus, contrary to this court's decision in *Carpenter*, there was sufficient evi-

"If those facts, taken as true, are sufficient to have met the state's burden of proving all of the elements of the crime charged beyond a reasonable doubt, the verdict must stand. In that circumstance, the *Carpenter* principles do not come into play, because to do so would be to engage in the inherently contradictory process described above, and would in effect permit an appellate court to substitute a different view of the evidence from the reasonable view taken by the jury. Put another way, once those facts are taken as true for purposes of an appellate challenge to the sufficiency of the evidence, those facts necessarily preclude the hypothesis of innocence posed by the defendant, because if those facts are true then the defendant's hypothesis becomes only possible as opposed to reasonable.

"There are cases, however, in which those facts, taken as true, do not establish all of the elements of the crime charged. In such a case, the *Carpenter* principles do come into play, and require a judgment of acquittal. Under this view, therefore, the application of the *Carpenter* principles, as applied to an evidentiary insufficiency claim on appeal, require[s] the conclusion that the evidence did not preclude all reasonable hypotheses of innocence. . . . Put another way, an appellate conclusion that the evidence adduced falls short of establishing any element of the crime charged means, by hypothesis, that the evidence was consistent with a rational conclusion other than guilt." (Citation omitted.) *State* v. *Sivri*, supra, 231 Conn. 134–36. Thus, because of our conclusion that the evidence adduced at trial permitted the jury reasonably to conclude that the defendant intentionally had killed the victim, the defendant's reliance on *Carpenter* is misplaced.

dence in the present case for the jury reasonably to conclude that the defendant intentionally had killed the victim.

## III

## PENALTY PHASE ISSUES

### A

### Jury Instructions Regarding the Weighing of the Aggravating and Mitigating Factors

The defendant first claims that the trial court improperly declined to instruct the jury that the aggravating factor found by the jury must outweigh the mitigating factor or factors beyond a reasonable doubt in order to sentence the defendant to death.[98] The state claims, in response, that the trial court properly instructed the jury. We conclude, on the basis of our decision in *State v. Rizzo*, supra, 266 Conn. 171,[99] that the trial court improperly declined to instruct the jury that it must be

---

[98] The defendant proposed the following jury instruction: "Each juror must weigh the aggravating factor with all the mitigating factors he or she has found. Weighing does not mean that you compare the relative number of the aggravating and mitigating factors. Nor does it mean that you assign numerical weights to each factor. The factors must be considered in terms of their substantiality and persuasiveness. Each juror must determine in his or her own judgment the cumulative weight, i.e., the substantiality and persuasiveness, of the mitigating factors proven; then each juror must determine in his or her own judgment whether the aggravating factor outweighs or does not outweigh all the mitigating factors proven beyond a reasonable doubt.

"The state must prove that the aggravating factor outweighs the mitigating factors beyond a reasonable doubt. The reasonable doubt standard here means something different than it does when applied to fact-finding. Weighing is not fact-finding but the exercise of judgment. The beyond-a-reasonable-doubt standard represents the level of confidence you must have in your judgment as to the appropriate sentence. It represents the highest possible degree of certainty that society requires because of the severity and irrevocable nature of the death penalty. It is meant to [convey] the solemnity of the task before you and the necessity for the highest possible degree of certitude before you may impose the death penalty."

[99] See footnote 6 of this opinion and accompanying text.

persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that, accordingly, it is persuaded beyond a reasonable doubt that death is the appropriate punishment in the case.

In *Rizzo*, we clarified the differences between the pre-1995, "nonweighing" capital sentencing statute and the current weighing scheme. See generally id., 181–82, 228–31. In contrast to the pre-1995 statute, we explained that the current statute includes an additional step: in addition to a finding of the existence of aggravating and mitigating factors, the jury must weigh the aggravating factors against the mitigating factors. Id., 230. We noted that "[t]his change in our capital sentencing scheme ha[d] effectively expanded the selection phase to include, in addition to the determination of whether the defendant has established mitigation, the weighing of the aggravating factors against the mitigating factors." Id., 230–31. We further noted that this change had "resulted in a significant gap in the sentencing scheme—namely, unlike our former, nonweighing statute, the current sentencing statute does not require the jury to make its ultimate determination—that the aggravating factors outweigh the mitigating factors, and that, therefore, death is the appropriate sentence—by a level of certitude beyond a reasonable doubt. Indeed, because the legislature was silent as to the required level of certitude imposed on the jury's weighing determination, there is a statutory lacuna, which . . . should be filled." Id., 231. This statutory lacuna, we concluded, potentially raised a significant state constitutional question regarding the burden of persuasion and the level of certitude required of a jury in determining whether death is the appropriate punishment in any particular case.[100] See id., 232–33. In order to avoid the

[100] As we explained in *Rizzo*, our decision in *State* v. *Ross*, 230 Conn. 183, 252, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), "may be read as standing for the proposition that, under our state constitution, our overarching concern for consistency and reliability in the imposition of the death penalty extends to the ultimate

potential state constitutional question, we concluded "that the highest burden of persuasion should be imposed on the jury's weighing process." Id., 233. Accordingly, "we fill[ed] the gap left by the legislature in defining the burden of persuasion on the weighing process by imposing, on the most important question that our legal system entrusts to the jury, namely, whether the defendant shall live or die, the highest burden of persuasion that our legal system recognizes." Id., 234.

In the present case, the trial court properly instructed the jury that "[t]here is no special meaning to be accorded to the word 'weighing'; it's given its common, everyday meaning."[101] The remainder of the trial court's instructions, however, did not conform to the

decision of whether to impose or to decline to impose that penalty. Therefore, because the issue in the present case directly involves the decision of whether to impose or to decline to impose the death penalty, *Ross'* requirement of reliability raises the potential state constitutional question of whether the sentencer's ultimate weighing decision, which may result in the imposition of the death penalty, must be channeled by a sufficiently high burden of persuasion." *State* v. *Rizzo*, supra, 266 Conn. 233.

[101] The trial court instructed the jury regarding the weighing process as follows: "Now, I am going to instruct you on the weighing process. That must be undertaken if any one of you determines that a mitigating factor exists. You must then determine whether the aggravating factor outweighs any mitigating factors found to be established. There is no special meaning to be accorded to the word 'weighing'; it's given its common, everyday meaning. In comparison, you will ask which one is greater. Those jurors who have found the existence of a mitigating factor in his or her own mind must determine whether the aggravating factor the jury has already unanimously found to exist beyond a reasonable doubt outweighs the mitigating factor or factors that the individual juror has determined to exist.

"If you had not unanimously found [that] the state proved the aggravating factor beyond a reasonable doubt, you would not be at this process. Weighing does not involve the mere comparison of the number of aggravating or mitigating factor[s] or assign any numerical weight to each factor. Weighing is the application of your individually reasoned judgment to your findings concerning the aggravating factor, the mitigating factor or factors that you have found proven.

"As stated by the jurors who have found the existence of a mitigating factor or factors would determine whether the aggravating factor that the

demanding standard that we articulated in *Rizzo*, namely, that the jury must be persuaded beyond a reasonable doubt that the aggravating factor or factors outweigh the mitigating factor or factors and that, therefore, it is persuaded beyond a reasonable doubt that death is the appropriate punishment in the case. See footnote 101 of this opinion. We are constrained, therefore, to reverse the judgment of the trial court insofar as it imposes the death penalty and to remand the case for a new penalty phase hearing. Although we have concluded that the defendant is entitled to a new penalty phase hearing, we address those remaining claims of the defendant that are likely to arise in that proceeding and those claims that, if successful, would require us to reverse the judgment imposing the death penalty and to direct the trial court to render judgment sentencing the defendant to life imprisonment without the possibility of release.

## B

### The Trial Court's Acceptance of the Jury's Second, Corrected Verdict

The defendant next claims that the trial court improperly accepted a corrected verdict from the jury after

jury has already unanimously found to [exist] outweighs the mitigating factor or factors that the individual juror has determined to exist. That is, you must weigh the aggravating factor against any mitigating factor found to exist.

"Now, if the jury unanimously finds that the aggravating factor does outweigh the mitigating factor or factors, then your deliberations will end and the verdict form will be marked accordingly, [and] you also [sign] the verdict form to show your unanimity, and the court will sentence the defendant to death.

"The jury's unanimous determination that the aggravating factor outweighs any mitigating factor or factors must be based upon each individual juror's belief that no mitigating factor exists, or that any mitigating factor or factors established are outweighed by the aggravating factor.

"If the jury unanimously finds that the aggravating factor found to exist does not outweigh the mitigating factor or factors, then your determinations will end, you will mark the verdict sheet accordingly, and you will all sign the verdict sheet to show your unanimity, and the court will impose the sentence of life imprisonment without release."

the trial court allowed the jury to reassemble upon concluding that the jury had made a mistake with regard to its first verdict. Specifically, the defendant claims that: (1) this court's decision in *State* v. *Pare*, 253 Conn. 611, 755 A.2d 180 (2000), compels the conclusion that the jury in the present case was discharged after rendering its first verdict and, therefore, was not permitted to reassemble for the purpose of correcting that verdict; (2) the trial court incorrectly characterized the jury's mistake as a scrivener's error; (3) the trial court's "enforcement" of the second verdict constituted a violation of the defendant's rights against double jeopardy; and (4) the trial court's acceptance of the second verdict violated the defendant's eighth amendment right to be free from cruel and unusual punishments. The state disputes these claims and contends, in response, that the trial court properly reassembled the jury and accepted the jury's second, corrected verdict. We agree with the state.

The essential facts relevant to the defendant's claim are set forth in the trial court's memorandum of decision regarding the reassembly of the jury and the acceptance of the jury's second, corrected verdict as the sole verdict in the present case. "On October 16, 2000, after approximately two and one-half . . . days of deliberation during the penalty phase of the trial, the court received a communication from the jury. The communication indicated that the jury had reached a verdict . . . . The court reconvened and the clerk inquired of the jur[ors] their findings from the special verdict form. The jur[ors] initially reported that they unanimously agreed: (1) that the state had proved the aggravating factor beyond a reasonable doubt . . . (2) that the defendant had not proved, by a preponderance of the evidence, the existence of one or a combination of statutory [mitigating] factors . . . (3) that [one or more jurors] had found the existence of a mitigating factor as defined . . . and

(4) that the aggravating factor had not outweighed the mitigating factor(s) found . . . . Neither party moved for a jury poll. The initial special verdict was accepted and recorded. The jury was excused and went to the deliberation room.

"Immediately upon exiting the courtroom, the jury, through a juror, informed the sheriff that there was a problem. The jury was in its deliberation room at this time, together as a group, and not with any outside parties. The sheriff informed the court that the jury had a problem, and the court proceeded to the jury room to inquire of the problem. The court was immediately informed that the problem was with the verdict. The court briefly responded to the inquiry and instructed the clerk, who was present, to inform the jurors to write a note indicating the specific problem. The jurors produced a note for the court . . . . The court alerted the parties [as] to the jury's problem and conducted discussions with the attorneys in chambers on how to appropriately address the issue. The court determined that a complete record with the jury had to be established for appellate review.

"The court reconvened, the jury's note was marked as [an exhibit], and each party was allowed to argue its position regarding the additional proceedings.

"Subsequently, a jury poll was taken and each individual juror indicated that [his or her] intent was to announce that the aggravating factor outweighed the mitigating factor(s). Each individual juror also indicated that the decision concerning [the jury's] corrected verdict was not a result of any force, threat or outside influence. At the conclusion of these questions, the court instructed the jurors to complete another special verdict form which indicated their intended findings. The court recessed for this purpose. The court reconvened after the jury had completed the [second] special

verdict form, and before accepting this corrected verdict form, the court again had the clerk question each individual juror if this verdict accurately indicated the decision of each juror. The jurors were polled as to this . . . second special verdict form. Each juror acknowledged that this . . . second special verdict form was [his or her] actual intent. [According to the second special verdict form, the jury found that the state had proven the existence of an aggravating factor beyond a reasonable doubt, one or more jurors found that the defendant had proven the existence of one or more nonstatutory mitigating factors, and the jurors unanimously agreed that the aggravating factor outweighed the mitigating factor or factors. Thus, the second verdict called for the imposition of the death penalty.]

"The jury was excused. During subsequent hearings [on] the matter, [defense counsel] filed [an] affidavit containing an allegation of judicial contact with the jury. Because of this allegation, the court referred the matter for review by the presiding criminal judge, *Damiani, J.* (presiding judge). The presiding judge conducted an evidentiary hearing on December 1, 2000, and questioned each of the twelve jurors concerning [his or her] contact with the court. After the hearing, the presiding judge ruled that any contact between the court and the jurors was proven harmless beyond a reasonable doubt."

Thereafter, the trial court concluded, in its memorandum of decision, that the jury had not been discharged prior to the individual polling of the jury and the correction of its verdict. Consequently, the trial court accepted the second verdict as the jury's true verdict. In so concluding, the trial court found that, prior to the jury's reassembly in the courtroom, "the jury [had] remained as an intact unit under the control and supervision of the court." The trial court also explained that the only individuals with whom the jury had contact after exiting

the courtroom were court personnel, and that such contact was initiated for the sole purpose of alerting the court of the jury's error. The trial court also found that the jury never left the jury room once it had exited the courtroom and that it went directly to the jury room. On the basis of these facts, the trial court determined that it properly had allowed the jury to correct its verdict to reflect the jury's decision to impose the death penalty on the defendant.

1

## Authority of the Trial Court to Recall the Jury Prior to Discharge

The defendant claims that the trial court improperly concluded that the jury had not been discharged prior to its reassembly and submission of its second verdict. Specifically, the defendant contends that, pursuant to this court's decision in *State* v. *Pare*, supra, 253 Conn. 611, the jury in the present case had separated and dispersed, and had the opportunity to mingle with others before it was reassembled and allowed to submit its second verdict. The defendant also claims that *Pare* does not sanction the reassembly of a jury for the purpose of allowing it to correct or to change its verdict. The state contends that the jury had not been discharged prior to being reassembled; specifically, the state claims the jury remained a single, undispersed unit that was not subject to any external influence. The state also contends that, because the jury had not been discharged, the trial court properly allowed the jury to reassemble and to correct its verdict.

As a threshold matter, we set forth the standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous." (Inter-

nal quotation marks omitted.) *Frillici* v. *Westport*, 264 Conn. 266, 277, 823 A.2d 1172 (2003). In the present case, the issue is whether the trial court properly reassembled the jury after learning that it had made a mistake in returning its first verdict. Accordingly, the authority of the trial court to reassemble the jury and the determination of whether the jury was discharged present questions of law over which our review is plenary. E.g., *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004). Therefore, "we must decide whether [the trial court's] conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000). Nevertheless, the trial court's findings as to the circumstances surrounding the reassembly of the jury and the purportedly mistaken first verdict are findings of fact that will not be disturbed unless clearly erroneous. E.g., *State* v. *Nosik*, 245 Conn. 196, 205, 715 A.2d 673 (1998). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Frillici* v. *Westport*, supra, 277.

Turning to the merits of the defendant's claim, we note that, "[w]hen a jury remains as an undispersed unit within the control of the court and with no opportunity to mingle with or discuss the case with others, it is undischarged and may be recalled." (Internal quotation marks omitted.) *State* v. *Pare*, supra, 253 Conn. 630, quoting *United States* v. *Marinari*, 32 F.3d 1209, 1214 (7th Cir. 1994); see also *Summers* v. *United States*, 11 F.2d 583, 586 (4th Cir.) ("After a verdict has been rendered, and the jur[ors], after being discharged, have separated, the jur[ors] cannot be recalled to amend their

verdict. But the mere announcement of their discharge does not, before they have dispersed and mingled with the bystanders, preclude recalling them." [Internal quotation marks omitted.]), cert. denied, 271 U.S. 681, 46 S. Ct. 632, 70 L. Ed. 1149 (1926). Thus, the issue presently before us is whether, in light of the circumstances of the present case, the jury had been discharged prior to its reassembly to correct its first verdict.

In *State* v. *Pare*, supra, 253 Conn. 611, the defendant, Joseph Pare, was charged with murder. At trial, following two days of deliberations, the jury informed the court that it had reached a verdict. Id., 617. Following a sidebar conference between defense counsel and the trial court, the jury was escorted into the courtroom and, thereafter, announced its verdict finding Pare guilty of murder. Id. After the jury verdict was announced, the clerk asked the members of the jury collectively whether they unanimously had agreed that Pare was guilty of murder. Id. The jurors collectively responded in the affirmative. Id. After reviewing the process through which the jury arrived at its verdict, the trial court instructed the jurors to retire to the deliberation room and to wait for the trial court to speak with them. Id., 617–19. Immediately after the jurors exited the courtroom, defense counsel requested that the trial court individually poll the jurors regarding the verdict. Id., 619. The trial court denied defense counsel's request. Id.

On appeal, Pare claimed that the trial court had violated his right, under Practice Book § 42-31,[102] to poll

---

[102] Practice Book § 42-31 provides: "After a verdict has been returned and before the jury have been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or they may be discharged."

members of the jury individually. *State* v. *Pare*, supra, 253 Conn. 620. In *Pare*, we first concluded that the language of § 42-31, as well as the history of its adoption, clearly indicated that the term "shall," as used therein, "constitute[d] a mandatory term," and, accordingly, that a trial court was required to conduct a poll of the individual jurors pursuant to a timely request. Id., 625. We then addressed the issue of whether defense counsel's request to poll the jurors individually was timely. Id. We explained that, in reading § 42-31 in its entirety, it was clear that the request to poll must occur before the jury is discharged. Id., 627–28.

In construing the meaning of "discharged," as used in Practice Book § 42-31, we first concluded that jurors are not necessarily relieved of their official obligations once they leave the courtroom and, therefore, under certain circumstances, jurors may be recalled for the purpose of submitting to a jury poll. Id., 628–29. Thus, "mere departure from the courtroom does not, in and of itself, discharge a jury from its obligation to render continued service in a particular case." *State* v. *Murray*, 254 Conn. 472, 495, 757 A.2d 578 (2000). In *Pare*, we went on to discuss when a juror's obligations are deemed complete such that the jury is no longer within the control of the court. See generally *State* v. *Pare*, supra, 253 Conn. 629–34. We concluded that a jury completes its task and relinquishes its status as a judicial body—and, therefore, is discharged—when "its members *actually separate or disperse*." (Emphasis added.) Id., 634. In so concluding, we explained that, "[w]hen a jury remains as an undispersed unit within the control of the court and with no opportunity to mingle with or discuss the case with others, it is undischarged and may be recalled." Id., 630, quoting *United States* v. *Marinari*, supra, 32 F.3d 1214. Until the members of the jury actually separate and disperse, "it can be assumed, in the absence of any indication to the contrary, that the delib-

erative process had not been tainted . . . ." *State* v. *Pare*, supra, 633. "After separating and dispersing, however, individual jurors may come into contact with outside influences . . . thereby tarnishing the deliberations that might take place thereafter. At that point, individual jurors effectively relinquish their status as jurors because they are no longer eligible to be recalled." (Citation omitted; internal quotation marks omitted.) *State* v. *Murray*, supra, 254 Conn. 495.

In *Pare*, we concluded that the jury had not been discharged when the trial court denied defense counsel's request to poll the jurors. *State* v. *Pare*, supra, 253 Conn. 634. In support of this conclusion, we explained that the trial judge expressly had "instructed the members of the jury to retire to the jury room and await his arrival." Id. Moreover, "[t]he jurors had not dispersed and they remained untainted by any outside contact." (Internal quotation marks omitted.) Id. Therefore, "the jury continued to exist as a judicial body under the control of the court." (Internal quotation marks omitted.) Id. Accordingly, we concluded that the trial court improperly had denied defense counsel's request to poll the jury.[103] See id., 634–35.

Applying the foregoing principles to the present case, we conclude that the jury had not been discharged when the trial court learned of the error in the jury's first verdict and that, consequently, the trial court properly reassembled the jury to allow it to correct its verdict.

---

[103] In *Pare*, we went on to reject the state's claim that a denial of a request to poll the jury is subject to a harmless error analysis. *State* v. *Pare*, supra, 253 Conn. 637–39. We explained that, "because the purpose of permitting an individual poll is to protect the accused's constitutional right to an acquittal in the absence of the full consensus of each juror, the denial of a timely request to poll is of substantial and unique magnitude." Id., 636. Consequently, we concluded that "a defendant's right to poll the jury, if not waived, is absolute, and its denial requires reversal even though the remainder of the trial may be error-free." (Internal quotation marks omitted.) Id., 638–39.

The trial court found that the jurors, after delivering their initial verdict and being excused from the courtroom, went directly to the deliberation room. Moreover, "[i]mmediately upon exiting the courtroom," a juror informed the sheriff that there was a problem. At the time the sheriff informed the trial court of the problem with the jury's verdict, the jury had remained as a group and had not had contact with any outside parties. After speaking briefly with the trial court, the members of the jury, still congregated as a group, prepared a note indicating the problem, namely, that the jury actually had concluded that the aggravating factor outweighed the mitigating factor or factors. Thereafter, the jury was recalled into the courtroom, where the trial court conducted a poll of the individual jurors. During that poll, each juror stated to the court that it was his or her intent to announce that the jury had found that the aggravating factor outweighed the mitigating factor or factors. Each juror further stated that his or her correction was not the product of duress or outside influence. The trial court thereafter instructed the jurors to complete another special verdict form indicating their intended findings. Because the jurors had not separated and dispersed, and because the jurors had no opportunity to mingle or to discuss the case with others, we conclude that the jury was not discharged, and, therefore, the trial court properly could reassemble the jury in order to allow it to correct its verdict.

The defendant contends, however, that the jury was discharged because: (1) the trial court never expressly instructed the members of the jury to retire to the jury room and to await his arrival; (2) the jurors in the present case had an opportunity to mingle and to discuss the case with others; and (3) the parties waived their right to have the jurors polled and, thus, the jurors had no outstanding obligations to fulfill.[104] First, we

---

[104] We note the fallacy in the defendant's argument that the parties had waived their right to poll the jurors and that, consequently, the jury could

deem the defendant's reliance on the lack of a specific trial court instruction that the jurors wait in the jury room as inapposite to the issue of whether the jury had been discharged. Just as "the mere announcement of [the jurors'] discharge" does not preclude a court from recalling them; *Summers* v. *United States*, supra, 11 F.2d 586; the lack of a specific instruction directing the jury to go directly to the deliberation room is not dispositive of the issue of discharge. Rather, the relevant inquiry is whether, under the circumstances of the case, the jurors had separated and dispersed and, therefore, were no longer a judicial body under the authority of the court. Consequently, although the trial court did not instruct the jury in the present case to go directly to the jury room, the trial court specifically found that the jurors had done so anyway, without ever separating or dispersing. Accordingly, the jury was not discharged before being reassembled.

We also reject the defendant's claim that the jurors had the opportunity to mingle and to discuss the case with outsiders. In support of this claim, the defendant relies on the fact that the jurors actually discussed their verdict with the sheriff and the judge. As the trial court noted in its memorandum of decision, however, "any contact that took place was initiated by the jury . . . for the sole purpose of alerting the court to [the jury's] error." We do not think that contact with court personnel for the sole purpose of alerting the court of a potential error in the verdict constitutes contact with outsiders sufficient to render the jury discharged. The policy supporting a finding of discharge after jurors have had contact with outsiders, namely, the avoidance

not have been reassembled. Practice Book § 42-31 allows a party to request that the court poll the jury before the jury is discharged. Because we have concluded that the jury was not discharged before it was reassembled and polled regarding its intended verdict, the parties could not have waived their right to poll the jury.

of taint to the deliberative process, is not served by precluding contact with court personnel for the sole purpose of alerting them of a mistake with regard to the verdict. Thus, the mere fact that the jury initiated contact with the sheriff and the trial court for the sole purpose of alerting them to its error in the first verdict did not automatically render the jury beyond the authority and control of the court and, therefore, discharged under the rule in *Pare*.[105] See *Commonwealth* v. *Brown*, 367 Mass. 24, 28, 323 N.E.2d 902 (1975) (jury not discharged and, therefore, permitted to amend its verdict when jury foreperson alerted *court officer* of mistake in initial verdict).

---

[105] We also note that, at a subsequent hearing to determine the propriety of the trial court's contact with the jury, the court, *Damiani, J.*, concluded that the judicial communication with the jury was harmless beyond a reasonable doubt. Specifically, the court stated: "In this matter, for the state to avoid a new penalty hearing, it must be shown beyond a reasonable doubt that the [jury's] communication was harmless. Now, based upon the questioning today of these jurors and based upon their answers, there's no question [that] the state has met its burden [of proving] beyond a reasonable doubt that any communication was harmless.

"The jurors' initial verdict was death. They realized the mistake. One juror said . . . less than five minutes, three minutes; [another juror said] two minutes; [another juror], thirty seconds; [another juror], less than five minutes; [another juror] right away; [another juror], thirty seconds; [another juror], thirty seconds; [another juror], twenty seconds, [another juror], short time; [another juror] either said immediately or instantaneously; [the jury foreperson] said seconds. They—no question in this court's mind—realized a mistake was made without any conversation from any outside person. It was only when that confusion was communicated to each other [that] the judge was called, and the judge simply went there to inquire what the problem was, and when the judge found out that the problem was a legal problem, not a physical problem with one of the jurors, the judge backed out. [The jury foreperson] said he was there some twenty seconds and he said, 'Put it in a note.'

"Therefore, the court finds that any contact was harmless. It's been proven beyond a reasonable doubt." Thus, it is clear that the jury initiated contact with the trial court for the sole purpose of alerting the trial court of the jury's error and that such contact did not have the effect of tainting the deliberative process.

The defendant also claims that, in *Pare*, this court only determined whether a trial court could recall a jury for the purpose of polling the individual jurors and, therefore, that *Pare* does not provide support for the authority of a trial court to recall a jury for the purpose of allowing it to correct its verdict. Although we acknowledge that *Pare* required us to decide only whether a trial court could recall a jury in order to poll its members individually, several other courts have concluded that a court has the power to recall a jury that has not been discharged in order to allow it to correct a mistake in its verdict. In *Commonwealth* v. *Brown*, supra, 367 Mass. 24, the jury initially returned verdicts finding each of the defendants not guilty of the crime of first degree murder but guilty of the crime of "armed entry . . . ."[106] Id., 27. After accepting the verdicts, the trial court discharged the jury. Id. Four minutes later, the jury was permitted to reenter the courtroom and to correct its initial verdicts by stating that it actually had found the defendants guilty of first degree murder. Id. At a subsequent evidentiary hearing, the trial court found that, as the jury was leaving the courtroom and entering the jury room, the jury foreperson had informed the court officer that something was wrong with the verdicts. Id., 28. The trial court also found that there had been "no commingling of the jurors with any members of the general public and no conversation between the jurors and the alternate jurors." Id. Moreover, "[t]he judge was promptly informed, and the jury [was] brought back into the court room. Despite the announcement of [the jurors'] discharge, the judge found . . . [that] they remained an undispersed unit, still within the control of the court and in the custody of the court officers, and they were not subject to any

---

[106] Specifically, the crime of "armed entry" required proof that the accused entered a dwelling while armed and committed an assault therein with the intent to commit another felony, such as robbery or larceny. See *Commonwealth* v. *Brown*, supra, 367 Mass. 26.

judicial or extra-judicial influence before they returned to the courtroom to announce the true verdicts." Id.

On appeal, the defendants claimed that the trial court improperly accepted the jury's corrected verdicts. Id., 27. The Supreme Judicial Court of Massachusetts began its analysis of the defendants' claim by explaining that, "once the jury ha[s] been discharged, [it has] no further power to deliberate or to agree to a verdict." Id., 28. The court went on to state, however, that it has "allowed juries to correct formal and clerical errors in the recording of verdicts to which they had properly agreed. . . . [T]hat principle applies to deny finality to the original verdicts here, since the jury, by [its] own action and without any suggestion from the judge or any one else, immediately indicated that the verdicts reported did not state what [the jurors] had agreed to." (Citations omitted.) Id., 28–29. Thus, the court concluded that there was "no impropriety in the correction of the verdicts on the murder indictments." Id., 29. Other courts similarly have permitted juries to correct their verdicts prior to being discharged. E.g., *State* v. *Myers*, 318 S.C. 549, 552, 459 S.E.2d 304 (1995) (because jury "remained an essentially undispersed unit, and was subjected to no outside influence" between release and reassembly, court properly reassembled jury to allow it to report "the actual verdict reached"); *State* v. *Edwards*, 15 Wash. App. 848, 851, 552 P.2d 1095 (1976) (Jury's corrected verdict properly was received when "[t]he jury did not pass from the control of the court but merely exited the courtroom to the adjacent jury room where it would have to remain until the bailiff entered and unlocked the outside door. No member of the jury had either the time or opportunity to separate from his fellows and commingle with nonmembers of the jury, nor did the jurors renew their deliberations or discuss the merits of the cause."), review denied, 88 Wash. 2d

1003 (1977).[107] Accordingly, we conclude that the trial court acted well within its discretion to reassemble the jury for the purpose of allowing it to correct its first verdict. Because we conclude that the jury in the present case was not discharged prior to its reassembly, the trial court properly accepted the jury's corrected verdict.

## 2

### Scrivener's Error

The defendant next claims that the trial court incorrectly characterized the jury's mistake in its initial verdict as a scrivener's error. In response, the state contends that the trial court correctly characterized the jury's mistake as a scrivener's error.

In its memorandum of decision, the trial court concluded "that fairness and justice would not allow a scrivener's error to thwart a true and accurate jury verdict." As we noted previously, "[t]o the extent that the trial court has made findings of fact, our review is

---

[107] In addition, several other courts have recognized the authority of a trial court to recall an undischarged jury for the purpose of allowing it to correct its verdict, but have concluded that the jury already had been discharged at the time the jury had been recalled. See *Montanez* v. *People*, 966 P.2d 1035, 1036–37 (Colo. 1998) (explaining that "a jury may change or modify its verdict up to the point the verdict is accepted by the court and the jury is formally discharged" but that jury already had been discharged because one juror was about to exit courthouse and another already had been outside and that both had opportunity to mingle and to discuss case with outsiders when trial court recalled jury to correct its verdict); *Burchett* v. *Commonwealth*, 734 S.W.2d 818, 820 (Ky. 1987) (recognizing that "a trial court has the authority before accepting a verdict and before discharging a jury to send [the jury] back to correct a mistake in its verdict" but concluding that jury had been discharged because jury was allowed to return to court on following day and was allowed to deliberate same issue it previously had decided); *State* v. *Green*, 995 S.W.2d 591, 613 (Tenn. Crim. App. 1998) (jury was discharged after rendering initial mistaken verdict because most, if not all, of jurors had left courtroom and exited into area that "was open to and occupied by members of general public, interested in and reacting to the outcome of the case").

limited to deciding whether such findings were clearly erroneous." (Internal quotation marks omitted.) *Frillici* v. *Westport*, supra, 264 Conn. 277. The trial court's determination that the jury's first verdict form, in which the jury noted that it had found that the aggravating factor did not outweigh the mitigating factor or factors, contained a scrivener's error is a finding of fact. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id.

Our review of the record in the present case reveals that the trial court's finding that the initial verdict contained a scrivener's error was not clearly erroneous. After learning that the jury had made an apparent mistake in returning its initial verdict, the trial court recalled the jury into the courtroom and directed the clerk to poll the jurors as to their intended verdict. Specifically, the trial court stated: "I received your communication . . . which indicates, 'It must be noted that the jury found the aggravating factors outweigh the mitigating factors.' And . . . the clerk is going to ask the foreperson . . . to basically go through that jury verdict form to find out what you intended if it's not what's on that form to be." In response, the foreperson responded: "We intended to sign . . . 'yes' to the aggravating factors overweighing the mitigating factors." Subsequently, the court clerk asked every juror: "As to the weighing, do you unanimously agree that the aggravating factor proven beyond a reasonable doubt by the state of Connecticut outweighs the mitigating factor or factors found to exist, yes or no?" Every juror responded "yes," signifying that the jury had intended to mark "yes," on the initial verdict form in responding to the question of whether the jury unanimously had

agreed that the aggravating factor outweighed the mitigating factor or factors. Furthermore, during an evidentiary hearing before *Damiani, J.*, regarding the propriety of the jury's contact with the trial court after the initial verdict was recorded, *all* of the jurors testified that when they entered the courtroom to deliver their first verdict, their intended result was that the defendant receive the death penalty. Thus, the record clearly indicates that the jury actually found that the aggravating factor outweighed the mitigating factor or factors. Accordingly, the trial court's finding that the initial verdict form contained a scrivener's error and, therefore, was amenable to correction to indicate the jury's actual intent, was not clearly erroneous. See, e.g., *State* v. *Farmer*, 158 N.C. App. 699, 705, 582 S.E.2d 352 (2003) (trial court properly gave jury second verdict form to correct clerical error in first verdict form that resulted in incorrect verdict); cf. *Martin* v. *State*, 732 So. 2d 847, 854 (Miss. 1998) (evidentiary rule prohibiting juror from testifying as to any matter or statement occurring during course of jury deliberations upon inquiry into validity of verdict "simply would not apply to a situation [in which] a jury reports a verdict that is not the actual verdict voted and agreed upon").

3

Double Jeopardy

The defendant next claims that the trial court's "enforcement" of the jury's corrected verdict violated his rights against double jeopardy. In response, the state contends that the defendant's rights against double jeopardy were not violated because "the defendant was not 'acquitted' of the death penalty by virtue of the jury's clerical mistake . . . ."

The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be subject for the same offense to be twice put in jeopardy

of life or limb . . . ." The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). "Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of [the Connecticut Constitution], include protection against double jeopardy. . . .

"We have recognized that the Double Jeopardy Clause consists of several protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense. . . . These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense. . . . The Clause operates as a bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent." (Citations omitted; internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 119, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

In the present case, the defendant claims that the "enforcement" of the jury's second verdict violated his rights under the double jeopardy clause because the jury's first verdict constituted "a complete and final judgment" to which jeopardy attached. The issue of whether a correction to a jury's verdict after the verdict has been recorded, but before the jury has been discharged, violates double jeopardy principles is an issue of first impression for this court. Other courts have addressed the issue, however, and concluded that the acceptance of a jury's corrected verdict does not violate double jeopardy principles.

For example, in *Brown* v. *Gunter*, 562 F.2d 122 (1st Cir. 1977), the First Circuit Court of Appeals explained that, during the petitioners' trial in state court, the jury had returned verdicts of not guilty of first degree murder. Id., 123. Within minutes, however, one of the jurors had reported to a court officer that the verdicts, as read in court, were incorrect. Id. Thereafter, the trial court recalled the jurors and allowed them to correct their verdicts to indicate that they had found each of the petitioners guilty of first degree murder. Id. At the state level, the Supreme Judicial Court of Massachusetts concluded that the jury had not been discharged and, therefore, that the trial court properly had allowed the jury to correct its verdicts. See *Commonwealth* v. *Brown*, supra, 367 Mass. 28–29; see also part III B 1 of this opinion (discussing *Commonwealth* v. *Brown*).

In their appeal from the denial of their habeas petitions, the petitioners claimed that their due process rights were violated when the trial court allowed the jurors to correct their verdicts. *Brown* v. *Gunter*, supra, 562 F.2d 124. The First Circuit Court of Appeals noted that "two Bill of Rights provisions [were] relevant . . . [namely] the Double Jeopardy Clause of the Fifth Amendment and the right to a jury trial guaranteed by the Sixth Amendment"; id.; both of which are applicable to the states through the fourteenth amendment due process clause. See id. and nn. 3–4, citing *Benton* v. *Maryland*, supra, 395 U.S. 784, and *Duncan* v. *Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). The court first noted that "[n]either provision ha[d] been violated on its face. [The petitioners] did receive a jury trial. [Furthermore] [t]he state did not reprosecute them [after] winning the original conviction[s], nor did [the state] impose a second punishment for the same criminal activity." *Brown* v. *Gunter*, supra, 124. The court went on to explain, however, that "[t]he provisions of the Bill of Rights . . . are not empty, meaning-

less forms. In deciding whether the [c]onstitution permits the rule Massachusetts has adopted in this case, we must go on to inquire whether by permitting operation of that rule we would grant the right[s] but in reality . . . withhold [their] privilege and enjoyment." (Internal quotation marks omitted.) Id.

The court then explained that the primary danger against which the double jeopardy clause protects, namely, repeated attempts to prosecute an individual for the same offense, was not implicated when the trial court allowed the jurors to correct the verdicts. See id., 125. Specifically, the court noted that that danger is "far greater than the mere disappointment that will follow from a defendant having thought for a few moments that he had been found not guilty. Moreover, the defendant's interest is not the only one at stake. We must also consider the societal interest in punishing one whose guilt is clear after he has obtained [a fair] trial. . . . Given that the harm to the [petitioners] is minor and that a jury has found them guilty, we conclude that the purposes of the Double Jeopardy Clause have not been undercut." (Citation omitted; internal quotation marks omitted.) Id.

Similarly, in *United States* v. *Stauffer*, 922 F.2d 508 (9th Cir. 1990), the Ninth Circuit Court of Appeals concluded that the trial court in that case "did not alter the jury's verdict itself; it simply corrected the verdict form to reflect the jury's true intent. Clearly, decreasing the impact of a judgment is less problematic to a defendant than expanding its impact. Still . . . no possible unfairness can be found in a judgment that reflects the jury's true intent. Despite [the defendant's] admirable effort to persuade this [c]ourt that his right to be free from double jeopardy has been violated, the facts do not support a conclusion that the double jeopardy clause has been compromised . . . ." Id., 514.

We are persuaded by the reasoning of these decisions and adopt that reasoning in the present case. Accordingly, we conclude that the trial court's acceptance of the jury's corrected verdict, prior to the jury's discharge, did not violate the defendant's double jeopardy rights. To be sure, we note that the United States Supreme Court has concluded that, "[i]f a jury unanimously concludes that a [s]tate has failed to meet its burden of proving the existence of one or more aggravating circumstances, double-jeopardy protections attach to that 'acquittal' . . . ." *Sattazahn* v. *Pennsylvania*, 537 U.S. 101, 112, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003).[108] In

[108] *Sattazahn* addressed the double jeopardy implications of a retrial after the defendant's successful appeal of his conviction. The defendant, David Allen Sattazahn, was convicted of first, second and third degree murder, among other crimes. *Sattazahn* v. *Pennsylvania*, supra, 537 U.S. 103. During the penalty phase, during which the commonwealth of Pennsylvania sought to prove the existence of one statutory aggravating factor, namely, the commission of the murder while in the perpetration of a felony, the jury informed the trial court that it was hopelessly deadlocked regarding the appropriate penalty. Id., 104. In accordance with Pennsylvania law, the trial court discharged the jury as hung and sentenced the defendant to life imprisonment. Id., 104–105. Thereafter, Sattazahn successfully challenged his murder conviction on direct appeal. Id., 105. At Sattazahn's retrial, the commonwealth again sought the death penalty and also sought to prove, during the penalty phase, a second aggravating factor, namely, the defendant's significant history of prior felony convictions involving violence or the threat of violence. Id. At the second trial, the defendant was found guilty of first degree murder, but this time the jury "imposed a sentence of death." Id.

On appeal to the United States Supreme Court, Sattazahn claimed that the double jeopardy clause barred the commonwealth from seeking the death penalty on retrial. See id., 115. The court rejected the defendant's claim, explaining that "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.' [Sattazahn] . . . cannot establish that the jury or the court 'acquitted' him during his first capital-sentencing proceeding. As to the jury: The verdict form returned by the foreman stated that the jury deadlocked 9-to-3 on whether to impose the death penalty; it made no findings with respect to the alleged aggravating circumstance. That result—or more appropriately, that non-result—cannot fairly be called an acquittal 'based on the findings sufficient to establish legal entitlement to the life sentence.' " Id., 109.

Moreover, the United States Supreme Court determined that the imposition of the life sentence at Sattazahn's first trial also was not an "acquittal"

the present case, however, the jurors indicated, both immediately after returning their initial, mistaken verdict and at a subsequent evidentiary hearing, that they unanimously had agreed that the aggravating factor outweighed the mitigating factor or factors. Thus, the jurors never *actually* unanimously agreed that the aggravating factor did not outweigh the mitigating factor or factors, despite the jury's initial, mistaken verdict to the contrary, and, therefore, the defendant was not "acquitt[ed]" within the meaning of *Sattazahn*. (Internal quotation marks omitted.) Id.

The defendant nevertheless relies on *State* v. *Green*, 995 S.W.2d 591 (Tenn. Crim. App. 1998), in support of his claim that the trial court's acceptance of the jury's second verdict violated the double jeopardy clause. In *Green*, the defendant, Rachel Marie Green, was charged with facilitation of first degree murder and facilitation of attempted first degree murder. Id., 598. The trial court charged the jury with respect to those crimes and the lesser included crimes of facilitation of second degree murder and facilitation of attempted second degree murder. Id., 607. After between one and two days of deliberations, the jury informed the trial court that it had reached a verdict. Id. When the jury entered the courtroom, the trial court asked the jury foreperson what the jury's verdict was regarding both counts of facilitation, to which the foreperson responded, "Not guilty." (Internal quotation marks omitted.) Id. The trial court then verbally discharged the jury. Id. Thereafter,

---

for double jeopardy purposes because, "under Pennsylvania's sentencing scheme, the [trial] judge has no discretion to fashion sentence once he finds that the jury is deadlocked. The statute directs him to enter a life sentence." (Internal quotation marks omitted.) Id., 109. Accordingly, "[s]ince judgment is not based on findings which resolve some factual matter, it is not sufficient to establish legal entitlement to a life sentence." (Internal quotation marks omitted.) Id., 110. Thus, because neither the jury nor the trial court "acquitted" Sattazahn in his first penalty phase hearing, double jeopardy did not bar Sattazahn's subsequent death sentence. Id., 109–10.

the jury left the courtroom and exited "into an area of the courthouse which was open to the public. This area was quite congested." Id. The jurors also were able to witness public reaction to the not guilty verdict, which "included crying." Id. The jury then was called back into the courtroom and polled by the trial court. Id., 608. The poll revealed that the not guilty verdict that the jury foreperson had announced was the jury's true verdict. Id. The foreperson stated, however, that the jury also had considered the other lesser charges, namely, facilitation of second degree murder and facilitation of attempted second degree murder. Id. After the trial court attempted to seek further clarification from the jury foreperson, it proceeded to poll the jurors as to whether their verdict was guilty as to facilitation of second degree murder and facilitation of attempted second degree murder, to which the jurors all responded affirmatively. Id.

On appeal, Green claimed, inter alia, that the reassembly of the jury violated her rights under the double jeopardy clause. See id., 614. The Tennessee Court of Criminal Appeals first concluded that the jury had been discharged before it had been reassembled to correct its verdict. Id., 613, 614. The court reasoned that most, if not all, of the jury members had exited the courtroom and entered into an area that was occupied by members of the public who were reacting to the outcome of the trial. Id., 613. Thus, the court concluded that there existed a possibility that the jurors had had contact with outsiders, and, therefore, the jury was "discharged" prior to being polled about its intended verdict. Id. The Tennessee Court of Criminal Appeals concluded that, because the jury had been discharged, the trial court improperly permitted the jury to correct its verdict. Id., 614. Accordingly, "[t]he not guilty verdicts reported by the jury, *coupled with the discharge*

*of the jury,* concluded the [d]efendant's jeopardy." (Emphasis added.) Id.

The defendant's reliance on *Green* is misplaced. We previously concluded that the trial court properly determined that the jury had not been discharged before being reassembled for the purpose of correcting its verdict. Accordingly, contrary to *Green, in which the jury already had been discharged,* the trial court's acceptance of the jury's corrected verdict in the present case did not violate the double jeopardy clause.

### 4

### Cruel and Unusual Punishment

The defendant finally claims that the trial court's acceptance of the jury's corrected verdict violated his right to be free from cruel and unusual punishments under the eighth[109] and fourteenth[110] amendments to the United States constitution. We disagree.

It is axiomatic that a capital defendant has an eighth amendment right to "a capital sentencing jury [that] recognizes the gravity of its task and [that] proceeds with the appropriate awareness of its truly awesome responsibility." (Internal quotation marks omitted.) *Caldwell* v. *Mississippi,* 472 U.S. 320, 341, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985). Additionally, in capital cases, the eighth amendment requires a "heightened need for reliability in the determination that death is the appropriate punishment in a specific case." (Internal quotation marks omitted.) Id., 340; accord *State* v. *Reynolds,* supra, 264 Conn. 177. We conclude, however, that the procedures employed by the trial court in the

---

[109] See footnote 19 of this opinion.

[110] The eighth amendment's prohibition against cruel and unusual punishments is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Estelle* v. *Gamble,* 429 U.S. 97, 101, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

present case satisfied the eighth amendment's "heightened need for reliability . . . ." (Internal quotation marks omitted.) *Caldwell* v. *Mississippi*, supra, 340.

After the trial court properly reassembled the jury upon discovering its apparent mistake, the trial court polled each juror to determine whether the jurors "unanimously agree[d] that the aggravating factor proven beyond a reasonable doubt by the state of Connecticut outweigh[ed] the mitigating factor or factors found to exist . . . ." Each juror responded affirmatively. The trial court also asked each juror to respond to the following question: "Has anyone forced you or threatened you or influenced any of you in any way in coming back here and saying that [you had found that the aggravating factor outweighed the mitigating factor or factors]?" Each juror responded, "No." Additionally, when the jurors returned a second time, after completing the second verdict form, the court clerk asked each juror to respond to the following question: "Does the aggravating factor proved beyond a reasonable doubt [by] the state of Connecticut outweigh any mitigating factor or factors known to exist?" Each juror responded affirmatively. The trial court also asked the jurors, as a group, whether they understood what sentence the court would impose as a result of their corrected verdict form. The jury foreperson responded, "[y]es," and indicated that the jury understood that "[t]he death penalty" would be imposed.

Furthermore, after the corrected verdict had been accepted, the trial court, *Damiani, J.,* held an evidentiary hearing to determine the propriety of the jury's contact with court personnel before the court had reassembled the jury. At that hearing, each juror testified that his or her intended verdict when initially entering the courtroom was that the defendant receive the death penalty. With this factual background in mind, we conclude that the procedures utilized by the trial court

satisfied the eighth amendment's requirement of heightened reliability in capital cases. In particular, the multiple jury polls and the subsequent evidentiary hearing ensured that the jury's intended verdict was indeed the one that the trial court had accepted. Accordingly, we reject the defendant's eighth amendment claim.

## C

### Right of Allocution

The defendant next claims that the trial court improperly denied him his right of allocution. The defendant claims that the trial court's denial of the right of allocution violated: (1) Practice Book § 43-10 (3)[111] and the common law; (2) § 53a-46a; (3) the sixth, eighth and fourteenth amendments to the federal constitution; and (4) article first, § 8, of the Connecticut constitution.[112]

The following additional facts guide our resolution of the defendant's claims. At the conclusion of the presentation of evidence at the defendant's penalty phase hearing, but prior to closing arguments, the defendant filed a motion to schedule an allocution. The defendant asserted that the rules of practice, the sixth, eighth and fourteenth amendments to the federal constitution, and this court's decision in *State* v. *Strickland*, 243 Conn. 339, 354, 703 A.2d 109 (1997), afforded him the right to make a statement to the jury. Thereafter, the trial court

[111] Practice Book § 43-10 provides in relevant part: "Before imposing a sentence or making any other disposition after the acceptance of a plea of guilty or nolo contendere or upon a verdict or finding of guilty, the judicial authority shall, upon the date previously determined for sentencing, conduct a sentencing hearing as follows:

\* \* \*

"(3) The judicial authority shall allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of the sentence. . . ."

[112] The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

denied the defendant's motion.[113] Before rendering judgment in accordance with the jury's verdict, however, the trial court asked the defendant if he wished to be heard. The defendant declined the trial court's offer.

We begin our review of the defendant's claims by setting forth the applicable standard of review. The issue of whether the right of allocution applies in capital sentencing hearings is a question of law. Accordingly, our review is plenary. See *State* v. *Valendon*, 261 Conn. 381, 385, 802 A.2d 836 (2002).

"At common law, [a] defendant in a felony case had a right called 'allocution' to be asked formally whether he had any reason to offer why judgment should not be awarded against him. . . . To place this right in its correct historical perspective, it must be considered that under the ancient English common law a person on trial for a felony was not allowed counsel and was not a competent witness in his own behalf. . . . The presiding judge theoretically was his counsel but did not represent the accused in the sense of a modern day advocate. If the judge omitted anything which was the right or privilege of the accused, it was considered the act of the court, which could not prejudice the prisoner.

[113] In denying the defendant's motion, the trial court stated: "First of all, I respect the position raised by the defense concerning that this is a sentencing phase of the trial and, therefore, the defendant should have the right [of] allocution. The court, however, in reviewing the statute, feels that this is a different sentencing phase than the one that was presented in the *Strickland* case, which is the supporting authority. . . . This is . . . [a case] that is based upon the jury's determination of [its] finding of facts and factors and then a weighing process. In this hearing there . . . are . . . burdens of proof. The state has the burden of proof beyond a reasonable doubt on the aggravating factor. The defendant has [the burden] of proof as it relates to the statutory factors in mitigation. Those . . . burdens are not present in a sentencing hearing. I understand that the rules of evidence, as [they relate] to the [defendant's] presentation, as to admissibility are not applied, but that doesn't say in the statute any unchallenged evidence. The defendant . . . did testify in the guilt phase. He did have the ability to testify in this [penalty] phase. So for those reasons, the court will deny the [motion]."

. . . Moreover, because the common-law judge generally had no discretion as to the amount of punishment in felony cases, which was usually a capital sentence, the purpose of the judge's question, or allocution, was not to seek mitigating evidence or a plea for leniency, but rather to give the defendant a formal opportunity to show one of the strictly defined legal grounds for avoidance or delay of the sentence: he was not the person convicted, he had benefit of clergy or pardon, he was insane, or if a woman, she was pregnant. . . . In many American jurisdictions, the practice of allocution has been codified in statutes or court rules, 'but except where this has been done it is apparent that the tendency is to regard the practice as a technical formality of little importance in modern criminal procedure, where other procedural devices afford the accused ample opportunity to protect himself at all stages of the proceeding.' . . . Even in capital cases the rule requiring allocution 'has been largely emasculated by the holdings that the failure to afford the accused an opportunity to speak merits reversal only where prejudicial error results.' . . . In spite of the fact that . . . the Federal Rules of Criminal Procedure [require] that the defendant be given an opportunity to speak in his own behalf before sentencing, the United States Supreme Court has held that the failure of the sentencing judge to ask a defendant represented by counsel whether he personally had anything to say was not 'an omission inconsistent with the rudimentary demands of fair procedure' and was not an error of constitutional dimensions. *Hill* v. *United States*, 368 U.S. 424, 428, 82 S. Ct. 468, 7 L. Ed. 2d 417 [1962]. The United States Supreme Court in *Hill* did not decide, and it has never directly determined, whether the sentencing of a defendant who wished to speak would rise to the level of a constitutional question. Id., [429] . . . . Although our state constitution, article first, § 8, provides that an 'accused

shall have a right to be heard by himself and by counsel,' we have never precisely construed this provision. Similar provisions in other states have not been construed to entitle an accused as a matter of right to be heard by both himself and by counsel." (Citations omitted.) *State* v. *Carr*, 172 Conn. 458, 473–75, 374 A.2d 1107 (1977).[114] With this background in mind, we turn to the defendant's specific claims.

1

### Right of Allocution under the Common Law, General Statutes and Rules of Practice

The defendant first claims that both Practice Book § 43-10 (3) and the common law afford capital defendants a right of allocution during the penalty phase.[115]

[114] We elaborated further on the right of allocution in *State* v. *Strickland*, supra, 243 Conn. 344–45, in which we concluded that the right applied in the disposition phase of probation revocation proceedings. Id., 354. We noted: "Modern day justifications for preserving the practice focus on tailoring punishment to individual circumstances, providing an avenue through which a defendant may ask for mercy based on factors that might not otherwise be brought to the court's attention, and promoting safety, certainty and equity in sentencing and the judicial process overall. [T]he opportunity to plead for mercy is another provision in a procedural body of law designed to enable our system of justice to mete out punishment in the most equitable fashion possible, to help ensure that sentencing is particularized and reflects individual circumstances. . . . Aside from its practical role in sentencing, the right has value in terms of maximizing the perceived equity of the process. . . . The right of allocution affords a criminal defendant the opportunity to make a final plea to the judge on his own behalf prior to sentencing. . . . Ancient in law, allocution is both a rite and a right. It is designed to temper punishment with mercy in appropriate cases . . . . [A]llocution provides a defendant the opportunity to meaningfully participate in the sentencing process and to show that he or she is a complex individual and not merely an object to be acted upon." (Citations omitted; internal quotation marks omitted.) Id., 344–45.

[115] We note that Practice Book § 43-10 (3) codifies the common-law right of allocution. See *State* v. *Strickland*, supra, 243 Conn. 344–46 and n.4 (construing Practice Book, 1978–97, § 919 [3], which is predecessor to Practice Book § 43-10 [3]). Accordingly, on the basis of our conclusion that Practice Book § 43-10 (3) does not apply to capital sentencing hearings, the defendant's reliance on the common law is misplaced. Thus, the justification

Our rules of practice specifically provide defendants "in criminal matters"[116] with a right of allocution. See Practice Book § 43-10 (3). In particular, Practice Book § 43-10 (3) provides that, prior to imposing a sentence, the court shall "allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of the sentence." Nevertheless, both the rules of practice and § 53a-46a,[117] which specifically governs capital sentencing hearings are silent with respect to whether a defendant has a right of allocution in a capital sentencing hearing. In addition, the issue of whether Practice Book § 43-10 (3) applies to capital sentencing hearings is an issue of first impression for this court. Many other jurisdictions, however, both federal and state, have addressed this issue in construing their own court rules, statutes or case law.

Our review of those authorities reveals that several courts have concluded that there is no statutory or common-law right of allocution in a capital sentencing hearing. *State* v. *Perkins*, 345 N.C. 254, 289, 481 S.E.2d 25 ("a defendant does not have a . . . statutory . . . or common law right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding"), cert. denied, 522 U.S. 837, 118 S. Ct. 111, 139 L. Ed. 2d 64 (1997); *Duckett* v. *State*, 919 P.2d 7, 22 (Okla. Crim. App. 1995) (in capital case, court concluded that "there is no statutory . . . [or] common-law . . . right of a defendant to make a plea for mercy or otherwise address his sentencing jury, in addition to closing argument by counsel"), cert. denied, 519 U.S. 1131, 117 S. Ct. 991, 136 L. Ed. 2d 872 (1997); *State* v.

for not applying the right of allocution under § 43-10 (3) to capital sentencing hearings applies equally to the common-law right of allocution.

[116] Practice Book § 43-10 is part of a group of rules that is contained within the portion of the Practice Book designated, "Superior Court—Procedure in Criminal Matters." See generally Practice Book §§ 36-1 through 44-37.

[117] See footnote 3 of this opinion.

*Stephenson*, 878 S.W.2d 530, 552 (Tenn. 1994) ("there is no statutory . . . [or] common-law . . . right to allocution in a capital case"); see *United States* v. *Hall*, 152 F.3d 381, 392–93 (5th Cir. 1998) (concluding that trial court did not violate former rule 32 [c] [3] [C] of Federal Rules of Criminal Procedure, which required court, before imposing sentence, to address defendant personally and to determine whether defendant wished to make statement or to present information in mitigation of sentence, when trial court denied defendant opportunity to make unsworn statement of remorse to capital sentencing jury but permitted defendant to make statement to court before it announced his sentence), cert. denied, 526 U.S. 1117, 119 S. Ct. 1767, 143 L. Ed. 2d 797 (1999); *State* v. *Whitfield*, 837 S.W.2d 503, 514 (Mo. 1992) ("the right of allocution in Missouri does not extend to addressing the jury"); *Commonwealth* v. *Abu-Jamal*, 521 Pa. 188, 212–13, 555 A.2d 846 (1989) (concluding that legislature had abrogated common-law rules governing capital cases by replacing them with statutory scheme and finding "no reason in law or logic" why defendants should be permitted to make unsworn statements to juries in capital sentencing hearings), cert. denied, 498 U.S. 881, 111 S. Ct. 215, 112 L. Ed. 2d 175 (1990).

In contrast to this approach, some courts have concluded that the common-law right of allocution applies to capital sentencing hearings. The majority of these jurisdictions, however, limit the right of allocution to pleas of mercy or leniency and expressions of future hope. *Harris* v. *State*, 306 Md. 344, 359, 509 A.2d 120 (1986) ("under the common law applicable to capital sentencing proceedings at the time [the defendant] was sentenced, a defendant who timely asserts his right to allocute, and provides an acceptable proffer, must be afforded a fair opportunity to exercise this right"); *Homick* v. *State*, 108 Nev. 127, 133–34, 825 P.2d 600

(1992) (concluding that capital defendants enjoy common-law right of allocution, limited to expressions of remorse, pleas for leniency and plans or hopes for future); see *State* v. *Zola*, 112 N.J. 384, 431–32, 548 A.2d 1022 (1988) (pursuant to its supervisory jurisdiction over state criminal trials, court authorized "narrowly-defined right of a capital defendant to make a brief unsworn statement in mitigation to the jury at the close of the presentation of evidence in the penalty phase [of a capital case]"), cert. denied, 489 U.S. 1022, 109 S. Ct. 1146, 103 L. Ed. 2d 205 (1989); *State* v. *Lord*, 117 Wash. 2d 829, 897, 900, 822 P.2d 177 (1991) (acknowledging right of allocution in capital case, but limiting right to pleas for mercy, and concluding that defendant went beyond permissible bounds of allocution and, thus, trial court properly permitted state to cross-examine him), cert. denied, 506 U.S. 856, 113 S. Ct. 164, 121 L. Ed. 2d 112 (1992).

Having reviewed the foregoing authorities, we are persuaded that the better course is to conclude that there is no right of allocution within the structured setting of a capital sentencing hearing. In so concluding, we are particularly persuaded by the reasoning of the Pennsylvania Supreme Court in *Commonwealth* v. *Abu-Jamal*, supra, 521 Pa. 188. In *Abu-Jamal*, a capital case, the defendant, Mumia Abu-Jamal, claimed that the trial court improperly had permitted the state to cross-examine him during his capital sentencing hearing. Id., 211. Abu-Jamal's claim was premised on his contention that he was exercising his common-law right of allocution and, therefore, should not have been subject to cross-examination. Id., 211–12. In rejecting Abu-Jamal's claim, the court noted that certain rules of criminal procedure applied specifically to capital cases and that Abu-Jamal's reliance on rules that applied to noncapital cases was misplaced. See id., 212. More importantly, however, the court rejected the notion that the com-

mon-law right of allocution applied to capital sentenc-
ing hearings. Id., 212–13. The court explained: "What-
ever force the common law of allocution has with
respect to other criminal cases, the [Pennsylvania legis-
lature] has abrogated that law and replaced it with
statutory law devised specifically for first degree mur-
der cases. The legislature has provided that a sentencing
hearing is required at which evidence may be presented
to the jury, or the judge as the case may be. The court
is given discretion to determine what evidence will be
received as relevant and admissible on the question of
the sentence to be imposed. Following the presentation
of evidence, counsel are permitted to argue to the sen-
tencing body for or against the death sentence.

"It is apparent from the structure provided that this
evidentiary hearing is intended to serve as part of the
'truth-determining process' to enable the sentencer to
discern and apply the facts bearing on the determination
of the appropriate sentence. Implicit in the fact that the
statute assigns to the defendant the burden of proving
mitigating circumstances by a preponderance of evi-
dence is the understanding that the jury is to asses[s]
the evidence for credibility. It must be left open for
the [c]ommonwealth to challenge the veracity of facts
asserted and the credibility of the person asserting
those facts, whether that person is a witness or the
defendant. We find no reason in law or logic why the
defendant's presentation of evidence in support of his
claim that life imprisonment is the appropriate sentence
should be shielded from the testing for truthfulness and
reliability that is accomplished by cross-examination."
Id.; see also *United States* v. *Hall*, supra, 152 F.3d 392–93
("[federal death penalty statute] counsels against con-
struing [federal rule of criminal procedure permitting
allocution] as establishing an unconditional right for the
defendant to make an unsworn statement of remorse to
the jury . . . [because the death penalty statute] sets

forth with great specificity the type of information that may be submitted to the jury during the penalty phase of a capital trial and the circumstances under which it may be presented").[118]

In devising this state's capital sentencing scheme, the legislature clearly set forth, in detail, the procedures to be followed by the courts in capital sentencing hearings, including the procedure governing the type of evidence that may be admitted. Specifically, General Statutes (Rev. to 1997) § 53a-46a (c) provides in relevant part: "*Any information* relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (i) shall be governed by the rules governing the admission of evidence in such trials. *The state and the defendant shall be permitted to rebut any information received at the hearing* and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. . . ." (Emphasis added.) In addition, mitigating factors are those that, "in fairness and mercy, may be considered as tending either to extenuate or reduce the

---

[118] In *Hall*, the Fifth Circuit Court of Appeals also concluded that the trial court had not violated the federal rule of criminal procedure permitting the defendant, Orlando Cordia Hall, to make a statement and to present information in mitigation of his sentence when it asked him if he wished to make his statement after the jury had returned its sentencing recommendation but before the court imposed the sentence. *United States* v. *Hall*, supra, 152 F.3d 392. In this regard, the court concluded that allowing Hall "to make an unsworn statement of remorse to the jury that is not subject to cross-examination would in no sense increase the accuracy and reliability of the capital-sentencing process. When the [trial] court receives . . . statement[s] in allocution, it recognizes the legal effect of the fact that the statements are not sworn and the attendant potential effect of this fact upon the credibility of the defendant's statements; the same cannot be said for a jury." Id., 393.

degree of [the defendant's] culpability or blame for the offense [of which the defendant was convicted] or to otherwise constitute a basis for a sentence less than death." General Statutes (Rev. to 1997) § 53a-46a (d). Thus, it is clear that, although the defendant is permitted to present any information relating to mitigation, the statutory scheme specifically contemplates that the state will be afforded an opportunity to rebut that information.

This point is a particularly apt response to the assertion of Justice Katz in her concurrence and dissent that the defendant has a right to make an unsworn plea for mercy to the jury that is free from cross-examination, albeit subject to extensive oversight and editing by the trial court. We agree with Justice Katz' suggestion that the principal goal of allocution is the dispensation of mercy. Indeed, we suggested as much in *Strickland.* See *State* v. *Strickland,* supra, 243 Conn. 344–45. In our view, however, that consideration counsels strongly in favor of the conclusion that the defendant has no right of allocution in a penalty phase hearing. The statutory scheme, which permits cross-examination and rebuttal by the state, specifically contemplates mercy as one of the factors for the jury to consider in making its life-or-death decision. See General Statutes (Rev. to 1997) § 53a-46a (c) and (d). It would be fundamentally inconsistent with that scheme, therefore, to afford the defendant the right to make a plea for mercy to the jury through an unsworn statement that is free from cross-examination.

The statute also places the burden of establishing the existence of mitigating factors on the defendant. In doing so, the legislature established a specific structure within which the state is permitted "to challenge the veracity of facts asserted and the credibility of the person asserting those facts." *Commonwealth* v. *Abu-Jamal,* supra, 521 Pa. 213. Moreover, the procedures

that the legislature prescribed for capital sentencing hearings fulfill the purposes of allocution, namely, to provide "a defendant the opportunity to meaningfully participate in the sentencing process and to show that he or she is a complex individual and not merely an object to be acted upon"; (internal quotation marks omitted) *State* v. *Strickland*, supra, 243 Conn. 345;[119] by permitting a defendant to offer *any* evidence of mitigation, regardless of whether it would be admissible under the evidentiary rules that govern criminal trials generally. See General Statutes (Rev. to 1997) § 53a-46a (c). Finally, a defendant is not otherwise precluded from testifying at his own penalty phase hearing and

---

[119] In *State* v. *Strickland*, supra, 243 Conn. 354, we concluded that Practice Book, 1978–97, § 919 (3), the predecessor of Practice Book § 43-10 (3), afforded a defendant the right of allocution in the disposition phase of a probation revocation proceeding. In so concluding, we first noted that Practice Book, 1978–97, § 943, now Practice Book § 43-29, which prescribed certain procedures that were to be followed in probation revocation proceedings, "[did] not purport to govern probation proceedings exclusively, and in fact [did] not address the procedure to be followed during the disposition phase of the hearing . . . ." *State* v. *Strickland*, supra, 349. In addition, we explained that, "[a]lthough the defendant [Greg Strickland] had an opportunity to make a statement on his own behalf at his original sentencing, that opportunity did not allow him meaningfully to attempt to influence the exercise of another judge's discretion with regard to the consequences to be imposed for the subsequent violation of probation." Id., 353. Thus, we concluded that the right of allocution, as prescribed by the rules of practice, applied in the disposition phase of a probation revocation proceeding. Id., 354.

As the state notes, *Strickland* is distinguishable from the present case. First, unlike the rules of practice at issue in *Strickland*, § 53a-46a exclusively governs capital sentencing hearings and specifically prescribes the procedure to be followed during such hearings. Second, unlike probation revocation proceedings, in which the defendant does not have the opportunity "to attempt to influence the exercise of another judge's discretion with regard to the consequences to be imposed for the subsequent violation of probation"; id., 353; a capital defendant is permitted to present any information relevant to mitigation during the penalty phase hearing, regardless of its admissibility under the evidentiary rules that govern criminal trials generally. General Statutes (Rev. to 1997) § 53a-46a (c). Thus, the justification for applying Practice Book § 43-10 (3) to probation revocation proceedings does not exist in the context of a capital sentencing hearing.

providing a statement of remorse or other information that an allocution traditionally offers. On the basis of the specific structure of the capital sentencing scheme, however, the defendant would be subject to cross-examination concerning his testimony. Thus, we conclude that Practice Book § 43-10 (3), which codifies the common-law right of allocution, does not afford the defendant a right of allocution in a capital sentencing hearing.[120]

## 2

### Federal Constitutional Right of Allocution

The defendant also claims that he possesses a federal constitutional right to allocute before his capital sentencing jury. Specifically, the defendant claims that the trial court's denial of his opportunity to make an allocution before the jury deprived him of his right to due process under the fourteenth amendment to the United States constitution and his right to present a defense under the sixth amendment to the United States constitution, which is made applicable to the states through the due process clause of the fourteenth amendment.[121]

---

[120] We also reject the defendant's claim that the text of § 53a-46a affords him a right of allocution in a capital sentencing hearing. Although we concede that the language of the statute allows the defendant to present "[a]ny information relevant to any mitigating factor"; General Statutes (Rev. to 1997) § 53a-46a (c); the statute also specifically allows the state to rebut that information. In particular, the statute provides that the state "shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating . . . factor." General Statutes (Rev. to 1997) § 53a-46a (c). Thus, because the state is permitted to rebut the information offered by the defendant to establish the existence of any mitigating factors, the plain text of § 53a-46a simply does not contemplate the right of a defendant to make a statement to the jury that is not subject to cross-examination. In addition, we previously have endorsed the state's authority to rebut mitigation evidence with any information, regardless of its admissibility under the evidentiary rules generally applicable to criminal trials. See *State* v. *Ross*, 251 Conn. 579, 589, 742 A.2d 312 (1999).

[121] In addition to these claims, the defendant also contends that the right of allocution is guaranteed by the eighth amendment's prohibition of cruel

See, e.g., *California* v. *Trombetta*, 467 U.S. 479, 485,

and unusual punishments and the equal protection clause of the fourteenth amendment. The defendant's eighth amendment claim is premised on the contention that the denial of a right to make an allocution prevented the defendant from presenting relevant mitigation evidence under *Lockett* v. *Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). In *Lockett*, the United States Supreme Court held that the eighth amendment requires that a sentencing jury "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis in original.) Id., 604. We reject the defendant's contention because, as we discussed previously, our capital sentencing scheme provides that a capital defendant may present any information relevant to any mitigating factor. General Statutes (Rev. to 1997) § 53a-46a (c). The statutory scheme, however, explicitly permits the state to rebut that information. General Statutes (Rev. to 1997) § 53a-46a (c). In our view, the ability of a capital defendant to make a statement to the sentencing jury that is free from cross-examination by the state far exceeds the scope of the mitigating evidence contemplated by the decision in *Lockett*. Thus, inasmuch as a capital defendant may offer any mitigating evidence during the capital sentencing hearing, it is not a violation of the eighth amendment to deny the defendant the opportunity to make an allocution to his capital sentencing jury.

We also reject the defendant's equal protection claim. The defendant specifically claims that the denial of the right of allocution in capital cases violates the capital defendant's equal protection rights inasmuch as defendants in other criminal and quasi-criminal proceedings are afforded such a right.

In *People* v. *Christiansen*, 116 Ill. 2d 96, 127–28, 506 N.E.2d 1253, cert. denied, 484 U.S. 873, 108 S. Ct. 208, 98 L. Ed. 2d 160 (1987), a capital case, the defendant, Edgar Christiansen, claimed, inter alia, that a statute denying him the right of allocution during the penalty phase of his capital trial violated his equal protection rights. In rejecting Christiansen's claim, the Supreme Court of Illinois stated: "[W]e are not persuaded that the statutory prohibition of allocution applicable only to capital defendants violates the guarantee of equal protection. This court has held that the normal deference to legislative classifications should not be departed from unless the classification either impinge[s] on some right deemed fundamental or [is] directed against a suspect class. . . . [A]llocution is not a fundamental right; therefore, on that point, its denial does not raise an equal protection issue. And, obviously, the capital-noncapital classification established by the statute does not categorize persons on the basis of arbitrary characteristics such as race, sex, or national origin. In the absence of an invidious classification, our deference to the legislature presumes that a statutory classification is rational and, absent a showing of irrationality, the scheme will be upheld. [There was] . . . no showing that the statutory classification at issue is

104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984); *State* v. *Genotti*, 220 Conn. 796, 803–804 n.7, 601 A.2d 1013 (1992). We conclude that there is no federal constitutional right to make an unsworn statement before a capital sentencing jury.

We initially note that the United States Supreme Court never has addressed the issue of whether a defendant has a constitutional right of allocution in a capital sentencing hearing. See *State* v. *Carr*, supra, 172 Conn. 475. The United States Supreme Court has determined, however, that a trial court's violation of the Federal Rules of Criminal Procedure by virtue of its failure to ask a defendant whether he wished to make a statement prior to sentencing did not result in a constitutional violation. *Hill* v. *United States*, supra, 368 U.S. 428. Specifically, the court determined that the failure of the trial court to ask the petitioner, who was represented by counsel, whether he wanted to exercise his rights under the rule was "an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, *nor an omission inconsistent with the rudimentary demands of fair procedure.*" (Emphasis added.) Id. The court specifically noted, however, that it was not deciding whether a constitutional violation would have existed if the court affirmatively had denied the petitioner's request to speak during the hearing at which his sentence had been imposed. Id., 429.

Although the United States Supreme Court never has addressed the precise issue of whether a defendant

irrational, and we decline to so hold." (Citation omitted; internal quotation marks omitted.) Id., 128–29.

Although *Christiansen* involved a statutory denial of allocution during penalty phase hearings, we conclude that the reasoning also applies in the present case, in which we have concluded that our capital sentencing scheme does not contemplate the right of allocution in capital sentencing hearings. Thus, we reject the defendant's equal protection claim.

possesses a constitutional right of allocution in a capital sentencing hearing, at least two federal circuit courts have concluded that no such constitutional right exists. In *United States* v. *Hall*, supra, 152 F.3d 381, the Fifth Circuit Court of Appeals concluded that former rule 32 (c) (3) (C) of the Federal Rules of Criminal Procedure, which required a federal district court, before imposing sentence, to "address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence," had been satisfied when "the district court allow[ed] the defendant to make a statement to the court after the jury return[ed] its [sentencing] recommendation but before the district court impose[d] sentence." *United States* v. *Hall*, supra, 392.

After determining that a defendant does not have a right of allocution in a capital case under the Federal Rules of Criminal Procedure; see id., 393; the Fifth Circuit then determined that there is no "constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross examination." Id., 396. The court first noted that, "[n]either the government nor Hall [the defendant] contend[ed] that [he] would not have been permitted to testify at the sentencing hearing and thereby in his own words introduce any information relevant to a mitigating factor." (Internal quotation marks omitted.) Id. The court further explained: "We simply cannot conclude that fundamental fairness required that Hall be allowed to make such a statement without being sworn or subject to cross-examination." Id. This point, in addition to the numerous state court decisions rejecting a constitutional right of allocution, led the Fifth Circuit to conclude that a defendant does not possess a constitutional right of allocution. The Fourth Circuit Court of Appeals has adopted the Fifth Circuit's decision in *Hall*, also concluding that a defendant does not have a constitutional

right of allocution. *United States* v. *Barnette*, 211 F.3d 803, 820 (4th Cir. 2000).

In addition, several state courts have concluded that a defendant does not possess a constitutional right to make an allocution before a capital sentencing jury. See, e.g., *People* v. *Robbins*, 45 Cal. 3d 867, 889, 755 P.2d 355, 248 Cal. Rptr. 172 (1988) (in light of defendant's opportunity to present evidence and to take stand to address jury during sentencing phase of capital trial, "we fail to see the need, much less a constitutional requirement, for a corresponding right to address the sentencer without being subject to cross-examination" [internal quotation marks omitted]), cert. denied, 488 U.S. 1034, 109 S. Ct. 849, 102 L. Ed. 2d 981 (1989); *People* v. *Kokoraleis*, 132 Ill. 2d 235, 281, 547 N.E.2d 202 (1989) (in capital case, court concluded that "[t]he failure to provide a defendant the opportunity to make a statement before being sentenced is not a constitutional deprivation"), cert. denied, 497 U.S. 1032, 110 S. Ct. 3296, 111 L. Ed. 2d 804 (1990); *State* v. *Perkins*, supra, 345 N.C. 289 ("a defendant does not have a constitutional . . . right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding"); *Duckett* v. *State*, supra, 919 P.2d 22 ("there is no . . . constitutional right . . . to make a plea for mercy or otherwise address [the] sentencing jury"); *State* v. *Stephenson*, supra, 878 S.W.2d 551 ("our review of the case law convinces us that a capital defendant does not have a . . . constitutional right to make an unsworn statement to a jury in the sentencing phase of a capital trial").

We are persuaded by these authorities and conclude that a defendant does not possess a federal constitutional right of allocution in a capital sentencing hearing. It is clear to us that the purpose of allowing allocution, namely, to permit the defendant to introduce to the jury information relevant to the defendant's plea for mercy,

is equally served by the structure of our capital sentencing scheme, which permits a capital defendant to present any information relevant to any mitigating factor during the penalty phase hearing, regardless of its admissibility under evidentiary rules applicable to criminal trials. See General Statutes (Rev. to 1997) § 53a-46a (c). Thus, in accordance with the majority of the courts that have addressed this specific issue, we conclude that a defendant does not possess a right of allocution under the federal constitution in capital sentencing proceedings.[122]

---

[122] The defendant relies, however, on two federal circuit court decisions in support of his claim that the denial of his right of allocution resulted in a constitutional violation. In *Ashe* v. *State*, 586 F.2d 334 (4th Cir. 1978), cert. denied, 441 U.S. 966, 99 S. Ct. 2416, 60 L. Ed. 2d 1072 (1979), the defendants, who had been convicted of safecracking and larceny, sought habeas corpus relief, claiming that the trial court's denial of their right of allocution resulted in a violation of their due process rights. Id., 335, 336. The Fourth Circuit Court of Appeals noted that "a defendant has no constitutional right to be asked if he wishes to address the court before sentencing." Id., 336. The court concluded, however, that "when a defendant effectively communicates his desire to the trial judge to speak prior to the imposition of sentence, it is a denial of due process not to grant the defendant's request." Id.

Similarly, in *Boardman* v. *Estelle*, 957 F.2d 1523 (9th Cir.), cert. denied, 506 U.S. 904, 113 S. Ct. 297, 121 L. Ed. 2d 221 (1992), the defendant, who had pleaded guilty to various crimes involving the sexual assault of children, sought habeas corpus relief, claiming that the trial court had violated his due process rights in denying him his right of allocution. Id., 1524. Relying on *Ashe*, the Ninth Circuit Court of Appeals agreed and concluded "that allocution is a right guaranteed by the due process clause of the [c]onstitution." Id., 1530.

We first note that the foregoing cases are distinguishable in that they both involved convictions for noncapital crimes. We previously have noted the distinction between noncapital cases and capital cases, the latter of which offer defendants an opportunity, during the penalty phase, to present any information relevant to mitigation. Thus, the cases on which the defendant relies "[may] be correct in . . . [that] a defendant may not be denied [the] opportunity [to allocute] when he requests it. The sentencing phase of a capital trial, on the other hand, specifically provides for such testimony. The defendant is allowed to present evidence as well as take the stand and address the sentencer." *People* v. *Robbins*, supra, 45 Cal. 3d 889. Thus, for all of the reasons that we previously have discussed, we conclude that there is no federal constitutional right of allocution in a capital sentencing proceeding.

3

## State Constitutional Right of Allocution

The defendant next claims that, even if we conclude that there is no federal constitutional right of allocution in a capital sentencing hearing, such a right is guaranteed under article first, § 8, of the Connecticut constitution. Specifically, the defendant claims that the command that "the accused shall have a right to be heard by himself and by counsel" provides a state constitutional basis for the right of allocution in a capital sentencing hearing. We disagree.

"The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, supra, 222 Conn. 684–86, we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 207–208.

The first *Geisler* factor we consider is persuasive relevant federal precedents. This factor favors a determination that our state constitution does not afford greater protection than the federal constitution because, as we discussed previously, at least two federal circuit courts have concluded that a capital defendant does not have a constitutional right to make an

---

In addition, the Fourth Circuit Court of Appeals impliedly has rejected *Ashe* in the context of a capital case. See *United States* v. *Barnette*, supra, 211 F.3d 820.

unsworn statement to a capital sentencing jury. See *United States* v. *Barnette,* supra, 211 F.3d 820; *United States* v. *Hall,* supra, 152 F.3d 396. The United States Supreme Court also has intimated that the right of allocution is not constitutional in nature. See *Hill* v. *United States,* supra, 368 U.S. 428.

The next *Geisler* factor is "the text of the operative constitutional provisions . . . ." (Internal quotation marks omitted.) *State* v. *Rizzo,* supra, 266 Conn. 208. The text of article first, § 8, which affords a criminal defendant the "right to be heard by himself and by counsel," appears neutral. Although the text does provide that the defendant has a right to be heard by himself, there is nothing to suggest that the framers intended that this clause specifically would afford a defendant the right of allocution in a capital sentencing proceeding.

We also consider related Connecticut precedents and any historical insight into the intent of our constitutional forebears. See *State* v. *Rizzo,* supra, 266 Conn. 208. We are persuaded that both these factors weigh in favor of a determination that article first, § 8, does not afford greater protection than the federal constitution.

In *State* v. *Gethers,* 197 Conn. 369, 370, 497 A.2d 408 (1985), the defendant, David Gethers, was charged with, and subsequently convicted of, tampering with a witness in violation of General Statutes § 53a-151.[123] On appeal to this court, Gethers claimed, inter alia, that the trial court had violated his state constitutional right

---

[123] General Statutes § 53a-151 provides in relevant part: "(a) A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding. . . ."

to hybrid representation.[124] Id., 382. Specifically, Gethers claimed that the plain meaning of the pertinent language of article first, § 8, of the Connecticut constitution, that the accused "shall have a right to be heard by himself and by counsel," compelled "the conclusion that the right to hybrid representation is one guaranteed by our state constitution." *State* v. *Gethers*, supra, 385.

In examining the historical background of article first, § 8, we explained that "there [were] two related yet separate legal developments that may have culminated in the original adoption of this provision of the first Connecticut constitution in 1818.

"First, the independent right of an individual accused of the commission of a crime to self-representation had evolved." Id., 388. Under the common law, "[t]he right to counsel . . . emerged as guaranteeing a choice between representation by counsel and the traditional practice of self-representation. . . .

"Historically, [i]n the American Colonies the insistence upon a right of self-representation was, if anything, more fervent than in England. . . . Because lawyers in colonial America were identified with the Crown, distrust of lawyers was institutionalized as several colonies, including Connecticut, initially prohibited pleading for hire in the [seventeenth] century. . . . By the end of that century, however, the right to counsel had been established in Connecticut. . . .

"Thus, by the time of the adoption of our first state constitution in 1818, a defendant in a criminal case had the right to present a defense, including one by counsel,

---

[124] In *Gethers*, we described "hybrid representation" "as the ultimate product of a criminal defendant's 'partial waiver' of both his . . . right [under *Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)] to self-representation and his right to assistance of counsel." *State* v. *Gethers*, supra, 197 Conn. 383. In addition, we described hybrid representation as "the joint presentation of [the defendant's] defense by him and by his counsel." Id.

if he so chose. Under the rationale as espoused by the . . . illustrative decision in *Hooks* v. *State*, [416 A.2d 189, 199 (Del. 1980)], *our constitutional provision guaranteeing a [defendant the] right to be heard by himself and by counsel simply was addressed to securing both of these equally important fundamental rights.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Gethers*, supra, 197 Conn. 389–91. Consequently, "we [were] not persuaded that a hybrid representation arrangement would be in any way consistent with or of assistance to the framers' original intent. The discussion in [*Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)] clearly shows that *the states envisioned the right to counsel as an adjunct to the ever-present right to self-representation, available if the defendant wishes to make use of it.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Gethers*, supra, 391.

The second legal development was the evolution of the criminal defendant's competency to testify at trial. Id. "By 1818 . . . one accused of a crime in our state had no right to testify in his own behalf. He could however, be 'heard' in his role as defendant by making an unsworn statement himself. The provision in article first, § 8, that guarantees the accused 'a right to be heard by himself and by counsel' may have been intended by the framers 'to insure that every accused citizen enjoyed the benefit of counsel and a correlative right to be heard in person.' " Id., 392. We concluded, however, that we did not need to decide which one of these historical backgrounds was more persuasive because "there [was] scant evidence that the framers ever intended, much less imagined, any such result. [Article first, § 8] has not previously been so construed by this court." Id., 393.

We are persuaded that the right encompassed by article first, § 8, as we explained in *Gethers*, is that of self-representation and not a right to make an allocution

before a capital sentencing jury. We first note that, although the right to representation finds support in historical texts describing the rights of Connecticut citizens prior to 1818; see, e.g., 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) pp. 398–99;[125] the right of a defendant to make "an unsworn statement himself," as referred to in *State* v. *Gethers*, supra, 197 Conn. 392, was based only on out-of-state sources[126] and speculation[127] about what that clause in article first, § 8, could mean. Furthermore, the discussion in *Gethers* concerning the right of a defendant to make an unsworn statement was dictum, the court having decided whether article first, § 8, afforded Gethers the right to

[125] Swift wrote: "We have never admitted that cruel and illiberal principle of the common law of England, that when a man is on trial for his life, he shall be refused counsel, and denied those means of defence which are allowed, when the most trifling pittance of property is in question. The flimsy pretense, that the court are to be counsel for the prisoner will only heightened our indignation at the practice: for it is apparent to the least consideration, that a court can never furnish a person accused of a crime with the advice, and assistance necessary to make his defense." 2 Z. Swift, supra, pp. 398–99.

[126] In *State* v. *Gethers*, supra, 197 Conn. 392, the court relied on *State* v. *Burkhart*, 541 S.W.2d 365, 371 (Tenn. 1976), and *Landers* v. *State*, 550 S.W.2d 272 (Tex. Crim. App. 1977), in support of the proposition that the right of a defendant to make an unsworn statement may have been what was intended under that part of article first, § 8, that guarantees an accused "a right to be heard by himself and by counsel . . . ." Conn. Const., art. I, § 8. We note, however, that the court in *Burkhart* concluded that there was *no* constitutional right to make an unsworn statement. *State* v. *Burkhart*, supra, 371. Instead, "[t]he *Burkhart* court opined that the Tennessee constitutional provision [affording a criminal defendant the right to be heard by himself and his counsel] might now read: In all criminal prosecutions the accused has the right to *testify* as a witness in his own behalf and to be represented by counsel." (Emphasis added; internal quotation marks omitted.) *State* v. *Stephenson*, supra, 878 S.W.2d 552. The court in *Stephenson* concluded that a capital defendant did not have a constitutional right to make an unsworn statement to the capital sentencing jury. Id. Thus, the court's reliance on *Burkhart* in *Gethers* appears to be misplaced.

[127] The historical background of the enactment of article first, § 8, reveals that that provision was passed without much debate. See, e.g., W. Horton, "Annotated Debates of the 1818 Constitutional Convention," 65 Conn. B.J. SI-31 (1991).

hybrid representation.[128] Id., 382. Moreover, subsequent case law has indicated that we view *Gethers* as construing article first, § 8, as guaranteeing a defendant the right to self-representation. See *State* v. *Gibbs*, 254 Conn. 578, 610, 758 A.2d 327 (2000) ("a defendant *either* may exercise his right to be represented by counsel . . . or his right to represent himself . . . but *he has no constitutional right to do both at the same time*" [citations omitted; emphasis in original]).

In addition, construing article first, § 8, as affording a criminal defendant a right to make an allocution to a capital sentencing jury would be inconsistent with other Connecticut precedent. In *State* v. *Carr*, supra, 172 Conn. 459, the defendant, Benjamin Carr, Jr., who had been convicted of bribing public servants, claimed that the trial court improperly had denied him a right of allocution. Id., 459–60, 473. After examining the origins of the common-law right of allocution, we noted that a trial court's failure to ask a defendant if he has something to say is "not an error of constitutional dimensions." Id., 475, citing *Hill* v. *United States*, supra, 368 U.S. 428. We also noted that, "[a]lthough our state constitution, article first, § 8, provides that an 'accused shall have a right to be heard by himself and by counsel,' we have never precisely construed this provision. Similar provisions in other states have not been construed to entitle an accused as a matter of right to be heard by both himself and by counsel." *State* v. *Carr*, supra, 475. We went on to conclude that the trial court did not improperly deny the defendant the right to make an allocution prior to being sentenced. Id., 477. Thus, in *Carr*, we impliedly rejected the notion that the right

---

[128] We also observe the court's conspicuous use of the word "may" when describing the framers' alleged intent with respect to the "right to be heard in person." (Internal quotation marks omitted.) *State* v. *Gethers*, supra, 197 Conn. 392. Thus, in *Gethers*, we were not explicitly articulating our view of the framers' intent, but hypothesizing, for discussion purposes, what it could have been.

of allocution was rooted in the command of article first, § 8, that an accused be afforded the right to be heard by himself and by counsel. Accordingly, we are persuaded that related Connecticut precedent and the historical insight into the intent of our constitutional forebears favor a construction that the state constitution does not afford greater rights than the federal constitution.

The next *Geisler* factor is "persuasive precedents of other state courts . . . ." *State* v. *Rizzo*, supra, 266 Conn. 208. Our research reveals that at least two states have concluded that similar state constitutional provisions do not afford a criminal defendant the right to make an allocution to a capital sentencing jury. In *State* v. *Stephenson*, supra, 878 S.W.2d 530, the Supreme Court of Tennessee rejected a claim that article first, § 9, of the constitution of Tennessee[129] permits a capital defendant to make an unsworn statement to the capital sentencing jury. See id., 552. The court explained "that the framers intended to insure that every accused citizen enjoyed the benefit of counsel and a correlative right to be heard in person." (Internal quotation marks omitted.) Id. Inasmuch as the common-law rule permitting a defendant to make an unsworn statement to the jury was rooted in the defendant's incompetency to testify, a rule eliminated by modern criminal procedure, the court concluded that "[t]he practice is no longer necessary or desirable in light of the abolition of those harsh rules and the development of rules protecting the rights of criminal defendants. Moreover, allocution is not necessary to protect the right of a capital defendant to present mitigating evidence in person to the sentencing jury." Id.

Similarly, in *Duckett* v. *State*, supra, 919 P.2d 7, the defendant, Robert Don Duckett, claimed that his due

---

[129] Article first, § 9, of the constitution of Tennessee provides in relevant part: "[I]n all criminal prosecutions, the accused hath the right to be heard by himself and his counsel . . . ."

process rights, under article second, § 20, of the Oklahoma constitution,[130] had been violated by virtue of the trial court's failure to allow him to make an allocution before his capital sentencing jury. See id., 20–21. After concluding that there is no federal constitutional right of allocution; id., 21; the Oklahoma Court of Criminal Appeals rejected the defendant's state constitutional claim. Id., 21–22. The court explained that article second, § 20, of the Oklahoma constitution did not afford a defendant a "constitutional right to make a plea for mercy, or otherwise address his sentencing jury, where he has elected counsel to make closing argument; you cannot have both. If a defendant elects to have his attorney speak, he cannot have *also* a second closing argument." (Emphasis in original.) Id. Accordingly, the court concluded that "there is no . . . constitutional right of a defendant to make a plea for mercy or otherwise address his sentencing jury, in addition to closing argument by counsel." Id., 22.[131] We find these cases

---

[130] Article second, § 20, of the Oklahoma constitution, which applies to "all criminal prosecutions," provides in relevant part: "[The accused] shall have the right to be heard by himself and counsel . . . ."

[131] We acknowledge that some courts have concluded that the right of allocution is guaranteed by their respective state constitutions. *State* v. *Chow*, 77 Haw. 241, 247, 883 P.2d 663 (App. 1994) ("the right of allocution is a right guaranteed under the due process clause, article I, section 5, of the Constitution of the state of [Hawaii]"); *DeAngelo* v. *Schiedler*, 306 Or. 91, 94, 757 P.2d 1355 (1988) ("it requires almost no interpretive work on our part to decide that [the] defendant has the right, not only procedural, but constitutional, to be heard at sentencing, since the Oregon Constitution unambiguously grants the accused the right to be heard during the entire criminal prosecution"); *Robalewski* v. *Superior Court*, 97 R.I. 357, 360, 197 A.2d 751 (1964) ("the constitutional liberty [guaranteed by article I, § 10, of the constitution of Rhode Island] includes the right of an accused, as he stands at the bar after conviction awaiting imposition of sentence, to bring to the attention of the court those matters which one in his position could at common law have spoken when inquiry was made as to why sentence should not be imposed").

We first note that none of these cases involved defendants who were tried for capital felonies, such as the present case. See *State* v. *Chow*, supra, 77 Haw. 243 (traffic offenses); *DeAngelo* v. *Schiedler*, supra, 306 Or. 93 (theft and forgery); *Robalewski* v. *Superior Court*, supra, 97 R.I. 358 (escape from

persuasive and conclude that the *Geisler* factor of other relevant state precedents favors a determination that our state constitution does not afford greater protection than the federal constitution.

The final *Geisler* factor is that of relevant public policies. *State* v. *Rizzo*, supra, 266 Conn. 208. We conclude that this factor also militates against the defendant's claim that the right of allocution in capital sentencing hearings is guaranteed by our state constitution. In our view, § 53a-46a, which affords the capital defendant an opportunity to present any information relevant to mitigation, adequately protects the defendant's rights during a capital sentencing hearing. Accordingly, because none of the *Geisler* factors favors the defendant's claim that article first, § 8, guarantees him the right of allocution in a capital sentencing hearing, we conclude that the trial court's denial of the defendant's request to make an allocution during the penalty phase did not violate article first, § 8, of the Connecticut constitution.

## D

### Evidence of Prior Misconduct

The defendant next claims that the trial court improperly permitted the state to introduce evidence of the defendant's misconduct toward the victim during the week prior to the victim's death. Specifically, the defen-

prison). Additionally, those courts that have recognized a state constitutional right of allocution have done so in the context of determining whether the defendant had a right to make an unsworn statement to the sentencing *judge* rather than a *jury*. We find this distinction of particular importance; see *United States* v. *Hall*, supra, 152 F.3d 393 ("[w]hen the [trial] court receives . . . statement[s] in allocution, it recognizes the legal effect of the fact that the statements are not sworn and the attendant potential effect of this fact upon the credibility of the defendant's statements; the same cannot be said for a jury"); and thus conclude that our state constitution does not afford a capital defendant the right of allocution in a capital sentencing hearing.

dant claims that the misconduct did not form the basis of the capital felony offense and, therefore, was not admissible to establish the existence of the aggravating factor, namely, that "the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ." General Statutes (Rev. to 1997) § 53a-46a (i) (4). In response, the state claims that the defendant's prior misconduct was relevant to prove that the defendant had intended to inflict extreme physical or psychological pain, suffering or torture on the victim. Alternatively, the state contends that the evidence of prior misconduct comprised part of the "facts and circumstances of the case"; General Statutes (Rev. to 1997) § 53a-46a (d); and, therefore, was relevant to the jury's consideration of the defendant's mitigation evidence. We conclude that the trial court properly permitted the state to introduce evidence of the defendant's prior misconduct.

The following additional facts are relevant to the resolution of the defendant's claim. On the first day of the defendant's penalty phase hearing, the state offered the testimony of Peter Jacoby, the emergency room physician who treated the victim on the day of her death.[132] Jacoby testified in detail about the condition of the victim's body when she arrived at the hospital. Specifically, Jacoby described to the jury that the victim had several scratch or gouge marks in the facial area. Jacoby explained that those injuries were not fresh because the scratch or gouge marks had started to "epitheliarize," the process by which skin grows back over the wound. Jacoby also testified that other parts of the victim's body had fresher, or newer, wounds.

---

[132] Jacoby also testified regarding the victim's prior injuries during the guilt phase of the defendant's trial. The defendant filed a motion in limine to exclude Jacoby's testimony at trial, which the trial court denied. The court reasoned that evidence of the victim's injuries and the defendant's prior abuse of the victim was relevant to establish the defendant's intent. That ruling is not at issue in this appeal.

Specifically, Jacoby pointed out an area of the victim's face near her left eye in one of the autopsy photographs that revealed "a reddened area" with "fresher" lacerations. Jacoby also testified that the victim had suffered from "traumatic alopecia," which Jacoby defined as the ripping out of hair from the victim's scalp. In addition, Jacoby noted the existence of what he described as "a battle sign" behind the victim's right ear. Jacoby defined "a battle sign" as "indicative of either a trauma directly to that area or . . . any type of fractured skull." Jacoby also testified that the victim had wounds on both of her shoulders. Jacoby described the wounds as "crater-like" and opined that they were caused by serious burns. Jacoby testified that the wounds on the victim's shoulders were "not quite as red and fresh as you would expect if they had just occurred."

Jacoby also noted that, when the victim arrived at the hospital, a bone in her arm was fractured. Jacoby explained that the victim had suffered a spiral fracture, which typically involves some kind of force and counter force. Jacoby also explained that there is a nerve located "right in the middle of the bone, which is right where the fracture is." Jacoby indicated that the bone had been fractured before the injuries that led to the victim's death were inflicted.

Jacoby testified as to the existence of bruising throughout the victim's body, including both arms and legs. Jacoby opined that these areas of bruising were at different stages of healing due to the different coloration of the bruises. Jacoby also noted that the victim had significant injuries to her buttocks, which were of "varying ages . . . ." According to Jacoby, the autopsy photographs also revealed "pattern" injuries to the victim's right arm, legs and buttocks. Jacoby testified that a "pattern" injury is one that may have been caused by the use of a specific type of instrument. Jacoby testified that these pattern injuries likely were inflicted at the

same time and through the use of a belt or a cord. Jacoby also opined that wounds on the victim's hands and right arm appeared to be defensive wounds that were inflicted while the victim was in a defensive posture.

In addition to Jacoby's testimony, the state offered a statement that the defendant had given to the police on the night that he was arrested for the victim's murder.[133] In the statement, the defendant admitted that,

[133] The defendant's statement provides: "I Ivo Colon of 418 Mill St. Waterbury Connecticut do give this statement voluntarily to [Lieutenant] Ricci. I do not speak English, but I understand English a little bit. My statement is being interpreted by Officer Velez. I have been advised of my constitutional rights and I have waived these rights. For about the last 6 months I have been staying with my girlfriend Virginia Quintero on and off at 633 South Main St. on the first floor. Virginia has three children. Their names are Tasha age 1 1/2, [the victim] age 2 1/2 and Crystal age 3 1/2. [The victim] and Crystal stay with me and Virginia and Tasha lives with her grandmother because she has asthma real bad. Several weeks ago we began to train [the victim] to go to the bathroom on her own. [The victim] was slow at learning this and I would get mad when she went to pee or potty on herself. About one week ago I came home at night and came into the apartment after hanging around outside. I checked on [the victim] and Crystal and found that [the victim] had gone potty on herself while she was sleeping in the playpen. I took [the victim's] clothes off and started to spank her with my hand. I then took [the victim] out of the playpen and took my belt off and started to hit her with my brown belt that I had been wearing on my pants. I took [the victim] into the bathroom and turned on the shower and made her get in the shower and hit her with my wet belt on the butt. Virginia was yelling at me to stop but I did not listen to her. After I finished spanking [the victim] I took her into the living room. I was still mad and was pinching [the victim] on the shoulders and the side of the neck and this made a little burn mark on her neck from my pinching her. A couple [of] days ago [the victim] wet on herself again and I was upset by this and I started to slap her in the face and took her out of her playpen. While I was slapping [the victim] she sat on the ground. I told [the victim] to get up but she would not get up. I grabbed her left arm and jerked her up off of the bedroom floor. When I grabbed her arm I heard something go pop, but I thought that her arm was out of place. [The victim's] mother Virginia came into the bedroom when I was looking at [the victim's] arm, and we saw that the arm was swollen and Virginia wanted to take [the victim] to the hospital. I told Virginia that we were not taking [the victim] to the hospital because of the marks and cuts on her butt which I had made when I hit her with my wet belt. We did not take [the victim] to the hospital but I did put [an] ACE

approximately one week prior to the victim's death, he struck the victim with his hands and hit her with a belt in order to discipline her for wetting herself. The defendant also admitted that he had struck the victim with a wet belt and had pinched the victim, which

bandage on her arm. This bandage caused water bubbles on [the victim's] arm and I would pinch the bubbles with my fingers. On Thursday night July 16, 1998 [the victim] again was wet when I checked her and I disciplined her by hitting with my hands I might have cut her on the face because I have rings on my fingers and they may have cut her when I hit her. I went to sleep after this and I woke up late in the morning on July 17, 1998. I looked at [the victim] and she was wet again. I was tired of her being wet and I wanted her cleaned up so I told Virginia to give [the victim] a bath. After Virginia gave [the victim] a shower I was still aggravated at her [and] began to hit [the victim] with my hands and kick her with my feet because I was mad that she is always peeing or going potty on herself. It was early afternoon now and I left Virginia in the house with the kids and went outside to hang around. I came home a little while later and gave Virginia some yellow rice, beans and steak to feed the kids. Virginia fed the kids but [the victim] threw up all the food that Virginia had fed her. I tried to make [the victim] walk into the bathroom but she was not walking [too] good, [sic] we got into the bathroom and I just started to bang [the victim's] head against the shower wall and [the victim] could not stand up so I kept on picking her up by the hair. I picked her up a couple of times and her hair was coming out in my hands. [The victim's] head was bleeding so I grabbed a red wine colored towel to stop the bleeding. Virginia got into the shower with [the victim] and was trying to clean her up. After Virginia and [the victim] got out of the shower I carried [the victim] to the livingroom and I could see that she was not breathing so I started to push on her chest and blow into her mouth. I told Virginia to stay with the baby and ran out the back door of the apartment to a neighbors [sic] house and called my mother. I told her to come over, because something bad had happened and the baby has to go to the hospital. The people in the house where I used the telephone asked me what had happened and I told them that the baby fell down the stairs from the second floor. I ran back to the apartment to wait for my mother Maria Ocasio and my stepfather Carmello Hernandez to come to the apartment. My mother and stepfather arrived and they took Virginia and [the victim] to the hospital. Before my mother and Virginia had taken the baby to the hospital I told the[m] to tell the people at the hospital that the baby had fallen down the stairs and that it was [an] accident. After my family left I went back to the apartment and took my cell phone, phone battery and charger which were in a plastic bag in Virginias [sic] apartment. I took these items as well as Virginias [sic] daughter Crystal to my mothers [sic] house on Mill St. and waited to hear from my mother. This statement is the truth and I have nothing else to add."

caused a burn-like mark on her neck. The defendant further admitted that, a few days before the victim's death, he slapped the victim and grabbed the victim's arm to pull her up from the ground and heard "something go pop . . . ." The statement also revealed that the night prior to the victim's death, the defendant hit the victim in the face with his hands while he was wearing rings, which caused the victim to suffer numerous lacerations.

During the penalty phase of the defendant's trial, the state offered the evidence of the defendant's prior abuse of the victim to prove the defendant's intent to torture the victim by engaging in a continuous course of abuse that culminated in her death. The state claimed that this evidence also was relevant to prove the victim's state of mind at the time of the offense.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held that such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 396–97, 788 A.2d

1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); see also Conn. Code Evid. §§ 4-3 and 4-5 (b).

"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . The problem is . . . one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Internal quotation marks omitted.) *State* v. *Vega,* supra, 259 Conn. 397.

In the present case, the state sought to prove the existence of an aggravating factor, namely, that "the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ." General Statutes (Rev. to 1997) § 53a-46a (i) (4). We previously have interpreted § 53a-46a (i) (4) to require proof that "the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain [suffering] or torture on the victim above and beyond that necessarily accompanying the underlying killing, *and* that the defendant specifically intended to inflict such extreme pain [suffering or] torture . . . or . . . the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim." (Emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne,* supra, 262 Conn. 545.

We conclude that the trial court properly allowed the state to introduce evidence of the defendant's prior

misconduct because it specifically related to the state's burden of proving that the defendant had inflicted extreme pain, suffering or torture on the victim above and beyond that necessary to accomplish the underlying killing. The evidence adduced by the state revealed that, at the time of her death, the victim had suffered numerous and severe injuries that were at various stages of healing. This evidence was relevant to establish the pain and suffering—and the concomitant psychological terror—that the victim had endured during the defendant's commission of the capital felony. Thus, because the evidence was relevant to establish the victim's state of mind at the time of the offense, and, accordingly, relevant to establish that the defendant had intended to inflict extreme pain, suffering or torture above and beyond that necessary to accomplish the underlying killing; cf. *State* v. *Johnson*, 253 Conn. 1, 77, 751 A.2d 298 (2000); the trial court properly allowed the state to introduce evidence of the defendant's prior abuse of the victim.

We also conclude that the probative value of the prior misconduct was not outweighed by the risk of unfair prejudice. Although we acknowledge that the evidence of the victim's injuries was disturbing, the prejudicial effect of that evidence during the penalty phase was negligible because the same jury already had seen, during the guilt phase, graphic autopsy photographs of the victim, which revealed the full extent of her injuries. Moreover, although the evidence of the victim's injuries likely had an effect on members of the jury, there is nothing to support the claim that the evidence unduly aroused the jurors' emotions or sympathy. Thus, the probative value of the evidence of misconduct was not outweighed by the risk of unfair prejudice.

## E

## Sufficiency of the Evidence of the Existence of the Aggravating Factor

The defendant next claims that the evidence was insufficient to establish beyond a reasonable doubt that he had murdered the victim in "an especially heinous, cruel or depraved manner," as required by General Statutes (Rev. to 1997) § 53a-46a (i) (4). We disagree.

As we previously noted, we have interpreted the aggravating factor set forth in § 53a-46a (i) (4) to require proof that "the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain [suffering] or torture on the victim above and beyond that necessarily accompanying the underlying killing, *and* that the defendant specifically intended to inflict such extreme pain [suffering or] torture . . . or . . . the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim." (Emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne*, supra, 262 Conn. 545.

"In reviewing a claim that the evidence fail[ed] to support the finding of an aggravating factor specified in [§ 53a-46a (i)]; [General Statutes § 53a-46b (b) (2)];[134] we subject that finding to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession . . . or the seizure of a defendant. . . . In such circumstances, we are required to determine whether the factual findings are supported by substantial evidence. . . .

[134] General Statutes § 53a-46b (b) provides in relevant part: "The Supreme Court shall affirm the sentence of death unless it determines that . . . (2) the evidence fails to support the finding of an aggravating factor specified in subsection (i) of section 53a-46a."

"Even with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, [first] by considering the evidence presented at the defendant's penalty hearing in the light most favorable to sustaining the facts impliedly found by the jury. . . . Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established [the existence of the aggravating factor] beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"Furthermore, [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with [the existence of the aggravating factor] and is not required to draw only those inferences consistent with [its nonexistence]. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 92–93.

"[Finally], [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes [the existence of an aggravating factor] in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the defendant's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks

omitted.) Id., 94. Guided by these principles, we turn to the merits of the defendant's claim.

The evidence adduced at the penalty phase hearing established that, on the day that the victim, who was merely two years old, was killed, the defendant dragged the victim into the bathroom and repeatedly thrust the victim's head into the shower wall. When the victim fell to the floor and was unable to stand up, the defendant pulled her up by her hair, causing clumps of her hair to detach from her scalp. Moreover, the defendant committed this crime with the knowledge that the victim already had been physically abused and was suffering from severe injuries inflicted by the defendant during the days leading up to the victim's death. Specifically, the defendant caused a spiral fracture in the victim's arm, various lacerations, scratches and gouges on her face, multiple layers of bruising throughout her body, deep, burn-like wounds on her shoulders, and wounds stemming from his assault of the victim with a belt, all within a week of the victim's death. The defendant admitted in his statement to the police that he had inflicted these injuries. In addition, the evidence revealed that the defendant had permitted his mother and Virginia Quintero to seek medical attention for the victim only after they agreed to lie to medical personnel regarding the cause and source of the victim's injuries.

We conclude that the evidence supported the jury's finding that the victim had experienced extreme physical and psychological pain and suffering during the commission of the crime, above and beyond that necessary to accomplish the killing. The jury reasonably could have found that the victim likely already was terrified of the defendant in light of the severe abuse leading up to the killing. This terror likely was intensified due to the victim's young age and complete helplessness to act in her own defense. In addition, we need not elaborate on the victim's probable state of mind or

on the extreme physical pain that the victim, who already was suffering from severe injuries, endured while she was dragged into the bathroom and repeatedly beaten and pulled up by her hair until she finally became unresponsive and subsequently died.

The evidence also supports the jury's finding that, in engaging in this course of conduct, the defendant had the requisite intent. The jury reasonably could have found that the defendant intended to inflict on the victim the extreme physical and psychological pain and suffering that she in fact had endured. "It is axiomatic that the fact finder may infer intent from the natural consequences of one's voluntary conduct." *State* v. *Cobb*, 251 Conn. 285, 450, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). The jury reasonably could have found that the defendant's entire course of conduct was intentional. The jury also reasonably could have found that the defendant "was callous and indifferent to the extreme physical and psychological pain and suffering that he was . . . inflicting on [the victim]"; id.; when, knowing the condition of the victim, he dragged her into the bathroom and repeatedly thrust her head against the shower wall and pulled her hair out of her scalp. Thus, we conclude that there was sufficient evidence to support the finding that the defendant murdered the victim "in an especially heinous, cruel or depraved manner . . . ." General Statutes (Rev. to 1997) § 53a-46a (i) (4).

F

Mitigation Evidence

1

Evidence of the Defendant's Childhood
and His Demeanor Toward a Friend

We review the defendant's claim regarding the admission of mitigation evidence under the abuse of discre-

tion standard. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Dehaney*, supra, 261 Conn. 354–55.

The defendant claims that the trial court improperly sustained two objections made by the state's attorney during the presentation of the defendant's mitigating evidence. The first objection came during the testimony of Israel Colon, the defendant's uncle. Defense counsel asked Israel Colon about his observations regarding how his brother, the defendant's father, had raised the defendant. Israel Colon responded by stating that "[e]verything that is happening to [the defendant] . . . was [the father's fault] . . . ." Before Israel Colon could explain further, the state's attorney objected on the ground that the answer was in the form of a narrative. The trial court sustained the objection on that ground.

The next objection arose during the testimony of Veronica Rivera, an eleven year old with whom the defendant had formed a friendship. Defense counsel asked Rivera whether the defendant ever had been mean to her. The state's attorney objected to the question, and the trial court sustained the objection.

We conclude that the trial properly sustained the objection to the narrative testimony of Israel Colon. In

*State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), we concluded that "the mandate of § 53a-46a (c) required the trial court to admit the mitigating evidence that [the defendant, Michael B. Ross] proffered in this case. The statute plainly provides that, in a penalty hearing conducted pursuant to § 53a-46a, [a]*ny information relevant* to any mitigating factor may be presented by either the state or the defendant, *regardless* of its admissibility under the rules governing admission of evidence in trials of criminal matters . . . . On its face, this language authorizes a judge presiding over a penalty hearing to exclude mitigating evidence *only* on the basis of a lack of relevancy." (Emphasis in original; internal quotation marks omitted.) Id., 268. Thus, although the defendant may offer any evidence relevant to any mitigating factor, the trial court is vested with discretion to exclude irrelevant information. A trial court depends on proper direct examination and cross-examination, neither of which contemplates the admission of testimony in narrative form, to screen for and exclude irrelevant evidence. Thus, the trial court properly sustained the state's attorney's objection to the narrative testimony in order to ensure that only relevant evidence was admitted. Accordingly, the trial court did not abuse its discretion in sustaining the state's objection to Israel Colon's narrative testimony.

Because Rivera may testify similarly at the defendant's penalty phase hearing on remand, we address whether the trial court properly sustained the objection of the state's attorney to Rivera's testimony. We conclude that Rivera's testimony was relevant to prove the defendant's character in mitigation. Thus, the trial court abused its discretion in sustaining the objection to Rivera's testimony.

2

## Shackles and Handcuffs

The defendant next claims that the trial court improperly precluded him from appearing before the jury in shackles and handcuffs during the penalty phase. Specifically, the defendant maintains that the trial court's order to remove the shackles and handcuffs violated his right to present relevant mitigating evidence to the jury. We disagree.

At the commencement of the penalty phase of the defendant's trial, the state's attorney objected to the defendant's wearing of shackles and handcuffs during the penalty phase. In response, defense counsel argued that the jury should be able to see what they had "done" to the defendant, that is, sentenced him to at least life in prison. The trial court ordered that the defendant's shackles and handcuffs be removed so that he could assist defense counsel.

"In reviewing a shackling [or restraints] claim, our task is to determine whether the trial court's decision . . . constituted a clear abuse of discretion." *State* v. *Tweedy*, 219 Conn. 489, 506, 594 A.2d 906 (1991). We conclude that the trial court did not abuse its discretion in ordering that the defendant's shackles and handcuffs be removed. Although the defendant claims that the trial court's order to remove the shackles and handcuffs precluded him from presenting relevant mitigating evidence to the jury, he has not pointed to any specific mitigating factor that would have been bolstered by his appearance in shackles and handcuffs. Moreover, the cases upon which the defendant relies in support of his claim involved the propriety of disallowing a defendant to appear in court unmedicated when the defense of

insanity was raised[135] or the propriety of involuntarily medicating a defendant to restore him to competency.[136] We conclude that these cases are inapposite to the situation in the present case, in which the defendant wanted to remain in shackles and handcuffs to appeal to the jurors' emotions and sympathy. In addition, although it is axiomatic that a capital defendant has a right to ensure that a capital sentencing jury recognizes the "gravity of its task" and is aware of its "truly awesome responsibility"; (internal quotation marks omitted) *Caldwell* v. *Mississppi*, supra, 472 U.S. 341; the defendant's appearance in shackles and handcuffs does nothing to further this objective. Thus, we conclude that the trial court did not abuse its discretion in ordering that the defendant's shackles and handcuffs be removed during the penalty phase hearing.

## G

### Other Jury Instructions During the Penalty Phase

The defendant next challenges certain aspects of the trial court's instructions to the jury during the penalty phase. As a preliminary matter, we set forth the standard of review governing each of these claims. "The standard of review for constitutional claims of improper jury instructions is well settled. In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon

[135] See *Commonwealth* v. *Louraine*, 390 Mass. 28, 35, 41, 453 N.E.2d 437 (1983) (reversing murder conviction because trial court declined to permit defendant to appear in court unmedicated when defense based on defendant's alleged insanity).

[136] See *State* v. *Murphy*, 56 Wash. 2d 761, 767–68, 355 P.2d 323 (1960) (reversing death sentence of defendant who involuntarily was medicated and testified while medicated as defendant's demeanor was important to jury's responsibility of assessing defendant's credibility).

the jury in guiding them to a correct verdict in the case.
. . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 182, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001). We address each of the defendant's claims in turn.

1

Instructions Regarding Juror Participation
in the Weighing Process

The defendant claims that the trial court improperly instructed the jurors that "they were only to weigh the mitigating factors that they individually found against the aggravating factor unanimously found [by the jurors]." Specifically, the defendant contends that the trial court should have instructed the jurors that they were required, or at least free, to weigh all the mitigating factors found by one or more jurors against the aggravating factor unanimously found by the jurors.

The trial court gave the following instruction regarding the mitigating factors: "In deciding whether a mitigating factor has been proven by the preponderance of the evidence, it is not necessary that you all agree as to what [the] particular mitigating factor is . . . . Now, should any of you determine that the defendant has proven by a preponderance of the evidence the exist-t[ence] of one or more mitigating . . . factors, you must then engage in the weighing process." During deliberations, the jury sent a note to the trial court, asking: "How are the mitigation factors settled, by those in question or also by the entire jury? And may the entire jury influence those with a mitigating factor?" In response, the trial court reread some of its charge to

the jury. The trial court stated in relevant part: "Those jurors who have found the existence of a mitigating factor in his or her own mind must determine whether the aggravating factor that the jury has already unanimously found to exist beyond a reasonable doubt outweighs the mitigating factor or factors that the individual juror has determined to exist." The trial court further explained: "You need not all agree that the same mitigating factor or factors exist as long as you all agree that a mitigating factor exists and that you all agree that the aggravating factor does not outweigh the mitigating factor or factors."

In claiming that the defendant failed to preserve his claim for appellate review, the state contends that the defendant had conceded at trial that the weighing process was individualized and required that each juror weigh only those mitigating factors that he or she individually finds.[137] Because this issue is likely to arise during the defendant's penalty phase hearing on remand, we review the defendant's claim.

We note that the trial court gave a potentially misleading instruction to the jury in the present case. The trial court, in one instance, instructed the jurors that, "should any of you determine that the defendant has proven by a preponderance of the evidence the exist[ence] of one or more mitigating . . . factors, you must then engage in the weighing process." In another instance, however, the trial court instructed the jurors that, "[t]*hose jurors who have found the existence of a mitigating factor in his or her own mind* must determine whether the aggravating factor that the jury has already unanimously found to exist beyond a reason-

---

[137] Specifically, the state contends that the defendant conceded as much by virtue of his request to charge the jury, which provides in relevant part: "In undertaking [the weighing] process, *each juror* must determine whether in his or her judgment the aggravating factor outweighs the mitigating factors he or she found." (Emphasis added.)

able doubt outweighs the mitigating factor or factors that the individual juror has determined to exist." (Emphasis added.) Because of the confusion that potentially could arise from the foregoing instructions, we take this opportunity to clarify our law regarding the role of jurors in the weighing process.

In instructing the jury, the trial court should make clear that, as long as one juror has found the existence of one or more mitigating factors, the entire jury then proceeds to the weighing process. It is not the case that only those jurors who have found the existence of a mitigating factor then proceed to the weighing process; rather, we conclude that, once one or more jurors determine that one or more mitigating factors exist, the entire jury participates in the weighing process. Not only does this conclusion represent the most logical approach, but it also finds support in the case law of the United States Supreme Court. In *McCoy* v. *North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990), the court concluded that North Carolina's capital sentencing statutory scheme, which required a unanimous jury determination of the existence of a mitigating factor prior to the weighing process; see id., 439; "impermissibly limit[ed] jurors' consideration of mitigating evidence" in violation of the eighth amendment. Id., 444. In so concluding, the court explained that the constitution "requires that *each juror* be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death. This requirement means that . . . *each juror must be allowed to consider* all mitigating evidence in deciding . . . whether aggravating circumstances outweigh mitigating circumstances, and whether the aggravating circumstances, when considered with any mitigating circumstances, are sufficiently substantial to justify a sentence of death. Under *Mills* [v. *Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988)],

such consideration of mitigating evidence may not be foreclosed by one or more jurors' failure to find a mitigating circumstance . . . ." (Emphasis added.) *McCoy* v. *North Carolina*, supra, 442–43. In our view, this precedent strongly suggests that once one or more jurors find that the defendant has proven the existence of a mitigating factor by a preponderance of the evidence, the entire jury, and not just those jurors who have found the existence of that mitigating factor, proceed to the weighing process.

In addition, in a case cited by the defendant, the United States Supreme Court explained that, "although a jury must unanimously agree that the [g]overnment established the existence of an aggravating factor beyond a reasonable doubt . . . *the jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by preponderance of the evidence . . . .*" (Citations omitted; emphasis added.) *Jones* v. *United States*, 527 U.S. 373, 377, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999). Although we acknowledge that the court in *Jones* was interpreting the federal death penalty statute,[138] which specifically provides for such a process; see 18 U.S.C. § 3593 (d) (2000); the process described in *Jones*, namely, that the entire jury move on to the weighing stage once one or more jurors have found the existence of a mitigating factor, is consistent with our own statutory scheme. Indeed, it would be impractical to separate the jurors into two groups prior to the weighing process, namely, a group of jurors who finds the existence of one or more mitigating factors, and a separate group of jurors who does not find the existence of a mitigating factor. Instead, it is more consistent with our statutory scheme for the entire jury to be involved in the weighing process even though only some of the jurors had found the existence of a mitigating factor.

---

[138] See generally 18 U.S.C. § 3591 et seq. (2000 & Sup. II 2002).

Moreover, in our view, it is beneficial for all of the jurors to participate in the discussion during the weighing process because jurors are capable of changing their minds about the existence of a mitigating factor through open dialogue with other members of the jury. Specifically, jury members could find that a mitigating factor exists even if, prior to the weighing process, they did not believe that it did. In addition, we believe it is appropriate for every juror to participate in the final stage of the capital sentencing process. Thus, capital sentencing juries should be instructed that once one or more jurors have found that the defendant has proven the existence of one or more mitigating factors by a preponderance of the evidence, the entire jury then moves on to the weighing process. Accordingly, the trial court's instruction that "[t]hose jurors who have found the existence of a mitigating factor" move on to the weighing process was improper.

This is not to suggest, however, that an individual juror must give any weight to a mitigating factor that he or she previously has rejected. As we have explained, the process of determining the existence of a mitigating factor is a highly individualized one. In addition, the import of the trial court's instructions reveals a now self-evident principle, namely, that an individual juror must weigh, against the aggravating factors unanimously found to exist, any mitigating factors individually found by him or her to exist, regardless of how many other jurors also have found that same mitigating factor to exist. We merely clarify, however, that the entire jury must *participate* in the weighing process, even if a particular juror who has not found the existence of a mitigating factor thereafter gives *no* weight to any mitigating factor found by any other juror to exist.

## 2

### Instructions Regarding § 53a-46a (h) (2)

The defendant next claims that the trial court improperly instructed the jury that he was required to prove that he "had a significant mental impairment," rather than that "his mental capacity was significantly impaired . . . ." General Statutes (Rev. to 1997) § 53a-46a (h) (2).[139] The defendant argues that the court's instruction in this regard was improper because it reasonably was possible for the jury to have interpreted the term "significant mental impairment" as requiring a diagnosis of mental illness, which, in turn, would have led it to dismiss the significance of the defendant's claim, for purposes of § 53a-46a (h) (2), that he was under the influence of drugs at the time of the offense.

The trial court instructed the jury with respect to § 53a-46a (h) (2) as follows: "This statutory factor . . . states that, at the time of the offense, the defendant's mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significant[ly] impaired, but not so impaired as to constitute a defense to prosecution. This statutory factor requires the defendant to establish by a preponderance of the evidence that his mental capacity was significantly impaired . . . ." Thereafter, the trial court stated in relevant part: "If you unanimously find by a fair preponderance of the evidence that the defendant had a significant mental impairment at the time of the offense . . . then you have found this statutory factor set out in the statute and claimed by the defendant."

---

[139] General Statutes (Rev. to 1997) § 53a-46a (h) provides in relevant part: "The court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict . . . that at the time of the offense . . . (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution . . . ."

"Although we recognize that the trial court generally should use the language of [the statute] in instructing the jury on the statutory mitigating factor, we cannot conclude that it is reasonably possible that the court's minor misstatement, involving such a tenuous semantic distinction, could have misled the jury." *State* v. *Ross*, supra, 269 Conn. 338–39. We note that the trial court quoted the statutory language verbatim twice and only misspoke once. We conclude that there is no reasonable possibility that the trial court's instruction led the jury to believe that the term "significant mental impairment" required a specific diagnosis of mental illness, thereby foreclosing any claim by the defendant that he had satisfied his burden of proof under § 53a-46a (h) (2) by virtue of being under the influence of drugs at the time of the offense. Accordingly, we reject the defendant's claim.

3

Instructions Regarding the Requirement of
Unanimity with Respect to the Finding of
the Existence of Mitigating Factors

The defendant claims that the trial court improperly instructed the jury that a finding of the existence of a mitigating factor must be unanimous. The defendant refers to the following instruction by the trial court: "You need not all agree on the same mitigating factor or factors . . . as long as you all agree that a mitigating factor exists and that you all agree that the aggravating factor does not outweigh the mitigating factor or factors." We agree with the defendant.

Because we conclude that the trial court's instruction reasonably could have misled the jurors regarding their role in finding the existence of mitigating factors, we again take this opportunity to clarify the law.[140] We

[140] We note that the trial court's instructions, when read as a whole, were not entirely improper. For example, the trial court also instructed the jury: "[S]hould *any* of you determine that the defendant has proven by a prepon-

conclude that, pursuant to the current weighing scheme, once at least one juror has found, by a preponderance of the evidence, that a mitigating factor exists, the jury then proceeds to the weighing process. Thus, the jurors need not unanimously agree that a mitigating factor exists.

We acknowledge that, in *State* v. *Daniels*, 207 Conn. 374, 387–88, 542 A.2d 306 (1988), this court concluded, in the context of interpreting the pre-1995, nonweighing death penalty statutory scheme, that the jury's determination that no mitigating factors exist must be unanimous. Specifically, we stated: "[A] jury verdict in the penalty phase of a capital case must comport with the guidelines that govern the validity of jury verdicts generally, including the requirement of unanimity." Id. In *Daniels*, we reasoned that juror unanimity in a capital sentencing hearing was essential to ensuring the heightened reliability demanded by the eighth amendment in death penalty cases. Id., 389. Our conclusion in *Daniels* made sense under the nonweighing statutory scheme because the ultimate decision of whether the defendant would be sentenced to death or life in prison often hinged on the jury's decision regarding mitigation. See General Statutes (Rev. to 1995) § 53a-46a (f) (under nonweighing scheme, if jury found existence of even one mitigating factor, defendant would be sentenced to life imprisonment without possibility of release). In the present case, however, the ultimate decision depended not on the jury's finding of one or more mitigating factors, but on the outcome of the weighing process. Thus, in our view, it is no longer necessary for

derance of the evidence the exist[ence] of one or more mitigating factor or factors, you must then engage in the weighing process." (Emphasis added.) In addition, the trial court instructed the jury that the weighing process "must be undertaken if *any* of you determines that a mitigating factor exists." (Emphasis added.) To the extent that those instructions implied that unanimity is not required with respect to the finding of the existence of the mitigating factors, we conclude that those instructions were proper.

the jury unanimously to agree on whether a mitigating factor or factors *exist*, but the jurors must unanimously agree on whether the aggravating factor or factors outweigh the mitigating factor or factors.[141]

---

[141] Justice Borden concludes in his concurring opinion that the text and legislative history of Public Acts 1995, No. 95-19, § 1 (P.A. 95-19), support the proposition that, when the legislature converted the nonweighing death penalty statutory scheme to a weighing scheme, it did not intend to change the requirement that the existence of any particular mitigating factor be found unanimously by the trier of fact. Nevertheless, he concludes that this requirement of unanimity in the new weighing statutory scheme would "be subject to serious constitutional question." Justice Borden therefore concurs in the result reached by the majority. We disagree with this analysis, principally for two reasons. First, we believe that the legislative history does not "strongly suggest" that the legislature intended to preserve the requirement that there be a unanimous finding with respect to the existence or nonexistence of a mitigating factor. Indeed, despite the passing comment of Representative Michael J. Jarjura, to which Justice Borden refers in his concurrence, the legislative history strongly suggests otherwise. The legislative history is replete with references to the need to make the then existing, nonweighing death penalty statute more "workable" due to the number of juries that had been unable to reach a unanimous conclusion on the existence or nonexistence of mitigating factors. Furthermore, Justice Borden's view of the legislative history of P.A. 95-19 would not result in a more workable statutory scheme but, instead, would lead to a bizarre result. "We cannot presume that the legislature intended to create such a bizarre result, but [rather] intended a sensible statutory construction." (Internal quotation marks omitted.) *DeMilo* v. *West Haven*, 189 Conn. 671, 679, 458 A.2d 362 (1983). In effect, Justice Borden's view of the effect of P.A. 95-19 is that it took the then existing statutory scheme that the legislature determined to be "unworkable" and added to it the additional requirement of weighing. This clearly could not have made the statute more workable, nor could it have been the legislature's intent. Both Representatives Peter A. Nystrom and Dale W. Radcliffe referred to a number of death penalty cases tried under the nonweighing statutory scheme that resulted in hung juries because of the inability of the jurors to agree unanimously on the existence or nonexistence of mitigating factors. Representative Radcliffe predicted that, if a weighing statutory scheme had been in effect, those juries potentially would not have deadlocked. This prediction could only be realized if the requirement of unanimity that existed under the nonweighing statutory scheme did not survive the conversion to a weighing scheme.

Second, Justice Borden concludes: "[I]f we were to interpret our death penalty scheme to permit a hung jury on the question of the existence of a nonstatutory mitigating factor, the statute would, at the least, be subject to serious constitutional question." He therefore concurs in the result reached in this opinion. It is difficult to fathom why Justice Borden, in reaching this conclusion, does not impute to the legislature the same knowl-

Accordingly, to the extent that the trial court instructed the jury that its determination that a mitigating factor exists must be unanimous, that instruction was improper. It is apparent, however, that, in the present case, the jurors understood that a finding that a mitigating factor existed did not need to be unanimous. During deliberations, the jury sent a note to the trial court asking which individual jurors participate in the weighing process once some jurors have found the existence of a mitigating factor. See part III G 1 of this opinion. If the jury had believed that the determination regarding the existence of a mitigating factor required unanimity, the jury would not have asked such a question. Thus, we conclude that, on remand, the jury should be instructed that its determination with respect to the existence of a mitigating factor need not be unanimous.

### 4

### Instructions Regarding the Requirement of Unanimity with Respect to the Determination of Whether the Defendant Has Proven Any Statutory Bars to the Imposition of the Death Penalty

The defendant next claims that the trial court improperly instructed the jury that its determination with respect to whether the defendant had proven any statutory bars to the imposition of the death penalty had to be unanimous.[142] The defendant's claim is without merit.

edge of the potential unconstitutionality of the statute and assume that the legislature, too, would have rejected that interpretation in light of the well established principle that "[w]e cannot impute to the Legislature an intent to pass an unconstitutional statute and a law should be construed, if it can reasonably be done, so as to make it valid." *State* v. *Muolo,* 119 Conn. 323, 330, 176 A. 401 (1935); accord *State* v. *Doe,* 149 Conn. 216, 229, 178 A.2d 271 (1962).

[142] The defendant requested that the trial court give the following charge: "The jury does not have to unanimously agree on the same statutory bar. Each juror must decide for his or her self whether a statutory bar to the death penalty exists. If a juror finds that a statutory bar exists [then] that juror has reached a verdict and he or she must report to the court that he

The trial court instructed the jury: "[A]s it relates to these statutory factors, your determination regarding the existence of the statutory factors barring the death penalty claimed by the defendant must be unanimous. Therefore, with regard to the statutory factor or factors claimed, you must all agree whether the defendant has proven the factor or factors by a preponderance of the evidence, or that he has failed to prove the factor or factors by a preponderance of the evidence." The jurors also were instructed that they need not be unanimous on which statutory factor existed, just that one existed.

The defendant argues that, under the trial court's instructions, "if one or more (but not all) the jurors found a statutory bar, none of the jurors could consider that statutory bar when weighing the aggravating factor against the mitigating factors." The premise of the defendant's argument is flawed, however. Under our statutory scheme, the jurors would proceed to the weighing process only if the jury unanimously had concluded that a statutory bar to the imposition of the death penalty did not exist. In other words, the jury never could be in the situation that the defendant describes, namely, one in which some jurors find the existence of a statutory bar but are not able to consider that bar in the weighing process, because the weighing process cannot even commence until a unanimous decision has been made regarding the statutory bars to the imposition of the death penalty. Thus, if, as the

---

or she found a statutory bar. When I say that the jury does not have to unanimously agree on the same mitigating factor, I mean that if one juror finds a statutory bar and eleven do not find a statutory bar, the one juror who has found a statutory bar has reached his or her verdict and must report it to the court. Similarly, if six jurors found one statutory bar, [and] six jurors found a different one . . . the jury would report to the court that the jury has unanimously agreed that a statutory bar exists. If any one of you or more than one of you [find a] statutory bar to exist please give the sheriff a note that you have done so and I will instruct you as to how to proceed."

defendant describes, some jurors found the existence of a statutory bar and others did not, the jury would be deadlocked concerning a dispositive aspect of the penalty phase.[143] Accordingly, we reject the defendant's claim.

### 5

### Incomprehensibility of the Trial Court's Instructions

The defendant claims that the trial court's instructions were "incomprehensible" and "created a constitutionally intolerable risk that the jurors imposed a death sentence in spite of factors which may call for a less severe penalty . . . ." (Internal quotation marks omitted.) In support of his claim, the defendant refers to the trial court's instruction that he claims required the jury's determination of the existence of a mitigating factor to be unanimous. We previously resolved a substantially similar claim in part III G 3 of this opinion and, therefore, need not address the defendant's "incomprehensibility" claim here.

### 6

### Instructions on the Standard of Reasonable Doubt

The defendant claims that the trial court improperly instructed the jury on the definition of reasonable doubt. The trial court's instructions on reasonable doubt during the penalty phase mirrored its instructions on reasonable doubt during the guilt phase. We previously concluded that the trial court's instructions on reasonable doubt during the guilt phase were not improper. See part II E 4 of this opinion. Accordingly, we reject this claim.

---

[143] Furthermore, we note that the special verdict form confirms that the jurors unanimously agreed that the defendant had failed to prove the existence of a statutory bar to the death penalty by a preponderance of the evidence.

7

## Instructions on the Need for Unanimity Regarding the Defendant's Sentence

Finally, the defendant claims that the trial court improperly instructed the jury "regarding the need for unanimity with respect to a life sentence . . . ." The defendant claims that our capital sentencing scheme requires the court to impose a sentence of life imprisonment without the possibility of release when the jury cannot reach a unanimous decision on whether to sentence a defendant to death or life imprisonment. The defendant further claims that, because "there [was] a reasonable possibility that [the] jury interpreted the court's charge to mean that the defendant would receive a life sentence only if the jury reached a unanimous life verdict," the trial court's instruction "was highly misleading." We disagree.

The defendant cites to the following portions of the trial court's charge in support of his claim: "If your deliberations result in a unanimous agreement that the aggravating factor outweighs any mitigating factor or factors, you would indicate that on the verdict sheet and end your deliberations upon the finding. Upon that finding, the court will sentence the defendant to death. If your deliberations result in [a] unanimous agreement that the aggravating factor does not outweigh any mitigating factor or factors, you would indicate that on the verdict sheet . . . . Upon that finding, the court will impose a sentence of life imprisonment without the possibility of release." In claiming that the foregoing instruction was improper, the defendant urges us to overrule *State* v. *Daniels*, supra, 207 Conn. 374. We decline to do so.

In *Daniels*, the state claimed, under the pre-1995, nonweighing statutory scheme, that once the jury found the existence of an aggravating factor, the death penalty

must be imposed unless the jury unanimously concluded that a mitigating factor existed. See id., 386. In other words, the imposition of the death penalty was a consequence of the jurors not reaching a unanimous decision on the existence of a mitigating factor. See id. The defendant, Jerry D. Daniels, claimed, however, that the statutory scheme did not authorize the imposition of the death penalty unless the jurors unanimously found that the defendant had failed to prove the existence of a mitigating factor. See id., 386–87. Daniels essentially argued that, if the jurors could not unanimously agree that no mitigating factor existed, then the trial court was required to impose a sentence of life imprisonment without the possibility of release. See id.

In *Daniels*, we concluded that a verdict may be reached in a capital sentencing hearing only if the ultimate decision was unanimous. Id., 388. We then addressed Daniels' claim that the court must impose a sentence of life imprisonment unless the jurors unanimously agree that no mitigating factor exists. Id., 390–94. In rejecting his claim, we concluded that the statutory scheme "does not mandate a determinate outcome for death penalty cases in which a trier of fact cannot come to a unanimous finding about the existence of mitigating factors. In such circumstances, the statute neither authorizes imposition of the death penalty nor requires the imposition of a life sentence. Lest any misperception occur, our holding is that the imposition of the death penalty under [the statutory scheme] must be premised on two unanimous findings by the trier of fact: that the state has proved beyond a reasonable doubt that an aggravating factor exists and that the defendant has not proved by a preponderance of the evidence that a mitigating factor exists. A unanimous jury verdict that the defendant did not prove that a mitigating factor exists fulfills the statutory requirement that the death penalty not be imposed unless no mitigat-

ing factors exist within the meaning of [the statutory scheme]." (Internal quotation marks omitted.) Id., 394. Thus, we concluded that a nonunanimous decision during the penalty phase of a capital trial does not result automatically in the imposition of a life sentence.

In urging us to overrule *Daniels*, the defendant relies on *Jones* v. *United States*, supra, 527 U.S. 373. In *Jones*, the United States Supreme Court concluded that, under the federal death penalty statutory scheme, in the event that the jury is unable to arrive at a unanimous verdict with respect to a capital defendant's sentence, the sentencing determination passes to the court, which then must impose a sentence of life imprisonment without the possibility of release. Id., 380, citing 18 U.S.C. § 3594.[144] The court further determined that, notwithstanding this fact, "the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree." *Jones* v. *United States*, supra, 381.

We first note that the United States Supreme Court based its decision on the federal death penalty statutory scheme, which specifically provides for the imposition of a life sentence after the jury has failed to reach a unanimous verdict with respect to a capital defendant's sentence. Id., 380; see 18 U.S.C. § 3594 (2000). In contrast, our sentencing scheme does not contemplate such a result; see *State* v. *Daniels*, supra, 207 Conn. 394; and, as we have explained, "[w]hether our decision [in

---

[144] Title 18 of the United States Code, § 3594, which is part of the Federal Death Penalty Act of 1994, Pub. L. No. 103-322, tit. VI, § 60002, 108 Stat. 1959 (1994) (codified as amended at 18 U.S.C. § 3591 et seq.), provides in relevant part: "Upon a recommendation . . . that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly. Otherwise, the court shall impose any lesser sentence that is authorized by law. Notwithstanding any other law, if the maximum term of imprisonment for the offense is life imprisonment, the court may impose a sentence of life imprisonment without possibility of release." 18 U.S.C. § 3594 (2000).

*Daniels*] calls for corrective action is a matter that only the legislature can decide." Id. Moreover, even if it is assumed that our statutory scheme contemplates such a result, the United States Supreme Court in *Jones rejected* the claim that the jury must be instructed regarding the consequences of its failure to reach a unanimous decision with respect to a capital defendant's sentence. *Jones* v. *United States,* supra, 527 U.S. 381. Accordingly, the defendant's claim that the trial court improperly instructed the jury regarding the unanimity of its decision with respect to the defendant's sentence is without merit.

H

The Special Verdict Form

The defendant next claims that the trial court improperly rejected the defendant's proposed special verdict form. We disagree.

At the conclusion of the penalty phase hearing, the defendant requested that the court give the jurors a special verdict form requiring them to indicate, for each of the mitigating factors alleged by the defendant, whether they had found a factual basis for each of the alleged mitigating factors and, if so, whether one or more jurors had found that factor to be mitigating in nature. The trial court rejected the defendant's proposed form in favor of one that required the jurors to indicate only whether they had found that the defendant had proven the existence of any mitigating factor by a preponderance of the evidence. On appeal, the defendant claims that the special verdict form that the court submitted to the jury did not provide sufficient information for meaningful review of the jury's verdict with respect to the mitigating factors.

"We rejected a virtually identical claim in *State* v. *Cobb,* supra, 251 Conn. 426, [in which] the defendant

[Sedrick Cobb] argued, in addition to his claim that the special verdict form in that case did not comply with the requirements of [Practice Book, 1978–97, § 4059, what is now Practice Book § 64-1], that both as a matter of constitutional capital jurisprudence, and as a matter of [our] supervisory authority over the procedures of the trial court, we should have required the special verdict form to contain a detailed and complete statement of the court's findings of fact and legal conclusions with regard to aggravating factors . . . . [Cobb] argued that, without such a detailed special verdict form, we could not provide meaningful appellate review. . . . In rejecting [Cobb's] claim, we stated: [Cobb] offers no authority, and we know of none, that requires a sentencing court to issue a detailed factual statement justifying its imposition of a sentence of death that is otherwise valid under the statutory scheme. The constitutional requirement is that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence . . . . The panel's special verdict, stating its factual findings, viewed in conjunction with the complete evidentiary record of the penalty phase hearing, discloses to this court the considerations that supported the death sentence, and provides an ample basis for our meaningful appellate review of that sentence. We decline categorically to impose any more exacting requirement under our supervisory power. . . . Although the . . . claim in [*State* v. *Rizzo*, supra, 266 Conn. 171] focuses on seeking a more detailed statement of the jury's findings in mitigation, the same principles that we articulated in *Cobb* lead us to reject the . . . claim [in *Rizzo*]. Our ability to review the . . . sentence [in *Rizzo*] has not been impaired by the less specific verdict form, because we have been able to examine the evidence on which the jury reasonably could have relied in arriving at its decision." (Citations omitted; internal quota-

tion marks omitted.) Id., 311–12; see also *State* v. *Reynolds*, supra, 264 Conn. 138 ("[w]e, like the United States Supreme Court, are not impressed with the claim that without written jury findings concerning mitigating circumstances, appellate courts cannot perform their proper role" [internal quotation marks omitted]). Accordingly, we reject the defendant's claim.

The defendant raises four additional claims with regard to the special verdict form. The defendant first claims that the special verdict form improperly required the jurors to be unanimous with respect to whether the defendant had proven the existence of a statutory bar to the imposition of the death penalty. We addressed a nearly identical claim in part III G 4 of this opinion. Because we previously have rejected this claim within the context of the defendant's challenge to the trial court's instructions, we similarly reject the defendant's claim within the context of a challenge to the special verdict form.

Next, the defendant claims that the special verdict form was improper because it did not define or otherwise limit the meaning of the term "especially heinous, cruel or depraved . . . ." General Statutes (Rev. to 1997) § 53a-46a (i) (4). We note that the trial court specifically instructed the jury regarding the limited meaning of that term as construed by this court. In particular, the trial court instructed the jury: "In order for the state to prove this aggravating factor, that the defendant committed the crime in an especially heinous, cruel or depraved manner, the state must prove beyond a reasonable doubt that the defendant intended to, and in fact did, inflict extreme physical or psychological pain, suffering or torture on the victim, or that he was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct, in fact, inflicted on the victim." The trial court further detailed the exact elements of the

aggravating factor. Thus, we conclude that the trial court adequately instructed the jury on the definition of the term "especially heinous, cruel or depraved," and the absence of a lengthy definition of that term from the special verdict form was not improper.

The defendant also contends that the special verdict form improperly required the jurors to be unanimous with respect to both a life sentence or a death sentence. This claim mirrors the defendant's claim that, under our statutory scheme, a nonunanimous verdict with respect to the defendant's sentence automatically results in a sentence of life imprisonment without the possibility of release, which the defendant made in the context of challenging the trial court's penalty phase instructions. See part III G 7 of this opinion. We rejected that claim and, accordingly, reject it within the context of a challenge to the special verdict form as well.

Finally, the defendant claims that the special verdict form was improper because it did not inform the jurors that, in order to sentence the defendant to death, they had to find that the aggravating factor outweighed the mitigating factor or factors beyond a reasonable doubt. We concluded, in part III A of this opinion, that the trial court improperly declined to instruct the jury that, in order to sentence the defendant to death, it must be persuaded beyond a reasonable doubt that the aggravating factor or factors outweigh the mitigating factor or factors and that, accordingly, it is persuaded beyond a reasonable doubt that death is the appropriate punishment. Thus, the defendant's claim essentially is resolved by virtue of our conclusion in part III A of this opinion, and the facts in the present case do not require us to determine whether a trial court's proper instruction in this regard would obviate the need to repeat such an instruction in a special verdict form.

## IV

## JUDICIAL MISCONDUCT CLAIMS

The defendant next claims that the trial court deviated from proper standards of judicial conduct during both the guilt and penalty phases of the defendant's trial. Specifically, the defendant claims that, during the penalty phase, the trial court improperly expressed impatience with defense counsel during his direct examination of two witnesses. The defendant also claims that, during the guilt phase, the trial court improperly indicated that it was going to deal with the state's allegations that defense counsel had engaged in misconduct after the trial, thereby unnerving defense counsel and hindering their ability to represent the defendant. The defendant contends, inter alia, that, as a consequence of these actions, the trial court deprived him of a fair trial as guaranteed by the federal and state constitutions.[145] We disagree.

"Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8 . . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . However, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent.

---

[145] The defendant claims specifically that the trial court's actions resulted in a violation of his rights under the sixth, eighth and fourteenth amendments to the United States constitution, and article first, §§ 8 and 9, of the Connecticut constitution. Because the defendant has failed to provide an independent analysis under the state constitution, we limit our review to the defendant's federal constitutional claims. E.g., *State* v. *Peeler*, 271 Conn. 338, 372 n.34, 857 A.2d 808 (2004).

. . . The risk of constitutional judicial misconduct is greatest in cases [in which] the trial court has interceded in the merits of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Velasco*, 253 Conn. 210, 237–38, 751 A.2d 800 (2000). With this background in mind, we address the defendant's claims in turn.

## A

### Expression of Impatience During the Penalty Phase

The defendant claims that, during the penalty phase, the trial court improperly expressed impatience during defense counsel's direct examination of two witnesses. We disagree.[146]

During the penalty phase, defense counsel offered the testimony of Maria Ocasio, the defendant's mother. During her testimony, Ocasio revealed the existence of marital problems between her and the defendant's father. After Ocasio explained the marital problems at length, the state's attorney objected on the basis of relevancy. In response to the objection, the trial court asked defense counsel whether he could "put this into perspective . . . ." When defense counsel responded affirmatively, the trial court overruled the state's attorney's objection but stated that, "[t]he issue is that, at some point in time, you've got to bring it into focus, and I just want to know if it's coming . . . ." Thereafter,

---

[146] The record reveals that, during the penalty phase, defense counsel did not object to the trial court's alleged improprieties. The defendant claims, however, that his claim was preserved in a motion for mistrial, which was made at the conclusion of the penalty phase. We note that the basis for the motion was that the state had engaged in prosecutorial misconduct, but we acknowledge that, during arguments on that motion, defense counsel alluded to the trial court's interference with the trial. For instance, defense counsel argued that the trial court had "a limited view of what mitigation is" and that it had "guid[ed] [the] witnesses as they're trying to show emotion . . . ." Thus, for the purposes of this appeal, we conclude that the claim properly was preserved.

the trial court overruled another objection to Ocasio's testimony but instructed the defendant to "keep moving forward rather than staying in one place." In addition, when defense counsel returned to the subject of the marital problems between Ocasio and the defendant's father, the state's attorney again objected. In response, the trial court stated to defense counsel: "You did cover this." The trial court thereafter asked defense counsel whether he was "going to spend a lot of time in this area." Even after defense counsel responded affirmatively, the trial court nevertheless allowed the testimony.

The defendant also challenges the trial court's conduct during the testimony of Geisha Santiago, the defendant's former girlfriend. Santiago testified regarding an alleged incident during which the defendant had thrown a frying pan at her during an argument. During this testimony, defense counsel asked Santiago who had decided that she should go to the police. The state's attorney objected, claiming that the question had been asked and answered. In response, the trial court stated: "The aunt. Remember the aunt, [defense counsel]?" Thereafter, defense counsel acknowledged his mistake, stating: "Oh, that's right . . . . I didn't take it down." The trial court thereupon sustained the state's attorney's objection.

Although we recognize that the task of determining judicial misconduct is difficult because we are "not given the benefit of witnessing the juxtaposition of personalities which may help prevent reading too much into the cold black and white of a printed record"; (internal quotation marks omitted) *State* v. *Woodson*, 227 Conn. 1, 31, 629 A.2d 386 (1993); it is clear to us that, when viewed in the greater context of the entire penalty phase, the record reveals no improprieties on the part of the trial court during defense counsel's direct examination of Ocasio and Santiago. To the contrary,

the trial court's statements to defense counsel during Ocasio's testimony merely directed counsel to advance his inquiry when counsel had been eliciting the same testimony from Ocasio. The trial court's conduct did not reflect upon the merits of the defendant's case or undercut it in any manner. Rather, the trial court merely attempted to ensure the orderly progress of the trial. Moreover, the trial court *overruled* all of the state's attorney's objections during the testimony in question and allowed defense counsel to question Ocasio further. With respect to Santiago's testimony, defense counsel clearly acknowledged his mistake and moved on from the subject. Thus, the defendant was not deprived of his right to a fair trial as a result of the challenged conduct of the trial court during defense counsel's direct examination of Ocasio and Santiago.

B

Alleged Improprieties During the Guilt Phase

The defendant claims that the trial court "repeatedly threatened defense counsel that [it] was going to deal with their perceived misconduct at a later time" and that, consequently, "a cloud of contempt hovered over [the] trial." The defendant refers to several instances during the guilt phase of the trial in which the trial court allegedly threatened defense counsel. The first incident arose during a hearing, which was conducted outside the presence of the jury, on the state's motion to quash a subpoena served on Lieutenant Rioux. The subpoena, which had been issued by the defense, sought any information, including investigative reports, regarding allegations of unprofessional conduct by several Waterbury police officers. The trial court noted that, although the subpoena directed Rioux to bring the information into court, defense counsel received the information directly from Rioux in redacted form. The trial court then stated: "The appropriateness of this receipt

when considering that it was subject to a subpoena to appear in court would be addressed at a later time."

The next instance arose during Virginia Quintero's testimony. In accordance with the trial court's granting of the defendant's motion to exclude evidence of the defendant's prior alleged abuse of Quintero, the trial court struck Quintero's testimony that the defendant had punched the victim the same night he struck Quintero. At another point in her testimony, Quintero again asserted that the defendant previously had hit her, and the trial court, outside the presence of the jury, cautioned Quintero not to discuss the defendant's prior misconduct.[147]

Thereafter, on cross-examination, defense counsel attempted to inquire of Quintero about the allegations that the defendant had hit her. The trial court instructed defense counsel that he could only ask Quintero about the allegations that were elicited during direct examination. Thereafter, defense counsel asked the court if he could make an offer of proof concerning a photograph of Quintero that the police had taken on the day of the victim's death. Outside the presence of the jury, the state contended that the sole purpose of the photograph was to show that Quintero had a long fingernail and that she could have been the source of some of the victim's injuries. The trial court stated that, although it had tried "to be fair to both the state . . . and to the defendant . . . [it did not] want to be put in a position where [it felt] like [it was] set up. That's the feeling I have on this situation." The trial court also reiterated that it was defense counsel who, in fact, had requested that the trial court exclude evidence of the defendant's alleged abuse of Quintero.

Another instance arose during defense counsel's offer of proof on evidence relating to the defendant's escape

---

[147] After Quintero testified, for the second time, that the defendant had hit her, defense counsel moved for a mistrial, which the trial court denied.

from police custody. Outside the presence of the jury, defense counsel argued that the escape evidence was not part of the uncharged misconduct that the court had addressed earlier. The trial court responded: "It's not . . . uncharged. I'm going to want to get into the uncharged misconduct. I have very strong feelings about what happened on . . . that uncharged misconduct and as to the basis . . . of your motions for filing uncharged conduct, and then the third question asked on cross-examination [of Quintero] goes into what I've ruled on the uncharged misconduct. *I'll deal with that later.*"[148] (Emphasis added.)

The final instance occurred during the state's attorney's cross-examination of Ocasio. Defense counsel objected to a portion of the assistant state's attorney's cross-examination of Ocasio. After defense counsel asked to be heard on the issue, the trial court excused the jury. Thereafter, outside the presence of the jury, the state's attorney took issue with defense counsel's conduct, noting that defense counsel had made a speech in conjunction with his objection even after the trial court repeatedly had instructed both parties simply to state their objections so as not to influence the jury. In response, the trial court stated: "I understand [the state's concerns] . . . and it's frustrating up on the bench myself . . . . *I'm going to take some action* and I know you're frustrated . . . because I'm not taking action now, but it is clear law in the state of Connecticut that you don't take action concerning counsel in the middle of a trial." (Emphasis added.) Defense counsel thereafter asked the trial court to take immediate action, if it deemed it appropriate, because counsel could not proceed under "a cloud of, 'I'm going to take some action.' " The trial court declined to do so.

---

[148] In response to this statement, defense counsel asked the court to address the issue immediately because he could not "operate under a cloud of something going to happen later about something I did . . . ." The trial court declined defense counsel's invitation to address the issue.

We first conclude that none of the trial court's actions was improper. Even if we assume, however, that some or all of the trial court's actions were improper, we would conclude that none of these instances of judicial impropriety deprived the defendant of a fair trial. We first note that none of the trial court's comments was made in front of the jury. In *State* v. *Tatum*, 219 Conn. 721, 741–42, 595 A.2d 322 (1991), we summarily rejected a claim that the trial court improperly had chastised defense counsel for not being prepared when the comments occurred outside the presence of the jury. In doing so, we noted that "any misconduct that occurred outside the presence of the jury could not possibly have had an impact on its verdict." Id. Moreover, having thoroughly reviewed the record in the present case, we are satisfied that the instances about which the defendant complains reveal nothing more than an attempt by the trial court to expedite the trial and to maintain courtroom decorum. In addition, the trial court's comments toward defense counsel often were invited by defense counsel in slanting the spirit of the defendant's motion in limine and his continued objections that were in violation of the trial court's directive to refrain from making speeches during objections. Accordingly, we conclude that the trial court's actions did not deprive the defendant of a fair trial.[149]

The defendant claims, however, that, notwithstanding the fact that the comments were made outside the

[149] Moreover, even if some of the trial court's statements toward defense counsel had been made in the presence of the jury, the trial court clearly instructed the jury to refrain from considering any opinions of the trial court in its deliberations. Specifically, the trial court instructed the jury: "If the court has expressed or intimated any opinions as to the facts, you are not bound by that opinion. What [the] verdict shall be is your sole and exclusive duty and responsibility." "In assessing the impact of a judge's actions, jury instructions can be a means of allaying potential prejudice." *Logue* v. *Dore*, 103 F.3d 1040, 1046–47 (1st Cir. 1997).

presence of the jury, the trial court's conduct was improper because there was "an intolerable risk that the misconduct unnerved or hindered the performance of defense counsel." In making this claim, the defendant relies on *State* v. *Gionfriddo*, 154 Conn. 90, 221 A.2d 851 (1966), in which this court concluded that the trial court "[had] assume[d] the role of an adversary and interfere[d] with the legitimate cross-examination of a witness." Id., 96. We concluded that the "repeated interruptions and rebukes of counsel in the presence of the complainants then on the witness stand could only have the effect of repressing counsel's attack on the credibility of the witnesses and of giving aid and advice to the witnesses." Id., 97. Thus, "[c]onsidering . . . the absence of corroboration and the closeness of [the] case," we reversed the judgment of conviction. Id.

The defendant cites *Gionfriddo* for the proposition that, even though the trial court's comments were made outside the presence of the jury, the trial court's conduct nevertheless was improper and violated the defendant's right to a fair trial. Our decision in *Gionfriddo*, however, does not support the defendant's claim because the defendant's case in *Gionfriddo* was tried to the court rather than a jury. Id., 91. Moreover, the actions of the trial court in *Gionfriddo* were more egregious than those of the trial court in the present case. For instance, the trial court in the present case in no way interfered with the examination of witnesses and refrained from admonishing defense counsel until after the jury had exited the courtroom. Thus, *Gionfriddo* is inapposite. We conclude that the defendant was not deprived of a fair trial.

## V

## MISCELLANEOUS CONSTITUTIONAL CLAIMS

### A

### Constitutionality of the "Facts and Circumstances" Language in § 53a-46a (d)

The defendant claims that the language of § 53a-46a (d)[150] is constitutionally infirm because it prevents the jury from giving effect to the proposed mitigating evidence. Specifically, the defendant contends that the requirement that the jury, in deciding whether the proposed mitigating evidence is mitigating in nature, make its determination "considering all the facts and circumstances of the case"; General Statutes (Rev. to 1997) § 53a-46a (d); renders the statute unconstitutional, both on its face and as applied, because the statute: (1) allows the jury "to refuse to consider constitutionally relevant mitigating evidence"; (2) allows the jury to conclude incorrectly that there must be a nexus between the mitigating evidence and the offense committed by the defendant; and (3) "screen[s] out" mitigating evidence from the weighing process.[151] We disagree.

---

[150] See footnote 3 of this opinion for the text of § 53a-46a (d).

[151] The defendant also claims that § 53a-46a unfairly favors the determination of aggravating factors over the determination of mitigating factors because, according to the defendant, the determination of the existence of an aggravating factor involves only two hurdles whereas the determination of the existence of a mitigating factor involves "four hurdles . . . ." According to the defendant, these four hurdles involve determinations that: (1) the defendant has established the mitigating factor by a preponderance of the evidence; (2) the factor is mitigating in nature; (3) the factor should be considered as tending to extenuate or to reduce the degree of the defendant's culpability or blame; and (4) the mitigating factor is outweighed by the aggravating factor. The defendant's claim lacks merit. The determination of the existence of a mitigating factor involves a two step process. First, the sentencer must determine that the defendant has established the factual bases of the mitigating factor by a preponderance of the evidence. Second, the sentencer must determine that the proposed evidence is mitigating in nature, which requires the sentencer to consider the facts and circumstances of the case. The sentencer then proceeds to the weighing process, which involves consideration of *both* the aggravating factor or factors and the

Before turning to the merits of the defendant's claims, "[w]e . . . reiterate the burden the defendant bears in challenging the constitutionality of a statute. [B]ecause a validly enacted statute carries with it a strong presumption of constitutionality, those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . In construing a statute, moreover, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 291.

Turning to the merits of the defendant's claims, we note that "[t]he United States Supreme Court has made clear that the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. . . . *Woodson* v. *North Carolina*, [428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)]. Under both the eighth and fourteenth amendments, a sentencer may not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . . *Lockett* v. *Ohio*, [438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)]. A sentencer also may not refuse to consider, *as a matter of law*, any relevant mitigating evidence. . . . *Eddings* v. *Oklahoma*, [455 U.S. 104, 114, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982)]. [I]t does not follow from *Lockett* and its progeny that a [s]tate is precluded from specifying *how* mitigating circumstances are to be

mitigating factor or factors. Thus, it is clear that § 53a-46a does not improperly favor the determination of aggravating factors over the determination of mitigating factors.

proved. . . . *Walton* v. *Arizona*, 497 U.S. 639, 649, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), overruled in part on other grounds, *Ring* v. *Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). The United States Supreme Court has never . . . held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. *Buchanan* v. *Angelone*, [522 U.S. 269, 276–77, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998)]. Nor has the court ever suggested that jury consideration of mitigating evidence must be undirected and unfocused . . . [or] concluded that [s]tates cannot channel jury discretion in capital sentencing in an effort to achieve a more rational and equitable administration of the death penalty. *Franklin* v. *Lynaugh*, 487 U.S. 164, 181, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 291–92.

The first and third of the defendant's claims are based on the structure of the death penalty statute. The defendant claims that, because § 53a-46a (d) requires the sentencer to consider the facts and circumstances of the case in making its determination of whether the proposed mitigating evidence is mitigating in nature, the statute allows the jury to refuse to consider relevant mitigating evidence. The defendant also contends that the facts and circumstances language "screen[s] out" mitigating evidence from the weighing process.[152] We recently have concluded, however, that the facts and circumstances language in the current weighing context passes constitutional muster.

In *Rizzo*, the defendant, Todd Rizzo, claimed "that, because § 53a-46a (d) requires the sentencer to consider

---

[152] By example, the defendant claims that, "if a crime is perceived to be extremely heinous, the facts and circumstances of that crime might well screen out substantial, important and compelling mitigating evidence preventing the fact finder from considering such evidence in the weighing process."

the facts and circumstances of the case in [determining] . . . whether the proposed mitigating evidence is mitigating in nature, the mitigating evidence is offset by the aggravating evidence at that stage in the deliberation process." Id., 292. Specifically, Rizzo claimed "that the more substantial the aggravating evidence, the less likely the jury will be to determine that the proposed mitigating evidence is mitigating in nature." Id., 292–93. In addressing this claim, we first explained that this court twice before had "rejected constitutional challenges to § 53a-46a (d), concluding that requiring the sentencer to determine whether the proposed mitigating evidence is mitigating in nature considering all the facts and circumstances of the case does not involve a weighing of aggravating and mitigating circumstances." Id., 293. As we noted, in State v. Ross, supra, 230 Conn. 284, we rejected a challenge to the facts and circumstances language of § 53a-46a (d) because "[a] jury that is entrusted with the awesome responsibility for deciding whether the death penalty should be imposed cannot be asked to find facts in a vacuum." (Internal quotation marks omitted.) State v. Rizzo, supra, 266 Conn. 294.

In addition, in Rizzo, we explained that we also had rejected a similar claim in State v. Cobb, supra, 251 Conn. 285. State v. Rizzo, supra, 266 Conn. 294–95. In Cobb, we rejected a claim that the sentencer improperly had failed to find the existence of a mitigating factor. State v. Cobb, supra, 486–87. "In rejecting [that] . . . claim . . . we stated that the mere establishment of the factual bases of mitigating evidence does not compel a conclusion, as a matter of law, that a defendant has proved the existence of mitigation. Id., 492–93. Indeed, the interpretation suggested by the defendant in Cobb would have effectively read out of § 53a-46a (d) the requirement that the sentencer determine whether the factor is mitigating in nature, rendering that language

in the statute superfluous. Id., 494–95. We concluded [in *Cobb*] that § 53a-46a does not require a capital sentencer to give mitigating force to any particular proven factor solely because that factor establishes something good about the defendant. Id., 495–96." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 295–96.

Thus, in *Rizzo*, we concluded that, "[d]espite [Rizzo's] attempt . . . to distinguish *Cobb* and *Ross*, because both of those decisions addressed the effect of the phrase 'considering all the facts and circumstances of the case' in a nonweighing context, the addition of the weighing provision to § 53a-46a does not alter our analysis of the impact of the facts and circumstances language on the capital sentencing process. The addition of the weighing provision does not change the nature of the jury's determination of mitigation— it merely changes what happens *after* the jury finds mitigation. Under the pre-1995 death penalty scheme, a [jury's] finding of mitigation required the imposition of a life sentence; now such a finding triggers the weighing process. This change in § 53a-46a (d) does not affect the requirement that the sentencer determine whether a proposed mitigating factor is mitigating in nature 'considering all the facts and circumstances of the case,' which merely defines the phrase 'mitigating in nature' and provides the jury with guidance in making its determination of the existence of mitigation. Rather than impermissibly limiting *what* the sentencer may consider as mitigating circumstances, the phrase 'considering all the facts and circumstances of the case' in § 53a-46a (d) simply specifies '*how* mitigating circumstances are to be proved.' " (Emphasis in original.) Id., 296.

Moreover, we noted that "[Rizzo's] suggested interpretation of the statute, which would allow any evidence that establishes 'something good' about the defendant to be considered a mitigating factor and therefore to be considered in the weighing process,

confuses *proposed* mitigating evidence with *established* mitigating factors. That is, [Rizzo] assumes that, once he has proved the factual basis for proposed mitigating evidence, he has also established that the evidence is mitigating in nature. This supposition is inconsistent with the requirement that the defendant must not only establish the factual bases of proposed mitigating evidence, but also must show that the proposed evidence is mitigating in nature. This two step process contemplates the possibility that not all proposed mitigating evidence is mitigating in nature. The process necessarily results in some 'screening out' of proposed mitigating evidence, regardless of whether the determination that the proposed evidence is mitigating in nature is made 'considering all the facts and circumstances of the case.' Therefore, just as in *Cobb*, [Rizzo's] interpretation would read out the requirement that the sentencer determine ' "whether that factor is mitigating in nature," ' rendering that language in § 53a-46a (d) superfluous." (Emphasis in original.) Id., 296–97.

Accordingly, our resolution of the defendant's claims in the present case is guided by the principles that we articulated in *Rizzo*. Thus, we conclude that the facts and circumstances language of § 53a-46a (d) is a constitutionally permissible method of defining how mitigating circumstances are to be established in the context of our current weighing statutory scheme, and therefore, we reject the defendant's first and third claims regarding the constitutionality of § 53a-46a (d).[153]

[153] We similarly reject the defendant's challenge to the trial court's instructions to the jury that, "[i]n determining whether a factor is mitigating in nature, you must consider it in the context of the all the facts and circumstances of the case." The defendant had requested the trial court to instruct the jury "that in considering whether a particular fact or set of facts are [sic] mitigating in nature, you may not consider the aggravating factor you may have found or the fact of the capital felony conviction itself." We rejected a similar challenge in *Rizzo*, concluding that "the [trial court's] instruction [in *Rizzo*, which was identical in all material respects to the one given in the present case] correctly reflected the requirement of § 53a-46a (d), that the jury make its determination of whether the proposed mitigating

The defendant also claims that § 53a-46a (d) allows the jury to conclude incorrectly that there must be a nexus between the mitigating evidence and the offense in order for the jury to find that that evidence is mitigating in nature. We rejected an identical claim in *Rizzo*. Id., 298–99. In doing so, we stated: "The language of the statute . . . is not as restrictive as [Rizzo] implies. Section 53a-46a (d) merely provides that the jury must make its determination of whether the proposed mitigating evidence is mitigating in nature considering all the facts and circumstances of the case. Nowhere does the statute require that mitigating evidence have some nexus to the offense. It merely provides that the jury consider the totality of the evidence, including the nature of the offense." Id., 298. Furthermore, the court's instruction in the present case that, "[i]n determining whether a factor is mitigating in nature, you must consider it in the context of all the facts and circumstances of the case," was proper. Nothing in the instruction suggested to the jury that it was required to find a nexus between the mitigating evidence and the offense before it could determine that that evidence was mitigating in nature. Accordingly, we reject the defendant's claim.

## B

### Vagueness Challenge to § 53a-46a (i) (4)

The defendant next seeks to prevail, under *State* v. *Golding*, supra, 213 Conn. 239–40, on his claim that the

evidence was mitigating in nature considering all the facts and circumstances of the case. Indeed, the United States Supreme Court has stated that '[t]he circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague *nor otherwise improper* under . . . Eighth Amendment jurisprudence.' . . . By contrast, [Rizzo's] requested instruction, which stated: 'It is important that you understand, however, that in considering whether a particular fact or set of facts are [sic] mitigating in nature, *you may not consider the aggravating factor you may have found or the fact of the capital felony conviction itself* . . . was an inaccurate statement of the law. The established aggravating factor and the fact of the capital felony conviction were part of the facts and circumstances of the case, and, thus,

aggravating factor of § 53a-46a (i) (4), namely, that the defendant committed the offense in an especially heinous, cruel or depraved manner, is unconstitutionally vague because the term "extreme pain or torture"; *State* v. *Breton*, 212 Conn. 258, 270, 562 A.2d 1060 (1989); is too subjective and, thus, too vague a standard to guide the sentencer's discretion, and because the definition "does not contain an objective standard that the cruel acts must be separate and distinct from the acts constituting the murder." The defendant's claim presents an issue of constitutional magnitude and the record is adequate for review. We already have rejected this claim, however, in prior cases. See *State* v. *Ross*, supra, 230 Conn. 241–42; *State* v. *Breton*, supra, 270–71. The defendant has failed to provide us with a compelling reason to reconsider these cases and, therefore, we decline the defendant's invitation to do so in the present case. Accordingly, the defendant cannot prevail on his claim.

C

The Trial Court's Denial of the Defendant's Request for a Hearing to Consider Racial Disparities in the Administration of the Death Penalty

We next consider the defendant's claim that the trial court improperly denied his motion for a continuance of his sentencing and for a hearing to determine whether racial disparities in the administration of the death penalty statute violated his constitutional rights and the statutory requirement that a death sentence not be "the product of passion, prejudice or any other arbitrary factor . . . ." General Statutes § 53a-46b (b) (1). We disagree.

the jury was required to consider them in arriving at its mitigating decision. The trial court properly refused to give [Rizzo's] requested instruction." (Citation omitted; emphasis in original.) *State* v. *Rizzo*, supra, 266 Conn. 297–98.

The following facts and procedural history are relevant to the defendant's claim. On November 9, 2000, the defendant filed a motion in the trial court seeking a continuance of the defendant's sentencing in order "to allow him to continue to develop and present evidence at a hearing in which he will seek to establish that the death penalty [in Connecticut] is administered in an arbitrary manner . . . ." Shortly thereafter, on December 5, 2000, defense counsel requested the court to grant a continuance of several months in order to allow the defense team time to gather evidence relating to this claim. Relying on *State* v. *Cobb*, 234 Conn. 735, 762–63, 663 A.2d 948 (1995), the trial court denied the request, concluding that the claim would be more appropriately raised in a postappeal petition for a writ of habeas corpus.

We addressed this identical claim in *State* v. *Reynolds*, supra, 264 Conn. 232–34. For the same reasons that we articulated in *Reynolds*, we believe that the proper course is not to require the trial court on remand to conduct a preliminary evidentiary hearing "but, rather, to afford the defendant an opportunity to renew his claim by way of a habeas corpus petition. . . . As long as the defendant has such recourse, he will not be prejudiced in any way by the denial of an evidentiary hearing in the trial court."[154] (Citation omitted.) Id., 232.

[154] As we explained in *Reynolds*, "since our decisions in [*State* v. *Cobb*, supra, 234 Conn. 735 (*Cobb I*), and *State* v. *Cobb*, supra, 251 Conn. 285 (*Cobb II*)], subsequent events have overtaken both the claim that the defendant [Richard Reynolds] raises . . . and the same claim made by [Sedrick] Cobb in his case. These events reaffirm our conclusion that [Reynolds] should be required to pursue his claim in a habeas corpus proceeding in the trial court. We affirmed Cobb's conviction and his death sentence. *Cobb II*, supra, [521]. In the course of that opinion, we reaffirmed our earlier conclusion in *Cobb I*, supra, [762–63], that Cobb would be permitted to raise his statistical claim by way of a petition for a writ of habeas corpus. *Cobb II*, supra, 499.

"At some time after our decision in *Cobb I*, which was released in 1995, the office of the public defender began to collect the data that it deemed necessary to establish the claim. In November, 2002 . . . the office of the public defender informed this court that it had completed its collection of

Accordingly, if the defendant intends to pursue this claim, he must do so in a subsequent habeas corpus proceeding. Thus, the trial court properly denied the defendant's motion.

## D

### Constitutionality of General Statutes (Rev. to 1997) § 53a-54b (9)

The defendant next claims, inter alia, that General Statutes (Rev. to 1997) § 53a-54b (9),[155] which renders the murder of a person under the age of sixteen a capital felony, violates his rights under the equal protection clause of the fourteenth amendment to the United States constitution. Specifically, the defendant claims that there is no rational basis for treating defendants who have murdered persons under the age of sixteen differently from defendants who have murdered per-

the data and that an expert's report analyzing the data would be completed by January 1, 2003. The office of the public defender also informed us that its preparation for a hearing on the data and report would take an additional three to six months. That time period does not include, however, the time necessary for the state to prepare its response to the claim. In December, 2002, Chief Justice William J. Sullivan appointed former Chief Justice Robert Callahan to serve as a special master to manage the process and timetable by which the claim would be litigated in the habeas court. At this point, we have received no further information regarding the status of that litigation.

"It is apparent, therefore, that neither the office of the public defender nor the state is ready to litigate the merits of this claim in the immediate future. It is also apparent that judicial economy, as well as fairness to both defendants and the state, mandates that this claim be litigated before the same habeas judge and in the same general, consolidated hearing, on behalf of all defendants who have been sentenced to death.

"Our conclusion applies to [Reynolds] . . . . [Reynolds] will have a full opportunity to present his claim in the habeas court and, as we previously have indicated, is not prejudiced in any way by the relegation of his claim to that forum." *State* v. *Reynolds*, supra, 264 Conn. 232–33.

[155] See footnote 1 of this opinion for the text of General Statutes (Rev. to 1997) § 53a-54b (9). We note that § 53a-54b has since been amended and what was subdivision (9) in the 1997 revision is now subdivision (8). See General Statutes (Rev. to 2003) § 53a-54b.

sons who are sixteen years of age or older.[156] We disagree.

The defendant concedes that he did not preserve this claim but nevertheless seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the record is adequate for review and the claim is of constitutional magnitude. Accordingly, the claim is reviewable. The defendant cannot prevail on the merits of his claim, however.[157]

"When a statute is challenged on equal protection grounds . . . the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard [under which] the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." (Internal quotation marks omitted.) *Ramos* v. *Vernon*, 254 Conn. 799, 829, 761 A.2d 705 (2000). The defendant in the present case concedes that the classification does not implicate

[156] As we noted previously, "[b]ecause a validly enacted statute carries with it a strong presumption of constitutionality, those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 291.

[157] An analytical predicate to the consideration of an equal protection claim is the determination of whether the allegedly disparately treated groups are similarly situated. See *State* v. *Wright*, 246 Conn. 132, 141, 716 A.2d 870 (1998). In the present case, we assume without deciding that the class of defendants who have intentionally murdered persons under the age of sixteen is similarly situated to the class of defendants who have intentionally murdered persons who are sixteen years of age or older.

a suspect class or any fundamental right. Therefore, we review the defendant's claim under the rational basis standard.

We previously have concluded that the distinction between the intentional murder of victims who are under sixteen years of age and the intentional murder of victims who are sixteen years of age or older is supported by a rational basis. In *State* v. *Higgins*, 265 Conn. 35, 826 A.2d 1126 (2003), which was decided after the defendant had filed his brief in the present case, the defendant, Sheldon Higgins, was convicted of capital felony in connection with the murder of a thirteen year old. Id., 40, 41. On appeal, Higgins challenged the constitutionality of what is now § 53a-54b (8); see footnote 155 of this opinion; claiming, inter alia, that the statute violated the equal protection clauses of the federal and state constitutions because it treated classes of defendants differently on the basis of the victim's age. *State* v. *Higgins*, supra, 62, 65. We concluded that the legislature had a rational basis for classifying the intentional murder of a person under the age of sixteen as a capital felony. Id., 67. In particular, we noted that "the state has a legitimate interest in protecting the lives of the most defenseless of our citizens and the most vulnerable." (Internal quotation marks omitted.) Id. Moreover, "[t]hat interest rationally is advanced by holding offenders who intentionally kill innocent persons liable for capital felony if their victims are under the age of sixteen. The fact that the state is not required to prove that the defendant knew that the victim was under the age of sixteen does not affect our conclusion. As we have noted, by providing that intentional killers take their victims as they find them, the legislature has created a strong incentive for potential killers to avoid even the risk of killing a child." Id.[158] Accordingly, we

[158] In *Higgins*, we rejected the "claim that there was no rational basis for the line drawn between victims who are sixteen or older and victims under the age of sixteen." *State* v. *Higgins*, supra, 265 Conn. 67. As we explained,

concluded that General Statutes (Rev. to 1997) § 53a-54b (9) does not violate the equal protection clause of the fourteenth amendment.

E

Constitutionality of Connecticut's
Death Penalty Statutes

The defendant challenges the constitutionality of this state's death penalty statutes under the federal and state constitutions. He contends that the statutory scheme is unconstitutional because it: (1) requires the defendant to shoulder the burden of proving the existence of a mitigating factor by a preponderance of the evidence; (2) calls for the imposition of the death penalty without allowing the jurors to determine whether, in the particular case at issue, the death penalty is appropriate on the basis of the aggravating factor or factors alleged by the state; (3) embodies a presumption that death is the appropriate sentence; (4) fails to provide for a capital sentencer who makes an individualized, reasoned and moral decision on the appropriateness of the death penalty; (5) provides for a standardless and unreviewable determination regarding the existence of nonstatutory mitigating factors; (6) authorizes the capital sentencer to reject mitigating evidence on irrelevant and improper grounds by directing the sentencer to consider "the facts and circumstances of the case" in

---

"[i]n every instance [in which] a line must be drawn or a cutoff established there are those who fall directly on either side. . . . [W]e cannot, for this reason, find the act unreasonable in its purpose and overall effect. . . . If a conceivable rational basis exists for the distinction, then the classification passes constitutional muster." (Internal quotation marks omitted.) Id., 68. Thus, "[t]o invalidate the legislature's choice, we would either have to hold that the Legislature cannot draw an age line—which would eviscerate any attempt to include child-murders within the ambit of the capital murder statute—or we would have to hold that the line should be drawn elsewhere—in which case, we would merely be legislating from the bench. . . . We decline to pursue either option." (Citation omitted; internal quotation marks omitted.) Id., 69.

determining the existence of mitigating factors; and (7) sanctions the imposition of the death penalty, which constitutes cruel and unusual punishment in violation of the state and federal constitutions.

We previously have considered and rejected each of these claims. Specifically, in *State* v. *Reynolds*, supra, 264 Conn. 1, we rejected claims identical in all material respects to the first five claims and the seventh claim raised by the defendant. Id., 236–37; see also *State* v. *Ross*, supra, 230 Conn. 229, 239–41 and n.24, 243–44, 256. Moreover, we recently rejected a claim identical in all material respects to defendant's sixth claim in *State* v. *Breton*, 264 Conn. 327, 414–15, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003). Although the defendant acknowledges that we previously have rejected all of his constitutional claims, he asks us to reconsider our earlier conclusions. Because we are not persuaded that any of our previous determinations are incorrect, we reject the defendant's invitation to reconsider our conclusions in those previous cases.

The judgment is reversed insofar as it imposes a sentence of death and the case is remanded to the trial court for a new penalty phase hearing; the judgment is affirmed with respect to the defendant's conviction of capital felony and murder.

In this opinion PALMER, VERTEFEUILLE and LAVERY, Js., concurred.

BORDEN, J., concurring. I agree with and join the majority opinion, except for that portion of part III G 3 in which the majority addresses the claim of the defendant, Ivo Colon, that the trial court improperly instructed the jury regarding whether a finding of mitigation by one or more jurors triggers the process of weighing the aggravating factor against any mitigating

factors found. The majority indicates that the trial court's instruction reasonably could have misled the jury. The majority continues, appropriately, to make clear that so long as at least *one* juror has found the existence of a mitigating factor, the weighing process must then take place. I reach the same conclusion as the majority, but I do so by a different route.

Unlike the majority, I think that the question of whether the jury's finding of a mitigating factor must be by all or any of the jurors is, in the first instance at least, a question of statutory interpretation. I conclude that: (1) in amending our death penalty statute, General Statutes § 53a-46a, from a nonweighing to a weighing statutory scheme, the legislature intended that our prior law, which contemplated a hung jury in the event of a lack of unanimity on the issue of mitigation, be retained; but (2) as so construed, the statute would likely be unconstitutional. Therefore, in order to avoid holding our entire death penalty statute unconstitutional, I would construe it to permit the determination of the existence of a mitigating factor, so as to trigger the weighing process, to be made by any one or more jurors.

Prior to 1995, a finding of mitigation by the jury precluded the imposition of the death penalty, irrespective of whether the aggravating factor outweighed the mitigating factor. *State* v. *Rizzo*, 266 Conn. 171, 181, 833 A.2d 363 (2003). In 1995, the legislature, by virtue of Public Acts 1995, No. 95-19, § 1, amended the statutory scheme to provide that the death penalty would be imposed if the jury found that the aggravating factor outweighed any nonstatutory mitigating factors. Id.[1] These statutory amendments were made by virtue of

---

[1] Under the amended statute, however, the presence of a so-called statutory mitigant, namely, one of those listed in General Statutes (Rev. to 1997) § 53a-46a (h), would preclude the imposition of the death penalty. *State* v. *Rizzo*, supra, 266 Conn. 181. I discuss later in this opinion my concerns about the factors set forth in subsection (h) of § 53a-46a.

Public Act 95-19, § 1, the relevant portions of which I have set forth in footnote 2 of this concurring opinion.[2]

*State* v. *Rizzo,* supra, 266 Conn. 171, was the first case to come to us under the weighing statute. The present case is the second.

[2] Section 1 of Public Act 95-19 provides in relevant part: "(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any [aggravating or mitigating] factor SET FORTH IN SUBSECTION (h), THE EXISTENCE OF ANY AGGRAVATING FACTOR OR FACTORS SET FORTH IN SUBSECTION (i) AND WHETHER ANY AGGRAVATING FACTOR OR FACTORS OUTWEIGH ANY MITIGATING FACTOR OR FACTORS FOUND TO EXIST PURSUANT TO SUBSECTION *(d)*.

"(f) If the jury or, if there is no jury, the court finds that *(1)* NONE OF THE FACTORS SET FORTH IN SUBSECTION (h) EXIST, *(2)* one or more of the AGGRAVATING factors set forth in subsection [(h)] *(i)* exist and [that] (3) (A) no mitigating factor exists OR (B) ONE OR MORE MITIGATING FACTORS EXIST BUT ARE OUTWEIGHED BY ONE OR MORE AGGRAVATING FACTORS SET FORTH IN SUBSECTION *(i)*, the court shall sentence the defendant to death.

"*(g)* If the jury or, if there is no jury, the court finds that *(1)* ANY OF THE FACTORS SET FORTH IN SUBSECTION (h) EXIST, OR *(2)* none of the AGGRAVATING factors set forth in subsection [(h)] *(i)* exists, or [that] *(3)* ONE OR MORE OF THE AGGRAVATING FACTORS SET FORTH IN SUBSECTION (i) EXIST AND ONE OR MORE MITIGATING FACTORS EXIST, BUT THE ONE OR MORE AGGRAVATING FACTORS SET FORTH IN SUBSECTION (i) DO NOT OUTWEIGH THE one or more mitigating factors, [exist,] the court shall impose a sentence of life imprisonment without the possibility of release.

"[(g)] *(h)* The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that [any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That] at the time of the offense (1) he was under the age of eighteen YEARS or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or [(3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4)] *(3)* he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or [(5)] *(4)* he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person. . . ." Language that was amended is indicated by italics and capitalization. Language that was deleted is indicated by brackets.

This court has recently adverted to the question of unanimity on the finding of mitigation, pointing out a potential conflict between our jurisprudence under our prior, nonweighing statute and our current, weighing statute. In *State* v. *Rizzo*, supra, 266 Conn. 204, we noted that the trial court had instructed the jury that any one juror's finding of mitigation would trigger the weighing process. We stated: "Under the prior, non-weighing statute, however, our law was clear that a finding of a mitigating factor or no mitigating factor must be made by a unanimous jury, and that, in the absence of such unanimity, there would be no finding regarding mitigation or the lack thereof, one way or another. *State* v. *Daniels*, [207 Conn. 374, 387–88, 542 A.2d 306, after remand for articulation, 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989)]. In addition, we subsequently clarified our holding in *Daniels*. In *State* v. *Ross*, 230 Conn. 183, 243, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), we rejected the defendant's claim 'that our death penalty system, as construed in *State* v. *Daniels*, supra, [374], is facially unconstitutional because it requires the jury to be unanimous in finding the existence of a mitigating factor before an individual juror can give effect to any mitigating factor,' purportedly contrary to the decision of the United States Supreme Court in *McKoy* v. *North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990). In rejecting this challenge, we stated: 'Our holding in *Daniels* did not imply that individual jurors are precluded from considering and giving effect to all mitigating evidence in a death penalty sentencing hearing. The unanimity requirement in our statute requires unanimity only in the sense that each juror must find at least one mitigating factor that was proved by a preponderance of the evidence. The jury need not unanimously find the same

mitigating factor to have been proven by a preponderance of the evidence. So construed, our death penalty sentencing statute avoids the unanimity problem identified in *McKoy*, because our unanimity requirement does not interfere with the ability of each individual juror to consider and to give effect to any mitigating factor of which he or she is convinced by a preponderance of the evidence.' . . . *State* v. *Ross*, supra, 244. Thus, in *Daniels* and *Ross*, we made clear that: (1) all the jurors must agree that a mitigating factor exists, in order for there to be a valid determination that such a factor existed; but (2) the jurors need not be unanimous regarding which mitigating factor has been established." *State* v. *Rizzo*, supra, 192–93 n.15.

Thus, under our prior, nonweighing statute, the absence of unanimity on the question of whether the defendant had proven a nonstatutory mitigant would result in a hung jury. *State* v. *Ross*, supra, 230 Conn. 243; *State* v. *Daniels*, supra, 207 Conn. 393–94. Furthermore, under that jurisprudence, if the jury were hung, the court has the discretion to impose a penalty of life without the possibility of release. *State* v. *Daniels*, supra, 396. The majority in the present case assumes without analysis, however, that when the legislature amended the death penalty statutory scheme to substitute a weighing for a nonweighing process, it implicitly abandoned our prior jurisprudence, exemplified by *Daniels* and *Ross*, that the jury's determination of whether a mitigating factor exists must be unanimous and that, in the absence of such unanimity, there would be a hung jury in the case. My analysis of the weighing statute leads me to conclude, to the contrary, that the legislature likely intended to incorporate that prior jurisprudence.

I first note that there is nothing in the language of Public Act 95-19 that specifically addresses the question involved in the present case, namely, whether there is

a requirement of jury unanimity regarding the existence of a mitigating factor. Indeed, to the extent that, in *Daniels* and *Ross*, we were necessarily interpreting the provision in prior revisions of § 53a-46a (g) that "[t]he court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict . . . that any mitigating factor exists," the absence of any amendment to that language in the 1995 Public Act suggests that the prior interpretations of it were intended to be left undisturbed.

There is, moreover, more than the absence of amendatory language.[3] The legislative history, particularly the debate in the House of Representatives, strongly suggests that the legislature specifically considered the question of jury unanimity and likely intended not to disturb that prior jurisprudence. Representative Peter A. Nystrom introduced the issue, indicating his under-

---

[3] The majority opinion suggests that we should assume that the legislature was aware of the potential unconstitutionality of the statute and that it therefore must have intended to abolish the unanimity requirement. For two reasons, I believe such an assumption is not justified. First, there is no evidence in the legislative history that the legislature had any such knowledge. Indeed, the evidence that I have cited, in which the unanimity requirement was specifically discussed, indicates that the legislature was unaware of any such potential infirmity. Thus, in this instance, engaging in the presumption that the majority urges, namely, to presume that the legislature intended to enact a constitutional statute, would be to transform the presumption into a transparent fiction. Second, this court itself was unaware of the constitutional infirmity of the statute, as evidenced by our judicial gloss in *Daniels* and *Ross*, and I am willing to presume—because the legislative history specifically confirms—that the legislature was aware of that judicial gloss. Thus, it is more than reasonable—it is quite clear—that the legislature was also unaware of the constitutional implications of the unanimity requirement; it was under the incorrect impression, as were we until now, that the *Daniels* and *Ross* glosses rendered the statute constitutionally sufficient. Finally, I note that although the majority does not take issue with my reading of the unanimity cases, it nonetheless does not explain either the basis of its conclusion that there can be no unanimity requirement on the finding of mitigation or the reason that there should be no such requirement despite our long history of requiring unanimity on critical jury determinations in criminal cases.

standing that the weighing statute would preclude a hung jury and a consequent judge's decision to impose a life sentence.[4] 38 H.R. Proc., Pt. 3, 1995 Sess., p. 1015. Representative Nystrom's remarks, however, did not stand unchallenged. They were directly referred to and contradicted by Representative Alex A. Knopp and by Representative Michael J. Jarjura, who presented and explained the bill to the House on behalf of the Joint Committee on the Judiciary, and who formally moved for adoption of the bill. See id., p. 922, remarks of Representative Jarjura.

In the debate, Representative Knopp specifically referred to the remarks of Representative Nystrom "where there was a hung jury on the matter of a mitigating factor"; id., p. 1047; and asked Representative Jarjura: "[I]sn't it the case that there is nothing in the File Copy, as amended, that would prevent a hung jury on a mitigating factor from occurring again?" Id. After Representative Jarjura indicated some confusion about the question and asked that it be repeated; id.; Representative Knopp did so: "The question was this. Under the bill, as amended, before us, isn't it the case that there could be a hung jury on the matter of whether or not there exists any mitigating factor?" Id., p. 1048. Representative Jarjura answered: "Sure. Yes." Id. Representative Knopp then asked, regarding the court's power to impose a life sentence if the jury is hung on the issue of mitigation: "Isn't the case under criminal procedure

---

[4] Representative Nystrom, after referring to *Daniels*, in which the jury was hung and the court imposed a life sentence, stated: "It was a hung jury on the issue of mitigation. They never determined that a mitigating factor existed. They never determined that it did not exist either. *And under our current law, without this recommended change, that could happen again.* . . . It is for that reason I support the weigh test and many others that have since followed. But I believe the law we have is flawed. For that issue could rise itself in another case and if you had a hung jury again on mitigation, under our current law, that could happen." (Emphasis added.) 38 H.R. Proc., Pt. 3, 1995 Sess., pp. 1014–15.

that has happened in that case, [namely, *Daniels*] that even though the [s]tate asked that there be a retrial on the issue of mitigation in the sentencing phase, the court nonetheless has the inherent power to impose a life sentence and to turn down the [s]tate's request to retry the issue of mitigation?" Id. Representative Jarjura answered: "Yes." Id. Representative Knopp then went on to analyze the fifteen cases under the prior law in which penalty phase hearings had been held, and pointed out that, among those that would *not* be affected by the bill, "[t]wo would not be affected because of the hung jury." Id., p. 1049.

Subsequently, Representative Dale W. Radcliffe, another proponent of the bill, made a similar, case-by-case analysis of those cases in which the outcome would arguably have been different under the weighing bill before the House. In doing so, he specifically referred to the case of "*State* v. *Steiger*, [218 Conn. 349, 590 A.2d 408 (1991)], [in which] a panel deadlocked two to one on whether or not there was a mitigating factor. . . . *Had they found a mitigating factor*, that factor may not have outweighed the aggravating factors in this case and yes, it may have made a difference in [*Steiger*]." (Emphasis added.) 38 H.R. Proc., supra, p. 1066. Thus, Representative Radcliffe understood, consistent with the remarks of Representative Knopp and Representative Jarjura, that the bill did not affect the potentiality of a hung jury on the question of whether a mitigating factor existed.

In my view, this record strongly suggests that, despite the belief of Representative Nystrom, the legislature understood and intended that the bill would not eliminate the requirement of jury unanimity on the question of the existence of a nonstatutory mitigating factor. I base this conclusion on the pointed legislative dialogue between Representative Knopp and Representative Jarjura, the chief proponent of the bill, who was

explaining it to his colleagues in response to Representative Knopp's questions specifically aimed at the hung jury scenario, and on the similar stated understanding of another of the bill's proponents, namely, Representative Radcliffe. This conclusion is further supported by the fact that any conclusion that the bill was intended to eliminate the unanimity requirement would necessarily have to be reached by implication, and we do not ordinarily read legislation in that fashion. *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 242, 756 A.2d 1264 (2000) (repeal by implication disfavored). This is particularly true regarding the general issue of jury unanimity, which has deep roots in our criminal jurisprudence. See, e.g., *State* v. *Sawyer*, 227 Conn. 566, 585–86, 630 A.2d 1064 (1993).

The question of whether, in the death penalty context, a jury's finding of mitigation may be required to be unanimous is, however, more than a question of statutory interpretation. It is also a question of federal constitutional law. My review of the relevant United States Supreme Court decisions, as well as the weight of authority following those decisions, persuades me that, at least in the context of a statutory weighing scheme, a requirement of jury unanimity on the question of the existence of a mitigating factor would potentially be unconstitutional. Therefore, in order to avoid any such potential unconstitutionality, I would interpret our statutory scheme so as not to impose such a requirement.

The seminal United States Supreme Court decisions on the question are *Mills* v. *Maryland*, 486 U.S. 367, 384, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988), and *McKoy* v. *North Carolina*, 494 U.S. 433, 435, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990). Those two cases have long been understood to stand for the proposition that, in order to avoid the potentially arbitrary imposition of the death sentence, a state could not require jury unanimity on the question of the existence of a mitigating

factor. See, e.g., *Beard* v. *Banks*, 542 U.S. 406, 408, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004). That potentiality would exist, in the Supreme Court's view, if either of two situations arose: (1) eleven of twelve jurors could agree that six mitigating circumstances existed, but one holdout could force the death penalty; or (2) all twelve jurors could agree that some mitigating circumstance existed, but could not agree on which particular circumstance. Id., 419; *McKoy* v. *North Carolina,* supra, 439–40; *Mills* v. *Maryland,* supra, 373–74.

Although neither *Mills* nor *McKoy* specifically dealt with the possibility of a hung jury on the question of mitigation, and although arguably they could have been read to be consistent with such a possibility,[5] that has not generally been the case. Indeed, the United States Court of Appeals for the Sixth Circuit has recently stated: "[A] state may not require unanimity in finding mitigating factors. Such a requirement 'impermissibly limits jurors' consideration of mitigating evidence.' [*McKoy* v. *North Carolina,* supra, 494 U.S. 444]. In fact, as *Mills* and *McKoy* hold, any requirement that mitigating factors must be found unanimously is incoherent. See [*Mills* v. *Maryland,* supra, 486 U.S. 400; *McKoy* v. *North Carolina,* supra, 442–43]. A unanimity requirement on mitigating factors would mean that, if aggravating factors have been found by the jury, one or more jurors who—in disagreement with other jurors—find no mitigating factor, or find different mitigating factors, or find that the aggravating factors do not outweigh mitigating factors found by some (but not all) of the jurors, or find that no mitigating factor outweighs aggravating factors, could still produce a death verdict *or*

_____

[5] In fact, this court has done precisely that. In *Ross,* we read *McKoy* to hold only that unanimity cannot be required on the question of *which* mitigating factor existed, and not on whether mitigation had been proven to the satisfaction of all of the jurors. See *State* v. *Ross,* supra, 230 Conn. 244. I now have serious doubt about the validity of this narrow reading of *McKoy.*

*a hung jury*, depending on how state law treats the disagreement. Thus, in order for Eighth Amendment law on mitigating factors to be coherent and capable of judicial administration without serious confusion, a capital jury must understand that, in the words of the Federal Death Penalty Act, 'a finding with respect to a mitigating factor may be made by one or more members of the jury.' " (Emphasis added.) *Davis* v. *Mitchell*, 318 F.3d 682, 688 (6th Cir. 2003); see also *Frey* v. *Fulcomer*, 132 F.3d 916, 921 (3d Cir. 1998) ("the essential holding of *Mills-McKoy* is simply that one juror cannot prevent the others from giving effect to mitigating evidence, regardless of whether the imposition of a life sentence depends on the existence of such evidence"); *Coe* v. *Bell*, 161 F.3d 320, 337 (6th Cir. 1998) (*Mills* and *McKoy* declare unconstitutional instructions that with reasonable probability could have led jurors to believe that they "could consider only those mitigating circumstances that they unanimously agreed were present"); *Kubat* v. *Thieret*, 867 F.2d 351, 371–73 (7th Cir. 1989) (*Mills* requires that jury be instructed "that even if one juror believed that the death penalty should not be imposed, [the defendant] would not be sentenced to death").

These authorities persuade me that, if we were to interpret our death penalty scheme to permit a hung jury on the question of the existence of a nonstatutory mitigating factor, the statute would, at the least, be subject to serious constitutional question. I decline to do so. I therefore join in the conclusion of the majority that if any one juror finds the existence of any mitigating factor, that is sufficient to trigger the weighing process called for by the statute.

One matter remains, however, for brief comment. The trial court in the present case instructed the jury that, in contrast to the nonstatutory mitigating factors, the existence of any of the factors listed in subsection

(h) of § 53a-46a, to which we previously have referred as the statutory mitigating factors; see *State* v. *Rizzo*, supra, 266 Conn. 180 n.5; must be established by a unanimous vote of the jury. Although the defendant did not challenge that instruction in the trial court and does not do so in this court, I am constrained to point out that I cannot see, at least on the basis of a preliminary analysis and on the basis of the authorities discussed previously in this opinion, how those factors can be constitutionally subject to a unanimity requirement. For example, to use one of the same hypothetical scenarios that so troubled the Supreme Court in *Mills* and *McKoy*, suppose that eleven of the twelve jurors were persuaded that six of the statutory factors existed; the one holdout could preclude the jury from giving effect to those six statutory factors. This likely would be subject to the same constitutional flaws regarding unanimity and mitigation discussed in the federal case law interpreting *Mills* and *McKoy*.

It is true that, by virtue of the 1995 amendments, those factors are no longer specifically referred to as "mitigating" factors; they are now simply referred to by their statutory subsection (h) of § 53a-46a. Nonetheless, they clearly perform the function of mitigating factors.[6] "Mitigating factors . . . are . . . evidence relevant to a defendant's character or record or other circumstances of the offense that might lead a sentencer to decline to impose the death sentence." *Davis* v. *Mitchell*, supra, 318 F.3d 688. It is also true that, if the jury finds the existence of any such factor, that finding precludes the imposition of the death penalty without any further weighing. At this point, however, I do not see how such a dispositive effect evades the constitutional flaws discussed in this concurring opinion. If anything,

---

[6] Indeed, in the debate in the House of Representatives, Representative Jarjura repeatedly referred to them as "dispositive or statutory mitigating factors." 38 H.R. Proc., supra, pp. 924–25.

the reasoning of those cases, barring a unanimity requirement on mitigation, seems to apply even more strongly to the statutory factors.

In sum, I conclude, consistent with the conclusion of the majority, that the jury must be instructed that, if any *one or more* jurors finds the existence of any mitigating factor proven by a preponderance of the evidence, then the jury must proceed to the weighing process. I also suggest, however, that the capital felony bench and bar look closely at the question of whether the same instruction must also be given regarding the factors listed in § 53a-46a (h).

NORCOTT, J., concurring. As I stated in my concurring opinion in *State* v. *Rizzo*, 266 Conn. 171, 313, 833 A.2d 363 (2003), "[i]n accordance with my ongoing position in cases regarding the resolution of issues that implicate the death penalty, but do not result directly in its imposition; see *State* v. *Courchesne*, 262 Conn. 537, 583–84, 816 A.2d 562 (2003) (*Norcott, J.*, concurring)"; I agree with the result reached in the majority opinion in the present case.

KATZ, J., concurring and dissenting. I maintain my belief that the death penalty fails to comport with contemporary standards of decency and thereby violates our state constitution's prohibition against cruel and unusual punishment. See Conn. Const., art. I, §§ 8 and 9. Nevertheless, I concur in the judgment reached by the majority because, as I have stated previously, "I have an obligation, consistent with my oath and responsibilities as a justice of this court, to decide the issue before the court . . . ." *State* v. *Courchesne*, 262 Conn. 537, 584, 816 A.2d 562 (2003) (*Katz, J.*, concurring and dissenting).

In the present case, in fulfilling my obligation, I agree with the majority, pursuant to what this court stated

in *State* v. *Rizzo*, 266 Conn. 171, 233, 833 A.2d 363
(2003), that, in order to establish that death is the appro-
priate sentence, the state must establish by a level of
certitude beyond a reasonable doubt that any aggravat-
ing factor upon which the jury unanimously has agreed
outweighs any mitigating factor. As I stated in *Rizzo*,
it is my view that "anything short of the highest standard
fails to comport with due process. This is because the
decision of whether the defendant should suffer the
ultimate penalty that the judicial system can impose—
death—is the most crucial decision made in any stage
of the proceedings, requiring jurors to make their
most reasoned and judicious moral determination.
Demanding that this final determination be made pursu-
ant to the highest standard of proof properly conveys
the seriousness of the task and the importance of the
highest degree of certainty in the outcome. We, as a
society, must have confidence that, should the penalty
of death be imposed, it is a decision about which no
reasonable person could differ. To allow jurors to make
that judgment guided by a procedure that demands less
than the highest level of certainty is, to me, inconceiv-
able." Id., 315–16 (*Katz, J.*, concurring and dissenting).
Therefore, I agree with the majority's conclusion in the
present case that the trial court improperly refused to
instruct the jury that, in order to impose the death
penalty, the jury had to be persuaded beyond a reason-
able doubt that any aggravating factor upon which it
unanimously has agreed outweighs any mitigating
factor.[1]

---

[1] I also continue to maintain that, to prevail at the penalty phase hearing, the state must convince the jury that any aggravating factor outweighs any mitigating factor beyond a reasonable doubt. In other words, I would require the jury to determine beyond a reasonable doubt that aggravating factors justify a sentence of death. *State* v. *Rizzo*, supra, 266 Conn. 317 (*Katz, J.*, concurring and dissenting). To achieve this, I believe that the same level of certitude should be applied both in arriving at the outcome of the weighing process as well as to the degree by which one factor outweighs another. Id., 321–22.

Where the majority and I part company, however, is with regard to the right of allocution, which permits a convicted defendant personally to address his or her sentencer and plead for mercy. The majority concludes that there is no common-law, statutory or constitutional right of allocution to the jury in a capital sentencing proceeding. Specifically, the majority concludes that Practice Book § 43-10 (3),[2] which codifies a common-law right of allocution in sentencing proceedings generally, does not apply in the context of capital sentencing proceedings, which are governed by General Statutes (Rev. to 1997) § 53a-46a.[3] In reaching this conclusion, the majority reasons that the capital sentencing procedures set forth by § 53a-46a (c) "fulfill the purposes of allocution" by allowing the defendant to offer any

---

[2] Practice Book § 43-10 (3) provides: "The judicial authority shall allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of the sentence."

[3] General Statutes (Rev. to 1997) § 53a-46a provides in relevant part: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section. . . .

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (i) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the aggravating factors set forth in subsection (i) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant. . . ."

To be consistent with the majority opinion, we refer herein to the 1997 revision of § 53a-46a, which was in effect at the time of the sentencing proceedings in the present case. We note, however, that the language of subsections (a) and (c) has remained unchanged.

evidence in mitigation and to testify at his sentencing hearing, albeit "subject to cross-examination concerning his testimony."

I cannot agree with the majority's conclusion, however, in light of the historical development of the right to allocution, the fundamental purposes served by that right and the purposes served by the separate capital sentencing hearing provided by § 53a-46a. Specifically, I would conclude that a defendant in a capital sentencing hearing has a common-law right to allocution, and that the legislature has not expressed any clear intention to abrogate or preempt that common-law right. The majority's conclusion to the contrary creates an anomalous result, namely, that a capital defendant has *less* of a right personally to address his sentencers and plead for mercy than a noncapital defendant, who has an unfettered right to allocution. I do not believe that the legislature intended such a bizarre result in its promulgation of § 53a-46a, which is meant to provide *greater* protections to defendants in capital sentencing hearings than those provided in sentencing hearings generally. See *State* v. *Rizzo*, supra, 266 Conn. 226–27. Accordingly, I respectfully dissent from part III C of the majority opinion.

Allocution has been defined as "[a]n *unsworn* statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. *This statement is not subject to cross-examination.*" (Emphasis added.) Black's Law Dictionary (7th Ed. 1999). In *State* v. *Strickland*, 243 Conn. 339, 703 A.2d 109 (1997), we reviewed the historical underpinnings of the right to allocution. "Allocution, or the right of a defendant to make a statement to the court on his own behalf and present information in mitigation of sentence, has its origins in the ancient common-

law practice of inquiring of every defendant if he had anything to say before sentence was imposed. . . . Historically, the practice marked a critical juncture in criminal proceedings, as it afforded defendants the opportunity to inform the court as to the applicability of any of numerous recognized exemptions from the otherwise severe punishments imposed by the common law of the period. When asked whether sentence should not be pronounced, a defendant might then 'plead his benefit of clergy, that he had obtained a pardon, identity of person, pregnancy [insanity] or . . . any ground in arrest of judgment . . . .' " (Citation omitted.) Id., 343, quoting P. Barrett, "Allocution," 9 Mo. L. Rev. 115, 121 (1944).

"Modern day justifications for preserving the practice focus on tailoring punishment to individual circumstances, providing an avenue through which a defendant may ask for mercy based on factors that might not otherwise be brought to the court's attention, and promoting safety, certainty and equity in sentencing and the judicial process overall." *State* v. *Strickland*, supra, 243 Conn. 344–45. "Thus, although at one time allocution as a critical stage in criminal proceedings was perceived to be on the wane in some jurisdictions, it has not disappeared from our jurisprudence, but instead has been affirmatively adopted by statute or procedural rule in several jurisdictions during the modern era. The United States Supreme Court has stated: 'We are not unmindful of the relevant major changes that have evolved in criminal procedure since the seventeenth century . . . [b]ut we see no reason why a procedural rule should be limited to the circumstances under which it arose if reasons for the right it protects remain. None of these modern innovations lessens the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant

as the defendant might, with halting eloquence, speak for himself.' *Green* v. *United States*, 365 U.S. 301, 304, 81 S. Ct. 653, 5 L. Ed. 2d 670 (1961) . . . ." *State* v. *Strickland*, supra, 345–46.

Practice Book § 43-10 is a detailed provision governing the procedures to be followed at sentencing hearings in general. This provision expressly does not distinguish between capital and noncapital proceedings. The common-law right of allocution is codified by § 43-10 (3), which provides: "The judicial authority shall allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf *and* to present any information in mitigation of the sentence." (Emphasis added.) In other words, § 43-10 (3) "explicitly affords the defendant *two* rights: to make a statement in his own behalf, and to present any information in mitigation of punishment." (Emphasis added; internal quotation marks omitted.) *Green* v. *United States*, supra, 365 U.S. 304 (construing rule 32 [a] of Federal Rules of Criminal Procedure, now rule 32 [c] [3] [C], providing right of allocution in federal cases).

Section 53a-46a (c), by contrast, specifically governs the admission and use of *information* at capital sentencing hearings. The statute provides in relevant part: "Any *information* relevant to any mitigating factor may be presented by either the state or the defendant . . . . The state and the defendant shall be permitted to rebut any *information* received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the *information* to establish the existence of any mitigating or aggravating factor. . . ." (Emphasis added.) General Statutes (Rev. to 1997) § 53a-46a (c).

It is a well established principle of statutory construction that this court cannot presume that a statute abrogates a common-law right in the absence of a clear expression of legislative intent to the contrary. See *Mat-*

*thiessen* v. *Vanech*, 266 Conn. 822, 838–39, 836 A.2d 394 (2003) ("[a]lthough the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed" [internal quotation marks omitted]); see also *State* v. *Brocuglio*, 264 Conn. 778, 792, 826 A.2d 145 (2003). Although § 53a-46a (c) expressly governs the presentation of *information* relevant to any mitigating or aggravating factor, it is silent concerning the other right afforded by § 43-10 (3) and the common law—the right "to make a personal statement in his or her own behalf . . . ." The legislative history of § 53a-46a similarly contains no reference to the right of allocution. Therefore, I cannot conclude that the legislature clearly has evidenced an intent to abrogate the common-law right of allocution in capital sentencing proceedings. Moreover, I cannot conclude that § 53a-46a (c) preempts the common-law right of allocution, that is, that the legislature "has manifested an intention to occupy the field" of allocution, or that application of the common-law right of allocution "would conflict with or frustrate the purpose of the [statute], so as to stay our hand in . . . [applying the] common law." *Craig* v. *Driscoll*, 262 Conn. 312, 323, 813 A.2d 1003 (2003).

Although the majority does not point to any clear expression of legislative intent to abrogate or preempt the common-law right of allocution in capital sentencing hearings, it nonetheless concludes that "there is no right of allocution within the structured setting of a capital sentencing hearing." In reaching this conclusion, the majority notes its approval of *Commonwealth* v. *Abu-Jamal*, 521 Pa. 188, 211–13, 555 A.2d 846 (1989), cert. denied, 498 U.S. 881, 111 S. Ct. 215, 112 L. Ed. 2d 175 (1990), wherein the Pennsylvania Supreme Court concluded that, "[w]hatever force the common law of allocution has with respect to other criminal cases, the

General Assembly has abrogated that law and replaced it with statutory law devised specifically for first degree murder cases." Id., 212. In so concluding, the court apparently treated allocution as "evidence"; see id.; and noted that "[i]mplicit in the fact that the statute assigns to the defendant the burden of proving mitigating circumstances by a preponderance of evidence is the understanding that the jury is to [assess] the evidence for credibility." Id., 213.

The problem with this reasoning, which the majority has adopted in the present case, is that it fundamentally blurs "the distinction between the accused giving *testimony* in his own behalf and the accused making a *plea for mercy*. In the first instance, the testimony is offered either to dispute a fact in issue at trial or to offer evidence of another fact which the accused advances defensively. . . . In contrast, the accused making a plea for mercy does not intend to advance or to dispute facts, but instead uses the plea to ask for lenience or understanding in the sentencer's decision." (Emphasis added.) J. Sullivan, "The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and Constitutional Mitigation," 15 N.M. L. Rev. 41, 63 (1985); see *United States* v. *Chong*, 104 F. Sup. 2d 1232, 1234 (D. Haw. 1999) (defendant's right to testify in own behalf does not implicate his right to allocute). Put another way, "[a]llocution is a plea for mercy; it is not intended to advance or dispute facts." *State* v. *Lord*, 117 Wash. 2d 829, 897, 822 P.2d 177 (1991), cert. denied, 506 U.S. 856, 113 S. Ct. 164, 121 L. Ed. 2d 112 (1992). "It is essential to understand and apply properly this fundamental distinction between the unrestricted right to present relevant *evidence* and speaking in allocution without being subject to cross-examination." (Emphasis in original.) *Shelton* v. *State*, 744 A.2d 465, 494–95 (Del. 1999), cert. denied, 530 U.S. 1218, 120 S. Ct. 2225, 147 L. Ed. 2d 256 (2000).

As previously stated, § 53a-46a (c) explicitly governs the presentation of *information* in capital sentencing proceedings. Neither the plain language nor the legislative history of § 53a-46a elaborates on whether "information" is the functional equivalent to "evidence," on the one hand, or whether that term encompasses procedures that are beyond the scope of standard evidentiary law. More important, § 53a-46a (c) governs only the presentation of information, and is silent concerning the other right that is explicitly provided for by § 43-10 (3)—the defendant's right to make a *personal statement* in his or her own behalf. Accordingly, I would conclude that § 53a-46a (c) neither abrogates nor preempts the common-law right of allocution in capital sentencing proceedings, insofar as that right permits a capital defendant personally to address his or her sentencers in a plea for mercy.[4]

Furthermore, I also would conclude that the right of allocution may be satisfied only by permitting the defendant personally to address the sentencing jury

[4] Like the majority, I recognize the split of authority concerning the existence of a common-law right to allocution in a capital sentencing proceeding. Some jurisdictions expressly have recognized such a right. See, e.g., *Harris* v. *State*, 306 Md. 344, 356, 509 A.2d 120 (1986); *Homick* v. *State*, 108 Nev. 127, 133–34, 825 P.2d 600 (1992); *State* v. *Zola*, 112 N.J. 384, 431, 548 A.2d 1022, cert. denied, 489 U.S. 1022, 109 S. Ct. 1146, 103 L. Ed. 2d 205 (1989); *State* v. *Lord*, supra, 117 Wash. 2d 900. Other jurisdictions do not recognize a common-law right of allocution in a capital sentencing proceeding. See, e.g., *United States* v. *Hall*, 152 F.3d 381, 393 (5th Cir. 1998), cert. denied, 526 U.S. 1117, 119 S. Ct. 1767, 143 L. Ed. 2d 797 (1999); *State* v. *Whitfield*, 837 S.W.2d 503, 514 (Mo. 1992); *State* v. *Perkins*, 345 N.C. 254, 289, 481 S.E.2d 25, cert. denied, 522 U.S. 837, 118 S. Ct. 111, 139 L. Ed. 2d 64 (1997); *Duckett* v. *State*, 919 P.2d 7, 22 (Okla. Crim. App. 1995), cert. denied, 519 U.S. 1131, 117 S. Ct. 991, 136 L. Ed. 2d 872 (1997); *Commonwealth* v. *Abu-Jamal*, supra, 521 Pa. 211; *State* v. *Stephenson*, 878 S.W.2d 530, 552 (Tenn. 1994). Although I find these authorities from other jurisdictions informative, I nevertheless would conclude, on the basis of the interplay between Connecticut's capital sentencing scheme and the common-law right of allocution, that the legislature has neither abrogated nor preempted that common-law right in the context of capital sentencing proceedings.

without subjecting himself to cross-examination. In *State* v. *Strickland,* supra, 243 Conn. 348, we recognized the right of allocution in the context of the disposition phase of a probation revocation proceeding. Specifically, we examined the interplay between the rule of practice that is now Practice Book § 43-29, which governs probation revocation proceedings, and the rule that is now § 43-10 (3). We noted that Practice Book, 1978–97, § 919, the precursor to § 43-10, "is a detailed provision that specifies the procedures to be followed at sentencing hearings, and subsection (3) specifically provides that the voice of the defendant himself is to be heard at the hearing should he elect to allocute." *State* v. *Strickland,* supra, 348. By contrast, Practice Book, 1978–97, § 943, the precursor to § 43-29, governed probation revocation proceedings, but did not govern those proceedings exclusively and did not specify the procedures to be followed during the disposition phase of those proceedings. See id., 348–49. Therefore, we concluded that, because probation revocation proceedings embody a form of sentencing, a defendant in those proceedings has a right of allocution. Id., 349–50.

In so concluding, we noted in *Strickland* that the right of allocution remained significant, in light of the trial court's discretion in determining the sanction for a violation of probation. We stated: "In this case . . . the punishment to be imposed for a violation of probation was not preordained. Under [General Statutes] § 53a-32, the court was vested with broad discretion during the disposition phase of the revocation hearing. . . . The court was not obligated to require the defendant to serve any or all of his remaining sentence; indeed, it had the discretion to continue probation, and modify or enlarge the conditions if it so chose. In these circumstances, allocution was not rendered a meaningless formality by a predetermined outcome to the proceeding. Instead, the circumstances involved an

exercise of broad discretion that the defendant could have attempted to influence if allocution had been allowed. Although the defendant had an opportunity to make a statement on his own behalf at his original sentencing, that opportunity did not allow him meaningfully to attempt to influence the exercise of another judge's discretion with regard to the consequences to be imposed for the subsequent violation of probation. *In other words, timing is an important element of the right of allocution.*" (Citation omitted; emphasis added.) Id., 353; see *United States* v. *Behrens*, 375 U.S. 162, 165–66, 84 S. Ct. 295, 11 L. Ed. 2d 224 (1963) (right of allocution "would be largely lost" if afforded only at time of preliminary commitment and not at final sentencing, which is "the sentence that counts"); *United States* v. *Buckley*, 847 F.2d 991, 1002 (1st Cir. 1988) (right of allocution must be extended when defendant is finally sentenced, even if allocution previously afforded at provisional sentencing), cert. denied, 488 U.S. 1015, 109 S. Ct. 808, 102 L. Ed. 2d 798 (1989).

The right of allocution is meaningless if it does not permit the defendant to make a personal statement on his own behalf to the body that actually has the discretion to sentence him. See *State* v. *Strickland*, supra, 243 Conn. 353–54. In Connecticut, as in many other states, the trial court has no discretion in a capital sentencing proceeding before a jury. Rather, once the jury has returned a verdict for the death penalty, the trial court shall sentence the defendant accordingly. See General Statutes § 53a-46a (f). Therefore, the defendant in a capital sentencing hearing must be afforded the right to make a personal statement to the jury. Anything less would render the process a " 'meaningless formality' " and, therefore, would not satisfy the right of allocution. See *United States* v. *Li*, 115 F.3d 125, 133 (2d Cir. 1997) (right to allocution is not satisfied if reduced to " 'meaningless formality' "); see also *State*

v. *Young*, 853 P.2d 327, 372 (Utah 1993) (Durham, J., dissenting) ("[a]llocution in a capital sentencing trial after the jury has returned its verdict on sentencing is a meaningless formality, 'no more than an empty gesture' ").

Furthermore, the defendant's right to make a personal plea to the jury for mercy must not be hampered by the threat that the defendant could incriminate himself, for use in further proceedings, by being subject to cross-examination. "[T]he fear of cross-examination might compel capital defendants to forego addressing the jury and offering pleas for mercy, expressions of remorse, or some explanation that might warrant a sentence other than death." *United States* v. *Chong*, supra, 104 F. Sup. 2d 1236. In other words, by equating allocution with testimony that is subject to cross-examination, the majority essentially forces capital defendants to choose between personally addressing the sentencing jury in a plea for mercy, on the one hand, and exercising their constitutional right to remain silent and free from self-incrimination, on the other. "Exercise of the right to remain silent, an important decision in terms of trial and appellate strategy, may prove correct in terms of avoiding negative evidence or waiver of error. It also may have the result of insulating the jury from the accused and isolating its sentencing decision from the fact that the death sentence, if imposed, will actually result in the execution of a fellow human being." J. Sullivan, supra, 15 N.M. L. Rev. 63. Consequently, "[t]he right to speak without threat of disclosing otherwise undisclosed information such as a prior record may prove valuable or decisive, to a capital defendant seeking to avoid the death penalty." Id., 42.

Moreover, I see "no reason why a *capital* defendant should have a lesser right to explain his position and ask for mercy by being sworn and subject to cross examination than a *non-capital* defendant, who has an

unfettered right to allocute." (Emphasis added.) *United States* v. *Chong*, supra, 104 F. Sup. 2d 1236; see *State* v. *Strickland*, supra, 243 Conn. 354 (recognizing right of allocution in probation revocation proceedings). As this court has stated, statutes must be construed to avoid bizarre, difficult or impractical results. *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, 266 Conn. 150, 165, 832 A.2d 1 (2003). Accordingly, I would conclude that the common-law right of allocution entitles a capital defendant personally to address his sentencing jury and plead for mercy without subjecting himself to cross-examination.

Finally, I note that this right of allocution is not unlimited. The trial court may limit the duration and content of allocution. *Harris* v. *State*, 306 Md. 344, 359, 509 A.2d 120 (1986) ("[a]lthough a sentencing court may not deny a defendant who elects to allocute a fair opportunity to exercise his right, the court may in its discretion curtail allocution that is irrelevant or unreasonably protracted"); *State* v. *Zola*, 112 N.J. 384, 430, 548 A.2d 1022 (1988) (defendant not "permitted to rebut any facts in evidence, to deny his guilt, or indeed, to voice an expression of remorse that contradicts evidentiary facts"), cert. denied, 489 U.S. 1022, 109 S. Ct. 1146, 103 L. Ed. 2d 205 (1989). The court may preview proposed allocution statements; *State* v. *Rogers*, 330 Or. 282, 302, 4 P.3d 1261 (2000); and may take remedial action if the defendant oversteps the bounds of allocution. See *State* v. *Lord*, supra, 117 Wash. 2d 900 (court may allow prosecution to cross-examine capital defendant if he offers testimony); see also *Bevill* v. *State*, 556 So. 2d 699, 710–11 (Miss. 1990) (if unsworn statement exceeds scope of evidence, state can point out to jury that no such statement was made under oath); *Homick* v. *State*, 108 Nev. 127, 134–35, 825 P.2d 600 (1992) (state can rebut remarks that are beyond scope of allocution). Therefore, the right of allocution, properly limited, is

consistent with the purposes underlying the statutory capital sentencing scheme. "The broad sweep of § 53a-46a (c) reflects a balance struck by the legislature between a defendant's eighth amendment right to receive individualized consideration when faced with the death penalty; see *Lockett* v. *Ohio*, [438 U.S. 586, 606, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)]; and a trial court's need to exercise appropriate control over courtroom proceedings." *State* v. *Ross*, 230 Conn. 183, 270, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).[5] Because the trial court may limit the scope and duration of allocution statements, the right of allocution would impose a minimal burden on the court's ability to exercise control over courtroom proceedings. Moreover, because the importance of allocution is even more pronounced when the defendant is facing the possibility of a death sentence; *People* v. *Borrego*, 774 P.2d 854, 856 (Colo. 1989); any burden on the trial court, or the state, is far outweighed by the defendant's interest in receiving individualized consideration in the face of the death

---

[5] The majority, referring to our decision in *State* v. *Ross*, 251 Conn. 579, 588, 742 A.2d 312 (1999), notes that § 53a-46a permits the state "to rebut mitigating evidence with any information, regardless of its admissibility under the evidentiary rules generally applicable to criminal trials." The majority therefore concludes that, "because the state is permitted to rebut the information offered by the defendant to establish the existence of any mitigating factors, the plain text of § 53a-46a simply does not contemplate the right of a defendant to make a statement to the jury that is not subject to cross-examination." In *State* v. *Ross*, supra, 251 Conn. 584–85, however, the defendant claimed that the state had no right to present information concerning any *mitigating* factor, despite the plain language of § 53a-46a (c) that such information may " 'be presented *by either the state or the defendant* . . . .' " (Emphasis in original.) We concluded therein "that § 53a-46a (c) should be applied as written." Id., 587. In the present case, however, a literal reading of the statute is silent concerning the right of allocution. Rather, the plain language of the statute concerns only *information*, which, as I have stated, is separate and distinct from the defendant's common-law right to make a *personal statement* in his or her own behalf. Therefore, the plain language of § 53a-46a (c) does not preclude operation of the common-law right of allocution in the context of capital sentencing proceedings.

penalty.[6] Therefore, the purposes of the capital sentencing scheme are only furthered by the right of allocution, which, as this court has noted, serves the "fundamental purposes" of "maintaining fair standards of procedure, individualized and equitable sentencing, and the perception of fairness in the judicial system overall . . . ." *State* v. *Strickland*, supra, 243 Conn. 354.

Because I would conclude that there is a common-law right of allocution in a capital sentencing hearing, I do not address whether the defendant had a constitutional right to allocution, as well. "The question . . .

[6] I recognize the majority's concern that the jury, unlike the trial court, might not recognize "the legal effect of the fact that the [allocution] statements are not sworn and the attendant potential effect of this fact upon the credibility of the defendant's statements . . . ." *United States* v. *Hall*, 152 F.3d 381, 393 (5th Cir. 1998), cert. denied, 526 U.S. 1117, 119 S. Ct. 1767, 143 L. Ed. 2d 797 (1999). By limiting allocution to a plea for mercy on the basis of facts that are already in evidence, however, the trial court greatly can reduce the possibility of any diminution in the reliability and accuracy of capital sentencing. See *Shelton* v. *State*, supra, 744 A.2d 496 (capital defendant's statements concerning new evidence must be sworn and subject to cross-examination); *Henry* v. *State*, 324 Md. 204, 247, 596 A.2d 1024 (1991) (right of allocution is not "a right to present a transcript of extraneous, out of court statements made by a person who did not testify at trial"), cert. denied, 503 U.S. 972, 112 S. Ct. 1590, 118 L. Ed. 2d 307 (1992); *State* v. *Zola*, supra, 112 N.J. 430 (defendant not permitted to rebut facts in evidence, deny guilt, or voice expression of remorse that contradicts evidentiary facts). In addition, the trial court could "require an appropriate limiting instruction explaining that any statements given by [the] [d]efendant are not under oath and not subject to cross-examination." *United States* v. *Chong*, supra, 104 F. Sup. 2d 1234 n.5.

Moreover, it is important to remember that "[t]he imposition of death by public authority is . . . profoundly different from all other penalties . . . ." *Lockett* v. *Ohio*, supra, 438 U.S. 605. In a capital sentencing proceeding, there is no verdict of "not guilty"—rather, a capital defendant who is not sentenced to death will receive a sentence of life imprisonment. Therefore, because the potential harm from an erroneous sentencing verdict is far greater for the defendant than it is for the state, the balance of equities requires that any inaccuracies in the capital sentencing process be resolved in favor of the defendant. See *State* v. *Rizzo*, supra, 266 Conn. 233–34 (recognizing "the unique and irrevocable nature of the death penalty, and . . . the consequently overarching need for reliability in the imposition of such a penalty").

is not what the Constitution commands, but what our civilization commends. Under our system of capital punishment, a jury of men and women forms the essential link between society and the defendant before the court. Each capital jury expresses the collective voice of society in making the individualized determination that a defendant shall live or die. Whatever the Constitution permits, it bespeaks our common humanity that a defendant not be sentenced to death by a jury 'which never heard the sound of his voice.' " *State* v. *Zola,* supra, 112 N.J. 429–30, quoting *McGautha* v. *California,* 402 U.S. 183, 220, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971).

Accordingly, I respectfully dissent.